No. 25-3567

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

PAUL QASSIS AND PETRA HOLDINGS, LLC,
Plaintiffs/Appellants,

v.

BOROUGH OF CARLSTADT,
Defendant/Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
New Jersey – Newark
(2:22-cv-03713)

---

**FED. R. APP. P. 28.1 (F) ADDENDUM TO BRIEF
OF DEFENDANT/APPELLEE BOROUGH OF CARLSTADT**

---

**CLEARY GIACOBBE ALFIERI JACOBS, LLC**
169 Ramapo Valley Road
Upper Level- Suite 105
Oakland, NJ  07436
(973) 845-6700
Jessica V. Henry, Esq.
Attorneys for Defendant/Appellee
Borough of Carlstadt

**ADDENDUM TABLE OF CONTENTS**

42 U.S.C. §1983..........................................................1

N.J.S.A. 10:6-2..........................................................2

N.J.S.A. 40A:60-5........................................................4

N.J.S.A. 40A:60-6........................................................6

N.J.S.A. 52:27D-121......................................................8

N.J.S.A. 52:27D-123.1...................................................11

N.J.S.A. 52:27D-124.....................................................12

N.J.S.A. 52:27D-126.....................................................15

N.J.S.A. 52:27D-130.....................................................18

N.J.S.A. 52:27D-131.....................................................20

N.J.S.A. 52:27D-132.....................................................22

N.J.S.A. 59:2-5.........................................................26

N.J.S.A. 59:8-3.........................................................27

N.J.S.A. 59:8-4.........................................................28

N.J.S.A. 59:8-8.........................................................29

N.J.S.A. 59:8-9.........................................................30

N.J.A.C. 5:23-1.4.......................................................31

N.J.A.C. 5:23-2.14......................................................40

N.J.A.C. 5:23-2.15......................................................48

N.J.A.C. 5:23-2.16......................................................61

N.J.A.C. 5:23-2.21......................................................65

N.J.A.C. 5:23-2.31......................................................67

N.J.A.C. 5:23-2.32......................................................70

N.J.A.C. 5:23-2.34......................................................73

N.J.A.C. 5:23-4.4...............................................75

N.J.A.C. 5:23A-2.1.............................................79

Bezerra v. Twp. of Belleville, 2006 WL 1971807(App. Div., July 17, 2006)........................................81

Button v. Snelson, 679 Fed. Appx. 150 (3d Cir. Feb. 10, 2017)................................................84

Duffy v. Kent County Levy Court, 591 Fed. Appx. 41 (3d Cir., Nov. 14, 2014)..........................................90

Fernandes v. City of Jersey City, 2017 WL 2799698 (D.N.J., June 27, 2017)........................................95

Hartman v. Bank of N.Y. Mellon, 650 Fed. Appx. 89 (3d Cir., May 5, 2016).............................................112

Heine v. Bureau Chief Div. of Fire & Safety, 765 Fed. Appx. 816 (3d Cir., Mar. 13, 2019)...........................118

Highway Materials, Inc. v. Whitemarsh Twp., 386 Fed. Appx. 251 (3d Cir. July 7, 2010)...........................127

Hill v. Umpstead, 639 Fed. Appx. 60 (3d Cir. Feb. 2. 2016).................................................135

James v. Vornlocker, 2022 WL 3927203 (D.N.J., Aug. 31, 2022)..............................................139

Joey's Auto Repair & Body Shop v. Fayette County, 785 Fed. Appx. 46 (3d Cir. Aug. 29, 2019).......................151

Miller v. Pocono Ranch Lands Prop. Owners Ass'n, 557 Fed. Appx. 141 (3d Cir., Feb. 21, 2014)......................156

Munoz v. City of Union City, 481 Fed. Appx. 754 (3d Cir., May 11, 2012)............................................161

Natsis v. Turner, 2020 WL 4582018 (D.N.J., Aug. 10, 2020)..............................................170

Papaiya v. City of Union City, 238 Fed. Appx. 848 (3d Cir. Aug. 14, 2007)............................................190

Skiles v. City of Reading, 449 Fed. Appx. 153 (3d Cir., Oct. 27, 2011)..............................................194

Thorpe v. Upper Makefield Twp., 758 Fed. Appx. 258 (3d Cir. 2018)................................................200

Vurimindi v. City of Phila., 521 Fed. Appx. 62 (3d Cir., Apr. 8, 2013)................................................206

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 21. Civil Rights (Refs & Annos)
      Subchapter I. Generally

42 U.S.C.A. § 1983

§ 1983. Civil action for deprivation of rights [Statutory
Text & Notes of Decisions subdivisions I to IX]

Effective: October 19, 1996
Currentness

<Notes of Decisions for 42 USCA § 1983 are displayed in multiple documents.>

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**CREDIT(S)**

(R.S. § 1979; Pub.L. 96-170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub.L. 104-317, Title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

42 U.S.C.A. § 1983, 42 USCA § 1983
Current through P.L. 119-73, except P.L. 119-60. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 10. Civil Rights
    Chapter 6. Civil Rights Act

N.J.S.A. 10:6-2

10:6-2 Civil actions for rights violations

Effective: September 10, 2004
Currentness

a. If a person, whether or not acting under color of law, subjects or causes to be subjected any other person to the deprivation of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, the Attorney General may bring a civil action for damages and for injunctive or other appropriate relief. The civil action shall be brought in the name of the State and may be brought on behalf of the injured party. If the Attorney General proceeds with and prevails in an action brought pursuant to this subsection, the court shall order the distribution of any award of damages to the injured party and shall award reasonable attorney's fees and costs to the Attorney General. The penalty provided in subsection e. of this section shall be applicable to a violation of this subsection.

b. If a person, whether or not acting under color of law, interferes or attempts to interfere by threats, intimidation or coercion with the exercise or enjoyment by any other person of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, the Attorney General may bring a civil action for damages and for injunctive or other appropriate relief. The civil action shall be brought in the name of the State and may be brought on behalf of the injured party. If the Attorney General proceeds with and prevails in an action brought pursuant to this subsection, the court shall order the distribution of any award of damages to the injured party and shall award reasonable attorney's fees and costs to the Attorney General. The penalty provided in subsection e. of this section shall be applicable to a violation of this subsection.

c. Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief. The penalty provided in subsection e. of this section shall be applicable to a violation of this subsection.

d. An action brought pursuant to this act may be filed in Superior Court. Upon application of any party, a jury trial shall be directed.

e. Any person who deprives, interferes or attempts to interfere by threats, intimidation or coercion with the exercise or enjoyment by any other person of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State is liable for a civil penalty for each violation. The court or jury, as the case may be, shall determine the

appropriate amount of the penalty. Any money collected by the court in payment of a civil penalty shall be conveyed to the State Treasurer for deposit into the State General Fund.

f. In addition to any damages, civil penalty, injunction or other appropriate relief awarded in an action brought pursuant to subsection c. of this section, the court may award the prevailing party reasonable attorney's fees and costs.

**Credits**

L.2004, c. 143, § 2, eff. Sept. 10, 2004.

N. J. S. A. 10:6-2, NJ ST 10:6-2
Current with laws through L.2025, c. 196 and J.R. No. 12.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
   Title 40a. Municipalities and Counties (Refs & Annos)
      Chapter 60. Boroughs

N.J.S.A. 40A:60-5

## 40A:60-5. Powers of the mayor

Currentness

a. The mayor shall be the head of the municipal government.

b. The mayor shall have all those powers designated by general law.

c. The mayor shall preside at meetings of the council and may vote to break a tie.

d. Every ordinance adopted by the council shall, within five days after its passage, Sundays excepted, be presented to the mayor by the borough clerk. The mayor shall, within ten days after receiving the ordinance, Sundays excepted, either approve the ordinance by affixing his signature thereto or return it to the council by delivering it to the clerk together with a statement setting forth his objections thereto or any item or part thereof. No ordinance or any item or part thereof shall take effect without the mayor's approval, unless the mayor fails to return the ordinance to the council, as prescribed above, or unless the council, upon consideration of the ordinance following its return, shall, by a vote of two-thirds of all the members of council, resolve to override the veto.

e. No ordinance shall be passed, or appointment of any subordinate officer of the borough be confirmed, except by a vote of a majority of the members of the council present at the meeting, provided that at least three affirmative votes shall be required for such purpose, the mayor voting only in the case of a tie.

f. If any ordinance contains more than one distinct section, clause or item, the mayor may approve one or more thereof and veto the rest.

g. The mayor shall nominate and, with the advice and consent of council, appoint all subordinate officers of the borough, unless the specific terms of the general law clearly require a different appointment procedure. He shall make his nomination to any such office within thirty days of that office becoming vacant.

h. The mayor shall see to it that the laws of the State and the ordinances of the borough are faithfully executed. He shall recommend to the council such measures as he may deem necessary or expedient for the welfare of the borough. He shall maintain peace and good order and have the power to suppress all riots and tumultuous assemblies in the borough.

**Credits**
L.1987, c. 379, § 1, eff. Jan. 1, 1988.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.                    1

N. J. S. A. 40A:60-5, NJ ST 40A:60-5
Current with laws through L.2025, c. 196 and J.R. No. 12.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.    2

New Jersey Statutes Annotated
    Title 40a. Municipalities and Counties (Refs & Annos)
        Chapter 60. Boroughs

N.J.S.A. 40A:60-6

40A:60-6. Powers of the council

Currentness

Powers of the Council. a. The council shall be the legislative body of the municipality.

b. The council may, subject to general law and the provisions of this act:

(1) pass, adopt, amend and repeal any ordinance or, where permitted, any resolution for any purpose required for the government of the municipality or for the accomplishment of any public purpose for which the municipality is authorized to act under general law;

(2) control and regulate the finances of the municipality and raise money by borrowing or taxation;

(3) create such offices and positions as it may deem necessary. The officers appointed thereto shall perform the duties required by law and the ordinances of the council. Other than the borough attorney, engineer, and building inspector, these officers shall be residents of the borough and shall serve at the pleasure of the council, except the clerk, who also shall be exempt from the borough residency requirement, the tax collector and tax assessor who shall serve for terms as provided in chapter 9 of Title 40A of the New Jersey Statutes. The council may exempt officers from the residency requirements but only pursuant to the adoption of an ordinance to that effect;

(4) investigate any activity of the municipality;

(5) remove any officer of the municipality, other than those officers excepted by law, for cause; and

(6) override a veto of the mayor by a two-thirds majority of all the members of the council.

c. The council shall have all the executive responsibilities of the municipality not placed, by general law or this act, in the office of the mayor.

d. The council, whenever it fails to confirm the nomination by the mayor of any official to a subordinate office of the borough within 30 days of being presented such nomination, shall make the appointment to that office, provided that at least three affirmative votes shall be required for such purpose, the mayor to have no vote thereon except in the case of a tie.

**Credits**

L.1987, c. 379, § 1, eff. Jan. 1, 1988. Amended by L.1988, c. 185, § 1, eff. Jan. 6, 1989.

N. J. S. A. 40A:60-6, NJ ST 40A:60-6
Current with laws through L.2025, c. 196 and J.R. No. 12.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 52. State Government, Departments and Officers
    Subtitle 3. Executive and Administrative Departments, Officers and Employees (Refs & Annos)
      Chapter 27D. Department of Community Affairs (Refs & Annos)
        State Uniform Construction Code Act (Refs & Annos)

N.J.S.A. 52:27D-121

52:27D-121. Definitions

Effective: December 17, 2018
Currentness

Definitions. As used in P.L.1975, c. 217 (C.52:27D-119 et seq.):

"Building" means a structure enclosed with exterior walls or fire walls, built, erected and framed of component structural parts, designed for the housing, shelter, enclosure and support of individuals, animals or property of any kind.

"Business day" means any day of the year, exclusive of Saturdays, Sundays, and legal holidays.

"Certificate of occupancy" means the certificate provided for in section 15 of P.L.1975, c. 217 (C.52:27D-133), indicating that the construction authorized by the construction permit has been completed in accordance with the construction permit, the State Uniform Construction Code[1] and any ordinance implementing said code.

"Commissioner" means the Commissioner of Community Affairs.

"Code" means the State Uniform Construction Code.

"Commercial farm building" means any building located on a commercial farm which produces not less than $2,500 worth of agricultural or horticultural products annually, which building's main use or intended use is related to the production of agricultural or horticultural products produced on that farm. A building shall not be regarded as a commercial farm building if more than 1,200 square feet of its floor space is used for purposes other than its main use. A greenhouse constructed in conjunction with the odor control bio-filter of a solid waste or sludge composting facility, which greenhouse produces not less than $2,500 worth of agricultural or horticultural products in addition to its function as a cover for the bio-filter, shall be considered a commercial farm building for the purposes of P.L.1975, c. 217 (C.52:27D-119 et seq.), provided, however, that the greenhouse is not intended for human occupancy.

"Construction" means the construction, erection, reconstruction, alteration, conversion, demolition, removal, repair or equipping of buildings or structures.

"Construction board of appeals" means the board provided for in section 9 of P.L.1975, c. 217 (C.52:27D-127).

"Department" means the Department of Community Affairs.

"Enforcing agency" means the municipal or county construction official and subcode officials provided for in section 8 of P.L.1975, c. 217 (C.52:27D-126), or section 1 of P.L.2018, c. 157 (C.52:27D-126.8) regarding a pilot county in the "County Code Enforcement Pilot Program," and assistants thereto.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    1

"Equipment" means plumbing, heating, electrical, ventilating, air conditioning, refrigerating and fire prevention equipment, and elevators, dumbwaiters, escalators, boilers, pressure vessels and other mechanical facilities or installations.

"Hearing examiner" means a person appointed by the commissioner to conduct hearings, summarize evidence, and make findings of fact.

"Maintenance" means the replacement or mending of existing work with equivalent materials or the provision of additional work or material for the purpose of the safety, healthfulness, and upkeep of the structure and the adherence to the other standards of upkeep as are required in the interest of public safety, health and welfare.

"Manufactured home" or "mobile home" means a unit of housing which:

(1) Consists of one or more transportable sections which are substantially constructed off site and, if more than one section, are joined together on site;

(2) Is built on a permanent chassis;

(3) Is designed to be used, when connected to utilities, as a dwelling on a permanent or nonpermanent foundation; and

(4) Is manufactured in accordance with the standards promulgated for a manufactured home by the Secretary of the United States Department of Housing and Urban Development pursuant to the "National Manufactured Housing Construction and Safety Standards Act of 1974," Pub.L.93-383 (42 U.S.C. s. 5401 et seq.) and the standards promulgated by the commissioner pursuant to P.L.1975, c. 217 (C.52:27D-119 et seq.).

"Municipality" means any city, borough, town, township or village.

"Outdoor advertising sign" means a sign required to be permitted pursuant to P.L.1991. c.413 (C.27:5-5 et seq.).

"Owner" means the owner or owners in fee of the property or a lesser estate therein, a mortgagee or vendee in possession, an assignee of rents, receiver, executor, trustee, lessee, or any other person, firm or corporation, directly or indirectly in control of a building, structure, or real property and shall include any subdivision thereof of the State.

"Premanufactured system" means an assembly of materials or products that is intended to comprise all or part of a building or structure and that is assembled off site by a repetitive process under circumstances intended to insure uniformity of quality and material content.

"Public school facility" means any building, or any part thereof, of a school, under college grade, owned and operated by a local, regional, or county school district.

"State sponsored code change proposal" means any proposed amendment or code change adopted by the commissioner in accordance with subsection c. of section 5 of P.L.1975, c. 217 (C.52:27D-123) for the purpose of presenting the proposed amendment or code change at any of the periodic code change hearings held by the National Model Code Adoption Agencies, the codes of which have been adopted as subcodes under P.L.1975, c. 217 (C.52:27D-119 et seq.).

"Stop construction order" means the order provided for in section 14 of P.L.1975, c. 217 (C.52:27D-132).

"State Uniform Construction Code" means the code provided for in section 5 of P.L.1975, c. 217 (C.52:27D-123), or any portion thereof, and any modification of or amendment thereto.

"Structure" means a combination of materials to form a construction for occupancy, use, or ornamentation, whether installed on, above, or below the surface of a parcel of land; provided the word "structure" shall be construed when used herein as though followed by the words "or part or parts thereof and all equipment therein" unless the context clearly requires a different meaning.

**Credits**

L.1975, c. 217, § 3. Amended by L.1977, c. 221, § 1, eff. Sept. 14, 1977; L.1981, c. 494, § 8, eff. Jan. 12, 1982; L.1983, c. 388, § 1, operative Dec. 22, 1983; L.1983, c. 496, § 1; L.1986, c. 119, § 1, eff. Oct. 8, 1986; L.1992, c. 12, § 1, eff. May 26, 1992; L.2004, c. 42, § 9, eff. June 29, 2004; L.2018, c. 157, § 2, eff. Dec. 17, 2018.

Footnotes

1       N.J.S.A. § 52:27D-119 et seq.

N. J. S. A. 52:27D-121, NJ ST 52:27D-121
Current with laws through L.2025, c. 196 and J.R. No. 12.

---

**End of Document**                                     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 52. State Government, Departments and Officers
    Subtitle 3. Executive and Administrative Departments, Officers and Employees (Refs & Annos)
      Chapter 27D. Department of Community Affairs (Refs & Annos)
        State Uniform Construction Code Act (Refs & Annos)

N.J.S.A. 52:27D-123.1

## 52:27D-123.1. Applicability over law or regulation to contrary

Currentness

Any law or regulation to the contrary notwithstanding, the structure, design, construction, maintenance and use of all buildings or structures to be erected and the alteration, renovation, rehabilitation, repair, maintenance, removal, or demolition of all buildings or structures already erected shall be regulated pursuant to the "State Uniform Construction Code Act," P.L.1975, c. 217 (C.52:27D-119 et seq.).

**Credits**

L.1983, c. 496, § 5.

N. J. S. A. 52:27D-123.1, NJ ST 52:27D-123.1
Current with laws through L.2025, c. 196 and J.R. No. 12.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 52. State Government, Departments and Officers
    Subtitle 3. Executive and Administrative Departments, Officers and Employees (Refs & Annos)
      Chapter 27D. Department of Community Affairs (Refs & Annos)
        State Uniform Construction Code Act (Refs & Annos)

N.J.S.A. 52:27D-124

52:27D-124. Powers of the commissioner

Currentness

The commissioner shall have all the powers necessary or convenient to effectuate the purposes of P.L.1975, c. 217 (C.52:27D-119 et seq.), including, but not limited to, the following powers in addition to all others granted by P.L.1975, c. 217 (C.52:27D-119 et seq.):

a. To adopt, amend and repeal, after consultation with the code advisory board, rules: (1) relating to the administration and enforcement of P.L.1975, c. 217 (C.52:27D-119 et seq.) and (2) the qualifications or licensing, or both, of all persons employed by enforcing agencies of the State to enforce P.L.1975, c. 217 (C.52:27D-119 et seq.) or the code, except that, plumbing inspectors shall be subject to the rules adopted by the commissioner only insofar as such rules are compatible with such rules and regulations, regarding health and plumbing for public and private buildings, as may be promulgated by the Public Health Council in accordance with Title 26 of the Revised Statutes.

b. To enter into agreements with federal and State of New Jersey agencies, after consultation with the code advisory board, to provide insofar as practicable (1) single-agency review of construction plans and inspection of construction and (2) intergovernmental acceptance of such review and inspection to avoid unnecessary duplication of effort and fees. The commissioner shall have the power to enter into such agreements although the federal standards are not identical with State standards; provided that the same basic objectives are met. The commissioner shall have the power through such agreements to bind the State of New Jersey and all governmental entities deriving authority therefrom.

c. To take testimony and hold hearings relating to any aspect of or matter relating to the administration or enforcement of P.L.1975, c. 217 (C.52:27D-119 et seq.), including but not limited to prospective interpretation of the code so as to resolve inconsistent or conflicting code interpretations, and, in connection therewith, issue subpoenas to compel the attendance of witnesses and the production of evidence. The commissioner may designate one or more hearing examiners to hold public hearings and report on such hearings to the commissioner.

d. To encourage, support or conduct, after consultation with the code advisory board, educational and training programs for employees, agents and inspectors of enforcing agencies, either through the Department of Community Affairs or in cooperation with other departments of State government, enforcing agencies, educational institutions, or associations of code officials.

e. To study the effect of P.L.1975, c. 217 (C.52:27D-119 et seq.) and the code to ascertain their effect upon the cost of building construction and maintenance, and the effectiveness of their provisions for insuring the health, safety, and welfare of the people of the State of New Jersey.

f. To make, establish and amend, after consultation with the code advisory board, such rules as may be necessary, desirable or proper to carry out his powers and duties under P.L.1975, c. 217 (C.52:27D-119 et seq.).

g. To adopt, amend, and repeal rules and regulations providing for the charging of and setting the amount of fees for the following code enforcement services, licenses or approvals performed or issued by the department, pursuant to the "State Uniform Construction Code Act," P.L.1975, c. 217 (C.52:27D-119 et seq.):

(1) Plan review, construction permits, certificates of occupancy, demolition permits, moving of building permits, elevator permits and sign permits; and

(2) Review of applications for and the issuance of licenses certifying an individual's qualifications to act as a construction code official, subcode official or assistant under P.L.1975, c. 217 (C.52:27D-119 et seq.).

(3) (Deleted by amendment, P.L.1983, c. 338)

h. To adopt, amend and repeal rules and regulations providing for the charging of and setting the amount of construction permit surcharge fees to be collected by the enforcing agency and remitted to the department to support those activities which may be undertaken with moneys credited to the Uniform Construction Code Revolving Fund.

i. To adopt, amend and repeal rules and regulations providing for:

(1) Setting the amount of and the charging of fees to be paid to the department by a private agency for the review of applications for and the issuance of approvals authorizing a private agency to act as an on-site inspection and plan review agency, a private on-site inspection agency, including a supplemental private on-site inspection agency, or an in-plant inspection agency;

(2) (Deleted by amendment, P.L.2005, c. 212)

(3) (Deleted by amendment, P.L.2005, c. 212)

j. To enforce and administer the provisions of the "State Uniform Construction Code Act," P.L.1975, c. 217 (C.52:27D-119 et seq.) and the code promulgated thereunder, and to prosecute or cause to be prosecuted violators of the provisions of that act or the code promulgated thereunder in administrative hearings and in civil proceedings in State and local courts.

k. To monitor the compliance of local enforcing agencies with the provisions of the "State Uniform Construction Code Act," P.L.1975, c. 217 (C.52:27D-119 et seq.), to order corrective action, or issue penalties, as may be necessary where a local enforcing agency is found to be failing to carry out its responsibilities under that act, to supplant or replace the local enforcing agency for a specific project, and to order it dissolved and replaced by the department where the local enforcing agency repeatedly or habitually fails to enforce the provisions of the "State Uniform Construction Code Act." This shall include the power to compel an enforcing agency to, within 15 business days, notify the department of any instance where the enforcing agency is unable to meet a deadline or other obligation imposed by law or regulation, and the power to order corrective action

or issue penalties as may be necessary where an enforcing agency is unable to meet its obligations under P.L.1975, c. 217 (C.52:27D-119 et seq.).

*l.* To adopt, amend, and repeal rules and regulations implementing the provisions of P.L.1999, c. 15, P.L.2003, c. 44, and section 1 of P.L.2015, c. 146 (C.52:27D-123f) concerning the installation and maintenance of carbon monoxide sensors.

**Credits**

L.1975, c. 217, § 6. Amended by L.1979, c. 121, § 1, eff. June 30, 1979; L.1983, c. 338, § 1, eff. Sept. 6, 1983; L.1985, c. 21, § 1, eff. Jan. 25, 1985; L.1993, c. 47, § 1, eff. Feb. 18, 1993; L.1999, c. 15, § 4, eff. Feb. 8, 1999; L.2003, c. 44, § 2, eff. April 16, 2003; L.2005, c. 212, § 1, eff. Nov. 1, 2005; L.2015, c. 146, § 2, eff. Nov. 9, 2015; L.2022, c. 139, § 1, (contingent effective date).

N. J. S. A. 52:27D-124, NJ ST 52:27D-124

Current with laws through L.2025, c. 196 and J.R. No. 12.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 52. State Government, Departments and Officers
    Subtitle 3. Executive and Administrative Departments, Officers and Employees (Refs & Annos)
      Chapter 27D. Department of Community Affairs (Refs & Annos)
        State Uniform Construction Code Act (Refs & Annos)

N.J.S.A. 52:27D-126

## 52:27D-126. Appointment of officials to administer and enforce the code

Effective: August 18, 2009

Currentness

a. The appointing authority of any municipality shall appoint a construction official , any necessary subcode officials and technical assistants to assist such officials to administer and enforce the code. The appointing authority may, by resolution or order as appropriate, set the total number of weekly hours of operation of the construction official's office and the total number of weekly work hours of the construction official, commensurate with the compensation paid to the construction official. The appointing authority shall not set the specific work hours of the construction official. The appointing authority shall also appoint a construction board of appeals to hear and decide appeals from decisions made by said construction official and subcode officials, in the administration and enforcement of the code. Nothing herein, however, shall prevent a municipality from accepting inspections as to compliance with the code or any subcode thereof made by an inspection authority approved by the State of New Jersey pursuant to law.

b. To establish tenure rights or any other right or protection provided by the "State Uniform Construction Code Act" or Title 11A, Civil Service, of the New Jersey Statutes, or any pension law or retirement system, the job title "construction official" shall be equivalent to that job title which, prior to the adoption of the State Uniform Construction Code as provided in section 5 of the "State Uniform Construction Code Act,"[1] entailed the chief administrative responsibility to enforce all construction codes which had been adopted by the municipal governing body, the enforcement of which was not the responsibility of an authorized private inspection agency; and the job title "subcode official" shall be equivalent to that job title which, prior to the adoption of the State Uniform Construction Code, entailed subordinate administrative responsibility to enforce one or more of the following construction codes: building, plumbing, electrical or fire code.

Any person, in a municipality operating under Title 11A, Civil Service, of the New Jersey Statutes, who, prior to the adoption of the State Uniform Construction Code, held the equivalent of the job title "construction" official or "subcode" official, but who no longer holds his position as a result of a determination that his old job title was not equivalent to that of "construction" official or "subcode" official, shall be offered reappointment as a construction official or subcode official, as the case may be, and shall be granted permanent classified status in such position. Tenure shall continue for (1) any construction official or subcode official who is serving under tenure as otherwise provided by law on the effective date of this act or within one year thereafter, or (2) any person certified pursuant to subsection c. of this section and who subsequently gains such tenure.

A construction official or subcode official appointed in a municipality operating under the provisions of Title 11A, Civil Service, of the New Jersey Statutes, who, at the time of adoption of the State Uniform Construction Code, January 1, 1977, or prior to January 1, 1981, had permanent classified status or was employed as a construction official or subcode official or in another position in the unclassified service, shall be included in the classified service without civil service examination in his respective title of construction official or subcode official. Any individual employed by a municipality, who, in his employment with the municipality between January 1, 1977 and prior to January 1, 1981, was charged with the chief administrative responsibility

to enforce all existing municipal construction codes, shall be deemed as appointed to the position of construction official for the purposes of this act. Any individual employed by a municipality, who, in his employment with the municipality between January 1, 1977 and prior to January 1, 1981, was charged with chief responsibility to enforce the municipal building, plumbing, fire, or electrical code, shall be deemed as appointed to the position of subcode official for the purposes of this act. No person, on or after January 1, 1981, shall be appointed as construction or subcode official in a municipality operating under Title 11A, Civil Service, of the New Jersey Statutes without having passed an examination administered by the Civil Service Commission certifying the merit and fitness of the person to hold such position; provided that, whenever a noncivil service municipality adopts the provisions of that Title, construction code officials and subcode officials of such municipality appointed prior to the filing of the petition for the adoption of civil service, shall attain permanent status in the classified service without examination. Any construction or subcode official appointed after January 1, 1981 on a provisional basis in a municipality which has adopted the provisions of Title 11A, Civil Service, of the New Jersey Statutes, may not be removed from office except for just cause after a fair and impartial hearing has been held at the local level, with no further appeal to the Civil Service Commission; provided, however, that such a construction or subcode official may be removed to permit the appointment of a person certified for appointment by the Civil Service Commission. A construction official or subcode official in a noncivil service municipality shall be appointed for a term of four years and shall, upon appointment to a second consecutive term or on or after the commencement of a fifth consecutive year of service, including years of service in an equivalent job title held prior to the adoption of the State Uniform Construction Code, be granted tenure and shall not be removed from office except for just cause after a fair and impartial hearing.

A construction or subcode official, to be eligible for appointment in civil service or noncivil service municipalities, shall be certified by the State of New Jersey in accordance with subsection c. of this section and shall have had at least three years' experience in construction, design or supervision as a licensed engineer or registered architect; or five years' experience in construction, design, or supervision as an architect or engineer with a bachelor's degree from an accredited institution of higher education; or 10 years' experience in construction, design or supervision as a journeyman in a trade or as a contractor. A subcode official shall, pursuant to any subcode which he administers, pass upon:

(1) matters relative to the mode, manner of construction or materials to be used in the erection or alteration of buildings or structures, except as to any such matter foreclosed by State approval pursuant to this act, and (2) actual execution of the approved plans and the installation of the materials approved by the State. The construction official in each municipality shall be the chief administrator of the "enforcing agency." He shall have the power to overrule a determination of a subcode official based on an interpretation of a substantive provision of the subcode which such subcode official administers, only if the construction official is qualified to act pursuant to this act as a subcode official for such subcode. He may serve as subcode official for any subcode which he is qualified under this act to administer. A subcode official or municipal engineer may serve as a construction official if otherwise qualified under the provisions of this act. The municipal enforcing agency shall require compliance with the provisions of the code, of all rules lawfully adopted and promulgated thereunder and of laws relating to the construction, alteration, repair, removal, demolition and integral equipment and location, occupancy and maintenance of buildings and structures, except as may be otherwise provided for.

Two or more municipalities may provide by ordinance, subject to regulations established by the commissioner, for the joint appointment of a construction official and subcode official for the purpose of enforcing the provisions of the code in the same manner.

c. No person shall act as a construction official or subcode official for any municipality unless the commissioner determines that said person is so qualified, except for the following:

(1) a municipal construction official or subcode official holding office under permanent civil service status, or tenure as otherwise provided by law on the effective date of this act or within one year thereafter and (2) a municipal construction official

or subcode official holding office without such permanent civil service status or tenure on the effective date of this act or within one year thereafter; provided said construction official or subcode official not having such permanent civil service status or tenure shall be certified in accordance with this act within four years of the effective date thereof; provided further that a person holding on the effective date of this act a valid plumbing inspector's license from the Department of Health and Senior Services pursuant to Title 26 of the Revised Statutes may serve as a plumbing subcode official and a person holding on the effective date of this act a valid electrical inspector's license from the Board of Public Utilities pursuant to Title 48 of the Revised Statutes may serve as an electrical subcode official. The commissioner, after consultation with the code advisory board, may authorize the preparation and conducting of oral, written and practical examinations to determine if a person is qualified by this act to be eligible to be a construction official or subcode official or, in the alternative, may accept successful completion of programs of training as proof of qualification within the meaning of this act. Upon a determination of qualification the commissioner shall issue or cause to be issued a certificate to the construction official or subcode official or trainee stating that he is so certified. The commissioner, after consultation with the code advisory board, may establish classes of certification that will recognize the varying complexities of code enforcement in the municipalities within the State. The commissioner shall, after consultation with the code advisory board, provide for educational programs designed to train and assist construction officials , subcode officials, and technical assistants to these officials in carrying out their responsibilities.

Whenever the commissioner is required by the terms of this subsection to consult with the code advisory board and the matter in question concerns plumbing subcode officials, the commissioner shall also consult with the Public Health Council and Commissioner of Health and Senior Services.

d. The commissioner, after consultation with the code advisory board, may periodically require that each construction official , subcode official, and technical assistant demonstrate a working knowledge of innovations in construction technology and materials, recent changes in and additions to the relevant portions of the State Uniform Construction Code, and current standards of professional ethics and legal responsibility; or, in the alternative, the commissioner, after consultation with the code advisory board, may accept successful completion of appropriate programs of training as proof of such working knowledge.

**Credits**
L.1975, c. 217, § 8. Amended by L.1979, c. 394, § 1, eff. Feb. 6, 1980; L.1981, c. 469, § 1, eff. Jan. 11, 1982; L.1982, c. 210, § 1, eff. Dec. 23, 1982; L.2000, c. 126, § 29, eff. Sept. 21, 2000; L.2008, c. 29, § 112, eff. June 30, 2008; L.2009, c. 119, § 1, eff. Aug. 18, 2009.

Footnotes
1        N.J.S.A. § 52:27D-123.

N. J. S. A. 52:27D-126, NJ ST 52:27D-126
Current with laws through L.2025, c. 196 and J.R. No. 12.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
    Title 52. State Government, Departments and Officers
        Subtitle 3. Executive and Administrative Departments, Officers and Employees (Refs & Annos)
            Chapter 27D. Department of Community Affairs (Refs & Annos)
                State Uniform Construction Code Act (Refs & Annos)

N.J.S.A. 52:27D-130

52:27D-130. Permit required for construction or alteration of buildings and structures; application therefor;
required contents of application; issuance, effect and duration of permits; certain public school facilities

Effective: April 30, 2021
Currentness

Except as otherwise provided by this act or in the code, before construction or alteration of any building or structure, the owner, or his agent, engineer or architect, shall submit an application in writing, including signed and sealed drawings and specifications, to the enforcing agency as defined in this act. When an enforcing agency begins to participate in the "Electronic Permit Processing Review System," pursuant to section 1 of P.L.2021, c. 70 (C.52:27D-124.4), the owner, or his agent, engineer or architect, may submit applications and scheduling requests electronically. The application shall be in accordance with regulations established by the commissioner and on a form or in a format prescribed by the commissioner and shall be accompanied by payment of the fee to be established by the municipal governing body by ordinance in accordance with standards established by the commissioner. The application for a construction permit shall be filed with the enforcing agency and shall be a public record; and no application for a construction permit shall be removed from the custody of the enforcing agency after a construction permit has been issued. Nothing contained in this paragraph shall be interpreted as preventing the imposition of requirements in the code, for additional permits for particular kinds of work, including but not limited to plumbing, electrical, elevator, fire prevention equipment or boiler installation or repair work, or in other defined situations.

Upon the transfer of ownership of property that is the subject of a construction permit, and prior to beginning or continuing work authorized by the construction permit, the new owner shall file with the enforcing agency an application for a permit update to notify the enforcing agency of the name and address of the new owner and of all other changes to information previously submitted to the enforcing agency. If the municipality has adopted an ordinance requiring a successor developer to furnish a replacement performance guarantee, and a performance guarantee has previously been furnished in favor of the municipality to assure the installation of on-tract improvements on the property that is the subject of an application for a permit update for the purpose of notifying the enforcing agency of the name and address of a new owner, the enforcing agency shall not approve the application for a permit update until it receives notification from the governing body or its designee that the new owner has furnished an adequate replacement performance guarantee.

No permit shall be issued for a public school facility unless the final plans and specifications have been first approved by the Bureau of Facility Planning Services in the Department of Education or a municipal code official who is appropriately licensed by the Commissioner of Community Affairs for the type and level of plans being reviewed. Approval by the Bureau of Facility Planning Services in the Department of Education shall only be required when a review for educational adequacy is necessary. Requirements determining when a review for educational adequacy is necessary shall be established jointly by the Department of Community Affairs and the Department of Education. The standards shall thereafter be adopted as part of the Uniform Construction Code regulations by the Department of Community Affairs. After the final plans and specifications have been approved for educational adequacy by the Bureau of Facility Planning Services in the Department of Education, a local board of education may submit the final plans and specifications for code approval to either the Bureau of Facility Planning Services in the Department of Education or a municipal code official who is appropriately licensed by the Commissioner of Community

Affairs for the type and level of plans being reviewed. The Bureau of Facility Planning Services in the Department of Education when approving final plans and specifications shall be responsible for insuring that the final plans and specifications conform to the requirements of the code as well as for insuring that they provide for an educationally adequate facility. In carrying out its responsibility pursuant to the provisions of this section the Department of Education shall employ persons licensed by the Commissioner of Community Affairs for the type and level of plans being reviewed.

**Credits**

L.1975, c. 217, § 12. Amended by L.1983, c. 496, § 4; L.1990, c. 23, § 3, eff. May 15, 1990; L.1990, c. 23, § 3, eff. May 15, 1990; L.2013, c. 123, § 5, eff. Aug. 9, 2013; L.2021, c. 70, § 4, eff. April 30, 2021.

N. J. S. A. 52:27D-130, NJ ST 52:27D-130
Current with laws through L.2025, c. 271 and J.R. No. 17

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 52. State Government, Departments and Officers
    Subtitle 3. Executive and Administrative Departments, Officers and Employees (Refs & Annos)
      Chapter 27D. Department of Community Affairs (Refs & Annos)
        State Uniform Construction Code Act (Refs & Annos)

N.J.S.A. 52:27D-131

52:27D-131. Examination and approval of applications for permits; expiration or cancellation of permits

Effective: December 2, 2015
Currentness

a. The enforcing agency shall examine each application for a construction permit. If the application conforms with this act, the code, and the requirements of other applicable laws and ordinances, the enforcing agency shall approve the application and shall issue a construction permit to the applicant. Every application for a construction permit shall be granted, in whole or in part, or denied within 20 business days, unless the application is limited to the construction of a ramp designed to provide wheelchair access to a one or two-unit dwelling, and required for such access by a resident of the dwelling, in which case the permit shall be granted or denied within five business days. If application is denied in whole or in part, the enforcing agency shall set forth the reasons therefor in writing. If an enforcing agency fails to grant, in whole or in part, or deny an application for a construction permit within the period of time prescribed herein, such failure shall be deemed a denial of the application for purposes of an appeal to the construction board of appeals unless such period of time has been extended with the consent of the applicant. The enforcing agency may approve changes in plans and specifications previously approved by it, if the plans and specifications when so changed remain in conformity with law. Except as otherwise provided in this act or the code, the construction or alteration of a building or structure shall not be commenced until a construction permit has been issued. The construction of a building or structure shall be in compliance with the approved application for a construction permit; and the enforcing agency shall insure such compliance in the manner set forth in section 14 of this act. [1]

The commissioner, after consultation with the code advisory board, may, for certain classes or types of occupancy posing special or unusual hazards to public safety, establish regulations designating the department as the enforcing agency for purposes of approving plans and specifications. A municipal enforcing agency shall not grant an occupancy permit for any such class or type of construction unless the applicant submits appropriate plans and specifications certified or approved by the department. Upon submission by an applicant of such certified approved plans and specifications, the enforcing agency shall recognize the approval when deciding whether to approve the application for a construction permit.

b. A construction permit, issued in accordance with the foregoing provisions, pursuant to which no construction has been undertaken above the foundation walls within one year from the time of issuance, shall expire.

c. The enforcing agency may revoke or cancel a construction permit in the event the project for which the permit is obtained is not completed by the third anniversary of the date of issuance of the construction permit. Notwithstanding the provisions of any other law, rule or regulation to the contrary, the enforcing agency may revoke or cancel a construction permit in effect on the effective date of P.L.2001, c. 457 (C.52:27D-131.1 et al.), if the project for which the construction permit was obtained is not completed by the third anniversary of the effective date of P.L.2001, c. 457 (C.52:27D-131.1 et al.).

d. If the project for which the permit is obtained is not completed by a deadline set forth in this section, the permittee may submit a request for an extension of the permit to the enforcing agency for review. The enforcing agency may extend the permit for a period of one year. Approval of the extension shall not be unreasonably withheld. Denial of a request for an extension may be appealed to the county construction board of appeals established pursuant to section 9 of P.L.1975, c. 217 (C.52:27D-127). If a project is not completed within the deadline set forth in this section, the enforcing agency shall take all appropriate action up to and including demolition of the uncompleted structure.

The provisions of this subsection shall not apply to a permit obtained: (1) to construct improvements to the interior of a residential property in which the permittee is currently residing that are not visible from the outside of the residential property, (2) for any building of which the exterior and all required site improvements have been fully constructed, or (3) for a project while that project is under the control of a mortgagee in possession.

The enforcing agency may suspend, revoke or cancel a construction permit in case of neglect or failure to comply with the provisions of this act or the code, or upon a finding by it that a false statement or representation has been made in the application for the construction permit.

**Credits**

L.1975, c. 217, § 13. Amended by L.2001, c. 457, § 1, eff. Jan. 14, 2002; L.2015, c. 159, § 1, eff. Dec. 2, 2015.

---

**Footnotes**

1          N.J.S.A. § 52:27D-132.

N. J. S. A. 52:27D-131, NJ ST 52:27D-131
Current with laws through L.2025, c. 271 and J.R. No. 17

---

End of Document                                                                © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 52. State Government, Departments and Officers
    Subtitle 3. Executive and Administrative Departments, Officers and Employees (Refs & Annos)
      Chapter 27D. Department of Community Affairs (Refs & Annos)
        State Uniform Construction Code Act (Refs & Annos)

N.J.S.A. 52:27D-132

52:27D-132. Inspection of construction by enforcing entity; right of entry; stop construction orders; reinspection

Effective: March 1, 2026

Currentness

a. The enforcing agency shall periodically inspect all construction undertaken pursuant to a construction permit issued by it to ensure that the construction or alteration is performed in accordance with the conditions of the construction permit and consistent with the requirements of the code and any ordinance implementing said code.

b. The owner of any premises upon which a building or structure is being constructed shall be deemed to have consented to the inspection by the enforcing agency and the department of the entire premises and of any and all construction being performed on it until a certificate of occupancy has been issued. An inspector, or team of inspectors, on presentation of proper credentials, shall have the right to enter and inspect such premises, and any and all construction thereon, for purposes of ensuring compliance with the provisions of the applicable construction permit, the code, and other applicable laws and regulations. All inspections pursuant to P.L.1975, c. 217 (C.52:27D-119 et seq.) shall be between the hours of 9 a.m. and 5 p.m. on business days or at another time that has been agreed upon by the owner and the relevant inspecting entity, whether the enforcing agency, department, or private on-site inspection agency, or when construction is actually being undertaken, provided, however, that inspections may be conducted at other times if the enforcing agency has reasonable cause to believe that an immediate danger to life, limb, or property exists or if permission is given by an owner or the owner's agent, architect, engineer, or builder. No person shall accompany an inspector or team of inspectors on any inspection pursuant to P.L.1975, c. 217 (C.52:27D-119 et seq.), unless the person's presence is necessary for the enforcement of P.L.1975, c. 217 (C.52:27D-119 et seq.), or the code or unless consent is given by an owner or the owner's agent, architect, engineer, or builder.

c. If the construction of a structure or building is being undertaken contrary to the provisions of a construction permit, P.L.1975, c. 217 (C.52:27D-119 et seq.), the code, or other applicable laws or ordinances, the enforcing agency may issue a stop construction order in writing which shall state the conditions upon which construction may be resumed and which shall be given to the owner or the holder of the construction permit or to the person performing the construction. If the person doing the construction is not known, or cannot be located with reasonable effort, the notice may be delivered to the person in charge of, or apparently in charge of, the construction. No person shall continue, or cause or allow to be continued, the construction of a building or structure in violation of a stop construction order, except with the permission of the enforcing agency to abate a dangerous condition or remove a violation, or except by court order. If an order to stop construction is not obeyed, the enforcing agency may apply to the appropriate court as otherwise established by law for an order enjoining the violation of the stop construction order. The remedy for violation of such an order provided in this subsection shall be in addition to, and not in limitation of, any other remedies provided by law or ordinance.

d. When an inspector or team of inspectors finds a violation of the provisions of a construction permit, the code, or other applicable laws and regulations at an owner-occupied single-family residence, and issues a notice of violation and an order to

terminate the violation, the enforcing agency shall require the same inspector or team of inspectors who found the violation to undertake any subsequent reinspection thereof at the premises. When the same inspector or team of inspectors cannot be assigned to undertake the reinspection, the enforcing agency may assign an available inspector, provided the scope of the reinspection shall be limited to the violation for which the reinspection is required. The requirements of this subsection shall not apply to violations of the plumbing or electrical subcodes, to fire safety code violations, or to any violation of any other subcode that the Department of Community Affairs determines to be a health or safety violation. Nothing in this subsection shall be construed to infringe upon the right of a property owner to request a different inspector, team of inspectors, or supervisor, to perform any required reinspection.

e. The owner, agent, or other responsible person in charge of work shall notify the enforcing agency when the work is ready for any required inspection under the code. This notice shall be given in writing at least 24 hours prior to the date and time requested for the inspection. The enforcing agency shall perform an inspection within three business days of the date for which the inspection is requested. The owner, agent, or other responsible person in charge of work may provide oral notice for inspections of minor work projects, as defined by the code.

(1) The owner, agent, or other responsible person in charge of work shall be present and prepared at the time of any inspection that has been scheduled upon the owner, agent, or other responsible person's request. A failure by the owner, agent, or other responsible person in charge of work to be present and prepared for inspection shall be considered a failed inspection.

(2) If the enforcing agency is unable to perform a requested inspection within three business days of the date for which the inspection is requested, or during the time window set pursuant to paragraph (5) of this subsection, the enforcing agency shall inform the owner, agent, or other responsible person in charge of work in writing within 24 hours of receiving the request that it is unable to perform the inspection within three business days and no less than 24 hours prior to the start of the four-hour time window set pursuant to paragraph (5) of this subsection if it is unable to perform the inspection during that window, at which time the enforcing agency and the owner, agent, or other responsible person in charge of work may agree to a different date and time for inspection. The enforcing agency shall commit the agreed upon inspection date to writing and provide a copy to the owner, agent, or other responsible person in charge of work.

(3) If the enforcing agency is unable to perform the requested inspection within three business days of the date for which the inspection is requested and the enforcing agency and the owner, agent, or responsible person in charge of work are unable to come to an agreement pursuant to paragraph (2) of this subsection, the owner, agent, or other responsible person in charge of work may choose to contract with a private on-site inspection agency authorized by the department to conduct on-site inspections pursuant to paragraph i. of section 6 of P.L.1975, c. 217 (C.52:27D-124) to perform the requested inspection or inspections.

(a) The owner, agent, or other responsible person in charge of work shall notify the enforcing agency in writing of any choice to utilize an authorized private on-site inspection agency to conduct the requested inspection or inspections.

(b) The owner, agent, or other responsible person in charge of work may elect to utilize the private on-site inspection agency to conduct all subsequent associated inspections. In the event of a project with multiple units in one building, this provision shall apply to the specific unit or units affected by the inspection delay.

(c) The use of a private on-site inspection agency by an owner, agent, or other responsible person for on-site inspections shall be subject to the conflict-of-interest provisions in the code. In addition to those requirements, no private on-site inspection agency shall perform an inspection for any owner, agent, or other responsible person in charge of work, if an owner, agent, or other

responsible person is currently employed by or affiliated with any individual affiliated with the private on-site inspection agency or has employed or was associated with an individual affiliated with the private on-site inspection agency within a timeframe established by the commissioner by regulation.

(d) The enforcing agency shall, if warranted, provide a fee reconciliation to the owner for an inspection completed by a private on-site inspection agency as a result of a missed inspection. The enforcing agency shall perform the reconciliation at the conclusion of the project. This reconciliation shall be based on the fees already paid less administrative costs for the enforcing agency and shall not exceed the amount already paid for the project, nor shall it exceed the amount that the enforcing agency is authorized to impose for inspections, and shall take into account the administrative costs of the enforcing agency.

(4) If the owner, agent, or other responsible person in charge of work believes an enforcing agency has demonstrated a repeated inability to conduct inspections for a construction project within the timelines required by this section, as established by the commissioner by regulation, the owner, agent, or other responsible person in charge of work may notify the department in writing to request authorization to utilize an authorized private on-site inspection agency. Within 15 business days of receiving a notification under this paragraph, the department shall determine whether the enforcing agency has demonstrated repeated inability and, if the department determines, shall authorize the owner, agent, or other responsible person in charge of work to utilize an authorized private on-site inspection agency for all or a portion of the necessary inspections for the remainder of the project.

(5) The enforcing agency shall notify, in writing, within 24 hours of receiving a request for an inspection, and not later than 24 hours prior to the start of a time window set for an inspection, the owner, agent, or other responsible person in charge of work of the four-hour time window, during which the enforcing agency will conduct the inspection. The owner, agent, or other responsible person in charge of work may file on the department's Internet website a complaint against a local enforcing agency for violations of this paragraph. Municipalities in which the Department of Community Affairs acts as the local enforcing agency, and projects in which the Department is the sole enforcing agency, shall not be subject to the provisions of this paragraph.

f. Each enforcing agency shall establish a process for ensuring inspections are performed within three business days of a requested inspection date, as required by subsection e. of this section, and that the applicable enforcing agency performs the inspection within the four-hour time window set pursuant to paragraph (5) of subsection e. of this section or that notice is provided pursuant to paragraph (2) of subsection e. of this section. Authorized processes include, but are not limited to, the use of supplemental shared services agreements with other municipalities or enforcing agencies and the use of contracted private on-site inspection agencies, including supplemental private on-site inspection agencies.

g. (1) At timeframes established by the commissioner by regulation, adopted in accordance with the "Administrative Procedure Act," P.L.1968, c. 410 (C.52:14B-1 et seq.), the municipal construction official shall submit an annual report detailing compliance with the code. The report shall include, at a minimum, information related to the staffing, staff titles, and expenses of the enforcing agency, in addition to any other information required by the commissioner. The annual report shall take into account projected work and agency resource needs for the next budget year.

(2) A municipality that enters into a contract for supplemental services pursuant to subsection f. of this section shall provide a copy of the contract to the department upon entering into the contract.

(3) The information required by paragraphs (1) and (2) of this subsection, in addition to the inspection log, the municipal monthly activity reports, and the fee schedule, shall be maintained by the municipal construction official or enforcing agency, and the

municipal construction official or enforcing agency shall make the information and documents described in this paragraph available to the department upon request.

(4) The department may utilize the information provided pursuant to this subsection to determine appropriate staffing levels for the enforcing agency. If the department determines that an enforcing agency has not maintained appropriate staffing levels, the department may require the municipality to take corrective actions to ensure that the enforcing agency's staffing needs are met.

(5) The department may take corrective action, including the issuance of penalties, pursuant to subsection k. of section 6 of P.L.1975, c. 217 (C.52:27D-124), if an enforcing agency fails to maintain or provide the information required by this subsection or maintain appropriate staffing levels, as determined by the department pursuant to paragraph (4) of this subsection.

h. If an enforcing agency is unable to meet its obligations under P.L.1975, c. 217 (C.52:27D-119 et seq.), the enforcing agency shall promptly notify the department within 15 business days. The department may take corrective action, including the issuance of penalties, pursuant to subsection k. of section 6 of P.L.1975, c. 217 (C.52:27D-124) if an enforcing agency fails to meet its obligations under P.L.1975, c. 217 (C.52:27D-119 et seq.).

**Credits**

L.1975, c. 217, § 14. Amended by L.2007, c. 149, § 1, eff. Aug. 21, 2007; L.2022, c. 139, § 2, (contingent effective date); L.2025, c. 173, § 1, eff. March 1, 2026.

N. J. S. A. 52:27D-132, NJ ST 52:27D-132
Current with laws through L.2025, c. 271 and J.R. No. 17

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 59. Claims Against Public Entities (Refs & Annos)
    Subtitle 1. New Jersey Tort Claims Act (Refs & Annos)
      Chapter 2. Immunity and Liability of Public Entity (Refs & Annos)

N.J.S.A. 59:2-5

## 59:2-5. Issuance, denial, suspension or revocation of permit, license, etc.

Currentness

A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or public employee is authorized by law to determine whether or not such authorization should be issued, denied, suspended or revoked.

**Credits**

L.1972, c. 45, § 59:2-5, eff. July 1, 1972.

N. J. S. A. 59:2-5, NJ ST 59:2-5
Current with laws through L.2025, c. 196 and J.R. No. 12.

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 59. Claims Against Public Entities (Refs & Annos)
    Subtitle 1. New Jersey Tort Claims Act (Refs & Annos)
      Chapter 8. Claims Against Public Entities (Refs & Annos)

N.J.S.A. 59:8-3

## 59:8-3. Claims for damages against public entities

Effective: December 1, 2019

Currentness

Claims for damages against public entities. a. Except as otherwise provided in this section, no action shall be brought against a public entity or public employee under this act[1] unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter.

b. The procedural requirements of this chapter shall not apply to an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c. 7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c. 109 (C.2A:61B-1).

**Credits**
L.1972, c. 45, § 59:8-3, eff. July 1, 1972. Amended by L.1994, c. 49, § 2, eff. June 23, 1994; L.2019, c. 120, § 8, eff. Dec. 1, 2019.

Footnotes
1       N.J.S.A. § 59:1-1 et seq.

N. J. S. A. 59:8-3, NJ ST 59:8-3
Current with laws through L.2025, c. 196 and J.R. No. 12.

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 59. Claims Against Public Entities (Refs & Annos)
    Subtitle 1. New Jersey Tort Claims Act (Refs & Annos)
      Chapter 8. Claims Against Public Entities (Refs & Annos)

N.J.S.A. 59:8-4

59:8-4. Contents of claim

Currentness

A claim shall be presented by the claimant or by a person acting on his behalf and shall include:

a. The name and post office address of the claimant;

b. The post-office address to which the person presenting the claim desires notices to be sent;

c. The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;

d. A general description of the injury, damage or loss incurred so far as it may be known at the time of presentation of the claim;

e. The name or names of the public entity, employee or employees causing the injury, damage or loss, if known; and

f. The amount claimed as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

**Credits**
L.1972, c. 45, § 59:8-4, eff. July 1, 1972.

N. J. S. A. 59:8-4, NJ ST 59:8-4
Current with laws through L.2025, c. 271 and J.R. No. 17

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 59. Claims Against Public Entities (Refs & Annos)
    Subtitle 1. New Jersey Tort Claims Act (Refs & Annos)
      Chapter 8. Claims Against Public Entities (Refs & Annos)

N.J.S.A. 59:8-8

## 59:8-8. Time for presentation of claims

Effective: August 7, 2013
Currentness

A claim relating to a cause of action for death or for injury or damage to person or to property shall be presented as provided in this chapter[1] not later than the 90th day after accrual of the cause of action. After the expiration of six months from the date notice of claim is received, the claimant may file suit in an appropriate court of law. The claimant shall be forever barred from recovering against a public entity or public employee if:

a. The claimant failed to file the claim with the public entity within 90 days of accrual of the claim except as otherwise provided in N.J.S.59:8-9; or

b. Two years have elapsed since the accrual of the claim; or

c. The claimant or the claimant's authorized representative entered into a settlement agreement with respect to the claim.

Nothing in this section shall prohibit a minor or a person who is mentally incapacitated from commencing an action under this act within the time limitations contained herein, after reaching majority or returning to mental capacity.

**Credits**

L.1972, c. 45, § 59:8-8, eff. July 1, 1972. Amended by L.1994, c. 49, § 4, eff. June 23, 1994; L.2013, c. 103, § 133, eff. Aug. 7, 2013.

Footnotes

1        N.J.S.A. § 59:8-1 et seq.

N. J. S. A. 59:8-8, NJ ST 59:8-8
Current with laws through L.2025, c. 196 and J.R. No. 12.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case: 25-3567   Document: 29   Page: 34   Date Filed: 06/05/2026

New Jersey Statutes Annotated
   Title 59. Claims Against Public Entities (Refs & Annos)
      Subtitle 1. New Jersey Tort Claims Act (Refs & Annos)
         Chapter 8. Claims Against Public Entities (Refs & Annos)

N.J.S.A. 59:8-9

## 59:8-9. Notice of late claim

Currentness

A claimant who fails to file notice of his claim within 90 days as provided in section 59:8-8 of this act, may, in the discretion of a judge of the Superior Court, be permitted to file such notice at any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby. Application to the court for permission to file a late notice of claim shall be made upon motion supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for his failure to file notice of claim within the period of time prescribed by section 59:8-8 of this act or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter; provided that in no event may any suit against a public entity or a public employee arising under this act be filed later than two years from the time of the accrual of the claim.

**Credits**
L.1972, c. 45, § 59:8-9, eff. July 1, 1972. Amended by L.1994, c. 49, § 5, eff. June 23, 1994.

N. J. S. A. 59:8-9, NJ ST 59:8-9
Current with laws through L.2025, c. 196 and J.R. No. 12.

**End of Document**  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
  Title 5. Community Affairs
    Chapter 23. Uniform Construction Code (Refs & Annos)
      Subchapter 1. General Provisions

N.J.A.C. 5:23–1.4

## 5:23–1.4 Definitions

Effective: April 1, 2024
Currentness

The following words and terms, when used in this chapter, shall have the following meanings, unless the context clearly indicates otherwise.

"Alteration" means the rearrangement of any space by the construction of walls or partitions, the addition or elimination of any door or window, the extension or rearrangement of any system, the installation of any additional equipment or fixtures and any work which affects a primary structural component.

"Billboard" means any sign which exceeds 32 square feet in area on any face, except for signs which advertise or otherwise identify activities performed upon the property on which the sign is located.

"Building" means a structure enclosed with exterior walls or fire walls, built, erected and framed of component structural parts, designed for the housing shelter, enclosure and support of individuals, animals or property of any kind. When used herein, building and structure shall be interchangeable except where the context clearly indicates otherwise.

"Building subcode official" means a qualified person appointed by the municipal appointing authority or the commissioner pursuant to the act and the regulations to enforce the provisions of the building subcode within the jurisdiction of the enforcing agency.

"Business day" means any day of the year, exclusive of Saturdays, Sundays, and legal holidays.

"Certificate of approval" means a certificate issued pursuant to N.J.A.C. 5:23–2 upon completion of work that requires a construction permit but not a certificate of occupancy.

"Certificate of compliance" means the certificate provided for in N.J.A.C. 5:23–2 and 12, indicating that potentially hazardous equipment is being maintained in accordance with the Act and this chapter.

"Certificate of continued occupancy" means the certificate provided for in N.J.A.C. 5:23–2, indicating that as a result of a general inspection of the visible parts of the building, no violations of N.J.A.C. 5:23–2.14 have been determined to have occurred and no unsafe conditions violative of N.J.A.C. 5:23–2.32 have been found, and that the existing use of the building has heretofore lawfully existed.

"Certificate of occupancy" means the certificate provided for in N.J.A.C. 5:23–2, indicating that the construction authorized by the construction permit has been completed in accordance with the construction permit, the act and the regulations.

"Change of use" means a change from one use to another use in a building or tenancy or portion thereof.

"Class 1 structure" means a structure not listed in N.J.A.C. 5:23–4.3A(d)1i through vi or 2ii through xxii.

"Class 2 structure" means a structure listed in N.J.A.C. 5:23–4.3A(d)2ii through xxii.

"Class 3 structure" means a structure listed in N.J.A.C. 5:23–4.3A(d)1i through vi.

"Commissioner" means the Commissioner of the Department of Community Affairs.

"Construction Board of Appeals" means the board provided for in N.J.A.C. 5:23A.

"Construction official" means a qualified person appointed by the municipal appointing authority or the commissioner pursuant to the act and the regulations to enforce and administer the regulations within the jurisdiction of the enforcing agency.

"Construction permit" means an authorization to begin work subject to the conditions established in subchapter 2 of this chapter.

"Department" means the Department of Community Affairs.

"Effective date" means, in the case of a new rule, amendment or repeal, the date of promulgation in the New Jersey Register. The effective date of a readoption is the date of filing with the Office of Administrative Law.

"Electric vehicle service equipment (EVSE)" or "electrical vehicle supply equipment" means the equipment, including the cables, cords, conductors, connectors, couplers, enclosures, attachment plugs, power outlets, power electronics, transformer, switchgear, switches and controls, network interfaces, point-of-sale equipment, and associated apparatus designed and used for the purpose of transferring energy from the electric supply system to a plug-in electric vehicle. "EVSE" may deliver either alternating current or, consistent with fast charging equipment standards, direct current electricity. "EVSE" is synonymous with "electric vehicle charging station."

"Electrical subcode official" means a qualified person appointed by the municipal appointing authority or the commissioner pursuant to the act and the regulations to enforce and provisions of the electrical subcode within the jurisdiction of the enforcing agency.

"Elevator" or "elevator device" means a hoisting and lowering device equipped with a car or platform which moves in guides for the transportation of individuals or freight in a substantially vertical direction through successive floors or levels of a building or structure; or a power driven, inclined, continuous stairway used for raising or lowering passengers; or a type of passenger carrying device on which passengers stand or walk, and in which the passenger carrying surface remains parallel to its direction of motion and is uninterrupted. This includes, but it is not limited to, elevators, escalators, moving walks, dumbwaiters, wheelchair lifts, manlifts, stairway chairlifts and any device within the scope of ASME A17.1 (Safety Code for Elevators and Escalators) or ASME A90.1 (Safety Standards for Belt Manlifts).

"Elevator subcode official" means a qualified person appointed by the municipal appointing authority or the Commissioner, pursuant to the Act and this chapter, to enforce the provisions of any subcode specifically designated for such enforcement in N.J.A.C. 5:23–3, within the jurisdiction of the enforcing agency.

"Enforcing agency" means the municipal or State administrative entity charged with the administration and enforcement of the regulations consisting of the construction official, subcode officials and assistants thereto appointed in accordance with N.J.S.A. 52:27D–126 of the act and the regulations.

"Equipment" means plumbing, heating, electrical, ventilating, air conditioning, refrigerating and fire prevention equipment, and elevators, dumb waiters, escalators, boilers, pressure vessels and other mechanical facilities or installations, which are related to building services and shall not include manufacturing, production or process equipment, but which shall include connections from building service to process equipment.

"Facility" for the purpose of applying for an annual permit means exclusive of a hotel/casino, a building or group of buildings under common ownership or control and whose maintenance work is performed under the direct supervision of a maintenance supervisor.

"Fire protection subcode official" means a qualified person appointed by the appropriate appointing authority or the commissioner pursuant to the act and the regulations to enforce those portions of any subcode, specifically designated for such enforcement in N.J.A.C. 5:23–3, within the jurisdiction of the enforcing agency.

"Ground sign" means a sign mounted on the ground or on multiple pole supports with its lower edge less than 15 feet above grade measured at the longest pole.

"Group" means the classification of an occupancy (also see "Use Group").

"Health care facility" means the facility or institution, whether public or private, engaged principally in providing services for health maintenance organizations, diagnosis or treatment of human disease, pain, injury, deformity or physical condition, including but not limited to a general hospital, special hospital, mental hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, home health care agency, home for the sheltered care of adult persons, and bioanalytical laboratory or central services facility serving one or more such institutions, but excluding institutions that provide healing solely by prayer.

1. This definition shall not be deemed to include nurses, doctors, or other staff housing not attached in accordance with minimum fire separation standards in the building subcode; administrative offices not attached in accordance with minimum fire separation standards in the building subcode; parking garages, or other such facilities for which the Federal government does not impose standards as a condition of funding.

"Hearing examiner" means a person appointed by the commissioner to conduct hearings, summarize evidence and make findings of fact.

"Lead abatement" means a process designed either to mitigate or to eliminate permanently lead-based paint hazards on a premises and includes, but is not limited to: the removal of lead-based paint and lead-contaminated dust; the containment or encapsulation of lead-based paint; the replacement of lead-painted surfaces or fixtures; the removal or covering of lead-contaminated soil; and all preparation, cleanup, disposal and post-abatement clearance testing activities associated with such measures. "Lead abatement" shall not include painting, woodworking, structural renovation or other indoor or outdoor contracting services that may result in the disturbance of paint, unless it is evident from the statements and/or actions of a person or persons authorizing or performing such services that an objective of the work is the mitigation or permanent elimination of a lead-based paint hazard.

"Lead evaluation" means a surface-by-surface investigation to determine the presence and condition of lead-based paint and the provision of a report explaining the results of the investigation, including, but not limited to, hazards and recommendations for abatement.

"Maintenance" means the replacement or mending of existing work with equivalent materials or the provision of additional work or material for the purpose of the safety, healthfulness and upkeep of the structure and the adherence to such other standards of upkeep as are required in the interest of public safety, health and welfare.

"Make-ready" means the pre-wiring of electrical infrastructure at a parking space, or set of parking spaces, to facilitate easy and cost-efficient future installation of EVSE including, but not limited to, Level Two EVSE and direct current fast chargers (DCFC). Make-ready includes expenses related to service panels, junction boxes, conduit, wiring, and other components necessary to make a particular location able to accommodate EVSE on a "plug and play" basis. For the purpose of this definition, Level 2 EVSE operates on a 40 to 100 amp breaker on a 208 or 240 volt AC circuit. DCFC operates on a 60 amp or higher breaker on a 480 volt or higher three phase circuit with special grounding equipment. DCFC stations can also be referred to as rapid charging stations.

"Manufactured home" means a structure with respect to which the manufacturer has filed a certification required by the Secretary of the United States Department of Housing and Urban Development and which complies with the standards established under 42 U.S.C. §§5401 et seq.

"Manufacturing, production, and process equipment" means all equipment employed in a system of operations for the explicit purpose of the production of a product. Manufacturing, production, and process equipment shall include, but is not limited to, the following:

1. Electrical generation equipment, such as turbines, condensors, generators, and the like;

2. Electrical transmission equipment such as transformers, capacitors, regulators, switchgears, and the like;

3. Air pollution equipment, such as scrubbers;

4. Metal working equipment, such as castings, screen machines, grinders, lathes, presses, drills, welders, and the like;

5. Material handling equipment, such as rollers, control belts, and the like;

6. Packaging equipment, such as bottling machines;

7. Process drying equipment, such as ovens, kettles, fans, and the like;

8. Finishing equipment, used for such purposes as heat treatment, plating, painting, and the like;

9. Petrochemical refinery/plant equipment used for distillation, conversion, treatment, and blending;

10. Electric, steam, pneumatic- or hydraulic-actuated equipment, such as motors, pumps, compressors, and the like;

11. Tanks which constitute part of a controlled industrial process, including those tanks containing flammable and combustible liquids, together with the dikes surrounding the tanks;

12. All piping used to transport products to and between industrial processes; any piping connected to the potable water supply downstream of an appropriate backflow prevention device; and any piping located upstream of the first joint at the outlet of the equipment or upstream of the indirect connection to the sanitary or storm sewer;

13. Pipe racks, hangers, and the like that support the process piping and the storage racks for the raw materials and finished products. Building structural systems supporting the racks, hangers, storage loads, and the like are excluded from the definition of process equipment, except that pipe support units that include a foundation and support steel shall be included as process equipment when they do not transfer loads to structures whose main function is other than supporting process pipe;

14. Boilers, pressure vessels, furnaces, and the like used exclusively for industrial process;

15. Pre-wired and/or pre-engineered (bearing name plate) electro-mechanical equipment or machinery used exclusively for an industrial process; and

16. Electrical work which forms a part of the power or control system of industrial process equipment, up to the point where that work connects to the plant electrical distribution system. Such a point shall be considered a suitable junction box, panel board, disconnect switch, or a terminal box which constitutes the final connection to the factory-installed equipment wiring. Where these items are not supplied as a part of the equipment, they shall be subject to local enforcing agency jurisdiction.

"Minor work" means construction work undertaken in existing structures, requiring no plan review, not altering in any way the structural members of a building and meeting the definition set forth in N.J.A.C. 5:23–2.17A.

"Municipality" means any city, borough, town, township or village.

"Municipal Procedures Manual" means the book established by the Commissioner, effective January 1, 1984, and any subsequent revisions, detailing the steps to be followed in completing, processing and filing the standards forms, logs and reports required for administration and enforcement of the State Uniform Construction Code.

"Operative date" means the date upon which the Department and local enforcing agencies shall enforce, and all parties shall comply with, an effective rule. Unless otherwise provided in the notice of adoption published in the New Jersey Register, the effective date is the operative date.

"Ordinary maintenance" means restoration or improvement of a routine or usual nature which is done by replacing a part of, or putting together, something that is worn or broken in a building, electrical, plumbing, heating, ventilation or air conditioning system and meeting the definition set forth in N.J.A.C. 5:23–2.7.

"Owner" means the owner or owners in fee of the property or a lesser estate therein, a mortgagee or vendee in possession, an assignee of rents, receiver, executor, trustee, lessee or any other person, firm or corporation, directly or indirectly in control of a building, structure or real property and shall include any subdivision thereof of the State.

"Plans and specifications" means and includes all of the written, graphic and pictorial documents prepared or assembled for describing the design, location and physical characteristics of the elements of the project controlled by these rules and necessary for obtaining a permit. They shall be drawn to an appropriate scale. Where the plans and specifications show, describe or document features of the project not controlled by these rules, the portion(s) of the plans and specifications showing features not controlled by these rules shall not be considered to be "plans and specifications" within the meaning of this definition.

"Plumbing subcode official" means a qualified person appointed by the municipal appointing authority or the commissioner pursuant to the act and the regulations to enforce the provisions of the plumbing subcode within the jurisdiction of the enforcing agency.

"Premanufactured system" or "premanufactured construction" means an assembly of materials or products that is intended to comprise all or part of a building or structure and that is assembled off-site by a repetitive process under circumstances intended to insure uniformity of quality and material content. The term shall include, but not be limited to, manufactured homes and industrialized/modular buildings.

"Primary function space" means a room or space housing a major activity for which the building or tenancy is intended, including, but not limited to, office area, auditorium, assembly space, dining room, bar or lounge, warehouse, factory, dwelling, care, confinement, retail, and educational spaces, but not including kitchens, bathrooms, storage rooms or other spaces supporting a primary function space. A building or tenancy may contain more than one primary function space.

"Prior approvals" means the necessary certifications or approvals issued or authorized by any Federal or State agency, or any political subdivision of the State, which are not inconsistent with this chapter and which are conditions precedent to the issuance of a construction permit or a certificate of occupancy or approval, as the case may be. Prior approvals shall include, but not be limited to, the following:

1. Zoning;

2. Soil erosion and sediment control;

3. Highway curb cuts;

4. Water and sewer treatment works approvals;

5. Coastal areas facilities review;

6. Compliance of underground storage tank systems with N.J.A.C. 7:14B;

   i. An approval granted by the Department of Environmental Protection or the construction official by authority of N.J.A.C. 7:14B shall be deemed to be a prior approval;

7. Educational adequacy review of public school facilities under N.J.A.C. 6A:26;

8. Pinelands review; and

9. Compliance of abandoned wells with N.J.A.C. 7:9–9.

i. Compliance with N.J.A.C. 7:9–9.1 shall be evidenced by a certification issued by a well driller licensed by the Department of Environmental Protection.

"Private inplant inspection agency", or "evaluation and inspection agency", means a business entity authorized pursuant to N.J.A.C. 5:23–4 or 4A to approve premanufactured construction.

"Private on-site inspection and plan review agencies" means a business entity authorized pursuant to N.J.A.C. 5:23–4 to act in lieu of a subcode official.

"Public school facility" means any building or part thereof used by a local, regional or consolidated board of education as a primary or secondary school.

"Pylon sign" means an elevated sign supported either by a monopole or by multiple pole supports and having its bottom edge 15 feet or more above ground level, measured at the base of the longest pole if there is more than one, or an elevated sign mounted on the roof of another structure.

"Reconstruction" means any project where the extent and nature of the work is such that the work area cannot be occupied while the work is in progress and where a new certificate of occupancy is required before the work area can be reoccupied. Reconstruction may include repair, renovation, alteration or any combination thereof. Reconstruction shall not include projects comprised only of floor finish replacement, painting or wallpapering, or the replacement of equipment or furnishings. Asbestos hazard abatement and lead hazard abatement projects shall not be classified as reconstruction solely because occupancy of the work area is not permitted.

"Rehabilitation" means the repair, renovation, alteration or reconstruction of any building or structure.

"Renovation" means the removal and replacement or covering of existing interior or exterior finish, trim, doors, windows, or other materials with new materials that serve the same purpose and do not change the configuration of space. Renovation shall include the replacement of equipment or fixtures.

"Repair" means the restoration to a good or sound condition of materials, systems and/or components that are worn, deteriorated or broken using materials or components identical to or closely similar to the existing.

"State sponsored code change proposal" means any proposed amendment or code change adopted by the commissioner in accordance with subsection c. of section 6 of the act as amended for the purpose of presenting such proposed amendment or code change at any of the periodic code change hearings held by the National Model Code adoption agencies, the codes of which have been adopted as subcodes under the Act. For purposes of this definition a State sponsored code change proposal may also oppose any code change under consideration by a model code agency.

"Stop construction order" means the order provided for in N.J.S.A. 52:27D–132 of the act and N.J.A.C. 5:23–2.

"Structure" means a combination of materials to form a construction for occupancy, use or ornamentation, whether installed on, above, or below the surface of a parcel of land; provided, the word "structure" shall be

construed when used herein as though followed by the words "or part or parts thereof and all equipment therein" unless the context clearly requires a different meaning.

"Subcode" means any of the national model codes, parts thereof or other codes or standards as adopted by reference in N.J.A.C. 5:23–3 or as set forth in N.J.A.C. 5:23–7, 8, 10 and 12.

"Supplemental private on-site inspection agency" means a business entity registered as a business in the State of New Jersey and authorized pursuant to N.J.A.C. 5:23–4 to act in lieu of a subcode official or inspector for the purpose of performing an inspection or inspections related to a specific project or to supplement the inspection staff of an enforcing agency.

"Tenancy" means an entire building, or that portion of a building or story, which is or is intended to be under the control of a single owner or tenant.

"The Code in effect at the time of permit application" means either the Code in effect on the date of submission of a complete permit application or the Code under which the original plans were reviewed and released pursuant to N.J.A.C. 5:23–1.6.

"Use" means that portion of a building or tenancy which is devoted to a single use group or special use or occupancy, as defined in the building subcode, or as established by the provisions of any other subcode for the purpose of specifying special requirements applicable to that portion of a building or tenancy.

"Use Group" means the classification of an occupancy (also see "Group").

"Wall sign" means a sign mounted on the wall of another structure in a manner such that it is exposed to wind loads from one side only.

"Work area" means any entire use, primary function space or tenancy comprising all or part of a reconstruction project as delineated on the approved permit application and/or plans.

**Credits**

Amended by R.1977 d.256, effective August 1, 1977; R.1978 d.162, effective June 1, 1978; R.1981 d.133, effective May 7, 1981; R.1982 d.7, effective February 1, 1982; R.1983 d.611, effective January 3, 1984; R.1984 d.120, effective April 16, 1984; R.1985 d.351, effective July 15, 1985; R.1990 d.57, effective February 5, 1990; R.1990 d.313, effective June 18, 1990; R.1991 d.325, effective July 1, 1991; R.1992 d.244, effective June 15, 1992; R.1993 d.420, effective September 7, 1993; R.1993 d.580, effective November 15, 1993; R.1995 d.381, effective July 17, 1995; R.1995 d.544, effective October 16, 1995; R.1996 d.190, effective April 15, 1996; R.1996 d.236, effective May 20, 1996 (operative January 1, 1997); R.1996 d.323, effective July 15, 1996 (operative January 1, 1997); R.1997 d.409, effective October 6, 1997; R.1997 d.417, effective October 6, 1997; R.1998 d.28, effective January 5, 1998; R.1999 d.424, effective December 6, 1999; R.2003 d.216, effective May 19, 2003; R.2003 d.473, effective December 15, 2003; R.2004 d.260, effective July 6, 2004; R.2004 d.393, effective October 18, 2004; R.2006 d.355, effective October 2, 2006; R.2007 d.384, effective December 17, 2007; R.2008 d.213, effective August 4, 2008; R.2013 d.081, effective June 3, 2013; R.2018 d.090, effective March 5, 2018; 52 N.J.R. 2097(a) R.2020 d.130, effective December 7, 2020; 55 N.J.R. 1999(a) R.2023 d.112, effective September 18, 2023; 56 N.J.R. 469(a) R.2024 d.028, effective April 1, 2024.

## CHAPTER EXPIRATION DATE

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 57, Issue 24, dated December 15, 2025. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–1.4, NJ ADC 5:23–1.4

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
  Title 5. Community Affairs
    Chapter 23. Uniform Construction Code (Refs & Annos)
      Subchapter 2. Administration and Enforcement; Process

N.J.A.C. 5:23–2.14

## 5:23–2.14 Construction permits—when required

Effective: August 18, 2025
Currentness

(a) It shall be unlawful to construct, enlarge, repair, renovate, alter, reconstruct or demolish a structure, or change the use of a building or structure, or portion thereof, or to install or alter any equipment for which provision is made or the installation of which is regulated by this chapter without first filing an application with the construction official, or the appropriate subcode official where the construction involves only one subcode, in writing and obtaining the required permit therefor.

1. Notwithstanding any provision of (b) below to the contrary, a permit shall be required for any work to abate violations cited in a Notice of Violation and Order to Terminate (F213) issued after a certificate of occupancy has been issued.

2. A permit is required when undertaking a project involving lead abatement for which a lead abatement clearance certificate is required pursuant to N.J.A.C. 5:23–2.23(p).

(b) The following are exceptions from (a) above:

1. Ordinary maintenance as defined in N.J.A.C. 5:23–2.7 shall not require a permit or notice to the enforcing agency;

2. Minor work as defined by N.J.A.C. 5:23–2.17A shall require a permit. However, work may proceed, upon notice to the enforcing agency, before the permit is issued;

3. Emergency work not involving lead abatement, except that notice shall be given as soon thereafter as is practicable, and a permit shall be applied for not later than 72 hours thereafter.

4. Exceptions to permit requirements for temporary structures, tents, tensioned membrane structures, canopies, and greenhouses are as follows:

    i. Temporary structures: A construction permit is not required for the erection, operation or maintenance of any temporary structures (excluding tents, tensioned membrane structures, canopies, and greenhouses) covering an area less than 120 square feet, including all connecting areas or spaces with a common means of egress or entrance and which remain in place for less than 180 days;

ii. Tents, tensioned membrane structures, and canopies: A construction permit is not required for tents, tensioned membrane structures, and canopies that meet all of the criteria in (b)4ii(1) through (5) below. Tents, tensioned membrane structures, and canopies meeting the following criteria shall be subject to the permitting requirements of the Uniform Fire Code (N.J.A.C. 5:70–2.7).

(1) The tent, tensioned membrane structure, or canopy is 140 feet or less in any dimension and 16,800 square feet or less in area whether it is one unit or is composed of multiple units;

(2) The tent, tensioned membrane structure, or canopy remains in place or will remain in place for fewer than 180 days;

(3) The tent, tensioned membrane structure, or canopy is used or occupied only between April 1 and November 30;

(4) The tent, tensioned membrane structure, or canopy does not have a permanent anchoring system or foundation; and

(5) The tent, tensioned membrane structure, or canopy does not contain platforms or bleachers greater than 11 feet in height.

iii. A temporary greenhouse, also called a "hoophouse" or "polyhouse," meeting the criteria stated in N.J.A.C. 5:23–3.2(d), shall not require a permit.

iv. Regardless of whether the temporary structure, tent, tensioned membrane structure, canopy, or greenhouse requires a permit, a permit shall be required for any electrical equipment, electrical wiring, or mechanical equipment that would otherwise require a permit.

5. A gas utility company shall not be required to obtain a permit or give notice to the enforcing agency for the replacement of interior gas utility company-owned metering (meter and related appurtenances) with exterior gas utility company owned-metering provided that the work is performed by qualified employees of the gas utility company.

i. When the work is performed by a contractor hired by the gas utility, the following shall apply:

(1) The contractor must be a licensed master plumber or a licensed heating, ventilation, air conditioning, and refrigeration contractor;

(2) The utility company must have in place a quality control program, staffed by employees of the utility company, to oversee the work of the contractor. The quality control personnel will inspect and provide documentation for all work performed by the contractor;

(3) The utility company must deliver, to the local enforcing agency, a list of all addresses where the work will be performed;

(4) The local enforcing agency will randomly choose 10 percent of the addresses and issue permits and perform inspections of the completed work. Fees will be paid for these permits.

(A) If the rate of failed inspections is 20 percent or greater, the Department shall be notified and 50 percent of all of the utility company's work associated with this program must be inspected in accordance with this protocol until the failure rate is reduced to below 20 percent; and

(5) Certificates of approval will be issued only for those addresses where construction permits were issued.

6. A permit shall not be required for a sign that meets all of the following conditions; provided, however, that the construction official shall have authority to require the removal of any sign that creates an unsafe condition or otherwise to require correction of any such condition:

i. It is supported by uprights or braces in or upon the ground surface;

ii. It is not served by an electrical circuit directly connected to the sign;

iii. It is not greater than 25 square feet in surface area (one side); and

iv. It is not more than six feet above the ground (mounted height).

7. Lead abatement work performed on a steel structure or other superstructure or in a commercial building.

8. A construction permit for building work shall not be required for garden-type utility sheds and similar structures that are 200 square feet or less in area, 10 feet or less in height, and accessory to buildings of Group R-2, R-3, R-4, or R-5 and which do not contain a water, gas, oil, or sewer connection. A construction permit for electrical work shall be required, when applicable.

9. A permit shall not be required for fences six feet or less in height. This exception does not apply to barriers surrounding public or private swimming pools.

10. A construction permit is not required for an outdoor maze, unless it is six feet or greater in height or contains any electrical equipment. Outdoor mazes that do not require a permit are subject to the permitting requirements of the Uniform Fire Code (N.J.A.C. 5:70–2.7).

i. For the purposes of applying this requirement, an outdoor maze is an attraction that lacks a roof and is designed to disorient patrons, reduce vision, present barriers, or otherwise impede the flow of traffic and does not consist solely of living rooted plants such as corn stalks or trees, but includes mazes created from plants that have been cut and attached to an object to support them.

11. A permit shall not be required for installation of portable or vehicle-mounted generators and the associated components of the portable distribution system serving carnivals and fairs when the system is in compliance with N.J.A.C. 5:23–2.18D. However, such installations are subject to inspection by the Department.

(c) An annual construction permit may be issued by the construction official to educational, industrial, institutional, mercantile, business and government facilities based upon submission of the following in duplicate:

1. Identification of the facility and the buildings covered by the application for the annual permit.

2. Identification of the location within the facility where the annual permit records will be maintained.

3. A listing of the names, titles and trade specialties of the facility's full-time maintenance staff.

4. The name of the person responsible for the maintenance logs, job assignments and quality control.

5. A statement from the management of the facility attesting that the maintenance staff performing work under the annual permit are under the direct supervision of a qualified individual, as set forth under N.J.A.C. 5:23–2.14(e)1, or are individually qualified in their respective trades.

i. Evidence of qualification shall be journeyman status, civil service status, trade experience, trade school certification, college degree, State licensure pursuant to law or other appropriate evidence of competence.

ii. No person employed on the maintenance staff of a facility shall be deemed to be qualified to engage in lead abatement unless he or she has been certified by the New Jersey Department of Health pursuant to section 3 of P.L. 1993, c.288 (N.J.S.A. 26:20–3) (see N.J.A.C. 8:62).

6. A statement from the management explaining their procedures for providing training at Department seminars on construction codes on a regular basis for at least one, but not more than three, individuals per subcode.

7. A statement from the management explaining the procedures of the applicant to ensure proper quality control of the work performed under the annual permit.

8. Receipt of the required annual permit fee and training registration fee.

(d) The Construction Official, upon review of the application, may issue or deny an annual construction permit in whole or in part. The construction permit (Form F-170) shall state that the permit is an annual permit and indicate the technical subcodes in which the facility is approved to do work under the annual permit. A copy of the annual permit shall be forwarded by the Construction Official to the Department of Community Affairs Training Section along with the appropriate training registration fee.

(e) Conditions of the annual permit are as follows:

1. The "annual permit" may be issued for building/fire protection, electrical, mechanical or plumbing work or any combination of those classifications of work, providing that the individual responsible for work done under the annual permit possesses knowledge as evidenced in accordance with N.J.A.C. 5:23–2.14(c)5, in the technical work classification for which the annual permit is sought.

i. An approved copy of the annual permit application shall be kept at a facility's maintenance office within the municipality having jurisdiction for review by the Construction Official and appropriate subcode official. The Construction Official shall be notified of the location of the facilities maintenance office.

2. The life of the annual construction permit shall be limited to one year;

3. The facility shall maintain a construction log of all work performed. The construction log shall contain the date, a brief description and estimated or actual cost of the project. This log shall be subject to a quarterly inspection by the construction official or his authorized representative. Any business record showing when and where work was done and the extent of such work shall be deemed to be a construction log: Applications for the renewal of the "annual permit" shall be filed with the Construction Official at least 60 days prior to the expiration of the current annual permit. The facility application shall make current the information previously submitted to the Construction Official. The application for renewal shall be accompanied by the established fee.

4. The annual permit covers all work subject to this chapter done by the facility's full-time maintenance staff, but shall not include work performed by outside contract even if the contractor is hired by the facility and is working under direct supervision of the facility's maintenance staff. Work performed by outside contract shall be subject to applicable UCC regulations and State Licensure Law.

5. A permanent work log, approved by the construction official, of all work done under the "annual permit" must be maintained at a facilities maintenance office on site or must be available at the time of the inspection upon 24 hours notice of such inspection. The log must contain the date, a brief description of the work, photographs for any work which was not inspected prior to closing as set forth in (e)8 below, and the name of the person supervising the work. The log shall be retained for three years.

6. Architectural or engineering drawings, as required by law for work done under the annual permit, shall be prepared by a registered architect or licensed engineer as defined by the statutory requirements of the professional registration laws of this State and shall be kept permanently on file and be made available to the Construction Official and appropriate subcode official, for review upon request.

7. The appropriate subcode official, at least two (2) times a year, shall perform inspections of the facility for which an annual permit has been issued. The maximum time between inspections shall be a six month period.

8. Work that is normally inspected prior to closing shall be ordered to be reopened by the facility upon written notice from the Construction Official or appropriate subcode official if he has reason to believe that a violation is present. A photograph shall be taken of any work intended to be enclosed without inspection.

9. Any work that is done under the supervision of the facilities maintenance staff and under a regular construction permit shall be entered into the annual permit log. The construction permit number shall be listed as a part of the entry.

10. Training for annual permits shall be provided at the seminars for code officials.

   i. The facility shall provide a list of at least one, but not more than three, individuals per subcode who are required to complete five hours of continuing education per year.

   ii. The Department shall maintain the training records for each annual permit. The annual permit shall not be renewed unless the facility completes the training for each issued subcode.

   iii. The Department shall notify the construction official who issued the permit if the training has not been completed.

11. Any changes to the annual construction permit application shall be forwarded to the Construction Official within 30 days of the change.

12. The following work is not permitted under an annual permit:

   i. Any work done on a facility that would result in a change of use of a building or part of a building;

   ii. New buildings and additions regardless of size;

   iii. Renovation, alteration or reconstruction work completed between inspection periods in an area in excess of 5,000 square feet per building;

   iv. Any work done on a facility that would result in an increase to the area of a building;

   v. The installation or alteration of a sprinkler system;

   vi. Any work that affects the required means of egress;

vii. Any modification work, other than routine maintenance, that affects life safety systems, such as, but not limited to:

(1) Emergency lighting systems;

(2) Smoke and heat detection systems;

(3) Stand-by generator systems;

(4) Emergency smoke evacuation systems.

viii. Any work which would disturb asbestos and require a permit to perform.

(f) Construction requirements for commercial farm buildings shall be as set forth in N.J.A.C. 5:23–3.2(d).

(g) No person shall construct, enlarge, alter, reconstruct, or demolish a retaining wall or series of retaining walls having a total height four feet or greater, or a retaining wall less than four feet having a negative impact on a foundation, without first obtaining a construction permit. The height of a retaining wall shall be the sum of the heights of all retaining walls on the same slope and shall be measured from the bottom of the footing to the top of the wall.

1. Exceptions: This requirement shall not apply to any retaining wall that is intended to be dedicated to the municipality and is subject to regulation, inspection, and the issuance of bonds under Article 6. Subdivision and Site Plan Review and Approval, of the Municipal Land Use Law, P.L. 1975, c. 291 (N.J.S.A. 40:55D-37 et seq.) nor shall it apply to any retaining wall subject to review and approval by a county engineer or by the State Department of Transportation.

**Credits**

Amended by R.1981 d.462, effective December 7, 1981; R.1985 d.351 effective July 15, 1985; R.1986 d.213, effective June 16, 1986; R.1990 d.558, effective November 19, 1990; R.1991 d.60, effective February 19, 1991; R.1991 d.325, effective July 1, 1991; R.1992 d.230, effective June 1, 1992; R.1993 d.662, effective December 20, 1993; R.1995 d.381, effective July 17, 1995; R.1995 d.475, effective September 5, 1995 (operative January 1, 1996); R.1996 d.297, effective July 1, 1996 (operative October 1, 1996); R.1997 d.302, effective July 21, 1997 (operative September 24, 1997); R.1998 d.28, effective January 5, 1998; R.1999 d.424, effective December 6, 1999; R.2000 d.166, effective April 17, 2000; R.2003 d.187, effective May 5, 2003; R.2004 d.67, effective February 17, 2004; R.2005 d.228, effective July 18, 2005; R.2006 d.157, effective May 1, 2006; R.2006 d.355, effective October 2, 2006; R.2009 d.126, effective April 20, 2009; R.2010 d.291, effective December 20, 2010; R.2011 d.269, effective November 7, 2011; R.2016 d.116, effective September 19, 2016; R.2018 d.021, effective January 16, 2018; R.2018 d.090, effective March 5, 2018; 52 N.J.R. 2057(a) R.2020 d.123, effective November 16, 2020; 57 N.J.R. 1817(a) R.2025 d.093, effective August 18, 2025.

**CHAPTER EXPIRATION DATE**

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 57, Issue 24, dated December 15, 2025. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–2.14, NJ ADC 5:23–2.14

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
  Title 5. Community Affairs
    Chapter 23. Uniform Construction Code (Refs & Annos)
      Subchapter 2. Administration and Enforcement; Process

N.J.A.C. 5:23–2.15

## 5:23–2.15 Construction permits—application

Effective: August 18, 2025
Currentness

(a) The application for a permit shall be submitted on the standard Construction Permit Application form, or its electronic equivalent, prescribed by the Commissioner at N.J.A.C. 5:23–4.5(b)2 and shall be accompanied by the required fee, as provided for in this subchapter and N.J.A.C. 5:23–4. The application shall contain a general description of the proposed work, its location, the use and occupancy of all parts of the building or structure, and all portions of the site or lot not covered by the building or structure, and such additional information as may be required by the construction official, which shall include, but not be limited to, the following:

1. The name and address of the owner: Where the owner is not a resident of the State, he shall designate a resident as agent for the purpose of service of any notices or orders which may be necessary. Such address shall not be limited to a post office box, but shall specify a physical location where such owner or agent may be found during normal business hours. Where the owner is a corporation, partnership or other business entity, the application shall indicate the names and addresses of the officers, or other responsible persons upon whom service may be made;

2. The street address and lot and block number of the property upon which the building or structure is proposed to be erected;

3. A description of the proposed work, including the use group classification, proposed construction type, lot ground coverage in square feet, total floor area in square feet, total building or structure volume in cubic feet, the total number of plumbing fixtures, the total number of electrical fixtures, outlets and major appliances, a description of the type of heating system, the source of water supply, the mode of sanitary waste disposal and a listing of any special, unusual or hazardous facilities proposed for inclusion in the building or structure;

4. The estimated cost of the work for which a permit is sought, including but not limited to building construction, on-site construction, and all integral equipment, built-in furnishings and finishes. Where any material or labor proposed for installation in the building or structure is furnished or provided at no cost, its normal or usual cost shall be included in the estimated cost;

5. A statement that all required State, county, and local prior approvals have been given, including such certification as the construction official may require;

i. Exception: For permit applications which lack one or more prior approvals, but are otherwise complete, plan review shall proceed as provided at (f)4ii(1) below;

6. For Class 1 structures or for a smoke control system installed in any structure, a list of all materials and work requiring special inspections, and a list of agencies, qualified licensed professionals, or firms intended to be retained for conducting those inspections in accordance with the requirements of the building subcode;

7. If the work involves lead abatement, the applicant shall provide the following:

i. A copy of the scope of work which shall describe precisely the location and extent of the work;

ii. A sketch plan showing the locations where abatement work is to be performed and showing emergency egress routes for any occupants to be in the building during abatement;

iii. A record of all materials to be used for all phases of the job, including encapsulants, enclosures, containment materials and replacement components, as appropriate;

iv. A copy of the lead evaluation report, if any has been done, prepared by a business firm certified by the Department pursuant to N.J.A.C. 5:17 to do lead evaluation; and

v. The degree to which any lead hazard identified in any report prepared by a lead evaluation firm certified by the Department will be abated; and

8. If the work involves reconstruction, an identification of the work area, except where plans are filed with the application, in which case the work area shall be delineated on the plans.

(b) In addition to the requirements at (a) above, the following information shall be required on any application for a construction permit when such information is available, but not later than the commencement of work.

1. The names and addresses of all contractors engaged or planned for engagement by the owner in the execution of the work.

i. A current validated State builder registration card shall be shown by the contractor and the registration number of the contractor shall be recorded on the permit, pursuant to the New Home Warranty and Builder's Registration Act (N.J.S.A. 46:3B–1 et seq.), if the project is a one or two family dwelling, condominium or cooperative, unless it is to be built in whole or in part by an owner, in which case an affidavit shall be filed by the owner on a form prescribed by the Department of Community Affairs, in which he acknowledges that work done by him, or by a subcontractor working under his supervision, is not covered under the New Home Warranty and Builders' Registration Act and states that he will disclose this information to any person purchasing the property from him within 10 years of the date of issuance of a certificate of occupancy.

2. The name and license number of the contractor(s) or subcontractor(s) for plumbing; electrical; or heating, ventilating, air conditioning, and refrigeration work, where such work is proposed.

i. Plumbing, electrical, heating, ventilating, air conditioning, and refrigeration work shall not be undertaken except by persons licensed to perform such work pursuant to law, except in the case of a single-family homeowner on his or her own dwelling.

ii. The seal and signature of the licensed plumbing; electrical; or heating, ventilating, air conditioning, and refrigeration contractor(s) shall be affixed to the corresponding subcode application form. An electronic signature and seal are acceptable for electronic submissions for review purposes provided that physical copies of plans at the worksite shall have a physical seal and wet signature affixed pursuant to the licensing law applicable to the relevant discipline.

3. The name and address of the contractor or subcontractor for installation, alteration, repair, or replacement work on liquefied petroleum gas systems, where such work is proposed.

i. Work on liquefied petroleum gas systems shall be undertaken only by persons certified to perform such work pursuant to N.J.A.C. 5:18, except in the case of a single-family homeowner performing work on his or her own dwelling, licensed plumbing contractors, or licensed heating, ventilating, air conditioning, and refrigeration contractors.

ii. The certification number of the liquefied petroleum gas contractor shall be affixed to the corresponding subcode technical section.

4. The name and address of the responsible person who will be in charge of the work and who is responsible to the owner for ensuring that all work is installed and completed in conformity with the regulations. The person may be the design architect or engineer, the contractor or a third party acceptable to the construction official.

5. If the work involves lead abatement, one of the following shall be supplied:

i. The name and Department certification number issued pursuant to N.J.A.C. 5:17 of any business firm undertaking the lead abatement; or

ii. If the work is to be done by employees of the owner of the property, the name and New Jersey Department of Health certification number issued pursuant to N.J.A.C. 8:62 of each such employee; or

iii. If the work is to be done on an owner-occupied single family dwelling, a certification by the owner stating that he or she owns and occupies the property as a principal place of residence, will be performing the abatement work, and has received the written information for homeowners prepared by the Department explaining the danger of improper lead abatement, procedures for conducting safe lead abatement, and the availability of certified lead abatement contractors or of any available training for homeowners.

6. If the work involves fire protection equipment, any contractor performing such work shall have the appropriate certification issued pursuant to N.J.S.A. 52:27D-25n et seq. The certification number of the contractor shall appear on the permit application.

  i. Exception: Certification shall not be required for licensed electrical contractors or for licensed alarm contractors installing fire alarms.

  ii. Exception: Certification shall not be required for homeowners performing work within their residences.

  iii. Exception: Certification shall not be required for in-house employees performing routine maintenance work, inspections, or testing of fire protection equipment.

  iv. Exception: Certification shall not be required for contractors who install water supply lines outside a building.

7. If the work involves a landscape irrigation system, any contractor performing such work shall be certified pursuant to the Landscape Irrigation Contractors Certification Act, N.J.S.A. 45:5AA-1 et seq. The seal and signature of the certified contractor shall be affixed to the permit application, except in the case of electronic submissions, in which case an electronic seal and signature is acceptable.

  i. Exception: Certification shall not be required for public employees performing work on property of the public entity, for vendors of landscape irrigation components, materials or equipment delivering, rendering advice or assistance or performing normal warranty service for such equipment, for contractors installing or performing work on irrigation equipment to be used solely for agricultural purposes or for licensed plumbing contractors.

  ii. Exception: Certification shall not be required for homeowners performing work on landscape irrigation systems on their own properties.

8. If the work involves a burglar alarm, fire alarm, or electronic security system, any contractor performing such work shall be licensed pursuant to N.J.S.A. 45:5A-18 et seq. The license number of the contractor shall appear on the permit application.

  i. Exception: Licensure shall not be required for telephone utility or cable television companies regulated by the Board of Public Utilities or for licensed electrical contractors.

  ii. Exception: Licensure shall not be required for homeowners performing work on burglar alarms, fire alarms, or electronic security systems in their own homes.

9. If work involves a home improvement performed by a contractor, such contractor shall be registered pursuant to N.J.S.A. 56:8–136 et seq. The registration number of the contractor shall appear on the permit application. No number shall be required to be provided by any person performing a home improvement who is not required to be registered, in accordance

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

with (b)8ii, iii, v, vi or viii below. The appropriate license, registration or certification number and documentation shall be provided by any person exempt from registration as a contractor pursuant to (b)8iv or vii below.

i. For purposes of this paragraph, "home improvement" shall mean and include any work subject to the code that involves the reconstruction, alteration, renovation, repair or demolition of the whole or any part of any building in Group R-2, R-3, R-4 or R-5, or in any building or structure appurtenant thereto, or the conversion of an existing building in another group into a building in Group R-2, R-3, R-4 or R-5;

ii. Exception: Registration shall not be required for any person performing a home improvement upon a building or structure in Group R-2, R-3, R-4 or R-5 owned by that person, or by a member of that person's immediate family;

iii. Exception: Registration shall not be required for any person performing a home improvement, without any charge for his or her services, upon a residential or non-commercial property owned by a bona fide charity or other non-profit organization;

iv. Exception: Registration shall not be required for any person regulated by the State as an architect, professional engineer, landscape architect, land surveyor, electrical contractor, master plumber, locksmith, burglar alarm business, fire alarm business, liquefied petroleum gas marketer, lead evaluation or abatement contractor or asbestos abatement contractor, or any other person in any other related profession requiring registration, certification or licensure by the State of New Jersey, who is acting within the scope of practice of that profession;

v. Exception: Registration shall not be required for any person employed by a community association or cooperative corporation or by a landlord who is making home improvements within the person's scope of employment at the residential or non-commercial property that is owned or leased by the community association or cooperative corporation or landlord;

vi. Exception: Registration shall not be required for any public utility, as defined under N.J.S.A. 48:2–13;

vii. Exception: Registration shall not be required for any person licensed as a home financing agency, a home repair contractor or a home repair salesman pursuant to N.J.S.A. 17:16C–77, provided that the person is acting within the scope of such license, and provided that such license number shall appear on the permit application;

viii. Exception: Registration shall not be required for any home improvement retailer with a net worth of more than $50,000,000 or any employee of such home improvement retailer who is making or selling such home improvements within the person's scope of employment by the home improvement retailer. This exception shall not apply to persons working as subcontractors for any such home improvement retailer.

10. If the work involves home elevation, any contractor performing such work shall be registered pursuant to N.J.S.A. 56:8-136 et seq. and shall be in compliance with the applicable provisions of N.J.A.C. 13:45A-17 and 17A. The registration number of the contractor shall appear on the permit application and the application shall include the certification required pursuant to N.J.S.A. 52:27D-123.16.

i. For purposes of this paragraph, "home elevation" shall mean and include any home improvement that involves raising an entire building of Group R-2, R-3, R-4, or R-5 to a higher level above the ground.

11. If the work involves an elevator, escalator, or a moving walkway, any mechanic performing such work shall be licensed pursuant to N.J.S.A. 45:14H–1 et seq. The license number of the mechanic shall appear on the permit application.

12. Contractors who are not subject to State licensing, registration or certification shall be subject to any applicable licensing, registration or certification requirement established by municipal ordinance. Any municipal license, registration or certification number issued to any such contractor shall be included in any application for a construction permit for work to be done by such contractor.

13. In the event of any change of contractor or person in charge of work at (b)1 through 12 above, such change shall be filed as an amendment to the application.

(c) A separate application and permit shall be required for each building.

(d) Application for a permit shall be made by the owner, or his or her agent, a licensed engineer, architect, plumbing, electrical, heating, ventilation, air conditioning, and refrigeration, or other contractor employed in connection with the proposed work. If the application is by a person other than the owner, it shall be accompanied by an affidavit of the owner or the authorized person making the application, that the proposed work is authorized by the owner, and that the applicant is authorized to make such application. All issued permits shall remain the property of the owner, even if the application was made by a contractor or authorized agent.

(e) Construction permits for individual tenant spaces in multi-tenant buildings shall be issued pursuant to N.J.A.C. 5:23–2.23A.

(f) Plans, plan review, plan release:

1. Plans and specifications: The application for the permit shall be submitted either electronically or physically. Electronic submissions shall comply with N.J.A.C. 5:23–2.15B. Physical submissions shall be accompanied by no fewer than two copies of specifications and of plans drawn to scale, with sufficient clarity and detail dimensions to show the nature and character of the work to be performed. Plans submitted shall be required to show only such detail and include only such information as shall be necessary to demonstrate compliance with the requirements of the code and these regulations or to facilitate inspections for code conformity. When quality of materials is essential for conformity to the regulations, specific information shall be given to establish such quality; and this code shall not be cited, or the term "legal" or its equivalent be used, as a substitute for specific information.

i. Site diagram: There shall also be filed a site plan showing to scale the size and location of all the new construction and all existing structures on the site, distances from lot lines and the established street grades; accessible route(s) for buildings required by N.J.A.C. 5:23-7 and Chapter 11 of the building subcode to be accessible; and it shall be drawn in accordance with an accurate boundary line survey. In the case of demolition, the site plan shall show all construction to be demolished and the location and size of all existing structures and construction that are to remain on the site or plot.

(1) Where any of the conditions in(f)1i(1)(A) through (C) below are met, a plan shall be submitted to the Construction Official detailing the manner in which the adjoining property will be protected. The Construction Official is authorized to utilize special technical services as per N.J.A.C. 5:23–2.19. No permit shall be issued until such plan has been filed.

(A) The foundation for the new building is immediately adjacent to an existing foundation, such that the existing foundation may be impacted by the construction work being performed;

(B) The footing for the new building is higher or lower than the footing for an existing building and the distance between the edges of the footings is equal to or less than the distance between the bottoms of the footings; or

(C) The new building roof is higher than the building roof on the adjoining property and the building roof of the adjoining property is a flat, hip or gable roofs with a slope of less than 70 degrees and the roof of the adjoining property is located 20 or fewer feet from the face of the new building.

ii. Building plans and specifications shall contain the following information:

(1) Foundation, floor, roof and structural plans;

(A) For buildings with roof or other truss systems, a truss layout and permanent truss bracing plan shall be submitted. This plan shall show all the permanent lateral and other bracing locations for individual truss members as well as the connections between the truss system and other components of the structural system necessary for the permanent lateral bracing of the entire structural system.

(2) Door, window and finish schedules; and

(3) Sections, details, connections and material designations.

iii. Electrical plans and specifications shall contain: Floor and ceiling plans; lighting, receptacles, motors and equipment; service entry location, line diagram and wire, conduit and breaker sizes.

iv. Plumbing plans and specifications shall contain: Floor plan; fixtures, pipe sizes, and other equipment and materials; riser diagram(s) with pipe sizes, fixture schedule, and sewage disposal.

v. Mechanical plans and specifications shall contain: Floor or ceiling plans; equipment, distribution location, size, and flow; gas riser diagram(s) with pipe sizes and input ratings; location of dampers and safeguards; and all materials.

vi. Energy calculations: Calculations showing compliance with the energy subcode shall be submitted for all new buildings and additions to existing buildings. As provided in (f)1vii below, these calculations shall be signed and

sealed by the design professional, with the exception of calculations for class 3 structures, which may be submitted by the heating, ventilation, air conditioning, and refrigeration contractor.

(1) For detached one- and two-family residential buildings and other residential buildings three stories or less in height, compliance may be demonstrated by the submission of NJ Clean Energy Program for Residential New Construction compliance documentation or other "above code" program documentation, the submission of printouts from software recognized by the Department, such as REScheck, or conforming with the prescriptive packages described in the current energy subcode compliance bulletin. REScheck software is available from the U.S. Department of Energy at www.energycodes.gov.

(A) To document compliance using REScheck, users shall meet or exceed the applicable provisions of the energy subcode. Please see the current energy subcode compliance bulletin for further guidance.

(2) For all other buildings, compliance may be shown with the COMcheck compliance software or equivalent, submission of the compliance forms found in the COMcheck user's manual or the ASHRAE 90.1 user's manual for the edition of ASHRAE adopted under the energy subcode. The COMcheck user's manual and software are available from the U.S. Department of Energy at www.energycodes.gov. The ASHRAE 90.1 user's manual is available from the American Society of Heating, Refrigerating and Air-conditioning Engineers Inc., at www.ashrae.org.

(A) To document compliance using COMcheck, users shall meet or exceed the applicable provisions of the energy subcode. Please see the current energy subcode compliance bulletin for further guidance.

vii. Engineering details and specifications: The construction official and appropriate subcode official may require adequate details of structural, mechanical, plumbing, and electrical work, including computations, stress diagrams, and other essential technical data to be filed. All engineering plans and computations shall bear the seal and signature of the licensed engineer or registered architect responsible for the design. Plans and computations may be electronically signed and sealed where the application is electronic. Plans for buildings shall indicate how required structural and fire-resistance rating will be maintained for penetrations made for electrical, mechanical, plumbing, and communication conduits, pipes, and systems.

(1) Plans for class 3 structures may be prepared by persons licensed or certified pursuant to their respective laws and rules.

(2) Whenever the licensing board or certifying agency pursuant to the applicable rules shall provide for a seal or other form of identification evidencing that the holder is licensed or certified, such shall be acceptable to the enforcing agency in lieu of affidavit.

viii. Work area: For reconstruction work in an existing structure, the work area shall be clearly delineated on the plans.

ix. Architect's or engineer's seal: The seal and signature of the registered architect or licensed engineer who prepared the plans shall be affixed to each sheet of each copy of the plans submitted and on the first or title sheet of the

specifications and any additional supportive information submitted. In the case of electronic submissions, such seal and signature may be electronic.

(1) Exception: The construction official shall waive the requirement for sealed plans in the case of a single family home owner who had prepared his or her own plans for the construction, addition, reconstruction, alteration, renovation, or repair of a detached structure used or intended to be used exclusively as his or her private residence providing that the owner shall submit an affidavit attesting to the fact that he or she has personally prepared the plans and provided further that said plans are in the opinion of the construction official, and appropriate subcode official, legible and complete for purposes of ensuring compliance with the regulations. This exception shall not apply to the structural design, specifications, and plans for new construction or substantial improvement of a home in a V zone in a flood hazard area, which must be developed or reviewed by a registered architect or licensed engineer pursuant to the National Flood Insurance Program rules, 44 CFR 60.3.

x. The construction official upon the advice of the appropriate subcode official may waive the requirement for plans when the work is of a minor nature.

xi. Those portions of the plans that are required to be submitted and which are not included at the time of application shall be listed by the design professional as part of the application.

(1) All documents prepared by people other than the design professional shall be reviewed by the design professional and submitted with a letter indicating that they have been reviewed and found to be in conformance with the regulations for the design of the building.

xii. Building, electrical, plumbing and mechanical work required to be shown may be shown on a single set of plans or a single drawing so long as the drawings are clear and legible.

2. Prototype plan filing: Where a design is used repeatedly at different locations in a municipality or throughout the State, the plans and specifications may be submitted for "prototype" release and filed as follows:

i. Two complete sets of the plans and specifications for each prototype shall be submitted with a request for prototype plan release, except that in the case of an electronic submission, one set is acceptable. The plans and specifications shall be signed and sealed by a licensed or registered design professional. The plans and specifications will be stamped as released and the plan number and date will be recorded with the prototype release so that prototype plan release may be confirmed for any subsequent use of the released prototype plans. Mirror-image designs shall not be a permitted option, and shall require separate prototype plan release, except for plans that are validated as identical to the original prototype, as provided at (f)2i(1) below. Prototype applications that include a foundation design shall specify the conditions and limitations of that design;

(1) Plans for a mirror-image design may be submitted with a letter signed and sealed by the design professional stating that the mirror-image design is identical to the original prototype, but reversed;

ii. Permit applications that rely on a released prototype shall consist of two copies of the following permit-specific documents to facilitate a thorough field inspection of the work. (Pursuant to N.J.A.C. 5:23–2.16(e), one set of the

released plans shall be retained by the construction official as either an electronic or physical set. The second set shall be a physical set and shall be kept at the building site.)

(1) A plot plan that is signed and sealed by a registered architect, licensed professional engineer, or licensed land surveyor that includes the location of all utility services, including septic connections;

(2) A specific foundation design or certification that the prototype foundation design is suitable for the site;

(3) A reference set of plans that includes and clearly identifies each of the options to be used for the building that is the subject of the permit application. The reference set of plans is not required to be signed and sealed;

(4) Exterior elevations of the specific building;

(5) The prototype file identification number;

(6) The plan number and date of the released prototype plan; and

(7) When an automatic fire sprinkler system is installed, the fire sprinkler system demand, including either hose stream allowances or the required domestic demand, as applicable, at the available water supply shall be documented.

iii. Plans that contain deviations that were not released as part of the prototype shall not be considered a prototype and shall require the submission of a new permit application and application fees for that project to the appropriate plan review agency.

3. Examination of plans: All plans submitted and any amendments thereto accompanied by the required documentation and application, and upon payment of the fee established by the enforcing agency, shall be numbered, docketed and examined promptly after their submission for compliance with the provisions of the regulations.

4. Plan review:

i. Department review: When a review and release of plans by the Department is required pursuant to N.J.A.C. 5:23–3.11 or requested for a prototype plan intended for use Statewide, the owner or agent of the owner shall file either a physical or an electronic application for construction plan release for each project. Where the application is not electronic, the owner or agent of the owner shall also file three physical sets of plans (two sets for prototypes), specifications, and such other supporting information as the Department may require on forms obtained from the Department. The plans, specifications, and other supporting information shall conform to the requirements at (f) above. Electronic submissions shall comply with the requirements at N.J.A.C. 5:23–2.15B.

(1) Release of plans: Plans complying with the provisions of the regulations shall be released by the Department and written notice of approval shall be given the applicant promptly and no later than 20 business days after

the submission thereof. Plans failing to comply with the provisions of the code shall be rejected and a written notice of rejection, stating the grounds for rejection, shall be given to the applicant not later than 20 business days after the submission thereof. Whenever plans have been rejected and are thereafter revised and resubmitted, the revised plans shall be released if the grounds for rejection have been corrected and code compliance has been demonstrated. In that case, a written notice of release shall be given to the applicant not later than seven business days after the resubmission of the revised plans. When the grounds for rejection have not been corrected or when code compliance has not been demonstrated, a written notice of rejection stating the grounds for rejection shall be given to the applicant not later than seven business days after the resubmission of the revised plans.

(2) Endorsement of released plans: All plans and amendments thereto, when approved by the Department, shall be stamped or endorsed "released", followed by a notation of the date of plan release. In the case of physical submissions, one set of such released plans shall be retained by the Department, two sets of such released plans shall be submitted to the local enforcing agency with the application for construction permit as herein provided. Electronic plan submissions shall comply with N.J.A.C. 5:23–2.15B.

(3) Partial filing: When circumstances require, a project may be filed in part (that is, footings, structural, electrical, plumbing, and so forth). Each partial submittal shall include sufficient detail to assure that the proposed portion of work complies with the regulations. A plan "release" for such a portion of work shall be issued without prejudice as to whether a "release" shall be issued for the entire project.

(4) Construction permits: Owners and their agents shall not apply to a local enforcing agency for a construction permit for any building or structure for which a Department plan review and release is required by N.J.A.C. 5:23–3, unless such review and release has been applied for and received by the applicant as evidenced by presentation of released plans to the local enforcing agency.

(5) Time limitation of application: An application for a plan review shall be deemed to have been abandoned 12 months after date of filing, unless such application has been diligently prosecuted or a release has been issued; except that, for reasonable cause, the Department may grant one or more extensions of time for additional periods not exceeding 90 days each.

(A) When plans are submitted for local review that are required to be reviewed by the Department, the local enforcing agency shall so notify the owner or agent in writing no later than three business days after the submission of the plans.

ii. Local enforcing agency plan review: Where a Department plan review is not required by the regulations, an applicant for a construction permit shall be deemed to have applied for a local enforcing agency plan review by filing an application for a construction permit.

(1) If required State, county or local prior approvals have not been granted, plan review shall proceed provided that the application for a permit is otherwise complete and the plan review fee has been paid. No permit shall be issued until all required State, county and local approvals are in place.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    11

(A) Exception: Permit applicants applying for plan review of individual owner-occupied one- or two family home addition or alteration projects must have zoning approval in place before plan review shall proceed.

(2) When the plans submitted with an application for a construction permit or amendment thereto are accompanied by plans which have been released by the Department, then further municipal plan review and fee therefor shall not be required. Release of the plans by the Department shall not prevent enforcing agency officials from thereafter requiring correction of any errors in said plans or from issuing a stop work order when in violation of the regulations. In such case the enforcing agency shall notify the Department;

iii. Validity of plan or prototype release: The released plans or prototype (Department or local) shall be valid for the purposes of applying for a construction permit until six months after the operative date of the next edition of the code, as set forth in N.J.A.C. 5:23–1.6.

iv. Time limitation of application: An application for a permit for any proposed work shall be deemed to have been abandoned six months after date of filing, unless such application has been diligently prosecuted or a permit shall have been issued; except that for reasonable cause, the construction official may grant one or more extensions of time for additional periods not exceeding 90 days each.

v. Amended plans and specifications: Amendments may be filed at any time; such amendments shall be deemed part of the original application and, when released, shall be filed therewith. Amended plans and specifications shall be required where deviations affect matters controlled by the code and, in the judgment of the subcode official having jurisdiction, such amended plans are necessary to assist in the determination of code compliance. The official may require the affected portions of the work to be halted until amended plans and specifications are released. If the amendment involves a substantial deviation from the original application, a new affidavit of consent may be required by the construction official. If a Department plan review was required originally, the enforcing agency shall not permit an amendment to the plans or specifications unless the amendment has been released by the Department.

vi. Building systems: Structural, electrical and mechanical designs performed and certified by licensed architects or engineers need not be checked in detail by the staff of the enforcing agency, but shall remain as the responsibility of the professional certifying such design.

vii. A schematic or sketch plan, when required pursuant to this subsection, shall not be deemed to be a construction copy of a plan and shall therefore not be required to be signed or sealed by a registered architect or licensed professional engineer.

**Credits**

Amended by R.1985 d.352, effective July 15, 1985; R.1985 d.479, effective September 16, 1985; R.1992 d.244, effective June 15, 1992; R.1993 d.353, effective July 19, 1993; R.1995 d.381, effective July 17, 1995; R.1995 d.544, effective October 16, 1995; R.1997 d.304, effective July 21, 1997; R.1998 d.28, effective January 5, 1998; R.2003 d.187, effective May 5, 2003; R.2003 d.216, effective May 19, 2003; R.2004 d.144, effective April 5, 2004; R.2006 d.32, effective January 17, 2006; R.2006 d.127, effective April 3, 2006; R.2007 d.125, effective May 7, 2007; R.2007 d.124, effective May 7, 2007; R.2007 d.231, effective August 6, 2007; R.2008 d.39, effective March 3, 2008; R.2009 d.49, effective February 2, 2009; R.2009 d.162, effective May 18, 2009; R.2011 d.270, effective November 7, 2011; R.2012 d.139, effective July 16, 2012; R.2013 d.081, effective June

3, 2013; R.2014 d.117, effective July 21, 2014; R.2014 d.161, effective October 1, 2014; R.2015 d.077, effective April 15, 2015; R.2016 d.116, effective September 19, 2016; R.2018 d.021, effective January 16, 2018. Amended by 50 N.J.R. 1888(a) R.2018 d.153, effective August 20, 2018. Amended by 52 N.J.R. 1821(a) R.2020 d.099, effective October 5, 2020; 52 N.J.R. 2097(a) R.2020 d.130, effective December 7, 2020; 53 N.J.R. 1375(a) R.2021 d.082, effective August 16, 2021; 55 N.J.R. 527(a) R.2023 d.039, effective March 20, 2023. Administrative changes made by 55 N.J.R. 1173(a) R.2023, effective May 10, 2023, printed June 5, 2023. Amended by 56 N.J.R. 2229(a) R.2024 d.113, effective November 18, 2024; 57 N.J.R. 1817(a) R.2025 d.093, effective August 18, 2025.

### CHAPTER EXPIRATION DATE

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 57, Issue 24, dated December 15, 2025. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–2.15, NJ ADC 5:23–2.15

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
  Title 5. Community Affairs
    Chapter 23. Uniform Construction Code (Refs & Annos)
      Subchapter 2. Administration and Enforcement; Process

N.J.A.C. 5:23–2.16

## 5:23–2.16 Construction permits—procedure

Effective: December 7, 2020
Currentness

(a) Action on application: The construction official or the appropriate subcode official in the case of construction involving only one trade or subcode, shall examine or cause to be examined all applications for permits and amendments thereto, and approve or deny in whole or in part the application, within 20 business days. If the application is denied in whole or in part, the enforcing agency shall set forth the reasons therefor in writing. If an enforcing agency fails to grant, in whole or in part, or deny an application within 20 business days, such failure shall be deemed a denial of the application for purposes of an appeal to the Construction Board of Appeals, unless such period of time has been extended with the consent of the applicant. Whenever plans have been rejected and are thereafter revised and resubmitted, the revised plans shall be released if the deficiencies that were stated as grounds for rejection have been corrected and code compliance has been demonstrated. In that case, a written notice of release shall be given to the applicant not later than seven business days after the resubmission of the revised plans. When the grounds for rejection have not been corrected or when code compliance has not been demonstrated, a written notice of rejection stating the grounds for rejection shall be given to the applicant not later than seven business days after the resubmission of the revised plans.

1. Exception: For a building designed in conformance with the one-and two-family dwelling subcode, where the Department or local enforcing agency has released a prototype plan which is to be used for the work covered by the permit application, the construction official shall act on the application within three business days.

i. Where the prototype release did not include the foundation detail, the construction official shall act on the application within seven business days.

2. Exception: For a building designed in conformance with the building subcode, where the Department or local enforcing agency has released a plan which is to be used for the work covered by the permit application, provided that the permit is complete, the construction official shall act on the application within five business days.

3. Exception -- Plan Release with Conditions and Permit Issuance: In buildings of Group B, F, M, or S, for alteration or reconstruction projects performed in accordance with N.J.A.C. 5:23–6, unless the code official finds that the plans are so deficient that they cannot be used as a means of determining code compliance upon inspection, the construction official shall act on the permit application by identifying and providing to the permit applicant a list of those conditions that require correction for code compliance, as follows:

i. A plan release with conditions shall mean that a list of code deficiencies identified through plan review shall be attached to the plans with the condition that the deficiencies so identified will have been corrected and will be code compliant upon inspection.

ii. The plan release with conditions shall identify any deferred submittals necessary to perform an inspection.

iii. A timeframe for the receipt by the enforcing agency of the deferred submittals and for the correction of code deficiencies shall be specified in the plan release with conditions. If revised drawings are determined to be necessary, a timeframe for submitting revised drawings shall be specified in the plan release with conditions.

iv. The plans shall be released with conditions and the permit application shall be acted upon following the written acceptance by the permit applicant of the conditions attached to the plan release. When the list of conditions attached to the plan release is provided to the permit applicant, the enforcing agency shall provide a copy of the conditions attached to the plan release to the design professional of record.

(1) The issuance of a plan release with conditions notwithstanding, the construction permit shall not be issued until the conditions of all prior approvals, as defined at N.J.A.C. 5:23–1.4, have been met in accordance with N.J.A.C. 5:23–2.15(a)5.

v. Plan release with conditions shall not apply to a change of use or to a change in the character of use in accordance with N.J.A.C. 5:23–6.

(b) Suspension of permit: Any permit issued shall become invalid if the authorized work is not commenced within 12 months after issuance of the permit, or if the authorized work is suspended or abandoned for a period of six months after the time of commencing the work.

(c) Previous approvals: The rules shall not require changes in the plans, construction or designated use of a building for which a lawful permit has been heretofore issued or otherwise lawfully authorized, and the construction of which shall have been actively prosecuted within six months after the operative date of the rules and completed with dispatch. This six months provision shall also apply to subsequent amendments.

(d) Signature to permit: The construction official shall attach his signature to every permit; or he may authorize a subordinate to affix such signature thereto. By doing so he shall certify that each responsible subcode official shall have reviewed and approved the application for permit.

(e) Released plans: The construction official shall stamp or endorse in writing both sets of plans released, and one set of such released plans shall be retained and the other set shall be kept at the building site, open to inspection of the construction official or the construction official's authorized representative at all reasonable times.

1. For plans released pursuant to (a)3 above, the conditions shall be attached to the plans that are retained on site and the plans that are retained by the enforcing agency and shall be available for use in performing inspections.

(f) Revocation of permits:

    1. The construction official may revoke a permit or approval issued under the provisions of this code in the following cases:

        i. If the applicant has submitted any false statement or misrepresentation of fact in the application or on the plans on which the permit or approval was based; or

        ii. If the project for which the permit was obtained is not completed by the third anniversary of the date of the issuance of the permit. If a project is not completed by such date, the permit holder may apply to the enforcing agency for a one-year extension of time for completion of the project. The enforcing agency shall not unreasonably withhold approval of any such extension request. If the project is not completed within the time allowed, the enforcing agency shall take such action under the code as may be appropriate, including, without limitation, demolition of the structure, in which case the legal authority of the jurisdiction shall institute appropriate action against the owner of the property for recovery of the costs incurred. The provisions of this subparagraph shall not apply to:

            (1) Improvements to the interior of a building in which the permit holder is currently residing, if such improvements are not visible from outside of the property;

            (2) Any building in which all exterior work and all required site improvements have been completed; or

            (3) Any project currently under the control of a mortgagee in possession.

(g) Approval of part: The construction official shall issue a permit for the construction of foundations or any other part of a building or structure before the entire plans and specifications for the whole building or structure have been submitted, provided adequate information and detailed statements have been filed complying with all the pertinent requirements of this code. The holder of such permit for the foundations or other part of a building or structure shall proceed at his own risk with the building operation and without assurance that a permit for the entire structure will be granted.

(h) Posting of permit: A true copy of the construction permit shall be kept on the site of operations open to inspection during the entire time of prosecution of the work and until the completion of the same.

(i) Notice of start: At least 24 hours notice of start of work under a construction permit shall be given to the construction official.

(j) Conditions of permit: The issuance of the construction permit shall be conditioned upon the following:

    1. The payment of appropriate fees;

    2. That work will conform to the requirements of the code applicable to the work for which the permit has been issued including prior approvals and any approved amendments thereto;

3. That the permit is a license to proceed with the work and shall not be construed as authority to violate, cancel or set aside any of the provisions of the regulations;

4. That the owner, his agent, contractor, or other employees will assist the enforcing agency in its inspection work, if requested;

5. That all escrows required to be paid by the applicant, pursuant to N.J.A.C. 5:23–4.17(d), in connection with work done under permits issued for development-wide violation correction, pursuant to N.J.A.C. 5:23–2.35(a)1, have been paid unless there is an appeal pending. For purposes of applying this paragraph, any escrow due from any person or entity affiliated with the applicant by way of having any common officers, directors, or shareholders with at least a 10 percent interest shall be deemed to be due from the applicant; and

6. That any change in ownership is reported through a permit update and that any required replacement performance guarantee has been furnished.

(k) Upon request of the local health department, the construction official shall supply copies of permits issued for lead abatement work.

**Credits**

Amended by R.1993 d.420, effective September 7, 1993; R.1995 d.381, effective July 17, 1995; R.1995 d.544, effective October 16, 1995; R.1997 d.409, effective October 6, 1997; R.1998 d.36, effective January 5, 1998; R.2003 d.216, effective May 19, 2003; R.2004 d.144, effective April 5, 2004; R.2004 d.364, effective October 4, 2004 (operative January 14, 2005); R.2006 d.355, effective October 2, 2006; R.2007 d.124, effective May 7, 2007; R.2010 d.291, effective December 20, 2010; R.2012 d.181, effective November 5, 2012; 52 N.J.R. 2100(a) R.2020 d.132, effective December 7, 2020.

**CHAPTER EXPIRATION DATE**

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 57, Issue 24, dated December 15, 2025. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–2.16, NJ ADC 5:23–2.16

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
   Title 5. Community Affairs
      Chapter 23. Uniform Construction Code (Refs & Annos)
         Subchapter 2. Administration and Enforcement; Process

N.J.A.C. 5:23–2.21

## 5:23–2.21 Construction control

Currentness

(a) Responsibilities: The provisions of this section shall define the construction controls required for all buildings involving professional architecture/engineering services and delineate the responsibilities of such professional services together with those services that are the responsibility of the contractor during construction.

(b) Professional architecture or engineering services:

1. Design: All new, renovation, alteration, reconstruction, expansion, addition or modification work involving the practice of professional architecture or engineering, as defined by the statutory requirements of the professional registration and licensing laws of this State, shall be prepared by registered architects or licensed engineers. All plans, computations and specifications required for a construction permit application must be prepared by or under the direct supervision of a registered architect or licensed engineer and bear his or her signature and seal in accordance with the State's statutes and regulations governing the professional registration and licensing of architects and engineers.

(c) Responsible person in charge of work: The owner shall designate a person to be in charge of the work who shall be responsible for:

1. Verification of all controlled materials per building subcode requirements of testing, certification and identification;

2. Special inspection of critical construction components;

3. Submission of amended plans and specifications whenever substantial deviations are necessary or desired, or when required to do so pursuant to N.J.A.C. 5:23–2.15(f)4v; and

4. The responsible person in charge of work shall perform the necessary services and be present on the construction site on a regular and periodic basis to determine that, generally, the work is proceeding in accordance with the code and any conditions of the construction permit.

(d) Reporting: At the completion of the construction, the responsible person in charge of work shall submit to the construction official a report as to the satisfactory completion and the readiness of the project for occupancy and shall certify that, to the best

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.                    1

of the responsible person's knowledge and belief, such has been done substantially in accordance with the code and with those portions of the plans and specifications controlled by the code, with any substantial deviations noted.

(e) Construction contractor services: The actual construction of the work shall be the responsibility of the contractor(s) as identified on the approved construction permit and shall involve:

1. Execution of work in accordance with the regulations;

2. Execution and control of all methods of construction in a safe and satisfactory manner;

3. Execution of all work in accordance with the code and those portions of the plans and specifications controlled by the code;

4. In general, render all such construction services as required to effect a safe and satisfactory installation of the project;

5. Upon completion of the construction, the contractor shall certify to the best of the contractor's knowledge and belief that such has been done substantially in accordance with the code and with those portions of the plans and specifications controlled by the code, with any substantial deviation specifically noted.

(f) The provisions of this section do not relieve the enforcing agency of any of the responsibilities required by the regulations.

**Credits**
Amended by R.1998 d.28, effective January 5, 1998; R.2003 d.216, effective May 19, 2003.

### CHAPTER EXPIRATION DATE

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 57, Issue 24, dated December 15, 2025. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–2.21, NJ ADC 5:23–2.21

**End of Document**                                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
  Title 5. Community Affairs
    Chapter 23. Uniform Construction Code (Refs & Annos)
      Subchapter 2. Administration and Enforcement; Process

N.J.A.C. 5:23–2.31

5:23–2.31 Compliance

Currentness

(a) If the notice of violation and orders to terminate have not been complied with, the construction official in addition to any other available remedies likely to bring about compliance, may request the legal counsel of the municipality, or of the joint enforcement agency, or the Attorney General in the case of the State, to institute the appropriate proceeding at law or in equity to restrain, correct, or abate such violation or to require the removal or termination of the unlawful use of the building or structure in violation of the provisions of the regulations or of the order or direction made pursuant thereto.

(b) Penalties:

1. Any person or corporation, including an officer, director or employee of a corporation, shall be subject to a penalty if that person:

i. Violates any of the provisions of the act or the regulations;

ii. Constructs a structure or building in violation of a condition of a building permit;

iii. Fails to comply with any order issued by an enforcing agency or the department;

iv. Makes a false or misleading written statement, or omits any required information or statement in any application or request for approval to an enforcing agency or the department.

2. Anyone who knowingly refuses entry or access to an inspector lawfully authorized to inspect any premises, building or structure pursuant to the act or the regulations, or who unreasonably interferes with such an inspection, shall be subject to a fine of not more than $250.00.

3. With respect to (b)1iii above, a person shall be guilty of a separate offense for each day that he fails to comply with a stop construction order validly issued by an enforcing agency or the department and for each week that he fails to comply with any other order validly issued by an enforcing agency or the department. With respect to (b)1i and iv above, a person shall be guilty of a separate offense for each violation of any provision of the act or the regulations and for each false or misleading written statement or omission of required information or statement made in any application or request for

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.                    1

approval to an enforcing agency or the department. With respect to (b)1ii above, a person shall be guilty of a separate offense for each violation of conditions of a construction permit.

4. No such penalty shall be assessed except upon notice of violation and orders to terminate and upon the expiration of the time period delineated in the notice; except that in the case of a false or misleading statement pursuant to (b)1iv above, the failure to obtain a construction permit or request required inspections, or allowance of occupancy prior to receipt of a certificate of occupancy, an order to pay a penalty shall be issued immediately upon the discovery of the violation.

5. The construction official may separately serve a notice of penalty assessment and order to pay a penalty.

6. The penalties pursuant to this section may be collected pursuant to the "Penalty Enforcement Law of 1999" (N.J.S.A. 2A:58–10 et seq.). Jurisdiction to enforce such penalties is conferred upon judges of the municipal court and of the Superior Court. Suit may be brought by a municipality or the State of New Jersey. Payment of a money judgment pursuant hereto shall be remitted in the case of a suit brought by a municipality to the municipal treasurer and in the case of a suit brought by the State of New Jersey to the State Treasurer.

(c) The construction official may assess a monetary penalty whenever such shall be likely to assist in bringing about compliance.

(d) Stop construction order:

1. If the construction of a structure or building is being undertaken contrary to the provisions of the regulations, or other applicable laws or ordinances, the enforcing agency may issue a stop construction order in writing which shall state the reasons for such order and the conditions under which construction may be resumed and which shall be given to the owner or the holder of the construction permit or to the person performing the construction. If the person doing the construction is not known, or cannot be located with reasonable effort, the notice may be delivered to the person in charge of, or apparently in charge of, the construction.

2. If, at the time of inspections requested pursuant to N.J.A.C. 5:23-2.18(c), a pattern or practice is identified and documented in writing of the same code violation(s) occurring in most or all of the dwelling units inspected within a housing development, affecting framing, fire safety or structural safety, the construction official may issue a stop construction order for all buildings within the development. A copy of the supporting documentation, including the violations, citations, and blocks and lots, shall be given to the owner or responsible person in charge of the project. A copy of the stop construction order shall be forwarded to the Department as per N.J.A.C. 5:23-4.5(h)1xi. Relief from any such stop construction order may be conditioned upon submission to the enforcing agency of an acceptable supervision and management plan. This plan shall include the institution of quality controls to ensure that the pattern of violations does not continue and the identification of qualified personnel to implement the plan. If the plan is not submitted within five business days of the issue date of the stop construction order, the order shall take effect.

3. No person shall continue, or cause to allow to be continued, the construction of a building or structure in violation of a stop construction order, except with the permission of the enforcing agency to abate a dangerous condition or remove a violation, or except by court order.

4. If an order to stop construction is not obeyed, the enforcing agency may apply to the appropriate court as otherwise established by law for an order enjoining the violation of the stop construction order. The remedy for violation of such an order provided in this subsection shall be in addition to, and not in limitation of, any other remedies provided by law.

(e) Penalties may be levied by an enforcing agency as follows:

1. Up to $1,000 per violation for failure or refusal to comply with any lawful order, unless the failure or refusal to comply is done with the knowledge that it will endanger the life or safety of any person, in which case the penalty shall be up to $2,000 per violation;

2. Up to $2,000 per violation for failure to obtain a required permit prior to commencing construction or for allowing a building to be occupied without a certificate of occupancy;

3. Up to $2,000 per violation for failure to comply with a stop construction order;

4. Up to $2,000 per violation for willfully making a false or misleading written statement, or willfully omitting any required information or statement in any application or request for approval;

5. Up to $500.00 per violation for any violation not covered under (e)1 through 4 above;

6. For purposes of this subsection, in an occupied building, a code violation involving fire safety, structural soundness or the malfunctioning of mechanical equipment that would pose a life safety hazard shall be deemed to endanger the life or safety of a person. In an unoccupied building, a code violation of a requirement intended to protect members of the public who are walking by the property shall be deemed to endanger the life or safety of a person.

**Credits**
Amended by R.2004 d.365, effective October 4, 2004; R.2007 d.46, effective February 5, 2007; R.2007 d.124, effective May 7, 2007.

### CHAPTER EXPIRATION DATE

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 58, Issue 1, dated January 5, 2026. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–2.31, NJ ADC 5:23–2.31

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
  Title 5. Community Affairs
    Chapter 23. Uniform Construction Code (Refs & Annos)
      Subchapter 2. Administration and Enforcement; Process

N.J.A.C. 5:23–2.32

5:23–2.32 Unsafe structures

Currentness

(a) All buildings or structures that shall become unsafe, or unsanitary, or that contain deficient or blocked exitway facilities, or which constitute a fire hazard or are otherwise dangerous to human life or the public welfare, or that by reason of illegal or improper use or occupancy shall be deemed unsafe buildings or structures, shall be taken down and removed or made safe and secure. A vacant building that is unguarded or open at door or window shall be deemed a fire hazard and unsafe within the meaning of this chapter.

1. Examination and record of damaged structure: The appropriate subcode official shall examine every building or structure reported as dangerous, unsafe structurally, unsanitary or constituting a fire hazard and shall prepare a report to be filed in a docket of unsafe structures and premises, stating the use of the structure, the nature of the hazard, the nature and estimated amount of damages, if any, caused by collapse or failure.

2. Notice of unsafe structure: If an unsafe or unsanitary condition is found in a building or structure, the construction official shall serve a written notice describing the building or structure deemed unsafe and specifying the required repairs or improvements to be made to render the building or structure safe and secure, or requiring the unsafe building or structure or portion thereof to be vacated or demolished within a stipulated time. Such notice shall require the person thus notified to immediately declare to the construction official his or her acceptance or rejection of the terms of the order. Such person may seek review before the Construction Board of Appeals within 15 days of receipt of the notice.

3. Restoration of unsafe structure: A building or structure condemned by the construction official may be restored to a safe condition in accordance with N.J.A.C. 5:23–6, Rehabilitation Subcode. A certificate of approval or certificate of occupancy, as appropriate, shall be obtained prior to reoccupancy of the building or structure.

4. Posting notice of unsafe structure: If the person addressed with a notice of unsafe structure cannot be found within the municipality after diligent search, then such notice shall be sent by registered or certified mail to the last known address of such person, as on file with the office of the tax collector, and a copy of the notice of unsafe structure shall be posted in a conspicuous place on the premises; and such procedures shall be deemed the equivalent of personal notice.

5. Upon refusal or neglect of the person served with a notice of unsafe structure to comply with the requirements of the order to abate the unsafe condition, the construction official shall, in addition to any other remedies herein provided, forward the matter to the legal counsel of the jurisdiction for an action to compel compliance.

(b) Emergency measures:

1. When, in the opinion of the construction official and appropriate subcode officials, there is actual and immediate danger of failure or collapse of a building or structure or any part thereof which would endanger life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the building or structure, the construction official is hereby authorized and empowered to order and require the occupants to vacate the same forthwith. The construction official shall cause to be posted at each entrance to such building a notice reading as follows: This structure is unsafe and its use or occupancy has been prohibited by the construction official, and it shall be unlawful for any person to enter such building or structure except for the purpose of making the required repairs or demolishing the same. The order of the construction official shall be effective immediately.

2. Temporary safeguards: When, in the opinion of the construction official, there is actual and immediate danger of collapse or failure of a building or structure or any part thereof which would endanger life, the construction official shall cause the necessary work to be done to render such building or structure or part thereof temporarily safe, whether or not the legal procedure herein has been instituted. Such work may include such demolition as may be necessary in order to eliminate any actual and immediate danger to human life; provided, however, that any demolition work shall not commence until at least 24 hours following service of notice of the pending demolition upon the owner, unless such service is not possible because the identity or the address of the owner cannot be determined from public records. Upon expiration of the 24–hour period, demolition may proceed unless stayed by order of the Superior Court.

3. Closing streets: When necessary for the public safety, the construction official may temporarily close sidewalks, streets, buildings and structures and places adjacent to such unsafe structure, and prohibit the same from being used.

4. Emergency repairs or demolition: For the purpose of this section, the construction official shall employ the necessary labor and materials to perform the required work as expeditiously as possible.

5. Costs of emergency repairs: Costs incurred in the performance of emergency work shall be paid from the treasury of the jurisdiction on certificate of the construction official; and the legal authority of the jurisdiction shall institute appropriate action against the owner of the premises for the recovery of such costs.

6. Appeals: An emergency order issued by a municipal construction official pursuant to this subsection shall be appealable only to a court of competent jurisdiction.

**Credits**

Amended by R.1991 d.509, effective October 7, 1991; R.1996 d.236, effective May 20, 1996 (operative January 1, 1997); R.1999 d.424, effective December 6, 1999; R.2003 d.201, effective May 19, 2003.

### CHAPTER EXPIRATION DATE

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 58, Issue 1, dated January 5, 2026. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–2.32, NJ ADC 5:23–2.32

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
   Title 5. Community Affairs
      Chapter 23. Uniform Construction Code (Refs & Annos)
         Subchapter 2. Administration and Enforcement; Process

N.J.A.C. 5:23–2.34

## 5:23–2.34 Protection of adjoining properties and public rights of way

Currentness

(a) Owners who undertake construction, rehabilitation, or demolition work at their properties shall protect adjoining properties and public rights of way from damage or hazardous conditions caused by the work.

1. In instances where it may be necessary to access the adjoining property to provide such protection, the owner intending to undertake the construction, rehabilitation, or demolition work that could potentially damage adjoining properties shall deliver written notice of such intent to the owners of the affected properties. The notice shall request written permission to enter the adjoining properties to determine the measures that must be taken to safeguard the properties from damage.

   i. Written consent from the owners of the adjoining properties must be obtained prior to entering the properties.

   ii. In those cases where owners of adjoining properties refuse access, work shall not proceed unless access to the properties is granted by the courts.

2. Upon approval of measures to safeguard adjoining properties, the owner intending to undertake the construction, rehabilitation, or demolition work shall provide a copy of the measures to the owners of adjoining properties and shall request and obtain written permission from the owners of the adjoining properties to implement the measures prior to the commencement of work.

(b) The measures to be taken to safeguard adjoining properties or public rights of way shall be submitted with the permit application for review and approval by the construction official. For projects undertaken using partial filing or partial releases, such measures shall be submitted for review and shall have been approved prior to the issuance of a construction permit for the portion of the work requiring the safeguarding of adjoining properties or public rights of way. Effective March 18, 2018:

1. Sections 3302, 3303, 3304, 3306, 3307, and 3308 of the building subcode shall be used as the minimum safeguards for all buildings and structures regulated by the one- and two-family dwelling subcode.

2. Where necessary to protect the public right of way, sidewalk, or street bridging, designed in accordance with the applicable requirements of the building subcode, shall be installed over public rights of way to protect persons and vehicles. Construction documents prepared by a design professional shall be submitted and released prior to the installation of sidewalk or street bridging. The sidewalk or street bridging shall be inspected and certified by the licensed design

professional prior to the start of construction work that may threaten the public right of way. The released drawings shall be available, upon request, at the site while the sidewalk or street bridging is in place.

(c) Effective March 18, 2018, for cranes of more than 160 feet in height, including jibs and any other extensions to the boom, located on a construction site or for cranes of more than 50 feet in height with a maximum rated capacity of greater than 20 tons located in a public right of way, measures shall be taken to protect adjoining property and public rights of way from any hazard to life or property that may be caused by the siting or use of the crane. Such measures may be omitted where the crane placement is such that failure would impact only the construction site itself and would not imperil any adjoining property, public right of way, or any building(s) or area(s) on the same property as the construction site occupied by other than construction workers.

1. An owner intending to use a crane that is sited on or lifts over a public way shall obtain approval from the local police or traffic safety department or the appropriate county or State authority. Approval to close the street and sidewalk while the crane is in operation shall be accepted as adequately protecting the public right of way.

2. Documentation for operation of a crane shall include a site plan indicating crane placement, support, or foundation, as appropriate, reach and lift limits, crane operating procedures to be followed under various wind or other environmental conditions, and any plans in place to control operation of the crane to minimize risk to adjoining property or public rights of way.

3. For erection of a tower crane, the required documentation shall include a signed and sealed plan for the footing layout and design, including a soils report, and a certification by the design professional of record that installation was performed in accordance with this plan and the manufacturer's specifications for the crane.

i. The tower and base shall have elevations shot to confirm that no movement has occurred after jumps. Additionally, the entity owning or operating the crane(s) shall maintain weekly reports of maintenance and connections to superstructure, as inspected and certified by the design professional.

**Credits**
Repealed by R.1996 d.236, effective May 20, 1996 (operative January 1, 1997). Adopted by R.2008 d.39, effective March 3, 2008. Amended by R.2017 d.234, effective December 18, 2017.

**CHAPTER EXPIRATION DATE**

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 57, Issue 24, dated December 15, 2025. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–2.34, NJ ADC 5:23–2.34

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case: 25-3567    Document: 29    Page: 79    Date Filed: 06/05/2026

New Jersey Administrative Code
  Title 5. Community Affairs
    Chapter 23. Uniform Construction Code (Refs & Annos)
      Subchapter 4. Enforcing Agencies; Duties; Powers; Procedures

N.J.A.C. 5:23–4.4

5:23–4.4 Municipal enforcing agencies—organization

Effective: April 1, 2024
Currentness

(a) The municipality shall organize its enforcing agency in accordance with the ordinance adopted pursuant to N.J.A.C. 5:23–4.3 and to meet the following additional requirements:

1. Construction official: The construction official shall serve as the chief administrator of the enforcing agency. He shall establish the day to day operating routines of the agency and shall coordinate the activities of the subcode officials. He shall be qualified in accordance with subchapter 5 of this chapter in at least one subcode.

2. Subcode officials: Subcode officials shall enforce the provisions of those subcodes for which they are responsible in accordance with N.J.A.C. 5:23–3 and qualified in accordance with N.J.A.C. 5:23–5 and for which they have been appointed by the appointing authority. Each subcode official shall be responsible for the administration and enforcement of the appropriate subcode, subject to the procedures of the enforcing agency as administered by the construction official. However, each subcode official shall have exclusive decision-making authority with respect to the technical provisions of the subcode for which he has been appointed the official.

3. Interface: Nothing shall prevent one person from serving in more than one position for which he is certified and qualified. However, more than one person shall not be appointed concurrently to the same position.

4. Assistants: The appointing authority may establish positions other than those provided in N.J.A.C. 5:23–5 as is deemed necessary. The commissioner reserves the right to establish categories of certification for such positions. The construction official or appropriate subcode official shall be responsible for the supervision of any such personnel.

5. Whenever the municipality contracts with private on-site inspection agencies for all subcodes, it shall as a minimum appoint a construction official to coordinate activities.

6. Acting appointments: A municipality shall appoint an acting construction official or subcode official any time the absence of such official would impede orderly administration of the Uniform Construction Code and other duties mandated by the municipality. Acting appointments shall be accomplished by any mechanism acceptable to the municipality; providing, however, that a written record shall be kept. Notice to the Department shall be provided within seven days any time an appointment is made for more than 30 days. Acting appointments may not be made for longer than 60 days, nor may they be extended or renewed beyond 60 days unless specific authority to do so is granted in writing by the Department.

i. Only an individual licensed as a construction official may be appointed as an acting construction official and only an individual licensed as a subcode official in a particular subcode may be appointed as an acting subcode official for that subcode. The technical license level of an acting construction or subcode official shall be superior or parallel to the enforcing agency classification of the municipality or such municipal classification shall be downgraded to the technical license level of the acting official for the period of time in the position. Employees of private on-site inspection agencies shall not serve as acting construction officials. Employees of private on-site inspection agencies may serve as acting subcode officials, provided that notice of any such appointment shall be given to the Department by the construction official within seven days of the making of the appointment and that such notice shall contain information as to the form and amount of the payment being made to the agency for the services of the acting subcode officials.

ii. Acting appointments shall not constitute the statutory four-year term for construction and subcode officials or any portion thereof.

iii. Conflict of interest provisions set forth in this subchapter shall apply to acting officials.

iv. Nothing in (b) of this section shall be interpreted as prohibiting licensed officials from serving in more than one municipality in regular or acting appointments.

7. The municipality shall provide the construction official, each subcode official and each inspector with personal identification which includes at least the name of the municipality, and the name, title and photograph of the individual. The identification shall be validated by the municipality.

8. A municipality may, in its discretion, employ a mechanical inspector to perform plan review and mechanical inspections, with oversight by a designated subcode official, for structures of Group R-3 or R-5.

9. Provisions concerning reappointment of construction and subcode officials in non-civil service municipalities are as follows:

i. At least 30 days prior to the expiration of the statutory four-year term of office of a construction or subcode official, the appointing authority shall give written notice to the official indicating whether or not he or she is going to be reappointed.

ii. In the event that the official is neither reappointed, nor given written notice that he or she is not being reappointed, prior to the date of expiration of the statutory four-year term of office, the official shall be deemed to have been appointed to serve in an acting capacity for a period of not more than 60 days, in accordance with (a)6 above. The municipality is not relieved of the obligation, pursuant to (a)6 above, to notify the Department within seven days any time any acting appointment will exceed 30 days.

iii. In the event that the official is neither reappointed, nor given written notice that he or she is not being reappointed, prior to the expiration of the 60–day period following the date of expiration of the prior statutory four year term of office, the Department, in such circumstance, shall not extend any such acting appointment and the official shall be

deemed to have been reappointed, such reappointment being effective retroactively to the date of expiration of the prior statutory four-year term.

(b) The municipality shall establish a central permit office under the direction and supervision of the construction official. This office shall receive applications for construction permits and plan review, issue construction permits and certificates of occupancy, collect fees, penalties, fines and issue notices, and orders. The office shall be open during normal business hours at times to be determined by the municipality. These times shall be posted in a conspicuous place and shall be comparable with the amount of construction activity in the municipality. Nothing herein shall prevent a municipality from establishing branch offices, but the public shall not, unless in the case of an emergency, unforeseen or unavoidable circumstance, be required to do business, except at the central permit office.

(c) The construction official and the subcode officials shall be available for consultation and discussion during normal business hours at scheduled times to be determined by the construction official. All inspections may take place between 7:00 A.M. and 6:00 P.M. on business days or on days and at times at which construction is taking place or at such other times as may be acceptable to the owner or the owner's representative, or otherwise in case of emergency.

(d) The municipality shall ensure that the enforcing agency has adequate staff to review plans, applications, and specifications, and to schedule and perform inspections in a timely manner, or that supplemental arrangements are in place pursuant to (e) below.

1. On or before February 10 of each year, in a municipality that budgets according to the calendar year (January 1 through December 31), or on or before August 10 of each year, in a municipality that budgets according to the State fiscal year (July 1 through June 30), the construction official shall prepare and submit to the Director of the Division of Codes and Standards, a plan documenting the means the enforcing agency will use to meet the expected demand for service in the coming year in order to conduct the inspections to be performed pursuant to N.J.A.C. 5:23–2.17A and 2.18, as applicable, are conducted within the timeframes required by those sections.

i. The plan shall include an analysis of expected demand for all services including, but not limited to, review of open permits; development projects pending before the planning board; the historic demand for inspections for minor work, alterations, and additions; and the total number of staff hours necessary to perform the work. The plan is to contain details by each code discipline and shall be provided on Form F XX, established by the Department.

ii. The plan shall identify current staffing levels in the enforcing agency and determine whether such staff shall meet the expected demand. If the enforcing agency has entered into a shared services agreement or contracted with an on-site inspection and plan review agency or a private on-site inspection agency, including a supplemental private on-site inspection agency, the plan shall so specify and determine whether such alternative arrangements in addition to enforcing agency staff will meet the expected demand.

iii. If the construction official determines that insufficient resources exist within the enforcing agency to meet the forecasted demand, the construction official shall detail the measures that the enforcing agency plans to take to meet expected demand to comply with the requirements at N.J.A.C. 5:23–2.17A and 2.18 and this subsection.

(1) If additional staffing is proposed, the plan shall include the amount of such staff and the timetable by which such staff will be hired.

(2) If the enforcing agency has entered into a shared services agreement contract or contracted with an on-site inspection and plan review agency or a private on-site inspection agency, including a supplemental private on-site inspection agency, the plan shall so specify.

(3) If the construction official plans to enter into new shared services agreements or contract with an on-site inspection and plan review agency or a private on-site inspection agency, including a supplemental private on-site inspection agency, the report shall describe the functions expected to be undertaken by the additional parties to such anticipated agreements.

(e) The municipality shall establish a process for ensuring inspections are performed pursuant to N.J.A.C. 5:23–2.17A or 2.18, as applicable. Authorized processes include, but are not limited to, entering into contracts for supplemental shared service agencies pursuant to N.J.A.C. 5:23–4.6 or supplemental private on-site inspection agencies in accordance with N.J.A.C. 5:23–4.16, as a means to offset inspections in order to meet all inspection deadlines.

1. Any contract between a local enforcing agency and another agency for supplemental shared services or supplemental private on-site inspection agencies shall detail the nature and projected number of inspections expected to be undertaken during the valid period of the contract.

2. The process established may include hiring additional staff to meet the demand for inspections.

**Credits**
Amended by R.1982 d.23, effective February 1, 1982; R.1993 d.187, effective May 3, 1993; R.1994 d.323, effective July 5, 1994 (operative January 1, 1995); R.1996 d.387, effective August 19, 1996 (operative November 1, 1996); R.2004 d.67, effective February 17, 2004; R.2007 d.143, effective May 7, 2007. Amended by 50 N.J.R. 1888(a) R.2018 d.153, effective August 20, 2018; 56 N.J.R. 469(a) R.2024 d.028, effective April 1, 2024.

**CHAPTER EXPIRATION DATE**

<Chapter 23, Uniform Construction Code, expires on February 9, 2029.>

Current through amendments included in the New Jersey Register, Volume 58, Issue 1, dated January 5, 2026. Some sections may be more current, see credits for details.

N.J.A.C. 5:23–4.4, NJ ADC 5:23–4.4

New Jersey Administrative Code
   Title 5. Community Affairs
      Chapter 23A. Construction Boards of Appeals (Refs & Annos)
         Subchapter 2. Board Procedures

N.J.A.C. 5:23A–2.1

5:23A–2.1 Hearing applications

Currentness

(a) A person who is aggrieved by any ruling, action, notice, order or decision of a local enforcing agency that enforces either the State Uniform Construction Code or the Uniform Fire Code, including, without limitation, any refusal to grant an application or any failure or refusal to act upon an application, but not including any order requiring the taking of emergency measures pursuant to N.J.A.C. 5:23–2.32(b), may file an application for a hearing with the secretary of the construction board of appeals having jurisdiction.

   1. Any such application shall be filed by the 15th day after receipt by the person of written notice of the ruling, action, order or notice complained of, or, in the case of inaction by a local enforcing agency, by the 15th day after the expiration of the period allowed for action by the local enforcing agency.

(b) In cases arising under P.L. 1995, c.54 or P.L. 1999, c.11, an applicant for approval who is aggrieved by any charge to an escrow account or a deposit by any municipal or municipal utilities authority or sewerage authority professional or consultant, or the cost of the installation of improvements estimated by the municipal or municipal utilities authority or sewerage authority engineer, may file an appeal with the county construction board of appeals.

   1. Any such appeal shall be filed within 45 days from receipt of the informational copy of the professional's voucher or the notice from the municipal or municipal utilities authority or sewerage authority engineer, as the case may be; provided, however, that if the professional has not supplied an applicant with an informational copy of the voucher, any appeal shall be filed within 60 days of receipt of the municipal statement of activity against the deposit or escrow account.

   2. An applicant may file an appeal regarding an ongoing series of charges by a professional during a period not exceeding six months to demonstrate that they represent a pattern of excessive or inaccurate charges; such charges need not be appealed individually.

(c) The appeal shall be in writing and shall briefly set forth the appellant's position. It shall include the name and address of the applicant, the address of the building or site in question, and the permit number (if applicable), and shall reference the specific provision(s) of a statute or rule upon which the applicant is relying and set forth the extent and nature of the applicant's reliance upon such provision(s). The applicant may append to the written application any data or information that he or she may deem appropriate. In the case of an appeal arising under P.L. 1999, c.11, the applicant shall include a statement specifically outlining the dates, time and personnel in dispute.

1. Upon receipt of a copy of the application for a hearing, the enforcing agency (or, in the case of an appeal under P.L. 1995, c.54 or P.L. 1999, c.11, the municipality, the municipal utilities authority or sewerage authority, the approving authority and/or professional) shall provide the construction board of appeals with a copy of the full record of the application below, including a detailed explanation of the reasons for denial of the applicant's request.

(d) Simultaneously with the filing of any application for a hearing, the person filing the application shall provide a copy thereof to the local enforcing agency or, in the case of an appeal under P.L. 1995, c.54 or P.L. 1999, c.11, to the municipality or municipal utilities authority or sewerage authority, the approving authority and any professional whose charge is the subject of the appeal. Proof of compliance with this requirement shall be filed with the board secretary. Such proof may be in the form of a certified mail receipt, a signed receipt for personal delivery or a sworn statement.

(e) The application shall be accompanied by a fee in the sum of $50.00, or such other fee not exceeding $100.00 as may be established by the county or municipal governing body having jurisdiction over the board or by interlocal agreement, as the case may be. An application shall not be considered complete unless accompanied by the fee; provided, however, that the fee shall be waived where the application is based upon the failure of an enforcing agency to act within a required time frame.

**Credits**
Amended by R.2003 d.201, effective May 19, 2003; R.2004 d.36, effective January 20, 2004.

**CHAPTER EXPIRATION DATE**

<Chapter 23A, Construction Boards of Appeals, expires on December 17, 2027.>

Current through amendments included in the New Jersey Register, Volume 57, Issue 24, dated December 15, 2025. Some sections may be more current, see credits for details.

N.J.A.C. 5:23A–2.1, NJ ADC 5:23A–2.1

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1971807
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Wilson X. BEZERRA, Plaintiff-Appellant,

v.

TOWNSHIP OF BELLEVILLE and Frank
DeLorenzo, Defendants-Respondents.

Argued June 1, 2006.
|
Decided July 17, 2006.

On appeal from the Superior Court of New Jersey, Law
Division, Essex County, L-2454-05.

**Attorneys and Law Firms**

Wilson X. Bezerra, appellant, argued the cause pro se.

Robert V. Fodera argued the cause for respondents (Gebhardt
& Kiefer, attorneys; Richard P. Cushing, of counsel; Mr.
Fodera, on the brief).

Before Judges WEISSBARD and SAPP-PETERSON.

**Opinion**

PER CURIAM.

 **\*1** Plaintiff Wilson X. Bezerra appeals the entry of an order
dated October 21, 2005, granting summary judgment in favor
of defendants Township of Belleville (Township) and Frank
DeLorenzo, dismissing his complaint for failure to state a
claim upon which relief may be granted. *R.* 4:6-2(e). We
affirm the dismissal in favor of the Township but reverse the
order dismissing the complaint against DeLorenzo.

Plaintiff's complaint arose out of his effort to secure building
permits to construct an addition to a structure and to construct
a modular house on another property. Both properties were
located in Belleville, New Jersey. Plaintiff claims that
defendant DeLorenzo deliberately and maliciously delayed
conducting the necessary inspections for the room addition,
which resulted in a header beam falling, causing considerable

damage to the property. With respect to the modular house,
plaintiff contends DeLorenzo deliberately and maliciously
caused further delays by raising various objections to
paperwork and alleging the project was not being constructed
in accordance with the plans. DeLorenzo issued a stop-work
order for the modular project. Plaintiff appealed that decision
to the Essex County Construction Board (Construction
Board). Following a hearing, the Construction Board found
the proposed structure was a three-story building, while
the permit issued "was for a two (2) to two and one-half
(2 1/2) story building." It upheld the stop-work order but
lifted the order for the sole purpose of enabling plaintiff
to install a roof truss system. Plaintiff then applied to
the Zoning Board of Adjustment (Board) for permission
to build a two-family structure on the premises. Plaintiff
also sought an interpretation of the definition of "story"
or, alternatively, a bulk variance to allow a three-story
structure. Following a hearing, the Board denied plaintiff's
application and memorialized its decision in an August 5,
2003, resolution. The Board found that the proposed structure
was a three-story building and that plaintiff had failed to prove
the need for such a structure on the property. The Board also
found:

> [T]he structure would not blend in with the type of
> residential structures in the area and would be somewhat of
> an aberration in its appearance and as a result the Applicant
> failed to meet the negative criteria in that this Application
> cannot be granted without substantial detriment to the
> public good and without impairing the intent and purpose
> of the zoning ordinance.

Plaintiff ultimately complied with the Township
requirements, and a certificate of occupancy was issued on
January 28, 2005. Plaintiff filed a complaint on March 29,
2005, and an amended complaint on August 16, 2005. In the
initial complaint, plaintiff alleged the Township negligently
supervised its employees, acted arbitrarily and unreasonably
with respect to the approval of plaintiff's construction plans,
and selectively prosecuted him. In the amended complaint,
it is alleged that DeLorenzo selectively prosecuted and
persecuted plaintiff, abused the power of his position, and
acted maliciously, intentionally, and willfully.

 **\*2** In lieu of filing an answer, defendants filed a motion to
dismiss the complaint for failure to state a claim upon which
relief may be granted. *R.* 4:6-2(e). Defendants raised defenses
under the New Jersey Tort Claims Act (Act), *N.J.S.A.* 59:1-1
to 12-3. They urged plaintiff's claims were barred pursuant
to *N.J.S.A.* 59:2-5, which immunizes a public entity for any
injury caused by the "failure or refusal to issue, deny, suspend

or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or public employee is authorized by the law to determine whether or not such authorization should be issued, denied, suspended or revoked[;]" *N.J.S.A.* 59:3-3, which immunizes public employees in the good faith execution and enforcement of any law; *N.J.S.A.* 59:3-8, which grants immunity to public employees arising out of the institution or prosecution of any judicial or municipal proceeding within the scope of the employee's employment; *N.J.S.A.* 59:3-9, which immunizes a public employee against a claim of trespass where entry is expressly or impliedly authorized by law; and *N.J.S.A.* 59:9-2(d), which bars recovery for pain and suffering unless the claimant vaults the statutory threshold.

In granting summary judgment, the motion judge found:

> The problem with the papers in this particular case is that all of the acts committed by Mr. DeLorenzo were supported by all the boards and appeared to be within the scope of his employment. Regardless of what his intent, whether there was any actual malice, the fact of the matter it appears that all of the acts were within the scope of his employment and approved and confirmed by the board, which has never been overturned.

The standard under which motions to dismiss are decided is well established in New Jersey. *F.G. v. MacDonell,* 291 *N.J.Super.* 262, 266 (App.Div.1996), *aff'd in part and rev'd in part on other grounds,* 150 *N.J.* 550 (1997). Trial courts should 'approach with great caution applications for dismissal under *R.* 4:6-2(e) based on the failure of a complaint to state a claim on which relief may be granted.' *Ibid.* (quoting *Printing Mart-Morristown v. Sharp Elec. Corp.,* 116 *N.J.* 739, 771-72 (1989)). The test for determining the adequacy of a pleading is whether a cause of action is 'suggested' by the facts. *Ibid.* "[T]he inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." *Ibid.* For purposes of the analysis, a plaintiff is entitled to have the complaint searched " 'in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.' " *Printing Mart-Morristown, supra,* 116 *N.J.* at 746 (quoting *Di Cristofaro v. Laurel Grove Mem'l Park,* 43 *N.J.Super.* 244, 252 (App.Div.1957)). Therefore, every reasonable inference will be given to a plaintiff and the motion will be granted only

in rare instances and generally, without prejudice. *Smith v. SBC Communs. Inc.,* 178 *N.J.* 265, 282 (2004). Thus, for such motions, all well-pled allegations of the complaint are accepted as true and the matter is to be resolved based on the pleadings themselves.

**\*3** We review the grant of such a motion by the same standard applied by the trial court. *Donato v. Moldow,* 374 *N.J.Super.* 475, 483 (App.Div.2005). Thus, considering and accepting as true the facts alleged in the complaint, we determine whether they set forth a claim upon which relief can be granted. *Ibid.* Here, when plaintiff's pleadings are viewed under this standard, he alleges facts which demonstrate that the actions of defendant DeLorenzo, though authorized, were undertaken deliberately and maliciously. These alleged acts included the deliberate and intentional delay in approving plaintiff's application, purposely and illegally altering construction permits, and, when plaintiff appealed the stop-work order, issuing forty-seven building code violations, which plaintiff claims were ultimately dismissed.

The motion judge reasoned that all defendant DeLorenzo's actions were supported by all the boards and appeared to be within the scope of his employment. The judge therefore concluded that [r]egardless of [defendant's] intent, whether there was any actual malice, the fact of the matter it appears that all of the acts were within the scope of his employment and approved and confirmed by the board, which has never been overturned.

We agree that the immunity provisions of the Act related to the issuance or denial of a certificate and the enforcement of laws provide absolute immunity to the Township. *N.J.S.A.* 59:2-4; 59:2-5. We do not agree, however, that the allegations as pled against DeLorenzo are entitled to similar protections at this stage in the litigation simply because "it appears that all of the acts were within the scope of his employment and approved and confirmed by the board, which has never been overturned."

*N.J.S.A.* 59:3-14 provides:

> a. Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or *constituted a crime, actual fraud, actual malice or willful misconduct.*

b. Nothing in this act shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment or constituted a *crime, actual fraud, actual malice or willful misconduct.*

[ (emphasis added).]

The plain language of *N.J.S.A.* 59:3-14 is beyond dispute. The use, in this section, of the term, "or," between the scope of employment provision and the conduct provision evidences the legislative intent to create an exception based upon conduct independent of the employee's authority to engage in the conduct.

"Statutory interpretation requires attention to the Legislature's intent, which is to be sought initially in the plain language of the statute." *Taglieri v. Moss,* 367 *N.J.Super.* 184, 195-96 (App.Div.2004) (citing *Frugis v. Bracigliano,* 177 *N.J.* 250, 280 (2003)). *See also* *Velez v. City of Jersey City,* 180 *N.J.* 284, 294 (2004). " 'Where statutory language is clear, courts should give it effect unless it is evident that the Legislature did not intend such meaning.' " *Bubis v. Kassin,* 184 *N.J.* 612, 626 (2005) (quoting *Rumson Estates, Inc. v. Mayor & Council of Fair Haven,* 177 *N.J.* 338, 354 (2003)).

**\*4** This section establishes what the Court in *Tice v. Cramer,* 133 *N.J.* 347 (1993), characterized as the outer limit for immunity imposed for conduct performed within the scope of employment. *Id.* at 375. Therefore, conduct that may be within the scope of an employee's employment, but is actuated by actual malice or willful misconduct, will not necessarily enjoy the protections of the Act. *See* *Fielder v. Stonack,* 141 *N.J.* 101, 127-28 (1995); *Hopkins v. City of Gloucester,* 358 *N.J.Super.* 271, 281-82 (App.Div.2003). Consequently, the exceptions act as a limitation on the immunity provisions of *N.J.S.A.* 59:3-2 and 59:3-3.

*See* *Fielder, supra,* 141 *N.J.* at 123; *B .F. by B.F. v. Div. of Youth & Family Servs.,* 296 *N.J.Super.* 372, 386 (App.Div.1997). *N.J.S.A.* 59:3-14 does not, however, establish an independent basis upon which to impose liability upon a public employee. *See* *Timber Properties, Inc. v. Twp. of Chester,* 205 *N.J.Super.* 273, 286 (Law Div.1984).

Thus, in evaluating the interaction between the immunity provisions of the Act and the exceptions under *N.J.S.A.* 59:3-14, courts must first determine whether the employee is immune and then consider whether an exception applies. *See* *Clarke v. Twp. of Mt. Laurel,* 357 *N.J.Super.* 362, 368 (App.Div.2003). Although, a board's approval of an employee's conduct may be evidence that the employee was properly exercising his or her discretion under *N.J.S .A.* 59:3-2 or acting in "good faith" under *N.J.S.A.* 59:3-3, that approval does not establish immunity for actions that are illegal, malicious or intentional. *Velez, supra,* 180 *N.J.* at 291.

We are persuaded that at this early stage of the litigation, plaintiff has set forth allegations against DeLorenzo sufficient to survive a motion to dismiss. In addition, dismissal of plaintiff's complaint, based upon the additional claim that plaintiff's injuries fail to vault the threshold provisions under *N.J.S.A.* 59:9-2(d), is premature in light of our decision in *Taglieri, supra,* 367 *N.J.Super.* at 196. There, we held the threshold provisions under this section do not apply where a public employee engages in willful misconduct under *N.J.S.A.* 59:3-14. *Ibid.* Finally, plaintiff's claim for punitive damages remains viable at this stage of the proceedings. *See* *Kelly v. County of Monmouth,* 380 *N.J.Super.* 552, 565 (App.Div.2005).

Affirmed in part and reversed in part.

**All Citations**

Not Reported in A.2d, 2006 WL 1971807

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

679 Fed.Appx. 150
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Edward BUTTON; Sandra Button;
Button Oil Company, Inc., Appellants

v.

Alan SNELSON; Dorrance Township

No. 16-1835
|
Submitted Pursuant to Third Circuit
L.A.R. 34.1(a) December 5, 2016
|
(Filed: February 10, 2017)

**Synopsis**
**Background:** Property owners brought action against township zoning officer and township, alleging that their substantive due process rights were violated by officer's enforcement activities. The United States District Court for the Middle District of Pennsylvania, Robert D. Mariani, J., 2016 WL 1252784, entered summary judgment in favor of officer and township. Owners appealed.

**Holdings:** The Court of Appeals, Fischer, Circuit Judge, held that:

[1] zoning officer's conduct did not violate owners' substantive due process rights, and

[2] district court did not erroneously find that owners filed an application for zoning variance.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**West Headnotes (2)**

**[1]    Constitutional Law** 🔑 Particular issues and applications

**Zoning and Planning** 🔑 Constitutional and civil rights in general

92    Constitutional Law
92XXVII    Due Process
92XXVII(G)    Particular Issues and Applications
92XXVII(G)3    Property in General
92k4091    Zoning and Land Use
92k4093    Particular issues and applications
414    Zoning and Planning
414XI    Enforcement of Regulations
414k1767    Defenses to Enforcement
414k1774    Constitutional and civil rights in general

Township zoning officer did not violate property owners' substantive due process rights when he initiated enforcement activities against them for storing underground petroleum tanks without proper zoning permits, since officer's actions did not shock the conscience, but rather were within his permitted regulatory authority, and were motivated by owners' noncompliance with zoning ordinances, not out of bare concern over the inherent danger of petroleum. U.S. Const. Amend. 14.

13 Cases that cite this headnote

**[2]    Zoning and Planning** 🔑 Review

414    Zoning and Planning
414XI    Enforcement of Regulations
414k1811    Review

Was application for zoning variance filed? Yes
Material Facts

- Although property owners claimed they never applied for variance, and only appeared before township zoning board by reason of enforcement actions taken by township zoning officer, who alleged owners were

operating business illegally, owners admitted board issued favorable decision on application

• Owners used favorable ruling to attack officer's decision to continue to pursue legal remedies after board's decision was issued

Causes of Action

Zoning Violation

District court did not erroneously find that property owners filed an application for zoning variance for the underground storage of petroleum tanks on their property, even though they claimed they never applied for a variance but merely appeared before township zoning board by reason of enforcement actions taken by township zoning officer, who alleged that owners were operating a business illegally, since owners admitted that the zoning hearing board issued a favorable decision on their application and they then used that favorable ruling to attack zoning officer's decision to continue to pursue legal remedies after the board's decision was issued.

More cases on this issue

**\*151** On Appeal from the United States District Court for the Middle District of Pennsylvania, (M.D. Pa. No. 3-12-cv-01941), District Judge: Honorable Robert D. Mariani

**Attorneys and Law Firms**

Bruce J. Phillips, Esq., Wetzel Phillips Rodgers & Falcone, Plains, PA, for Plaintiffs-Appellants

John J. Mahoney, Esq., Siana Bellwoar & McAndrew, Chester Springs, PA, for Defendants-Appellees

Before: FISHER[*], KRAUSE and MELLOY[**], Circuit Judges.

[*]     Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

[**]     Honorable Michael J. Melloy, Senior Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

OPINION[***]

[***]     This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

FISHER, Circuit Judge.

In this land-use dispute, Edward and Sandra Button claim the District Court erred in granting summary judgment against them on their Fourteenth Amendment due process claims, brought under 🚩42 U.S.C. § 1983. We will affirm the District Court's order and final judgment in favor of Alan Snelson and Dorrance Township.

**\*152** I.

The Buttons are the acting owners and operators of the Blue Ridge Truck Stop in Dorrance Township, Pennsylvania. In 1991, they received conditional land development approval from the Dorrance Township Board of Supervisors to operate Blue Ridge as "a gas station, truck fueling stop and convenience store."[1] This approval was conditioned upon the authorization of an "Erosion and Sedimentation Control Plan" and the issuance of a Highway Occupancy Permit. The Buttons admit they did not obtain an approved Sedimentation Control Plan until 2011 or receive the required Highway Occupancy Permit before filing this lawsuit in 2012. The first official recording of an approved land development plan did not occur until nearly twenty-three years after the initial conditional approval and twenty months after the Buttons filed their complaint in the District Court.

[1]     App. 4a.

The 1991 approval did not authorize the "storage, distribution or sale of propane." Nevertheless, in 2010, the Buttons applied to Dorrance Township for a zoning permit to construct a fence to enclose a "bulk propane storage facility."[2] Believing the Buttons' intended propane usage was "subject to land use regulations that require[d] approval beyond what [they] had already obtained," part-time zoning officer

Alan Snelson wrote the Buttons a letter styled as a "Cease and Desist Order."[3] The letter outlined "a list of items" required for compliance, requested documentation regarding "approvals that have been granted for the operations being conducted at the 'storage building,' " and warned of potential enforcement remedies (for example, civil action) available to the Township if the Buttons failed to comply.[4]

[2]     App. 7a.

[3]     App. 7a, 64a.

[4]     App. 64a-65a.

The Buttons' attorney responded to Snelson, asserting that the Buttons' propane storage complied with Dorrance Township's relevant requirements. Snelson replied with a "multitude of mail and email letters," reiterating his stance that "further zoning and land approvals [were required] for the operation of a bulk propane storage and distribution business on their property."[5] Snelson also "notified" the Buttons that the Township intended to take legal action against them for their ongoing violations; told the Buttons' employees at Blue Ridge he could "shut them down"; and said to Sandra Button when presented with the original land development plan, "This means nothing. See this new book? It draws a line in the sand. You're starting over."[6]

[5]     App. 9a-10a.

[6]     App. 12a, 20a, 21a. The book Snelson referenced is unclear.

Contrary to municipal protocol, Snelson initiated his own lawsuit against the Buttons in state court, listing himself (i.e., the "Dorrance Township Zoning Officer") as plaintiff. His complaint alleged that the Buttons "failed to receive all appropriate permits and land development approvals" and sought $12,000 in damages.[7] After a January 2012 hearing in state court, Snelson directed an *ex parte* correspondence to the presiding District Judge's attention to "wrap-up ... what was said."[8] The judge ultimately entered a default judgment for the Buttons, and no appeal was taken.

[7]     App. 16a.

[8]     App. 17a.

**\*153**  Around this time, the Zoning Hearing Board determined that a zoning variance was not necessary for the Buttons because their construction of the propane facility at Blue Ridge was a valid, non-conforming use. Even so, the land development approval for the property remained outstanding until May 2014.

The Buttons sued Snelson and Dorrance Township in the District Court for the Middle District of Pennsylvania in September 2012, alleging violations of their procedural and substantive due process rights under the Fourteenth Amendment. The Buttons sought compensatory damages for lost income and injury to their business reputation, as well as punitive damages against Snelson. Both parties moved for summary judgment. The District Court denied the Buttons' motion but granted Snelson and Dorrance Township's motion, entering final judgment in their favor. This timely appeal followed.

II.[9]

[9]     The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

We review the District Court's disposition of a summary judgment motion *de novo*, applying the same standard as the District Court. Summary judgment is appropriate if the movant shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.[10]

[10]     *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014); *see* Fed. R. Civ. P. 56(a).

III.

On appeal, the Buttons argue that the District Court (A) improperly concluded that Snelson's conduct did not meet the "shock-the-conscience" test for substantive due process violations and (B) erroneously found that the Buttons applied for a zoning variance. We consider each argument in turn.

A.

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by

the Constitution or laws of the United States."[11] A substantive due process violation occurs if a government official engages in "an abuse of executive power so clearly unjustified by *any* legitimate objective of law enforcement" that it is barred by the Fourteenth Amendment.[12] To establish a *prima facie* case under ⚑ § 1983, the Buttons must show that (1) Snelson deprived them of a substantive due process right (2) under color of state law.[13] The first prong of the analysis requires the Buttons to prove that the "particular interest at issue is protected by the substantive due process clause and the **\*154** government's deprivation of that protected interest shocks the conscience."[14]

[11]   ⚑ *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.,* 422 F.3d 141, 146 (3d Cir. 2005). The Buttons' complaint alleged procedural and substantive due process claims. However, the Buttons do not argue that Dorrance Township "violated their rights by failing to provide them with adequate procedures to remedy any deprivation that Snelson might have inflicted." App. 27a. Rather, they assert that Snelson exercised his official power without reasonable justification. We therefore agree with the District Court that this matter is one of substantive due process only.

[12]   ⚑ *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (emphasis added).

[13]   *See* ⚑ *Shuman,* 422 F.3d at 146.

[14]   *See* ⚠ *Chainey v. Street,* 523 F.3d 200, 219 (3d Cir. 2008).

 **[1]**   There is no dispute that the Buttons have a fundamental property interest in their business protected under the Fourteenth Amendment Due Process Clause. However, we agree with the District Court that no reasonable jury could find that Snelson's conduct "shocks the conscience."

"The 'shocks the conscience' standard encompasses 'only the most egregious official conduct' "[15] and prevents this Court from "being cast in the role of a 'zoning board of appeals.' "[16] Conduct that may shock the conscience varies "depending on the factual context."[17] In the land-use context, we look for evidence of corruption, self-dealing, intentional interference with constitutionally protected activity, virtual "takings," or bias against an ethnic group on the part of

local officials.[18] In ⚑⚠ *Eichenlaub v. Township of Indiana,* for example, a landowner alleged that township officials violated his due process rights by applying subdivision requirements inconsistently, pursuing "unannounced and unnecessary inspection and enforcement actions," delaying permits and approvals, increasing tax assessments, and "malign[ing] and muzzl[ing]" him.[19] We concluded that the alleged misconduct did not "rise sufficiently above that at issue in a normal zoning dispute to pass the 'shocks the conscience test' " and that the allegations mirrored ordinary disagreements frequent in planning disputes.[20]

[15]   ⚑⚠ *United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 400 (3d Cir. 2003) (quoting ⚑ *Lewis,* 523 U.S. at 846, 118 S.Ct. 1708).

[16]   ⚑⚠ *Id.* at 402 (quoting ⚑⚠ *Creative Env'ts, Inc. v. Estabrook,* 680 F.2d 822, 833 (1st Cir. 1982)).

[17]   ⚑⚠ *Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 286 (3d Cir. 2004) (quoting ⚑⚠ *United Artists,* 316 F.3d at 400).

[18]   ⚑⚠ *Id.*

[19]   ⚑⚠ *Id.*

[20]   ⚑⚠ *Id.*

Guided by ⚑⚠ *Eichenlaub,* we see no evidence in this record from which a reasonable jury could find that racial invidiousness, corruption, or self-dealing motivated Snelson's enforcement activities. Rather, the evidence suggests Snelson very consistently, although somewhat misguidedly, pursued one goal: the Buttons' compliance with township-zoning and land-development requirements to legitimize their storage of propane at Blue Ridge. The Buttons point to evidence that Snelson "rudely" told Sandra Button, "You're starting over." But given that the Buttons had yet to comply with the original land development approval plan when Snelson began his enforcement activities and that they had been noncompliant for twenty years, we agree with the District Court that Snelson's alleged statements do not create a triable issue of fact exposing him to constitutional liability. Though a reasonable jury may view Snelson's actions as overzealous or ill-advised—particularly his state court lawsuit and *ex parte* communications with the District Judge—merely negligent

or sometimes contentious performance of official duties, like Snelson's, does not shock the conscience.

Attempting to show conscience-shocking conduct, the Buttons argue that no legal justification existed for Snelson's enforcement activities. They assert that their zoning district allows propane storage, that Snelson's attempts to regulate their propane storage is preempted by the Pennsylvania Propane and Liquefied Petroleum **\*155** Gas Act, and that Snelson's enforcement actions were impermissibly motivated by the "inherent danger" of propane rather than traditional zoning functions. Untangling these assertions, we agree with the District Court that "many of the issues in this case arise out of confusion concerning the overlap and the relationships between zoning board approval, land development approval, and the outcomes of the civil action that Snelson filed."[21] The Buttons' arguments fail for the reasons below.

[21]    App. 29a.

First, even if the Zoning Hearing Board determined that a zoning variance was not needed to approve the Buttons' propane storage facility, Snelson was still authorized to pursue the land development approval outstanding until 2014. Snelson's enforcement actions were permitted, despite the Buttons' assertions to the contrary, because he acted under municipal authority not preempted by the Pennsylvania Propane and Liquefied Petroleum Gas Act. That Act provides that "[t]he Commonwealth specifically reserves the sole right and ability to regulate any and all matters related to the operation of the Liquefied Petroleum Gas Industry."[22] Subsection 15(b)(3) of the Act states that, "[e]xcept as provided in this subsection, a municipality may not prohibit or otherwise regulate the use or storage of [Liquefied Petroleum Gas], including the location or replacement of storage tanks." However, as the District Court correctly noted, subsection 15(b)(2) provides an exception for municipal regulation. Under that subsection, a municipality retains the right under local zoning ordinances to require any Liquefied Petroleum Gas facility to locate within approved zones and "obtain zoning permits, pay zoning fees and undergo inspections." As such, we agree with the District Court that Snelson's regulatory authority was not preempted by state law as the Buttons suggest.

[22]    35 Pa. Cons. Stat. § 1329.15(a).

Further, the record supports the District Court's conclusion that the Buttons' noncompliance motivated Snelson, not his bare concern over the "inherent danger" of petroleum. The Buttons point to just one instance among Snelson's numerous correspondences where he mentions the "dangerous nature of the bulk storage of propane." But for that single instance, however, he consistently asserted that the Buttons could remedy their violations with proper Township approval and merely sought the enforcement of standard municipal policies excepted from preemption. Given these circumstances, we see no error in the District Court's analysis. Summary judgment was proper on the Buttons' due process claims.

**B.**

 **[2]**  The Buttons' second argument on appeal is that the District Court erroneously found that they filed an application for a zoning variance for the activities taking place on their property on June 23, 2011. They claim they "never applied for a variance" but merely appeared before the Dorrance Township Zoning Board "by reason of the actions of Snelson in alleging that [the Buttons'] existing business was operating illegally."[23] This argument is meritless. The Buttons admitted that the Zoning Hearing Board issued a favorable decision on their application on August 30, 2011. They then used that favorable ruling to "attack Snelson's decision to continue to pursue legal remedies after the Board's decision was issued."[24] We therefore see no **\*156** error in the District Court's finding that the Buttons filed a zoning-variance application.

[23]    Appellants' Br. 33.

[24]    App. 13a n.4.

**IV.**

For the reasons above, we will affirm the District Court's summary judgment order and final judgment.

**All Citations**

679 Fed.Appx. 150

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Duffy v. Kent County Levy Court, 591 Fed.Appx. 41 (2014)

591 Fed.Appx. 41
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Michael DUFFY, Appellant,

v.

KENT COUNTY LEVY
COURT; P. Brooks Banta.
Michael Duffy, Appellant,

v.

M. Mange, CEO; Kent County
Delaware; P. Brooks Banta, also known
as Brooke; Kent Levy Court Inc.

Nos. 14–1668, 14–1669
|
Submitted for Possible Summary Action Pursuant to
Third Circuit LAR 27.4 and I.O.P. 10.6 Oct. 23, 2014.
|
Opinion filed: Nov. 14, 2014.

**Synopsis**
**Background:** Property owner brought actions against county
levy court, county itself, and individual county officials,
alleging violations of Americans with Disabilities Act (ADA)
and unlawful seizure or taking of property under Fourth and
Fifth Amendments. The United States District Court for the
District of Delaware, Sue L. Robinson, J., 2014 WL 975139,
adopting report and recommendation of Sherry R. Fallon,
United States Magistrate Judge, 2014 WL 573345, entered
judgment for defendants. Owner appealed.

**Holdings:** The Court of Appeals held that:

[1] owner was neither excluded from participation nor denied
benefits based on his disability, precluding his ADA claims;

[2] defendants' actions did not constitute unconstitutional
taking of owner's property; and

[3] seizure of owner's property was reasonable.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (3)

[1]    **Civil Rights**  👉 Discrimination by reason of
handicap, disability, or illness

    78    Civil Rights
    78I    Rights Protected and Discrimination
    Prohibited in General
    78k1051    Public Services, Programs, and Benefits
    78k1053    Discrimination by reason of handicap,
    disability, or illness
Property owner was neither excluded from
participation nor denied benefits based on his
disability, precluding his ADA claims against
county levy court and county commissioner;
after receiving notification that structures on
his property were deemed unsafe, owner
contacted county, identified himself as disabled,
and requested assistance in complying with
condemnation order, county then met with
owner, explained demolition and rehabilitation
process, discussed permit requirements and
deadline extensions, offered to assign staff
member to assist owner, and provided owner
several extensions of time in which to correct
unsafe conditions, and only adverse action was
denial of owner's request for trash dumpster,
but this was consistent with county policy to
not provide trash dumpsters at its expense to
private land owners for activities to benefit only
one person or parcel of land. Americans with
Disabilities Act of 1990, § 202, 🚩42 U.S.C.A.
§ 12132.

[2]    **Eminent Domain**  👉 Nuisance and
demolition

    148    Eminent Domain
    148I    Nature, Extent, and Delegation of Power
    148k2    What Constitutes a Taking;  Police and
    Other Powers Distinguished

148k2.10 Zoning, Planning, or Land Use; Building Codes

148k2.10(3) Nuisance and demolition

Did deeming unsafe and ordering demolition of structures without compensation constitute unconstitutional taking? No Material Facts

- There was no dispute that owner maintained ownership of property
- There was no dispute that structures on property were unsafe
- Demolition was performed pursuant to exercises of traditional police power
- Lien on owner's property did not foreclose all economically viable uses of land

Causes of Action

Inverse Condemnation

Actions by county and two of its commissioners, deeming unsafe, and ordering demolition of, several structures on his property without compensation, did not constitute unconstitutional taking of owner's property, precluding owner's Fifth Amendment claim, where there was no dispute that owner maintained ownership of property and that structures were unsafe, demolition was performed pursuant to exercises of traditional police power, and lien on owner's property did not foreclose all economically viable uses of his land. U.S.C.A. Const.Amend. 5.

3 Cases that cite this headnote
More cases on this issue

[3] **Health** Buildings, structures, and building components

**Municipal, County, and Local Government** Nuisances in general

**Municipal, County, and Local Government** Judicial review or intervention in general

198H Health

198HII Public Health

198Hk390 Unsafe or Unhealthful Premises

198Hk392 Buildings, structures, and building components

(Formerly 104k21.5 Counties)

268 Municipal, County, and Local Government

268VIII Particular Powers and Functions

268VIII(G) Regulation of Private Conduct; Police Power

268VIII(G)2 Particular Subjects of Regulation

268k2208 Nuisances in general

(Formerly 104k21.5 Counties)

268 Municipal, County, and Local Government

268VIII Particular Powers and Functions

268VIII(G) Regulation of Private Conduct; Police Power

268VIII(G)4 Proceedings

268k2242 Judicial review or intervention in general

(Formerly 104k21.5 Counties)

Seizure of owner's property, in form of county and two of its commissioners deeming unsafe, and ordering demolition of, several structures on property, was reasonable, precluding owner's Fourth Amendment claim, where structures posed public danger, defendants provided owner with proper notice of condemnation and demolition, and owner was able to challenge defendants' actions, including seeking injunction in state courts. U.S.C.A. Const.Amend. 4.

3 Cases that cite this headnote

**\*42** On Appeal from the United States District Court for the District of Delaware (D.C. Civil Nos. 09–cv–00198, 11–cv–00013), District Judge: Honorable Sue L. Robinson.

**Attorneys and Law Firms**

Michael Duffy, Clayton, DE, pro se.

Chad J. Toms, Esq., Whiteford, Taylor & Preston, Wilmington, DE, for Defendant–Appellee.

Before: RENDELL, CHAGARES and SCIRICA, Circuit Judges.

OPINION[1]

[1]     This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PER CURIAM.

Michael Duffy appeals pro se from District Court orders entering judgment in favor of the defendants. For the following reasons, we will grant the Appellees' motions to summarily affirm.

In May 2008, a storm damaged structures on a property in Kent County, Delaware, that is owned by Duffy. The Division of Inspections and Enforcement of the Kent County Department of Planning Services deemed several of those structures unsafe and ordered their demolition if the unsafe conditions were not corrected. After negotiating for several months with Kent County authorities regarding the rehabilitation or demolition of the structures, Duffy filed a civil action in the Court of Chancery. While that lawsuit was ongoing, Duffy was granted a demolition permit but failed to fully raze the structures. Consequently, after proving Duffy with notice that it intended to proceed with demolition, Kent County caused the structures to be demolished. Kent County placed a lien on the property in the amount of $1400, the cost of the demolition. Thereafter, Duffy initiated several lawsuits, including the two District of Delaware cases relevant to his present appeals.

In the first case, Duffy, who claims that he is disabled because of Parkinson's Disease, alleged that the Kent County Levy Court (Kent County) and one of its commissioners, P. Brooks Banta, violated the Americans with Disabilities Act (ADA). By order entered September 27, 2010, the District Court granted the defendants' motions to dismiss Commissioner Banta because the ADA provides for recovery against only a public entity. Several years later, a Magistrate Judge recommended granting Kent County's motion for summary judgment because Duffy failed to "produce sufficient evidence to create a material issue of fact as to whether he suffers from a disability within the meaning of the ADA." The Magistrate Judge also concluded that even if Duffy were disabled, his ADA claim would fail because he did not demonstrate that he was excluded from participation in, or denied the benefits of, a public entity's services, programs,

or activities. By order entered March 10, 2014, the District Court adopted the Magistrate Judge's recommendation, **\*43** granted the motion for summary judgment, and entered judgment in favor of Kent County. Duffy appealed, and the matter was docketed here at C.A. No. 14–1668.

In the second case, Duffy alleged that Kent County, Banta, and another commissioner, Michael J. Petit de Mange, caused a taking of his property without compensation in violation of the Fifth Amendment, and that the demolition of the structures resulted in an unlawful seizure under the Fourth Amendment.[2] The defendants filed a motion for summary judgment. The Magistrate Judge recommended granting that motion because condemnation of the structures was necessary to protect public safety and because Duffy was given proper notice and adequate recourse to challenge the demolition. The District Court adopted the Magistrate Judge's report and recommendation. Duffy appealed. The matter was docketed here at C.A. No. 14–1669.

[2]     Duffy also alleged violations of the False Claims Act, federal statutes pertaining to eminent domain (16 U.S.C. § 814 and 49 U.S.C. § 24311), and Federal Rule of Civil Procedure 71.1, which governs condemnation proceedings. By order entered May 3, 2011, the District Court dismissed those claims as frivolous under 28 U.S.C. § 1915(e)(2)(B) because they "have either been raised in various other complaints here and in the State Court, or they are related to the other cases [Duffy] has filed." Duffy does not designate that judgment as one which he seeks to appeal. *See* Fed. R.App. P. 3(c)(1). Even if he had, however, we would affirm, for the reasons provided by the District Court.

We have jurisdiction under 28 U.S.C. § 1291. "We review district court decisions regarding both summary judgment and dismissal for failure to state a claim under the same de novo standard of review." *Barefoot Architect, Inc. v. Bunge,* 632 F.3d 822, 826 (3d Cir.2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotations omitted). Summary judgment is proper where, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(a); 🚩⚠️*Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 422–23 (3d Cir.2006). We may affirm on any basis supported by the record. *See Fairview Twp. v. EPA,* 773 F.2d 517, 525 n. 15 (3d Cir.1985).

 **[1]** Duffy alleged that Kent County and Commissioner Banta violated Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

🚩42 U.S.C. § 12132. To establish a prima facie case under the ADA, Duffy "must demonstrate (1) that [ ]he is a qualified individual with a disability; (2) that the defendants are subject to [the ADA]; and (3) that [ ]he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability." 🚩*Harris v. Mills,* 572 F.3d 66, 73–74 (2d Cir.2009). In support of his claim, Duffy asserted that Kent County and Commissioner Banta failed to assist him in correcting the violations on his property and denied his request for a trash dumpster. The undisputed facts, however, establish that Duffy was neither "excluded from participation" nor "denied **\*44** ... benefits" because of his disability.[3]

[3]  In our discussion, we will assume, without deciding, that Duffy was a qualified individual with a disability under the ADA.

After receiving notification that structures on his property had been deemed unsafe, Duffy contacted Kent County, identifying himself as disabled and requesting assistance in complying with the condemnation order. In response, Kent County met with Duffy and explained the demolition and rehabilitation process, discussed the requirements for permits and deadline extensions, and offered to assign a staff member to assist Duffy. Kent County also provided Duffy several extensions of time in which to correct the unsafe conditions on his property and granted his request for a demolition permit. The only adverse action occurred when Kent County rejected Duffy's request for a trash dumpster. The Director of the Department of Planning Services for Kent County explained in an affidavit that, although the County had provided two dumpsters for a community-organized storm debris clean-up event, it "never provides trash dumpsters at its expense to private land owners for activities that benefit only one person or parcel of land." By contrast, Duffy offered no

evidence indicating that the decision to deny a dumpster was motivated by his disability. *See* 🚩*CG v. Pa. Dep't of Educ.,* 734 F.3d 229, 236 (3d Cir.2013) (stating that to satisfy the ADA's causation requirement, "Plaintiffs must prove that they were treated differently based on the protected characteristic, namely the existence of their disability."). Under these circumstances, we conclude that the District Court properly granted the motion to dismiss Commissioner Banta and Kent County's motion for summary judgment on Duffy's ADA claims.

 **[2]** The District Court also properly granted summary judgment in favor of the defendants on Duffy's Fourth and Fifth Amendment claims. The Fifth Amendment, made applicable to state and local governments through the Fourteenth Amendment, authorizes the taking of private property for public use if just compensation is paid to the owner. *See* 🚩*Cowell v. Palmer Twp.,* 263 F.3d 286, 290 (3d Cir.2001). A Takings Clause claim cannot lie where the plaintiff was not deprived of all beneficial uses of his property. *See* 🚩*Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). Assuming that Duffy's Fifth Amendment claim was ripe, *see* 🏳*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), we conclude that the defendants' actions did not constitute a taking. There is no dispute that Duffy maintained ownership of the property and that the structures on that property were unsafe. Notably, the destruction of the unsafe structures was performed pursuant to exercises of traditional police power, "which do not entitle the individuals affected to compensation." *National Amusements Inc. v. Borough of Palmyra,* 716 F.3d 57, 63 (3d Cir.2013) (recognizing that the "government must pay just compensation for ... takings 'except to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the property.' " (quoting 🚩*Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005))); 🚩*McKenzie v. City of Chicago,* 118 F.3d 552, 557 (7th Cir.1997) ("Razing nuisances, like killing diseased livestock and burning infected plants, is a time-honored use of a state's police power"). In addition, Duffy has not shown that the lien on his property "foreclose[d] **\*45** all economically viable uses of the land." 🚩*Cowell,* 263 F.3d at 291 (holding that imposition of a municipal lien did not constitute a taking).

**[3]** Duffy also failed to establish the existence of a genuine issue of material fact concerning his claim that the defendants violated his rights under the Fourth Amendment. A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County, Ill.,* 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). Whether a government seizure violates the Fourth Amendment depends on its overall reasonableness, which must be based upon a "careful balancing of governmental and private interests." *Id.* at 71, 113 S.Ct. 538 (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)). Here, the Magistrate Judge properly concluded that the seizure was reasonable because the structures on Duffy's property posed a danger to the public, because the defendants provided Duffy with proper notice of the condemnation and demolition, and because Duffy was able to challenge the defendants' actions, including seeking an injunction in the Court of Chancery. *See* *Freeman v. City of Dallas,* 242 F.3d 642, 651 (5th Cir.2001) (en banc) (holding that warrantless demolition of a nuisance property was not unreasonable where "the City[ ]

adhere[d] to its ordinances and procedures as a prelude to ordering the landowners to abate their nuisance structures."); *Samuels v. Meriwether,* 94 F.3d 1163, 1168 (8th Cir.1996) (concluding that no Fourth Amendment violation occurred where "the City acted pursuant to a noticed hearing and a resolution effectuating municipal ordinances."). Therefore, the defendants were entitled to judgment as a matter of law.

Accordingly, as these appeals present no substantial question, we will grant the Appellees' motions to summarily affirm the judgments of the District Court.[4]

[4]  We have considered Duffy's letter in support of appeal (filed in C.A. No. 14–1668 on May 2, 2014), his "Motion of Objections," which outlines the causes for his appeals (filed in C.A. Nos. 14–1668 and 14–1669 on May 21, 2014), and his document in support of appeal (filed in C.A. No. 14–1668 on Oct. 8, 2014). All of Duffy's outstanding motions in both appeals are denied.

**All Citations**

591 Fed.Appx. 41

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case: 25-3567    Document: 29    Page: 99    Date Filed: 06/05/2026

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)

2017 WL 2799698

2017 WL 2799698
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Carlos FERNANDES and
Jean Neimiller, Plaintiffs,

v.

CITY OF JERSEY CITY, Jersey City Office
of Construction Code Official, Jersey City
Historic Preservation Commission, Jersey
City Police Department, Steven M. Fulop,
Anthony B. Lewis, John and Jane Does (1-20),
and ABC Corporations (1-20), Defendants.

Civ. No. 2:16-cv-07789-KM-JBC
|
Signed 06/27/2017

**Attorneys and Law Firms**

Markis M. Abraham, Jersey City, NJ, for Plaintiffs.

James M. Labianca, City of Jersey City, Jersey City, NJ, for Defendants.

**OPINION**

KEVIN MCNULTY, United States District Judge

**\*1** The plaintiffs, Carlos Fernandez and Jean Neimiller, bring this action against the City of Jersey City and various officials. The Complaint alleges that the plaintiffs obtained a construction permit and began remodeling work on their home, but that the City halted work, saying that they had not obtained a required approval from the Historic Preservation Commission. When work ceased, siding had already been removed from the home, resulting in weather damage. When Fernandes complained about the situation, City officials allegedly defamed and falsely arrested him.

Before the Court is the defendants' motion (ECF No. 6) to dismiss the complaint for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

# I. BACKGROUND

## A. Plaintiffs' Interrupted Remodeling Efforts[1]

[1] The following facts are taken from the complaint and assumed to be true for purposes of deciding the defendants' motion to dismiss. Certain record items repeatedly cited are abbreviated as follows:

Compl. = Complaint, ECF No. 1

Br. = Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 6

Opp. = Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 8-1, Ex. A

Reply = Letter Brief of the Defendants in Reply to Plaintiff's Opposition, ECF No. 9

Plaintiffs are a married couple who own and reside at a home (the "Property") located in the West Bergen-East Lincoln Park Historic District neighborhood of Jersey City, New Jersey. (Compl. ¶¶ 1, 14) Named as defendants are four municipal entities: the City of Jersey City ("Jersey City" or the "City"), the Jersey City Office of Construction Code Official (the "Building Department"), the Jersey City Historic Preservation Commission (the "HPC"), and the Jersey City Police Department (the "PD").[2] Also named as defendants are Jersey City Mayor Steven M. Fulop and Police Officer Anthony B. Lewis.

[2] Of these four, at least the PD is not a proper defendant, as it is only an instrumentality of municipal government and therefore not an entity that can sue and be sued in its own right. *See Hussein v. New Jersey*, 403 Fed.Appx. 712, 716 (3d Cir. 2010) (non-precedential) (affirming dismissal of the Jersey City Police Department because "a municipal police department is not an entity separate from the municipality" (citing N.J. Stat. Ann. § 40A:14–118)); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997) ("[W]e treat the municipality and its police department as a single entity for purposes of section 1983 liability."); *Cordial v. Atl. City*, No. 1:11-CV-01457 RMB, 2014 WL 1095584, at \*9 (D.N.J. Mar. 19, 2014) ("A municipal department and the municipality itself are not deemed separate legal entities under the law, and therefore cannot both be named as parties to an action."). The defendants claim the HPC is not a separate entity from the Building Department. (Br. 1) Whether this is so and whether the Building Department is a separate legal entity from Jersey City may depend on whether

Case: 25-3567    Document: 29    Page: 100    Date Filed: 06/05/2026

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)
2017 WL 2799698

the entities were created under New Jersey statute or Constitution or only by local municipal ordnance—an issue the parties do not address and which I do not reach on this motion. *See, e.g., Von Rhine v. Camden Cty. Sheriff's Office*, No. CIV. 09-6093 JBS/AMD, 2012 WL 3776026, at *9 (D.N.J. Aug. 29, 2012) (reasoning that "a county sheriff's office's capacity to be sued is not necessarily analogous to a municipal police department's capacity to be sued, as the office of the sheriff, under New Jersey law, is a constitutionally created office whereas a municipal police department is created only by local municipal ordinance."); *cf.* ⚠ *Trinity Res., Inc. v. Twp. of Delanco*, 842 F. Supp. 782, 793 (D.N.J. 1994) ("The position of Construction Official is mandated by the Construction Act and is regulated for licensing purposes by the New Jersey Department of Community Affairs."). Nevertheless, the Complaint fairly supports a reading of all claims against the PD, the Building Department, and the HPC as claims intended solely against Jersey City. I will treat them as such. Therefore, the clerk will be directed to drop the Building Department, the HPC, and the PD from the caption. The correction is technical; the substance of the Plaintiffs' claims is not affected.

**\*2** On July 20, 2015, Power Home Remodeling Group, Inc. ("Power HRG"), a remodeling contractor, applied to the Building Department for a permit to remove wood siding and install vinyl siding on the Plaintiffs' Property. (*Id.* ¶¶ 15–16) On August 11, 2015, the Building Department issued a construction permit. (*Id.* ¶ 17) On August 25, 2015, Power HRG commenced removing the wood siding from the Property.

On August 28, 2015, officials from the Building Department and HPC (including Brian Blaziak, Raymond Meyer, and Dan Wrieden, who are not named as defendants) arrived at the Property and directed Power HRG to stop working. Those officials claimed that Power HRG lacked authorization to perform the work. (Compl. ¶¶ 20–21) Jersey City Police officers also arrived at the Property that day and, unprovoked, threatened to arrest Fernandes. (*Id.* ¶ 22) The officials gave no explanation for their demands at the time.

Several days later, on September 3, 2015, the Building Department issued a formal "Stop Work Order." That Order cited Plaintiffs' failure to obtain the HPC's approval before renovating the Property. (*Id.* ¶ 23) Power HRG stopped its work, leaving three quarters of the Property without siding. Because the Building Department also prohibited the Plaintiffs from covering their home by other means, the walls remained exposed. (*Id.* ¶¶ 24, 29)

Fernandes sought an explanation, but "Jersey City refused to provide any answers to the Plaintiffs and refused to acknowledge that a permit had been issued." (Compl. ¶¶ 25–26) In October 2015, through their counsel, Plaintiffs contacted Jeremey Farrell, Corporation Counsel for Jersey City (and counsel of record for all defendants in this action). Farrell recommended that Plaintiffs' counsel contact James LaBianca, counsel for the "Planning Board" and the HPC. (*Id.* ¶ 27) Plaintiffs' counsel did so, e-mailing LaBianca to ask whether Plaintiffs could cover their home to protect it against oncoming winter weather. (*Id.* ¶ 28) LaBianca responded by offering to meet with Plaintiffs' counsel, copying Building Department officials on his e-mail. (*Id.* ¶ 30) Days later, however, LaBianca wrote to Plaintiff's counsel stating "HP[C] has no objection to your client installing temporary but sufficient, long-lasting preservation measures to protect the property, including the installation of Tyvek or some other proper board material." (*Id.* ¶ 32) Thereafter, LaBianca did not respond to the requests of Plaintiffs' counsel to arrange a meeting, or to his requests for further clarification as to what types of preservation measures and board materials the HPC would allow. (*Id.* ¶¶ 33-34)

Plaintiffs covered the Property with a plastic tarp. (Compl. ¶ 35) "Despite those efforts, the Property suffered substantial damage, including but not limited to water damage...." (*Id.* ¶ 36) Afterward, the Plaintiffs decided to take no further action until warmer weather arrived, so that the Property could dry out and the damage could be assessed. (*Id.* 38)

**B. Alleged Disparate Treatment**
The Plaintiffs allege that other property owners on their street have made alterations to their properties without obtaining permits or HPC authorization. These alterations have included disfavored ones, like vinyl siding, and prohibited ones, like metal frame windows. (Compl. ¶ 38) One couple on their street were allowed to alter their property without HPC approval, allegedly because they "were married by Mayor Fulop and ... were significant supporters of Mayor Fulop's campaign." (*Id.*)

**C. The Plaintiffs' Attendance at Public Meetings**
**\*3** In January 2016, Plaintiffs began attending City Council meetings, as well as public meetings that Mayor Fulop organized throughout Jersey City. (Compl. ¶ 40) Fernandes spoke at these meetings about the condition of his Property and "the intimidation and disrespectful treatment he and his

wife suffered at the hands of" the defendants. (*Id.* ¶ 41) After one such meeting, Jersey City Council President Rolando Lavarro "accosted Mr. Fernandes and demanded Fernandes meet with him the next day." (*Id.* ¶ 42) On January 29, 2015, Fernandes and his counsel met with Lavarro, who promised to assist the Plaintiffs but never did so. (*Id.* ¶ 43)

During a February 3, 2016 public meeting, although Fernandes "was not causing any disturbance," PD officers in plain clothes "forcibly grabbed [him] by the arms, lifted him from his feet" and removed him from the meeting "at the behest of Mayor Fulop." One of the PD officers involved was defendant Lewis. (Compl. ¶¶ 44–46, 87)

A February 8, 2016 letter from Plaintiffs' counsel to Jeremey Farrell followed. In that letter, Plaintiffs' counsel included an Open Public Record Act ("OPRA") request for the names of the officers who had removed Fernandes and an explanation for the removal. (*Id.* ¶ 47) The letter reported that Fernandes had been physically injured and that both Plaintiffs had suffered emotional injury. Additionally, the letter stated:

> Mayor Fulop made several untrue statements to the audience in attendance when asked why he had Mr. Fernandes removed. First, it is untrue that my client attended "every single one of these meetings"; as Mayor Fulop stated. It is untrue that my client made a "disruption for twenty to thirty minutes" or "five to ten minutes" at any meeting. The City never "cited for violations" his property. To date, Mr. Fernandes has not received any notice of any violations against his, his wife or their property. The Mayor should recant these slanderous. [sic]
>
> ....
>
> Mr. Fernandes has every right to attend any and every public meeting held by Mayor Fulop and he will continue do so. There is no basis in law or in fact to deny him his right to attend these meetings.
>
> Obviously, this situation is extremely distressing to my clients. Not only has the City ignored their attempts to resolve this issue amicably, now it seems the City has an agenda to assassinate the character of Mr. Fernandes and prohibit him from exercising his rights as a citizen of Jersey City. The City has gone to the length of physically assaulting my client to achieve this agenda. Such behavior is unacceptable.

(*Id.* ¶ 47). The letter requested a meeting with Farrell, but Plaintiffs' counsel did not receive any response.

Plaintiffs eventually received a Use of Force Report, but it provided inadequate information. This prompted Plaintiffs' counsel, on March 25, 2016, to demand that the City Clerk respond more fully to the OPRA request. (Compl. ¶ 51) That same day, Plaintiffs' counsel wrote to Jeremy Farrell seeking a further response to the February 8, 2016 letter; noting the city clerk's inadequate response to the OPRA request; and raising a new grievance.

That new grievance related to Mayor Fulop's alleged behavior towards Fernandes during a March 14, 2016 public meeting. (*Id.* ¶ 52) The letter stated:

> On March 14, 2016, I attended a public meeting in Ward F at the Bethune Center with Carlos Fernandes. There, my client asked the Mayor a question, to which the Mayor again answered that my client is a disgruntled person because his property had been cited for numerous violations by the City, and that the matter is currently the subject of litigation. Again, to date, Mr. Fernandes has not received any notice of any violations against him, his wife or their property. The Mayor knows his statements are untrue. The Mayor must be aware of the true circumstances in this matter because after he made the untrue statements at the February 3, 2016 meeting in Ward A I wrote to you informing you that his statements were untrue.
>
> **\*4** The Mayor's behavior toward my client is unacceptable. Instead of seriously addressing legitimate issues my client has with the City's handling of abruptly halting construction at his home after the City issued a valid permit for the same construction (and the City's refusal to allow my client to go forward with construction resulting in significant damage to his property), the Mayor is waging a smear campaign against my client in an attempt to minimize his claims against the City.

(*Id.*)

### D. The Plaintiffs' Tort Claim Notice and Complaint

On November 25, 2015—after the work had been shut down and the Property had sustained damage, but before the Plaintiffs began attending public meetings—the Plaintiffs filed a Tort Claim Notice (a "TCN"). (Compl. ¶ 39; *see* Br. 14)[3] On or about April 18, 2016, Plaintiffs' counsel received

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)
2017 WL 2799698

a response to the TCN from Jersey City, disclaiming liability. (*Id.* ¶ 54)

3    The parties do not provide a copy of the November 25, 2015 TCN, and the Complaint does not describe it. The defendants argue that the Plaintiffs failed to file a TCN only with respect to the Plaintiffs' Count 5 defamation claim. This I interpret as an implied concession that the Plaintiffs' TCN did address the Count 6 negligence claim.

On September 22, 2016, the Plaintiffs filed a civil complaint in the Superior Court of New Jersey, Law Division, Hudson County. (*See* Compl. p.1) The defendants removed the action to this Court on October 24, 2016. (*See* ECF No. 1)

The complaint is in six counts—four under 🚩 42 U.S.C. § 1983 and two under state tort law:

- **Count 1:** Violation of the Plaintiffs' right to Equal Protection under the Fourteenth Amendment, pursuant to 🚩42 U.S.C. § 1983 ("🚩Section 1983") (Compl. ¶¶ 56–66) (*against the City*)[4];

- **Count 2:** Violation of the Plaintiffs' right to procedural due process under the Fourteenth Amendment, pursuant to 🚩Section 1983 (*id.* ¶¶ 67–76) (*against the City*);

- **Count 3:** Violation of the Plaintiffs' First Amendment speech rights, pursuant to 🚩Section 1983 (Compl. ¶¶ 77–82) (*against the City, Mayor Fulop in his individual capacity, and Anthony B. Lewis in his individual and official capacities*[5])

- **Count 4:** Unlawful seizure and false arrest, in violation of the Fourth Amendment, pursuant to 🚩Section 1983. (*Id.* ¶¶ 83–91) (*same parties as Count 3*)

- **Count 5:** Defamation by slander. (Compl. ¶¶ 92–98) (*against Mayor Fulop in his individual capacity*)

- **Count 6:** Negligence. (*Id.* ¶¶ 99–104) (*against the City*)

4    As noted above, counts asserted against the PD, the Building Department and the HPC are treated as claims against the City. *See* n.2, *supra*.

5    The opening paragraph of the complaint refers to "Steven M. Fulop, individually" but "Anthony B. Lewis" with no such qualifier. (*See* Compl. p.1) Therefore, I construe

the complaint as suing Lewis in both his individual and official capacity.

## II. LEGAL STANDARD ON MOTION TO DISMISS

The defendants move to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trustees Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

**\*5**  Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 🚩*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." 🚩*Id.* at 570; *see also* 🚩*Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🚩*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing 🚩*Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." 🚩*Iqbal*, 556 U.S. at 678.

As the Third Circuit instructed *post-Iqbal*, "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." 🚩*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting 🚩*Iqbal*, 556 U.S. at 662). "Nor does a complaint suffice if it tenders 'naked assertion[s]'

Case: 25-3567    Document: 29    Page: 103    Date Filed: 06/05/2026

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)
2017 WL 2799698

devoid of 'further factual enhancement.' " 🚩*Iqbal*, 556 U.S. at 662 (citing 🚩*Twombly*, 550 U.S. at 555).

### III. DISCUSSION

The government moves to dismiss the complaint on a number of grounds. I first consider whether Counts 1 through 4 state a constitutional claim under 🚩42 U.S.C. § 1983 (section III.A); I next consider whether any such liability extends to the City under 🚩*Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 98 S. Ct. 2018 (1978) (section III.B); I then consider the qualified immunity of defendants Fulop and Lewis in their individual capacities (section III.C); and finally I consider the sufficiency of the state law tort claims, Counts 5 and 6 (section III.D).

### A. Sufficiency of 🚩Section 1983 Claims

To state a claim for relief under 🚩§ 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law. *See* 🚩*Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (citations omitted); *see also* 🚩*West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250 (1988).

### 1. *Count 1—Equal Protection*

The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state a traditional equal protection claim, a plaintiff must allege facts showing the existence of purposeful discrimination. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (citing 🚩*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). The plaintiff must have received treatment different from that received by other individuals similarly situated. *Id.*

Most commonly, a plaintiff will allege that a state actor intentionally discriminated because of his or her membership in a protected class, such as a racial or religious minority. *Lande v. City of Bethlehem*, 457 Fed.Appx. 188, 192 (3d Cir. 2012) (citing *Chambers*, 587 F.3d at 196). The Plaintiffs

here allege that their neighbors were allowed to perform comparable work on their homes. That allegation, however, does not place Plaintiffs in a protected class.

Alternatively, however, a plaintiff may assert an Equal Protection claim under a "class of one" theory. 🚩*Lanin v. Borough of Tenafly*, No. 2:12-02725 KM MCA, 2014 WL 31350, at *8 (D.N.J. Jan. 2, 2014).

**\*6** A "class of one" Equal Protection claim asserts that a person was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 🚩*Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L.Ed.2d 1060 (2000). The plaintiff must allege: "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." 🚩*Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). *Id.* at \*7; *see also* 🚩*Ecotone Farm LLC v. Ward*, 639 Fed.Appx. 118, 124 (3d Cir. 2016) (non-precedential).

Here, the allegedly "similarly situated" individuals are "other homeowners in the Historic District"—more specifically, property owners on the Plaintiffs' street whom the City has allowed to alter their properties in ways Jersey City guidelines disfavor or prohibit, "without HPC approval or valid permits." (Compl. ¶¶ 38, 63) The Plaintiffs never expressly allege that all properties in the Historic District need HPC approval prior to renovation. Nevertheless, on a motion to dismiss, I will assume this to be the case[6] and accept that Plaintiffs and their neighbors are therefore similarly situated.

---

[6]    Such an assumption would not appear to be unfounded. *See* Jersey City Code of Ordinances, Municipal Code § 345-30, *available at* https://library.municode.com/nj/jersey_city/codes/code_of_ordinances ("No permit shall be issued or amended nor shall any construction, alteration, minor alteration, ordinary maintenance and repair or demolition be started on a landmark building nor on any sign, building, structure, object, site or landscape feature within a designated historic district, whether or not a construction permit is required, prior to a filing of an application for review by the Historic Preservation Commission or the issuance of either a Certificate of Appropriateness or a Certificate of No Effect.").

As for the second element, there can be no dispute that the Plaintiffs allege intentional action.

Turning to the third element, the Plaintiffs allege that Building Department and HPC officers Blaziak, Meyer, and Wrieden ordered them to cease construction on their Property. (Compl. ¶¶ 20, 60, 71,) The Plaintiffs, in their brief, argue that "[i]t can easily be inferred from the complaint that the Plaintiffs not only did not support Mayor Fulop but were outspoken opponents of Mayor Fulop." (Opp. 13) The only relevant allegation in the Complaint is somewhat different: "One couple who conducted alterations to their property without HPC approval were married by Mayor Fulop and ... were significant supporters of Mayor Fulop's campaign." The Complaint does not allege that the Plaintiffs publicly spoke out against any of the defendants prior to January 2016, or against Mayor Fulop at any time. (*See* Compl. ¶ 40–41) It does not allege that any officer or defendant involved in enforcing the Stop Work Order knew that they did not support Mayor Fulop (if indeed that was the case). Nor, conversely, did any defendant allegedly suggest that support for Mayor Fulop would expedite approval of their renovation efforts. In short, the allegations of politically-based discrimination are quite weak.

Still, the class-of-one claim does not require a political motive—only the lack of any rational basis for the disparate treatment.[7] The Complaint alleges that the reason given for shutting down work could not have been the real reason. *See* *Lanin*, 2014 WL 31350, at *8 (in analyzing the rational basis element on a motion to dismiss, "[a] sufficient allegation that Defendants' stated motivations were not the real ones might support a cause of action."). An insincere explanation may suggest that there is no good one. The Plaintiffs allege, for example, that the City (at least initially) refused to acknowledge that they possessed a building permit; that the City permitted neighbors to perform similar construction without HPC authorization, and that in at least one case there was an appearance of political favoritism. No other, acceptable basis for the alleged disparate treatment appears on the face of the complaint.

[7]    Of course, First Amendment retaliation, alleged in Count 3, is a different matter.

**\*7**  Class-of-one Equal Protection claims are difficult to prove, and they rarely succeed. Such a claim has, however, been alleged here.

### 2. *Count 2—Procedural Due Process*

To state a procedural due process claim, the Plaintiffs must establish (1) that they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty and property, and (2) that the procedures available to them did not provide due process of law. *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011). It is not controversial that real property ownership generally constitutes a protected property right. Whether the Plaintiffs had a protected property interest in renovating their home, or in receiving all requisite approvals and permits to do so, is less certain.

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it....
>
> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972). *Cf.* *Indep. Enterprises Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179 (3d Cir. 1997) ("[T]he law of this circuit recognizes that 'an entitlement may exist for a benefit sought but not yet obtained if state law limits the exercise of discretion by the state official responsible for conferring the benefit.' " (quoting *Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 679 (3d Cir. 1991)).

The Complaint fails to state specifically the manner in which enforcement of HPC rules deprived Plaintiffs of a property right. State law, the source of property rights, suggests that they would have great difficulty in doing so. *Cf.* *Waters v. Twp. of Galloway*, 286 N.J. Super. 222, 237–38, 668 A.2d 1086, 1095 (App. Div. 1995) ("The legitimacy of entitlement, in instances relating to denial of building or other municipal permits, is based on whether plaintiffs have

Case: 25-3567    Document: 29    Page: 105    Date Filed: 06/05/2026

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)
2017 WL 2799698

complied with all legal requirements contained in the local codes or ordinances.").

Even assuming that there is a protected property right, however, the Complaint fails to state a procedural due process claim. Among other things, Plaintiffs never allege that they even attempted to take advantage of state and local procedures for challenging the defendants' allegedly erroneous Stop Work Order.

A state "provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body." *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 597 (3d Cir. 1995) (affirming district court's conclusion that "New Jersey provides a constitutionally adequate process for challenging wrongful zoning decisions"), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003). Therefore, "when a state affords a full judicial mechanism with which to challenge the administrative decision in question, the state provides adequate procedural due process ... whether or not the plaintiff avails him or herself of the provided appeal mechanism." *Id.* (citations and internal quotations omitted); *see also Bello v. Walker*, 840 F.2d 1124, 1128 (3d Cir. 1988) (municipality's delay in issuing building permit did not raise procedural due process where state "affords a full judicial mechanism with which to challenge the administrative decision"), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003).

**\*8** Jersey City's Code of Ordinances, Section 345-30 sets forth a clear set of instructions for applying for a Certificate of Appropriateness or a Certificate of No Effect (i.e., approval) from the HPC. The same Section provides for a review process with a written decision by the HPC and a procedure for appealing the HPC's decision to the Board of Adjustment.[8] Land Development Ordinance of the Jersey City, Hudson County, New Jersey, § 345-30.

8    I also note that the ordinance provides for an emergency procedure for certifying the immediate necessity for HPC approval in the event that a property owner needs an immediate permit to "commence to stabilize, secure, repair or protect a landmark building, structure, object, site or landscape feature damaged" by "an act of God or

any other unexpected event". *Id.* The Plaintiffs' failure to avail themselves of this procedure, if it was truly available, could conceivably defeat their claims for lack of causation.

The Complaint makes no mention of these available procedures. It does not allege that the Plaintiffs attempted to take advantage of them and were turned back in some way. It does not allege that the procedures are inadequate. A substantive challenge under state law may be possible, but (at least as currently alleged) there is no procedural due process claim. "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.... [A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

The Plaintiffs also allege that, after issuing the Stop Work Order, "Jersey City refused to provide any answers to the Plaintiffs and refused to acknowledge that a [construction] permit had been issued" (Compl. ¶ 26), and that they "were not given any right to appeal, contest or be heard regarding the 'Stop Work Order'...." (*Id.* ¶ 73) These allegations, directed to the allegedly vanished construction permit, come closer to stating a claim,[9] but still fail. These are no more than bare-bones conclusory statements of a procedural deprivation. The defendants cannot have failed to "give" any right to appeal unless plaintiffs allege, for example, that they filed or attempted to file such an appeal. What appears from the face of the complaint is a letter-writing campaign, accompanied by in-person demands and accusations of bureaucratic indifference. And even as to that, the only specific allegations relate to e-mail communications between Plaintiffs' counsel and LaBianca.[10] Otherwise, the Plaintiffs fail to give any indication of who (beyond "Jersey City") they asked for answers, what they were told, and what (if any) statutory rights they sought to invoke.[11] There may be more, but it does not appear in this Complaint. Without even this minimal factual enhancement, I cannot conclude that a procedural due process claim is facially plausible. *See Fowler*, 578 F.3d at 210.[12] The motion to dismiss Count 2 for failure to state a claim is therefore granted.

9    A protected property right, for example, is easier to find in the case of a permit already granted. *See, e.g., Fairview Ritz Corp. v. Borough of Fairview*, No. CIV.A. 9-875

Case: 25-3567     Document: 29     Page: 106     Date Filed: 06/05/2026

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)

2017 WL 2799698

JLL, 2013 WL 5946986, at *14 (D.N.J. Nov. 6, 2013) (reasoning that "the due process requirements attendant upon the denial of an application for a property right *not yet granted* where an appellate process was available but the plaintiff did not take advantage of it, on the one hand, and the revocation of a *previously granted* certificate without notice or a pre-deprivation hearing, on the other, require a different analysis"); *Alvin*, 227 F.3d at 116 ("In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, *unless those processes are unavailable* or patently inadequate." (Emphasis added.)

10   The allegations fail to show that any of LaBianca's representations amounted to deprivation of process by the defendants. To the contrary, the plaintiffs allege that LaBianca told Plaintiffs' counsel they could install "long-lasting preservation measures to protect the [P]roperty...." (Compl. ¶ 32) The decision not to do so (i.e., to cover the Property with only plastic tarp), appears to have been the Plaintiffs' own decision. (*See id.* ¶ 35)

11   For example, the Plaintiffs fail to mention the municipal and state procedures available pursuant to Jersey City's Code of Ordinances and New Jersey's Uniform Construction Code Act (UCCA), *see, e.g.*, N.J.S.A. 52:27D-119–141, which, in and of themselves, provide for due process procedures and protections that likely pass constitutional muster. *See, e.g.,* *Plemmons v. Blue Chip Ins. Servs., Inc.*, 387 N.J. Super. 551, 568, 904 A.2d 825, 836 (App. Div. 2006) (denied construction permits and stop work orders did not constitute deprivation of procedural due process in light of procedures and remedies afforded by New Jersey statues, including the UCCA).

12   In their briefing, the parties address whether Plaintiffs have stated a substantive due process claim as well. But Count 2 of the Complaint is styled as a procedural due process claim, and a substantive due process would have to be alleged far more specifically. For what it is worth, the defendants' issuance and enforcement of the Stop Work Order and refusal to acknowledge the construction permit that the Plaintiffs allegedly secured, even if there was some selective enforcement, is not alleged to reach the level of shocking the conscience. *See* *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392, 402 (3d Cir. 2003) (holding that substantive due process claims in the land use context must be held to the shocks-the-conscience test and explaining that "[l]and-use decisions

are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives."); *Shamrock Creek, LLC v. Borough of Paramus*, No. CIV.A. 12-2716, 2014 WL 4824353, at *4–5 (D.N.J. Sept. 24, 2014) (collecting land-use cases in which courts declined to find the shocks-the-conscience test met); *see also* *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 287 (3d Cir. 2004) ("[W]e do not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation.").

### 3. Count 3—First Amendment Retaliation

**\*9**   Count 3 is a claim that Jersey City, Mayor Fulop, and Officer Lewis retaliated against the Plaintiffs for exercising their First Amendment rights at public meetings. Such a retaliation claim requires allegations of "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006); *see also* *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010); *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009); *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006); *Citizens For A Better Lawnside, Inc. v. Bryant*, No. 05-4286 RBK, 2006 WL 3825145, at *6 (D.N.J. Dec. 22, 2006). The first element is an issue of law; the second and third are questions of fact. *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001); *Johnson v. Lincoln Univ.*, 776 F.2d 443, 454 (3d Cir. 1985).

The first element—constitutionally protected speech—is clearly present. The Plaintiffs allege that Fernandes's speech at meetings concerned "the failings of Jersey City, the Building Department, the HPC and their related officials, and the condition of this home" as well as "the intimidation and disrespectful treatment [the Plaintiffs] suffered at the hands of Jersey City, Building Department Officials, ... and Jersey City police officers." (Compl. ¶¶ 41, 79) A core purpose of the First Amendment is to protect speech on matters of public interest. There is no question that speech by a private citizen concerning matters of public concern, and especially governmental affairs, is constitutionally protected conduct.

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)
2017 WL 2799698

*See* 🚩*Mills v. State of Ala.*, 384 U.S. 214, 218, 86 S. Ct. 1434 (1966) ("there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs."). Courts in fact afford heightened protection to speech given in public forums, such as public meetings. 🚩*Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist.*, 201 N.J. 544, 569, 993 A.2d 805, 819 (2010).

The defendants argue that the Plaintiffs' allegations regarding "the failings of Jersey City" are too vague and implausible to meet *Twombly's* and *Iqbal's* pleading standards. I disagree. Viewing the complaint in its entirety, it is clear what "failings" are referred to. Fernandes objects to the thwarted renovation attempts, the resulting damage to his home, and the City's allegedly discriminatory or irrational enforcement of the rules. (*See* Compl. ¶¶ 23–38, 41, 47, 52, 78–79) The particulars of his speech at the meetings may be fleshed out in discovery.

As for the second and third elements, the Plaintiffs say the defendants violated Fernandes's First Amendment rights: (1) when police officers, at Fulop's instruction (in reaction to Fernandes's prior railings against Jersey City), removed him from the February 3, 2016 public meeting; (2) when Mayor Fulop made allegedly defamatory comments about Fernandes during the February 3, 2016 meeting and again at a March 14, 2016 meeting in response to Fernandes's questions; and (3) when police officers intimidated Fernandes at public meetings by their proximity to him. (Compl. ¶¶ , 44–47, 52, 80)[13]

[13] "[I]t has never been established that a governmental official who does not himself retaliate but instead pressures another individual to retaliate ... can be held personally liable." 🚩*Zaloga v. Borough of Moosic*, 841 F.3d 170, 177 (3d Cir. 2016). Here, however, the Complaint gives rise to a plausible inference that the Mayor acted, and directly ordered the police to implement retaliatory acts, a different situation.

 **\*10**  The first letter from Plaintiffs' counsel to Jeremey Farrell complains that, at the February 3, 2016 meeting, Mayor Fulop stated publicly that Fernandes's Property has been cited for violations and that he had Fernandes removed because Fernandes frequently disrupts public meetings. (*Id.* ¶ 47) In the second letter to Farrell, Plaintiffs' counsel states that when Fernandes asked Mayor Fulop a question during the March 14, 2016 meeting, Mayor Fulop accused Fernandes of being disgruntled because his property has been cited for

numerous violations. (*Id.* 52) These are sufficient allegations of retaliation *because* Fernandes had vocalized concerns at public meetings. Such steps could deter a reasonable person from speaking further.

Defendants' motion suggests a couple of caveats. Although neither supports dismissal at present, I discuss them briefly for the parties' guidance.

The first caveat pertains to Fernandes's alleged removal from the meeting and intimidation by police presence. To be sure, "viewpoint-based restrictions violate the First Amendment regardless of whether they also serve some valid time, place, manner interest." 🚩*Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006); *see also* 🚩*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S. Ct. 948, 955 (1983) ("In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."). Nevertheless, the law permits a public body to control its proceedings in a content-neutral manner by stopping a speaker who is disruptive or who disregards a meeting's properly-confined subject matter limitations. *See* 🚩*Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist.*, 201 N.J. 544, 571, 993 A.2d 805, 820–21 (2010); 🚩⚠️*Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004).

In *Eichenlaub*, for example, a plaintiff who attended a Township Board of Supervisors meeting was removed during the public comment period because he was "repetitive and truculent," and "repeatedly interrupted the chairman of the meeting." 🚩⚠️*Id.* at 281. The United States Court of Appeals for the Third Circuit affirmed the district court's dismissal of the plaintiff's First Amendment claims, agreeing that the chairman's motive for ejecting the plaintiff "was the perfectly sustainable and content-neutral desire to prevent his badgering, constant interruptions, and disregard for the rules of decorum." *Id.* To let a speaker "hijack" or "filibuster" the proceedings, the Court emphasized, would only "impinge on the First Amendment rights of other would-be participants." *Id.*

The defendants claim that any restrictions on Fernandes's speech were content-neutral and served a constitutionally

permissible purpose. The issue here, however, is whether the Plaintiffs have adequately alleged otherwise. I think they have. The motion to dismiss the Count 3 First Amendment retaliation claim based on Fernandes's removal and the presence of police cannot be granted on these fact-intensive grounds.

The second caveat pertains to Mayor Fulop's alleged defamatory statements. Although I have already sustained Count 3, I nevertheless consider whether to excise those statements as part of the basis for a First Amendment retaliation claim.

Where an alleged act of retaliation is one that takes the form of an official's own speech—which may itself enjoy First Amendment protection—the Third Circuit "employ[s] a more specific test to determine whether the official's speech amounts to a retaliatory act. [It] ask[s] whether there was a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." *Mirabella v. Villard*, 853 F.3d 641, 651 (3d Cir. 2017) (internal quotation marks omitted). *See also* *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001) ("When a public official is sued for allegedly causing a third party to take some type of adverse action against plaintiff's speech, we have held that defendant's conduct must be of a particularly virulent character. It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must "threaten" or "coerce" the third party to act.").

 **\*11**  In *Koren v. Noonan*, 586 Fed.Appx. 885, 888 (3d Cir. 2014), where the plaintiff alleged the defendants "smeared his unblemished professional record in an attempt to derail his ongoing candidacy[,] ... [t]he question ... [was] not whether [the defendants'] remarks were defamatory—it [was] whether they would have deterred a person of ordinary firmness ... from pursuing a similar run for office." *Id.* at 888 (internal quotation marks and citation omitted). Cautioning that "in the political arena, courts have consistently rejected First Amendment retaliation claims based upon assertions of purportedly false reports or criticism," the court concluded that speech "which involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow,' would not dissuade a person of ordinary firmness from seeking political office."

*Id.* (quoting *Suarez_Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)).

As exacting as the Third Circuit's test is, I think that Plaintiffs have alleged statements by Mayor Fulop that need not be, but could be, construed as threats of adverse regulatory action, in the context of all the facts. I will not strike those statements from Count 3, but leave them as part of the overall picture of alleged First Amendment retaliation.

### 4. Count 4—Fourth Amendment

Based on events at the same February 3, 2016 meeting discussed above, Count 4 alleges that Jersey City, Mayor Fulop, and Officer Lewis violated the Fourth Amendment's protection against unreasonable seizures. *See* U.S. Const. amend. IV. In particular, Plaintiffs allege that Fernandes was falsely arrested. (Compl. ¶¶ 87–88)

"To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes–Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995); *Bowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988)).

The defendants attack the second element, *i.e.*, asserting that there was probable cause. The police officers, they say, possessed probable cause because Fernandes had previously caused a disturbance and was engaging in similar conduct during the February 3, 2016 meeting. (Br. 11; Reply 4–5) In support, Defendants cite the February 8, 2016 letter from Plaintiffs' counsel to Jeremey Farrell, described in the Complaint. (Compl. ¶ 47) That letter, however, is not an admission of wrongdoing by Fernandes; it states only that *Mayor Fulop told the audience* that Fernandes was removed because he disrupted public meetings. (*Id.*) The Complaint alleges, in so many words, that the Mayor's statement was false. On a motion to dismiss standard, I cannot resolve the fact-bound issue of probable cause.

I move on to the first element: whether the Complaint alleges that Fernandes was allegedly "arrested" or "seized." The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent

Case: 25-3567   Document: 29   Page: 109   Date Filed: 06/05/2026

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)
2017 WL 2799698

arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."

🚩*United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S. Ct. 1870, 1877 (1980) (quoting 🚩*United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 3081). The United States Supreme Court has described the level of restraint that must be imposed for constitutional safeguards to apply:

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

**\*12** *Id.* at 554 (footnote omitted); *see also* 🚩*Berg v. Cty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) ("A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement.").

The Complaint alleges that Mayor Fulop instructed Jersey City police officers to remove Fernandes from a public meeting; that the police officers laid hands on Fernandes and ejected him; that they did so without probable cause or explanation; and that Fernandes suffered physical injury as a result. (Compl. ¶¶ 44–45, 85–86, 88) Plaintiffs also allege that the presence of officers intimidated them; that allegation may turn out to be superfluous, but it does not detract from the clear allegation of a seizure. Plaintiffs' allegations of a "seizure" suffice at this stage.

Plaintiffs allege that the seizure was ordered by the Mayor.[14] Liability can "extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion." 🚩*Berg v. Cty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000); *see also* 🚩*Kilboum v. Thompson*, 103 U.S. 168, 200 (1880) ("[H]e who assumes the authority to order the imprisonment of another is responsible for the acts of the person to whom such order is given, when the arrest is without justification."); *cf. Garcia v. City of Paterson*, No. 11-CV-6587, 2015 WL 857801, at \*3 (D.N.J. Feb. 27, 2015) (dismissing false arrest claim against defendant who gave

information to police relevant to plaintiffs' arrest because he did not "instigate" or "intentionally cause" the arrests).

[14] Plaintiffs seem to allege that more than one officer was involved, but only Lewis is currently identified.

These allegations suffice to state a Fourth Amendment claim for an unreasonable seizure of the person. The motion to dismiss is denied as to Count 4.

### B. *Monell* Liability of the City

I have found that Counts 1, 3, and 4 state 🚩Section 1983 claims for violations of the Fourteenth Amendment's Equal Protection clause and the First and Fourth Amendments. (*See* Section III.A, *supra.*) I now consider whether any such liability is sufficiently alleged to extend to the City itself.[15]

[15] Again, claims against the City are construed to include the claims asserted against the PD, the Building Department, and the HPC. *See* n.2, *supra* As noted above, the Complaint might be construed as suing Lewis is in his official capacity, as well as his personal capacity. A lawsuit against a government official in his official capacity is effectively a suit against the office. 🚩*Brandon v. Holt*, 469 U.S. 464, 471, 105 S. Ct. 873, 878 (1985). I therefore do not discuss official-capacity claims for damages separately from those against the City.

A City, of course, can act only through people—its officers and employees. A municipality's liability under 🚩Section 1983 "may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." 🚩*Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); 🚩*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91, 98 S. Ct. 2018, 2035–36 (1978) (a municipality may be liable under 🚩section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). Within this framework, longstanding jurisprudence recognizes two grounds for "*Monell* liability": (1) unconstitutional policies and customs, and (2) inadequate training of employees.[16]

Case: 25-3567    Document: 29    Page: 110    Date Filed: 06/05/2026

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)
2017 WL 2799698

16    The Plaintiffs use the wrong terminology (respondeat superior), but have the right idea. They seek to hold the City liable based on municipal policies and the City's failure to train employees and officers. (Opp. 7-8)

**\*13** First, a municipality or local government unit can be found liable under Section 1983 "where its policies are the 'moving force [behind] the constitutional violation' " that is alleged. *City of Canton Ohio v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694). That liability-creating "force" may be exercised through formal policy or custom. Policy is made when a " 'decisionmaker possess[ing] final authority to establish [local] policy with respect to the action' issues an official proclamation, policy, or edict," *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)), while "[c]ustom ... can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as to virtually constitute law." *Bielevicz v. Dubinion*, 915 F.2d 845, 850 (3d Cir. 2007) (citing *Andrews*, 895 F.2d at 1480).

"A municipal defendant need not, however, promulgate an official legislative policy or follow a repeated practice to face liability.... The policy or custom requirement may [ ] be satisfied by a single official act by a local governmental body, or official with final decisionmaking authority." *Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 366–67 (D.N.J. 2000); *see also Longford v. City of Atl. City*, 235 F.3d 845, 846-50 (3d Cir. 2000). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S. Ct. 1292, 1300 (1986).[17]

17    *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 125, 108 S. Ct. 915, 925 (1988) ("[S]tate law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.").

The Third Circuit has summarized the above custom-and-policy principles in simpler terms:

"[A] municipality may only be liable for the torts of its employees in one of three ways: First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes."

*Ecotone Farm LLC v. Ward*, 639 Fed.Appx. 118, 127 (3d Cir. 2016) (quoting *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (citations omitted)).

Second, *Monell* liability based on a municipality's failure to train or supervise employees "requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact. Additionally, the identified deficiency in a city's training program must be closely related to the ultimate injury; or in other words, the deficiency in training [must have] actually caused the constitutional violation." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotation marks and citations omitted). "[I]n order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (citations and footnote omitted). Therefore, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted).

1. *Monell* liability for Equal Protection Claim (Count 1)

**\*14** With respect to their Equal Protection claim (Count 1), the Plaintiffs allege that the Building Department issued a Stop Work Order on their Property; that the City, through the Building Department and the HPC, refused to let work

continue without HPC approval; that Jersey City refused to acknowledge that the Building Department had issued a building permit for the renovations; and that the City and its departments have allowed other property owners in the same historic neighborhood to perform similar renovations without HPC approval or permits. (Compl. ¶¶ 23, 26, 61–64)

On the face of the Complaint, Plaintiffs allege no City policy or custom that would have resulted in the injuries alleged. No established policy of discrimination is alleged. At most, one could plausibly infer a pattern of lax enforcement, from which the Plaintiffs believe they, too, should benefit. Therefore, the Plaintiffs have failed to allege that any widespread policy or custom was "the moving force" behind the alleged constitutional deprivation. *See* *Monell*, 436 U.S. at 694.

More plausibly, the Plaintiffs urge that the City is nevertheless liable based on a "single decision" to enforce an ordinance in a discriminatory manner. (Opp. 7) The whole rationale of *Monell*, recall, is that liability must be direct, not imputed. Such direct involvement may be found where the defendant allegedly "was the final policymaker with regard to enforcing [the] ordinance." *Ecotone Farm LLC v. Ward*, 639 Fed.Appx. 118, 127 (3d Cir. 2016). Thus "[n]o one has ever doubted ... that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body...." *Pembaur v. City of Cincinnati*, that 475 U.S. 469, 480, 106 S. Ct. 1292, 1298 (1986).

The Complaint alleges, not just an arbitrary decision by a subordinate official, but the formal issuance of a Stop Work Order by the agency or agencies with decision-making responsibility and authority. There is room for doubt as to whether *Monell* liability would ultimately be found, but that is not the standard now. These allegations are sufficient to permit further exploration in discovery.

Accordingly, Count 1 of the Complaint adequately alleges municipal liability under *Monell*.

2. Counts 2, 3, and 4 Against Jersey City

Count 2 has already been dismissed for failure to state a claim. I consider whether Counts 3 and 4 (First Amendment retaliation and Fourth Amendment illegal seizure) adequately allege *Monell* liability of the City.

The Complaint fails to allege that the actions of the police officers at the public meetings implemented a preexisting policy. Nor do they allege facts suggesting substandard training, or a "pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. at 61 (2011). I would not find *Monell* liability on this basis.

Once again, however, the Complaint alleges that these actions were undertaken at the direct order of the Mayor. It is not implausible that the Mayor has the authority to direct the actions of the police, or to control the proceedings at a public meeting. That is a sufficient allegation that the Mayor is an "official with final decisionmaking authority" who spoke for the City in this instance. Counts 3 and 4 adequately allege municipal liability under *Monell*.

**C. Qualified Immunity of Fulop and Lewis**

Counts 3 and 4, in addition to naming the City, name Mayor Fulop and Officer Lewis in their individual capacities. As individuals, they are entitled to assert personal defenses, such as qualified immunity.

Qualified immunity protects government officials from insubstantial claims in order to "shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 116 L.Ed.2d 589 (1991)). To overcome qualified immunity, a plaintiff must plead facts "showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735. A right is clearly established if 'its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right.' " *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392, 398–99 (3d Cir. 2003) (quoting *Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir. 2000)).

1. First Amendment Claim (Count 3)

**\*15** As discussed, Count 3 adequately pleads that Lewis and Fulop violated Fernandes's First Amendment rights. The remaining qualified immunity question, then, is whether the relevant right was clearly established at the time. Count 3 alleges two alleged retaliatory actions: (1) Fernandes's removal from the February 3, 2016 public meeting and (2) Mayor Fulop's defamatory statements during the February 3, 2016 and March 14, 2016 meetings.[18]

[18]   The Plaintiffs never allege that Lewis was one of the police officers who intimidated them with their nearby presence at public meetings, or that Mayor Fulop directed officers to stand near them. (See Compl. ¶ 80) I therefore do not discuss this form of alleged intimidation here.

*Fernandes's Removal*
In *Monteiro v. City of Elizabeth*, the United States Court of Appeals for the Third Circuit addressed whether a public official who excludes a citizen from a public meeting may enjoy qualified immunity. 436 F.3d 397, 404–05 (3d Cir. 2006). "It is clearly established," the Court explained, "that when a public official excludes an elected representative or a citizen from a public meeting, she must conform her conduct to the requirements of the First Amendment"; and it is likewise "clearly established that content-based restrictions on speech in a public forum are subject to strict scrutiny, while viewpoint-based restrictions violate the First Amendment regardless of whether they also serve some valid time, place, manner interest." *Id.* at 404–05. Whether the officer violated clearly established law, then, will depend in part upon his or her motivation. Motivation being a question of fact, the court affirmed the district court's decision to deny the defendant's post-trial motion for judgment as a matter of law based on qualified immunity. *Id.* at 405.

The Plaintiffs' First Amendment claim here raises a qualified immunity issue similar to the one that was tried in *Monteiro*. *A fortiori*, it is inappropriate for resolution at the motion to dismiss stage. The allegations here create a factual issue as to whether Mayor Fulop and Officer Lewis (a) acted properly to maintain order at public meetings or instead (b) sought to prevent Fernandes from vocalizing his opposition to the City's actions in connection with his Property.

Defendants further suggest that this alleged arrest, even if retaliatory, was supported by probable cause. *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). *See also Primrose*

*v. Mellot*, 541 Fed. Appx. 177, 180 n.2 (3d Cir. 2013) (noting that Third Circuit has "not decided whether the logic of Hartman applies to retaliatory arrest claims," and reasoning that an officer who the plaintiff claimed issued her a retaliatory summons for engaging in protected speech would be entitled to qualified immunity because a jury had found that the officer had probable cause.); *Cresci v. Aquino*, No. CV134695KMJBC, 2017 WL 1356322, at \*10 (D.N.J. Apr. 10, 2017). Again, such assertions of qualified immunity leapfrog the factual issue here. The Complaint alleges that Fernandes was not being disruptive, and that the Mayor simply ordered him removed without cause. (See Compl. ¶¶ 44–46, 88–89.) Such application of force, without probable cause (and, *a fortiori*, for the unconstitutional purpose of silencing the Plaintiff) would set forth a clearly established violation. That is what the Complaint alleges.

While qualified immunity issues must be addressed, and should be resolved, at the earliest possible stage, they often require factual development. This is such a case. The need to develop the factual record renders dismissal on the basis of qualified immunity inappropriate at this stage.[19]

[19]   Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury. *See Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed 2d 238 (1995) (qualified immunity may turn on disputed issues of fact); *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995) ("While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination."). Motive is a question of fact that must be decided by the jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor. *See Mitchell v. Forsyth*, 472 U.S. 511, 529, 105 S. Ct. 2806, 86 L.Ed.2d 411 (1985) (improper intent is a pure question of fact); *Walker v. Horn*, 286 F.3d 705, 710 (3d Cir. 2002).

*Monteiro*, 436 F.3d at 405. *See also Newland v. Reehorst*, 328 Fed.Appx. 788, 791 (3d Cir. 2009) (non-precedential) (cautioning "that it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases."); *Scnrob v. Catterson*, 967 F.2d 929, 938 (3d Cir. 1992) ("[I]f the plaintiffs allegations are sufficient as a matter of law

to avoid an immunity defense, but the defendant denies engaging in the alleged conduct, then discovery may be necessary before [the question of qualified immunity] can be resolved" (internal quotation marks omitted)).

**\*16** Qualified immunity, then, does not bar the assertion of Count 3 against Mayor Fulop and Officer Fulop based on their having allegedly forcibly removed Fernandes from the meeting.

*Mayor Fulop's Defamatory Statements*

Count 3 alleges that Mayor Fulop's defamatory statements, too, constituted retaliation for Fernandes's exercise of First Amendment rights. Count 3, as I have stated, is going forward in any event, but I discuss this alternative theory briefly.

The Third Circuit has stated that its "cases do not provide government officials with clear guidance as to when a government official's own speech can [ ] constitute unconstitutional retaliation." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 176 (3d Cir. 2016). And very recently, in *Mirabella v. Villard*, 853 F.3d 641 (3d Cir. 2017), the Court reminded us not to " 'define clearly established law at a high level of generality.' " *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 2084 (2011)). Thus it held that although "the 'right to be free from retaliation for one's speech,' " was clearly established, the "right to be free from a retaliatory restriction on communication with one's government" was not. *Id.* at 653 (quoting *Reichle*, 132 S. Ct. at 2094).

Still, two judges in the District of Delaware have grappled with the specific question of whether freedom from retaliatory defamation is clearly established, only to reach different conclusions. *Compare* *Rappa v. Hollins*, 991 F. Supp. 367, 382 (D. Del. 1997) ("it was not clearly established that [the plaintiff] had a constitutional right not to be subjected to defamatory remarks in retaliation for engaging in constitutionally protected First Amendment activity"), *aff'd*, 178 F.3d 1280 (3d Cir. 1999), *with* *Neuberger v. Gordon*, 567 F. Supp. 2d 622, 641 (D. Del. 2008) (framing the relevant inquiry as "whether the right retaliated *against* was clearly established").[20]

[20] Agreeing with *Rappa* are, *e.g., Blume v. Meneley*, 283 F. Supp. 2d 1178, 1188 (D Kan. 2003) ("[E]ven if a cause of

action exists under § 1983 for the alleged defamation, that cause of action is not based on a clearly established legal principle of which defendant [ ] should have been aware at the time."), and *Guy v. State of Ill.*, 958 F. Supp. 1300, 1310 (N.D. Ill. 1997) (reasoning "it was not 'clearly established' that defamation alone could provide the basis for a violation of plaintiff's first amendment rights").

This, however, is not an allegation of defamation alone, but defamation-plus. The Mayor's alleged statements might take on a different hue in the context of his ordering the police to remove Fernandes. I therefore will not perform surgery on Count 3, but will permit the allegations to be developed in discovery.

In sum, the motion to dismiss Count 3 as against Mayor Fulop on grounds of qualified immunity is denied.

2. <u>Fourth Amendment Claim (Count 4) Against Lewis and Mayor Fulop as Individuals</u>

Plaintiffs have sufficiently alleged Lewis's and Mayor Fulop's violation of Fernandes's Fourth Amendment rights. As to whether the right violated was clearly established, "Police officers clearly know that they need probable cause to arrest someone and we can assume that they know they face personal liability if they arrest someone without probable cause." *George v. Rehiel*, 738 F.3d 562, 583 (3d Cir. 2013); *see also Ciardiello v. Sexton*, 390 Fed.Appx. 193, 198 (3d Cir. 2010) ("In the context of a false arrest claim, we may review whether a reasonable officer could have believed that probable cause existed to arrest the plaintiff...." (internal quotation marks omitted)); *Rios v. City of Bayonne*, No. CIV. 2:12-4716, 2013 WL 6008481, at \*6 (D.N.J. Nov. 12, 2013) ("As to false arrest, false imprisonment, and illegal search and seizure, the factual inquiry is whether the information in the possession of the arresting officers was sufficient to constitute probable cause."). As the Complaint describes the scene, Lewis and the other arresting PD officers had virtually no reason to arrest Fernandes (to the extent they *did* arrest him) other than Mayor Fulop's instruction.

**\*17** Whether it was objectively reasonable for Mayor Fulop to believe that probable cause supported Fernandes's arrest when he allegedly directed Lewis and other PD officers to remove Fernandes from the meeting is an independent inquiry, and one that raises factual questions I cannot resolve

Case: 25-3567    Document: 29    Page: 114    Date Filed: 06/05/2026

Fernandes v. City of Jersey City, Not Reported in Fed. Supp. (2017)
2017 WL 2799698

at this stage. *See [Blaylock v. City of Philadelphia](#), 504 F.3d 405, 411 (3d Cir. 2007)* ("The qualified immunity standard is one of objective legal reasonableness. Although the question of what facts the arresting officer knows is relevant to the inquiry, his subjective motivation for making the arrest is not." (internal quotation marks and citations omitted)); *cf.* [Merkle v. Upper Dublin Sch. Dist.](#), 211 F.3d 782, 794 (3d Cir. 2000)* (explaining that instigators of an arrest may have had information they did not provide to the arresting officer that would negate their reasonable belief of probable cause, even if the arresting officer had a reasonable belief of probable cause).

Accordingly, I cannot determine whether Lewis and Fulop are immune from suit until the factual record sheds more light on what information they had before them (e.g., what behavior they observed in Fernandes).

### D. Common Law Claims

Plaintiffs also seek to hold Mayor Fulop liable for defamation and Jersey City liable for negligence. No one disagrees that New Jersey state law applies to these claims.

### 1. *Count 5—Defamation*

Under New Jersey law, the essential elements of defamation, aside from damages, are " '(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher.' " *[G.D. v. Kenny](#), 411 N.J. Super. 176, 186, 984 A.2d 921, 927–28 (App. Div. 2009), aff'd, [205 N.J. 275, 15 A.3d 300 (2011)](#)* (quoting *[Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585, 969 A.2d 1097 (2009)](#)*). Plaintiffs allege only slander (oral defamation), not libel (written defamation). (*see* Compl. ¶¶ 92–98) To satisfy the pleading standards of [Fed. R. Civ. P. 8](#), a plaintiff must at a minimum "plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication.' " *[Foy v. Wakefem Food Corp.](#), No. CIV.A 09-1683(JLL), 2010 WL 147925, at \*6 (D.N.J. Jan. 7, 2010)* (quoting *[Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 514 A.2d 53, 63 (N.J. Super. Ct. App. Div. 1986)](#)*).[21]

[21]  Although New Jersey imposes a heightened pleading standard whereby a claimant must allege the specific defamatory words used, in this Court the ordinary federal pleading standard applies. *[Mangan v. Corp. Synergies Grp., Inc.](#), 834 F.Supp.2d 199, 204 (D.N.J. 2011)* (noting that a plaintiff "must allege the elements of defamation as applied by New Jersey law to a degree of sufficient specificity to satisfy the standards outlined in [Rule 8](#).").

Additionally, a slander claim not rising to the level of slander per se "(e.g., accusation of a crime, a loathsome disease, misfeasance in business, or serious sexual misconduct") generally require[s] proof of special damages—an economic or pecuniary loss." *[W.J.A. v. D.A.](#), 210 N.J. 229, 240, 43 A.3d 1148, 1154 (2012); see also [Marino v. Westfield Bd. of Educ.](#), No. 16CV00361WHWCLW, 2017 WL 216691, at \*6 (D.N.J. Jan. 18, 2017)* (" 'Special damages are defined as harm of a material or pecuniary nature.' " (quoting *[Ward v. Zelikovsky](#), 136 N.J. 516, 540, 643 A.2d 972, 984 (1994)))*). Under the Federal Rules of Civil Procedure, special damages "must be specifically stated." [Fed. R. Civ. P. 9(g)](#).

The Complaint, by reference to excerpts from counsel's February 8, 2016 letter to Jeremy Farrell, alleges that Mayor Fulop told audience members at the February 3, 2016 meeting that Fernandes attends "every single one of these meetings," "made a disruption for twenty to thirty minutes' or five to ten minutes';" at meetings, and that the Property has been "cited for violations." (Compl. ¶ 47) The Complaint further alleges that their counsel's February 8, 2016 letter informed Farrell that Mayor Fulop's previous statements were untrue. Nevertheless, Mayor Fulop stated during a March 14, 2016 meeting that Fernandes "is a disgruntled person because his property had been cited for numerous violations by the City, and that the matter is currently the subject of litigation." (*Id.* ¶¶ 52, 95)

**\*18** The defendants make two arguments as to why the Plaintiffs fail to state a prima facie case. First, they say, Mayor Fulop's alleged statements were not false. The Complaint, however, alleges that they were. Such questions of fact cannot be resolved on this motion.

Second, the defendants argue that Plaintiffs have failed to adequately plead special damages. (*Id.* 17) I agree. Plaintiffs allege that Mayor Fulop's slander has "injured their reputation, caused [them] to lose the goodwill o[f] others, and has injured [them] in their business." (Compl.

¶ 98) These are not statements, such as false attributions of criminality or accusations that a person cannot properly conduct his business, trade, or profession, that naturally give rise to an inference of damages. *See generally DeVries v. McNeil Consumer Prod. Co.*, 250 N.J. Super. 159, 166, 593 A.2d 819, 824 (App. Div. 1991). The Complaint provides no specific (or even general) facts suggesting that Plaintiffs have suffered economic or pecuniary loss. For example, it does not state what business Plaintiffs are in, or what goodwill they allegedly enjoy[ed]. Accordingly, the Complaint fails to state a claim for slander, and the motion to dismiss is granted as to Count 5.[22]

[22]  Because Plaintiffs have not stated a claim for slander, I do not reach whether Mayor Fulop would be entitled to state law qualified immunity under the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. § 59:1-1 *et seq.*, or whether Plaintiffs' alleged failure to comply with that Act's requirement of filing a TCN renders their slander claim jurisdictionally infirm. Should the Plaintiifs seek to amend, those issues might again arise.

*2. Count 6—Negligence*

Under New Jersey law, a cause of action for negligence has four essential elements: "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Townsend v. Pierre*, 221 N.J. 36, 51, 110 A.3d 52, 61 (2015) (internal quotation marks omitted). Here, Plaintiffs allege the Building Department issued them a permit to alter the Property, then ordered Plaintiffs to stop work on the Property after siding had been removed, resulting in weather damage.

Public entities, however, enjoy certain immunities from a suit for negligence. In particular, "[p]ublic entities are immune from negligence suits unless such suits are specifically authorized by the NJTCA. Accordingly, the NJTCA must be strictly construed to permit lawsuits only where specifically allowed." *Gourley v. Twp. of Monroe*, No. A-1595-11T2, 2013 WL 68715, at *3 (N.J. Super. Ct. App. Div. Jan. 8, 2013) (citation omitted); *see also* N.J. Stat. Ann. § 59:1-2 (West) ("[It] is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein.")

The NJTCA explicitly immunizes public entities such as the City from suits for damages based on denial or suspension of a permit or similar authorization:

> A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or public employee is authorized by law to determine whether or not such authorization should be issued, denied, suspended or revoked.

**\*19**  N.J. Stat. Ann. § 59:2-5.

The applicability of the NJTCA immunity is apparent from the face of the Complaint. It may be possible to plead around it in an amended version of Count 6. As it stands, however, Count 6 must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the complaint is **GRANTED** in part and **DENIED** in part, as follows:

> **A.** The motion is granted as to Counts 2, 5, and 6, which are dismissed in their entirety, **WITHOUT PREJUDICE** to the filing of a proposed amended complaint within 30 days.

> **B.** The motion is denied as to Count 1, which remains against Jersey City; and

> **C.** The motion is denied as to Counts 3 and 4, which remain against Jersey City, Mayor Fulop in his individual capacity, and Anthony B. Lewis in his individual and official capacities.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2799698

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

650 Fed.Appx. 89
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Dorothy HARTMAN, a/k/
a Dorothy M. Hartman, Appellant

v.

BANK OF NEW YORK MELLON, f/
k/a the Bank of New York, Trustee for
the Certificate Holder of CWALT, Inc.,
Alternative Loan Trust 2005–86CB, Mortgage
PassThrough Certificates Series 2005–86–
CB, c/o Bank of America, N.A.; City of
Philadelphia; Prudential Fox & Roach Realtors,
known as Prudential Real Estate and Mike
McCann, as agent; Bay View Loan Services.

No. 15–3818
|
Submitted for Possible Dismissal Pursuant to
28 U.S.C. § 1915(e)(2)(B) or Summary Action
|
Pursuant to Third Circuit LAR 27.4
and I.O.P. 10.6 April 28, 2016.
|
Opinion filed May 5, 2016.

**Synopsis**
**Background:** Homeowner brought action against bank, loan servicer, city, realty company and individual agent, alleging approximately 38 claims connected to the purchase of a home. The United States District Court for the Eastern District of Pennsylvania, Paul S. Diamond, J., dismissed homeowner's fourth amended complaint for failure to state a claim. Homeowner appealed.

**Holdings:** The Court of Appeals held that:

[1] homeowner failed to state a claim against bank and loan servicer for retaliation;

[2] homeowner failed to state a claim against bank and loan servicer for violation of the Fair Housing Act, the Equal Credit Opportunity Act, or Title VII;

[3] homeowner failed to adequately plead any claim against the city; and

[4] homeowner's allegations were insufficient to state a claim against realty company or agent for failure to disclose defects in the property.

Affirmed.

See also, 604 Fed.Appx. 218.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (7)

[1]   **Mortgages and Deeds of Trust**  Pleading

266   Mortgages and Deeds of Trust
266XII   Actions and Proceedings in General
266k1646   Pleading
   (Formerly 266k216)

Did conclusory allegations state claim for retaliation? No
Material Facts

- There was no showing of causal connection between alleged protected activity and retaliatory action

Causes of Action
Retaliation

Homeowner's conclusory allegations failed to state claim against bank and loan servicer for retaliation, absent showing of a causal connection between alleged protected activity and retaliatory action. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

More cases on this issue

[2]   **Civil Rights**  Loans and financing

**Finance, Banking, and Credit** 🔑 Credit discrimination; equal credit opportunity

78   Civil Rights
78I   Rights Protected and Discrimination Prohibited in General
78k1074   Housing
78k1079   Loans and financing
172H   Finance, Banking, and Credit
172HXVI   Federal Regulation of Consumer Finance and Credit
172HXVI(K)   Enforcement, Remedies, and Proceedings
172HXVI(K)4   Actions
172Hk1600   Pleading
172Hk1604   Credit discrimination; equal credit opportunity
    (Formerly 92Bk66 Consumer Credit)

Was discrimination claim sufficiently pled? No
Material Facts

- Homeowner failed to allege that bank and loan servicer acted with discriminatory purpose or treated individuals outside of homeowner's protected class differently

Causes of Action
Civil Rights Violation > Race DiscriminationCivil Rights Violation > Disability Discrimination

Homeowner failed to state claim against bank and loan servicer for violation of the Fair Housing Act, the Equal Credit Opportunity Act, or Title II, based on their refusal to allow her to refinance, given absence of plausible allegation that they acted with a discriminatory purpose or treated individuals outside of homeowner's protected class differently. Civil Rights Act of 1964, § 201 et seq., 🚩42 U.S.C.A. § 2000a et seq.; Civil Rights Act of 1968, § 804, 🚩42 U.S.C.A. § 3604; Equal Credit Opportunity Act, § 701(a)(1), 🚩15 U.S.C.A. § 1691(a)(1); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

5 Cases that cite this headnote

More cases on this issue

[3]   **Municipal, County, and Local Government** 🔑 Cities and municipal corporations in general

268   Municipal, County, and Local Government
268XII   Torts and Tort Claims
268XII(B)   Grounds of Liability and Immunity Therefrom
268XII(B)1   In General
268k3285   Entities Subject to Liability or Entitled to Immunity
268k3289   Cities and municipal corporations in general
    (Formerly 268k723 Municipal Corporations)
Under Pennsylvania Tort Claims Act, city was immune from homeowner's state tort claims. 42 Pa.C.S.A. §§ 8541, 🚩8542.

1 Case that cites this headnote

[4]   **Civil Rights** 🔑 Property and housing

78   Civil Rights
78III   Federal Remedies in General
78k1342   Liability of Municipalities and Other Governmental Bodies
78k1351   Governmental Ordinance, Policy, Practice, or Custom
78k1351(3)   Property and housing

Was racial discrimination sufficiently pled? No
Material Facts

- Homeowner failed to allege that execution of city's policy or custom inflicted her injury

Causes of Action
Civil Rights Violation > Race Discrimination

Homeowner failed to state claim against city for racial discrimination in violation of the Fourteenth Amendment, absent allegation that the execution of the city's policy or custom inflicted her injury. U.S.C.A. Const.Amend. 14.

More cases on this issue

**[5]**  **Civil Rights** 🔑 Property and housing

78  Civil Rights
78III  Federal Remedies in General
78k1392  Pleading
78k1395  Particular Causes of Action
78k1395(3)  Property and housing

> Was disability discrimination claim sufficiently pled? No Material Facts
>
> • Homeowner made conclusory allegations of disability discrimination

Causes of Action
Civil Rights Violation > Disability Discrimination

Homeowner's conclusory allegations of disability discrimination were insufficient to state a claim against city. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

1 Case that cites this headnote
More cases on this issue

**[6]**  **Civil Rights** 🔑 Sale; vendor and purchaser

**Civil Rights** 🔑 Discrimination by reason of handicap, disability, or illness

78  Civil Rights
78I  Rights Protected and Discrimination Prohibited in General
78k1074  Housing
78k1076  Sale; vendor and purchaser
78  Civil Rights
78I  Rights Protected and Discrimination Prohibited in General
78k1074  Housing
78k1083  Discrimination by reason of handicap, disability, or illness

> Were allegations sufficient to support claims of deceptive advertising, racial discrimination, or disability discrimination? No Material Facts
>
> • Homeowner's allegations against realty company and agent were insufficient to support claims of deceptive advertising, racial discrimination, or disability discrimination

Causes of Action
False or Deceptive AdvertisingCivil Rights Violation > Race DiscriminationCivil Rights Violation > Disability Discrimination

Homeowner's allegations against realty company and agent were insufficient to support claims of deceptive advertising, racial discrimination, or disability discrimination.

More cases on this issue

**[7]**  **Brokers** 🔑 Misrepresentation or fraud of broker

65  Brokers
65VIII  Rights, Powers, and Liabilities as to Third Persons
65k102  Misrepresentation or fraud of broker

> Was complaint sufficient to state claim for failure to disclose? No Material Facts
>
> • Homeowner's complaint did not allege that realty company or agent knew of defects or of misrepresentation concerning defects

Causes of Action
Disclosure Requirement Violation

Homeowner's complaint was insufficient to state claim against realty company or agent for failure to disclose certain defects in the property, absent allegations that they knew of the defects or of a misrepresentation concerning the defects. 68 Pa.C.S.A. § 7310; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

More cases on this issue

**\*90** On Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C. Civil No. 2–13–cv–01909), District Judge: Honorable Paul S. Diamond.

**Attorneys and Law Firms**

Dorothy M. Hartman, Philadelphia, PA, pro se.

Daniel J. Auerbach, Esq., Michael R. Miller, Esq., City of Philadelphia Law Department, Philadelphia, PA, Jason J. Sweet, Esq., Reger Rizzo & Darnall, Philadelphia, PA, Joseph F. Riga, Esq., McCabe, Weisberg & Conway, Philadelphia, PA, for Bank of New York Mellon, f/k/a the Bank of New York, Trustee for the Certificate Holder of CWALT, Inc., Alternative Loan Trust 2005–86CB, Mortgage PassThrough Certificates Series 2005–86–CB, c/o Bank of America, N.A.; City of Philadelphia; Prudential Fox & Roach Realtors, known as Prudential Real Estate and Mike McCann, as agent; Bay View Loan Services.

Before: FISHER, JORDAN and VANASKIE, Circuit Judges.

OPINION[*]

[*]    This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PER CURIAM.

Pro se appellant Dorothy Hartman appeals the District Court's order dismissing her fourth amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, we will summarily affirm the District Court's judgment. *See* 3d Cir. L.A.R. 27.4; 3d Cir. I.O.P. 10.6.

Hartman filed her original complaint in 2013. She amended the complaint multiple times, including twice in response to orders from the District Court dismissing the complaint without prejudice to Hartman's refiling. At issue in this appeal is her fourth amended complaint. In this complaint, she named as defendants the Bank of New York Melon ("BNY Mellon"), Bay View Loan Services, the City of Philadelphia, Prudential Fox & Roach Realtors, and Prudential's employee Michael McCann. Hartman presented roughly 38 claims that, while loosely connected to her purchase of her home in 2003, catalog grievances spanning over 20 years. *See* Fourth Am. Compl. at pgs. 16, 18, 21 (listing claims). She alleges, among many other things, that the defendants failed to disclose certain defects in her property, subjected her to excessive utility charges, **\*91** directed sewage water into her basement, placed for-sale signs on properties around her home to reduce her home's value, vandalized her car, refused to allow her to refinance her mortgage, ruined her credit, picked up her trash separately from her neighbors', and committed unidentified hate crimes against her.

The defendants filed Rule 12(b)(6) motions to dismiss, and the District Court granted the motions and dismissed Hartman's fourth amended complaint. Hartman filed a timely notice of appeal. In this Court, she has filed a motion to expedite, as well as a motion requesting a default judgment, to summarily vacate the District Court's judgment, and to bar an attorney from BNY Mellon from participating in the appeal.

We have jurisdiction under 28 U.S.C. § 1291 and exercise a plenary standard of review. *See* *Fleisher v. Standard Ins. Co.,* 679 F.3d 116, 120 (3d Cir.2012). To survive a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"; neither does "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also* *Fantone v. Latini,* 780 F.3d 184, 193 (3d Cir.2015) (recognizing that a pro se complaint must satisfy *Twombly* and *Iqbal's* pleading standard).

 **[1]**    We agree entirely with the District Court's well-reasoned analysis.[1] Turning first to Hartman's claims against BNY Mellon and Bay View Loan Services,[2] while Hartman's complaint asserts claims of "wrongful lawsuit," libel, defamation, slander, inflicting emotional distress, and conspiracy to defame, she has presented no factual allegations to support those claims. Similarly, she has alleged retaliation in only the most conclusory fashion, without making any showing of "a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir.2007). The District Court therefore did not err in dismissing those claims.

[1]    We note that in the documents Hartman has filed in this Court, she primarily complains about a remand order issued by the District Court. Before Hartman

filed her first complaint in this action, BNY Mellon had filed a foreclosure action against her in state court. Hartman subsequently removed that action to the District Court. The District Court granted BNY Mellon's motion to remand, and we summarily affirmed that order. *See* C.A. No. 13–4622. Hartman has provided no basis for us to reconsider that ruling. *See generally* *In re City of Phila. Litig.,* 158 F.3d 711, 717–18 (3d Cir.1998) (discussing law-of-the-case principles). Moreover, Hartman's allegations in support of her contention that the District Judge should have recused himself are utterly groundless. *See* *Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

[2]    The District Court sua sponte dismissed the complaint as to Bay View Loan Services. Given the numerous opportunities the Court gave Hartman to amend to address the complaint's shortcomings and the fact that the claims concerning Bay View are coterminous with the claims against BNY Mellon, we conclude that the District Court did not err in this respect. *See* *Oatess v. Sobolevitch,* 914 F.2d 428, 430 n. 5 (3d Cir.1990); *Bryson v. Brand Insulations, Inc.,* 621 F.2d 556, 559 (3d Cir.1980).

 **[2]**    Further, while Hartman contends that these defendants violated the Fair Housing Act and the Equal Credit Opportunity Act by refusing to allow her to refinance due to her race or disability, which resulted in her credit being ruined **\*92** and her being forced into bankruptcy, her complaint does not plausibly allege that the defendants acted with a discriminatory purpose. *See* 15 U.S.C. § 1691(a)(1) (prohibiting discrimination by creditors "on the basis of race"); 42 U.S.C. § 3604 (prohibiting discrimination in the sale of housing "because of race" or "because of a handicap"). Rather, the complaint specifically states that BNY Mellon and Bay View Loan Services denied refinancing based on information provided by the City about Hartman's nonpayment of utility charges and the value of her home based on its zoning and classification. In these circumstances, she has failed adequately to plead a violation of the Fair Housing Act or the Equal Credit Opportunity Act. *See generally* *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.,* 421 F.3d 170, 176 (3d Cir.2005); *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.,* 727 F.3d 502, 504–05 (6th Cir.2013). Likewise, while she cites 42 U.S.C. § 2000a, she has not meaningfully alleged that the defendants

treated individuals outside her protected class differently or otherwise displayed discriminatory animus. *See* *Fahim v. Marriott Hotel Servs., Inc.,* 551 F.3d 344, 350 & n. 2 (5th Cir.2008). Moreover, § 2000a does not authorize money damages, which is all that Hartman has sought. *See* *Newman v. Piggie Park Enters., Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

 **[3]**    Hartman has also failed adequately to plead any claim against the City. The vast majority of her claims sound in state law, but, with exceptions that are not pertinent here, the Pennsylvania Tort Claims Act grants the City immunity for all state torts. *See* 42 Pa. Cons.Stat. §§ 8541–42; *see also* *Lory v. City of Phila.,* 544 Pa. 38, 674 A.2d 673, 675 (1996). Hartman's federal claims fare no better. She asserted that the City retaliated against her for her previous complaints about the City's behavior, but has again failed to allege any facts tending to show the requisite causal connection. *See* *Lauren W.,* 480 F.3d at 267.

 **[4]     [5]**    Moreover, the District Court properly dismissed Hartman's claim that the City committed race discrimination in violation of the 14th Amendment because she failed altogether to allege that the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury." *Watson v. Abington Twp.,* 478 F.3d 144, 155 (3d Cir.2007) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Finally, Hartman's claims of disability discrimination are entirely conclusory and fail to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

 **[6]     [7]**    Nor did the District Court err in dismissing Hartman's claims against Prudential and McCann. Hartman has failed to allege any facts that would support her claims of deceptive advertising, race discrimination, or disability discrimination. She does allege somewhat more clearly that these defendants improperly failed to disclose certain defects in the property to her. However, under Pennsylvania law, an agent can be liable only if he or she has "actual knowledge of a material defect that was not disclosed to the buyer or of a misrepresentation relating to a material defect." 68 Pa. Cons.Stat. § 7310. Hartman does not allege that Prudential or McCann had knowledge of the alleged defects, which

she describes as "latent and not readily identified," or of a misrepresentation concerning such a defect. *See* *Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 560–65 (1999) (refusing to require a real estate agent, who had relayed the results of a home inspection, to investigate the **\*93** reliability of the inspection); 63 Pa. Stat. and Cons.Stat. § 455.606a(i).[3]

---

[3]   Because the District Court permitted Hartman to amend her complaint on multiple occasions and provided her with clear guidance as to the information that an amended complaint should contain, the Court did not abuse its

discretion in declining to provide Hartman leave to amend her complaint yet again. *See* *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC,* 499 F.3d 663, 666–67 (7th Cir.2007).

Accordingly, we will summarily affirm the District Court's judgment. We deny Hartman's pending motions.

**All Citations**

650 Fed.Appx. 89

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

765 Fed.Appx. 816
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Ellen HEINE; Christopher Grieco; Kara
Grieco; Ann R. Schildknecht; Andrew
Tuscano; Richard Holler; Joseph Fabics; Paul
Dean; Keri Burke; Ruthan Hughes; Unita Peri-
Okonny; Theodoro Pagan; Thomas Combs;
Soliman A. Youssef; Susan Miller; Peter
Martens; Frank Bright; Nadeem Shahidi;
Wendell Sellers; Robert T. Dow; John
and Jane Doe 1 TO 10; Ruben Williams
v.
BUREAU CHIEF DIVISION OF FIRE
AND SAFETY; Commissioner New Jersey
Department of Community Affairs; Div. of
Youth and Family of Bergen County and
Middlesex County; City of Garfield and
its Agents; Township of Montclair and its
Agents; City of New Brunswick and its Agents;
Township of North Brunswick and its Agents;
Township of South Brunswick and its Agents;
Highland Park and its Agents; JP Morgan
Chase Bank, N.A and its Assignees of the
Mortgages of Plaintiffs' and the Plaintiff's
Property; ABC Companies and/or Entities
1 to 20 Director of Codes and Standards
Ellen Heine; Christopher Grieco; Kara Grieco;
Ann R. Schildknecht; Andrew Tuscano;
Richard Holler; Paul Dean; Keri Burke;
Ruthan Hughes; Unita Peri-Okonny; Soliman
A. Youssef; Susan Miller; Frank Bright;
Wendell Sellers; Robert T. Dow, Appellants

No. 18-2313
|
Submitted Pursuant to Third Circuit
LAR 34.1(a) February 1, 2019
|
(Opinion filed: March 13, 2019)

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    1

**Synopsis**

**Background:** Residents and property owners brought action against several municipalities and state agencies, officials or agents of those municipalities and agencies, and one bank, seeking relief pursuant to § 1983 for alleged violations of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and the enforcement of municipal health and safety and housing codes. The United States District Court for the District of New Jersey, No. 2:15-cv-08210, Esther Salas, J., 2019 WL 1167898, granted several defendants' motions to dismiss, and denied motion for reconsideration. Residents and property owners appealed.

**Holdings:** The Court of Appeals held that:

[1] claims against township and city were barred by res judicata;

[2] claims against Department of Community Affairs and several of its Divisions were barred by res judicata;

[3] residents and property owners failed to allege that any constitutional violation stemmed from a policy or custom of municipalities or state agencies, as required to hold them liable;

[4] granting residents and property owners leave to amend their complaint would have been futile; and

[5] district court did not abuse its discretion in denying residents and property owners' motion for reconsideration.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim; Motion to Amend the Complaint; Motion for Reconsideration; Motion to Expand the Record; Other.

West Headnotes (11)

**[1]**    **Federal Courts**    Requisites and sufficiency;  defects

170B    Federal Courts
170BXVII    Courts of Appeals

170BXVII(E)    Proceedings for Transfer of Case
170Bk3446    Notice of Appeal, Writ of Error, or Citation
170Bk3448    Requisites and sufficiency;  defects

Were plaintiffs who did not sign the notice of appeal parties to the appeal? No
Material Facts

- Parties could only proceed in federal court pro se or through counsel
- Pro se appellants were not permitted to represent any other litigant on appeal
- Only a subset of plaintiffs signed appellants' corrected notice of appeal
- Two appellants signed the notice of appeal but did not sign appellants' consolidated brief

Causes of Action
Civil Rights Violation > General

Residents and property owners who did not sign notice of appeal, were not parties to appeal of their action against several municipalities and state agencies, officials or agents of those municipalities and agencies, and one bank, seeking relief pursuant to § 1983 for alleged violations of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and the enforcement of municipal health and safety and housing codes; they could not be represented on appeal by other pro se appellants. U.S. Const. Amends. 1, 4, 5, 8, 14; 28 U.S.C.A. § 1654; 42 U.S.C.A. § 1983.

More cases on this issue

**[2]**    **Federal Courts**    Defects, objections, and amendments;  striking brief

170B    Federal Courts
170BXVII    Courts of Appeals
170BXVII(H)    Briefs
170Bk3504    Defects, objections, and amendments;  striking brief

Did court dismiss appeal for failure to sign consolidated brief? Yes
Material Facts

- Given that only a subset of plaintiffs signed appellants' corrected notice of appeal, any remaining plaintiffs were not parties to this appeal
- Two appellants signed the notice of appeal but did not sign appellants' consolidated brief

Court of Appeals would dismiss appeal as to residents and/or property owners who signed notice of appeal but did not sign consolidated brief.

More cases on this issue

**[3]    Res Judicata** ⚷ Constitutional law, civil rights, and discrimination in general

336H    Res Judicata
336HV    Particular Subjects of Litigation
336Hk362    Constitutional law, civil rights, and discrimination in general
        (Formerly 228k570(4))

Were plaintiffs' Section 1983 claims for violations of constitutional rights barred by res judicata? Yes
Material Facts

- Residents and property owners brought previous federal cases alleging materially identical claims against township and city
- Those claims were dismissed with prejudice

Causes of Action
Civil Rights Violation > General

Claims brought by residents and property owners against township and city, alleging violations of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property

inspections and the enforcement of municipal health and safety and housing codes, were barred by res judicata; residents and property owners brought previous federal cases alleging materially identical claims against township and city, and their claims were dismissed with prejudice. U.S. Const. Amends. 1, 4, 5, 8, 14.

4 Cases that cite this headnote
More cases on this issue

**[4]    Res Judicata** ⚷ Constitutional law, civil rights, and discrimination in general

**Res Judicata** ⚷ Real property in general

336H    Res Judicata
336HV    Particular Subjects of Litigation
336Hk362    Constitutional law, civil rights, and discrimination in general
        (Formerly 228k570(4))
336H    Res Judicata
336HV    Particular Subjects of Litigation
336Hk368    Property in General
336Hk370    Real property in general
        (Formerly 228k585(2))

Were plaintiffs' Section 1983 claims for violations of constitutional rights barred by res judicata? Yes
Material Facts

- Majority of the residents and property owners previously asserted the same allegations against Department and Divisions in at least one prior federal action
- In those actions, their claims were dismissed with prejudice

Causes of Action
Civil Rights Violation > General

Claims brought by residents and property owners against Department of Community Affairs and several of its Divisions, alleging violations of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and the enforcement of municipal health and safety and housing codes, were barred by res judicata; majority of the residents and

property owners previously asserted the same allegations against Department and Divisions in at least one prior federal action, in which their claims were dismissed with prejudice. U.S. Const. Amends. 1, 4, 5, 8, 14.

More cases on this issue

**[5]** **Civil Rights** 🔑 Property and housing

78 Civil Rights
78III Federal Remedies in General
78k1392 Pleading
78k1395 Particular Causes of Action
78k1395(3) Property and housing
Residents and/or property owners failed to allege that any constitutional violation stemmed from a policy or custom of the Department of Community Affairs (DCA) or its Divisions, as required to hold them liable under § 1983 for alleged violations of residents and property owners' First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and the enforcement of municipal health and safety and housing codes; residents and property owners simply alleged generally that their residences had somehow been incorrectly designated by the DCA and other entities and that they were waiting to reoccupy a property that had been closed because it was deemed an imminent hazard. U.S. Const. Amends. 1, 4, 5, 8, 14; 🚩42 U.S.C.A. § 1983.

**[6]** **Civil Rights** 🔑 Property and housing

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1351 Governmental Ordinance, Policy, Practice, or Custom
78k1351(3) Property and housing
Residents and property owners failed to allege that any constitutional violation stemmed from a policy or custom of municipalities or state agencies, as required to hold them liable under § 1983 for alleged violations of residents and property owners' First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and the enforcement

of municipal health and safety and housing codes; although several residents and/or property owners alleged that two municipalities issued citations or fines against them, that another municipality boarded up and changed the locks on a home, and that agency was somehow involved with monitoring various families, they did not explain how such actions occurred as a result of a policy or custom of the entities. U.S. Const. Amends. 1, 4, 5, 8, 14; 🚩42 U.S.C.A. § 1983.

**[7]** **Constitutional Law** 🔑 Fourteenth Amendment in general

92 Constitutional Law
92VII Constitutional Rights in General
92VII(B) Particular Constitutional Rights
92k1073 Fourteenth Amendment in general
Resident and/or property owner failed to allege a basis for liability against bank in § 1983 action alleging violations of residents and property owners' First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and the enforcement of municipal health and safety and housing codes; the only resident and/or property owner who mentioned bank claimed only that bank was unaware of the constitutional violations alleged.

U.S. Const. Amends. 1, 4, 5, 8, 14; 🚩42 U.S.C.A. § 1983.

**[8]** **Civil Rights** 🔑 Property and housing

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Employees and Officials
78k1357 Property and housing
Residents and property owners failed to make any specific factual allegations regarding officials and agents of municipalities and state agencies, as required to hold officials and agents liable in their personal capacities, in § 1983 action alleging violations of residents and property owners' First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and the enforcement of

municipal health and safety and housing codes.

U.S. Const. Amends. 1, 4, 5, 8, 14; ⚑ 42 U.S.C.A. § 1983.

**[9]** **Federal Civil Procedure** 🔑 Form and sufficiency of amendment; futility

170A Federal Civil Procedure
170AVII Pleadings
170AVII(E) Amendments
170Ak851 Form and sufficiency of amendment; futility

Was amendment of complaint futile? Yes
Material Facts

- At no point during the course of litigation did residents and property owners identify a policy or custom by state and municipal entities that they claimed violated their constitutional rights, either in the district court or on appeal
- At no point during the course of litigation did residents and property owners identify any wrongdoing by bank, either in the district court or on appeal
- Their claims were based on a number of seemingly unrelated inspections and enforcement incidents in various counties
- Their claims did not suggest the existence of a policy or custom underlying the challenged municipal or agency actions

Causes of Action

Civil Rights Violation > General

Granting residents and property owners leave to amend their complaint would have been futile, in § 1983 action alleging violations of

their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and enforcement of municipal health and safety and housing codes; at no point during the course of litigation did residents and property owners identify a policy or custom by state and municipal entities that they claimed violated their constitutional rights or any wrongdoing by bank, either in the district court or on appeal, and their claims were based on a number of seemingly unrelated inspections and enforcement incidents in various counties and did not suggest the existence of a policy or custom underlying the challenged municipal or agency actions. U.S. Const. Amends. 1, 4, 5, 8, 14; ⚑ 42 U.S.C.A. § 1983.

More cases on this issue

**[10]** **Federal Civil Procedure** 🔑 Grounds and objections

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1839 Reconsideration, Vacation, or Setting Aside
170Ak1840 Grounds and objections

Did district court abuse its discretion in denying plaintiffs' motion for reconsideration? No
Material Facts

- Motion for reconsideration was not based on an intervening change in the law, newly discovered evidence, or the need to correct a clear error of law or fact or to prevent manifest injustice
- Public records used to support motion, which were available prior to the start of litigation, did not constitute newly discovered evidence
- Regardless, such records did not demonstrate residents

and property owners' claims could survive dismissal

Causes of Action

Civil Rights Violation > General

District court did not abuse its discretion in denying residents and property owners' motion for reconsideration of dismissal of their § 1983 action alleging violations of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of property inspections and enforcement of municipal health and safety and housing codes; motion for reconsideration was not based on an intervening change in the law, newly discovered evidence, or the need to correct a clear error of law or fact or to prevent manifest injustice, as public records used to support motion, which were available prior to the start of litigation, did not constitute newly discovered evidence, and regardless, they did not demonstrate residents and property owners' claims could survive dismissal. U.S. Const. Amends. 1, 4, 5, 8, 14; 🚩42 U.S.C.A. § 1983.

6 Cases that cite this headnote
More cases on this issue

[11]    **Federal Courts**  🗝 Failure to file or serve, or to file or serve in time

170B    Federal Courts
170BXVII    Courts of Appeals
170BXVII(H)    Briefs
170Bk3505    Failure to file or serve, or to file or serve in time

Was time extension for filing reply brief warranted? No
Material Facts

- Plaintiffs were previously granted an extension of time to file their reply brief
- Plaintiffs were advised that no further extensions of time to file a reply brief would be granted

Court of Appeals would deny residents and property owners' motion to file a reply brief out of time, where they were previously granted an extension of time to file their reply brief and were

advised that no further extensions of time to file a reply brief would be granted.

More cases on this issue

**\*818**  On Appeal from the United States District Court for the District of New Jersey (D.N.J. Civil Action No. 2:15-cv-08210), District Judge: Honorable Esther Salas

**Attorneys and Law Firms**

Ellen Heine, Pro Se

Christopher Greico, Pro Se

Kara Grieco, Pro Se

Ann R. Schildknecht, Pro Se

Andrew Tuscano, Pro Se

Richard Holler, Pro Se

Paul Dean, Pro Se

Keri Burke, Pro Se

Ruthan Hughes, Pro Se

Unita Peri-Okonny, Pro Se

Soliman A. Youssef, Pro Se

Susan Miller, Pro Se

Frank Bright, Pro Se

Wendell Sellers, Pro Se

Robert T. Dow, Pro Se

Theodoro Pagan, Pro Se

Thomas Combs, Pro Se

Joseph Fabics, Pro Se

Ruben Williams, Pro Se

Peter Martens, Pro Se

Nadeem Shahidi, Pro Se

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    6

Susan M. Scott, Esq., Office of Attorney General of New Jersey, Department of Law & Public Safety, Trenton, NJ, for Defendants-Appellees Bureau Chief Division of Fire and Safety, Commissioner New Jersey Department of Community Affairs, Director of Codes and Standards

Cameryn J. Hinton, Esq., Greenbaum Rowe Smith & Davis, Iselin, NJ, for Defendant New Jersey Division of Youth and Family Services

Donald A. Klein, Esq., Weiner Law Group, Parsippany, NJ, for Defendant-Appellee Township of Montclair

Susan K. O'Connor, Esq., Hoagland Longo Moran Dunst & Doukas, New Brunswick, NJ, for Defendant-Appellee City of New Brunswick

Evan M. Sampson, Esq., New York, NY, for Defendant JP Morgan Chase Bank NA

Before: CHAGARES, BIBAS and GREENBERG, Circuit Judges

## OPINION[*]

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PER CURIAM

**\*819** The above-captioned pro se appellants appeal from the District Court's dismissal of their complaint, as well as the denial of their request for reconsideration. For the reasons that follow, we will affirm the District Court's judgment.

## I.

 **[1]** **[2]** Because we write primarily for the benefit of the parties, we will recite only the facts necessary for our discussion. In 2015, appellants, joined by numerous other plaintiffs who are not parties to this appeal,[1] filed a complaint against several New Jersey municipalities and state agencies, officials or agents of those municipalities and agencies, and one bank. Appellants sought relief pursuant to 42 U.S.C. § 1983 for alleged violations of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in the course of

property inspections and the enforcement of municipal health and safety and housing codes.

1 Parties may only proceed in federal court pro se or through counsel. See 28 U.S.C. § 1654. Pro se appellants are not permitted to represent any other litigant on appeal.

See Osei-Afriyie v. Med. Coll. of Pa., 937 F.2d 876, 882-83 (3d Cir. 1991). Given that only a subset of plaintiffs signed appellants' corrected notice of appeal, any remaining plaintiffs are not parties to this appeal. Two appellants, Ann R. Schildknecht and Unita Peri-Okonny, signed the notice of appeal but did not sign appellants' consolidated brief. Accordingly, this appeal is dismissed as to appellants Schildknecht and Peri-Okonny.

Upon motions by several defendants, the District Court dismissed appellants' complaint with prejudice, concluding that granting appellants leave to amend would **\*820** be futile for a number of reasons. Appellants sought reconsideration, which was denied. They timely appealed both decisions.

## II.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's dismissal of appellants' complaint. See Fowler v. UPMC Shadyside, 578 F.3d 203, 206 (3d Cir. 2009). In our review, "we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011). Dismissal is appropriate "only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that [the] plaintiff's claims lack facial plausibility." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "[W]e review the District Court's denial of leave to amend for abuse of discretion, and review de novo its determination that amendment would be futile." See U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P., 769 F.3d 837, 849 (3d Cir. 2014). We review a district court's denial of a motion for reconsideration for abuse of discretion. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 246 (3d Cir. 2010).

III.

We agree with the District Court's carefully reasoned opinion that appellants' claims cannot survive dismissal, and that granting appellants leave to amend would have been futile. Many of appellants' claims are barred by res judicata, and the remainder fail to state a claim upon which relief can be granted.

 **[3]**    Several appellants brought claims against the Township of Montclair and the City of New Brunswick. Both of these defendants raised res judicata defenses in their motions to dismiss. "[T]he doctrine of claim preclusion, or res judicata, ... bars repetitious suits involving the same cause of action once a court of competent jurisdiction has entered a final judgment on the merits." United States v. Tohono O'Odham Nation, 563 U.S. 307, 315, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011) (internal quotation marks omitted). It is an affirmative defense, and "the party asserting such a bar bear[s] the burden of showing that it applies." United States v. Athlone Indus., Inc., 746 F.2d 977, 983 (3d Cir. 1984).

As detailed by the District Court, these appellants brought previous federal cases alleging materially identical claims against Montclair and New Brunswick, and their claims were dismissed with prejudice. Because appellants' claims against these defendants have already been resolved through a final judgment on the merits, all claims brought by appellants against Montclair and New Brunswick in this action are barred by res judicata.

 **[4]**    **[5]**    A number of appellants also brought claims against the Department of Community Affairs ("DCA") and several of its Divisions. The majority of these appellants previously asserted the same allegations against these defendants in at least one prior federal action, in which their claims were dismissed with prejudice. Thus, we agree with the District Court's thorough reasoning that their claims are barred by res judicata. Three appellants were not involved in prior litigation, but their claims were properly dismissed because they did not allege that any constitutional violation stemmed from a policy or  **\*821**  custom of any of these entities.[2] See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); see also Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir.

1996) ("When a suit against a municipality is based on § 1983, [a] municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.").

[2]    These three appellants alleged generally that their residences had somehow been incorrectly designated by the DCA and other entities and that they were waiting to reoccupy a property that had been closed because it was deemed an imminent hazard.

 **[6]**    **[7]**    **[8]**    Similarly, appellants failed to identify any policy or custom that led to a constitutional violation by the remaining state or municipal defendants — the Township of North Brunswick, the Township of South Brunswick, the City of Garfield, Highland Park, and the Division of Youth and Family Services of Middlesex and Bergen Counties ("DYFS").[3] Appellants made no specific factual allegations about constitutional violations against Highland Park. Several appellants alleged that North and South Brunswick issued citations or fines against them, that Garfield boarded up and changed the locks on a home, and that DYFS was somehow involved with monitoring various families. These appellants did not explain how any of those actions occurred as a result of a policy or custom of these entities.[4] Finally, the only appellant who mentioned the remaining defendant, JPMorgan Chase Bank, claimed only that Chase was unaware of the constitutional violations that appellants allege. Accordingly, the District Court properly dismissed all of appellants' claims.

[3]    Appellants also named numerous officials and agents of several municipalities and agencies in their official capacities. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Appellants made no specific factual allegations regarding any official or agent; to the extent that they sought to sue those parties in their personal capacities, such claims would fail because "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

[4]    Appellants' sole argument regarding this issue on appeal is that "[t]he municipal ordinances and state codes that are used by the inspectors are a product of a government policy, and the inspector's methods are often the results of

customs, policies and practices in the town." Appellants' Br. at 6.

**[9]** The District Court also correctly concluded that granting leave to amend would have been futile in this case. At no point during the course of this litigation have appellants been able to identify a policy or custom by the state and municipal entities that they claim violated their constitutional rights, or any wrongdoing by Chase, either in the District Court or on appeal. Their claims are based on a number of seemingly unrelated inspections and enforcement incidents in various counties in New Jersey and do not suggest the existence of a policy or custom underlying the municipal or agency actions they challenge.[5] Under these circumstances, there is **\*822** no reason to believe that appellants' claims could be salvaged by amendment.

[5]    For this reason, the District Court concluded that an alternative basis for dismissal was that appellants lacked standing to bring generalized grievances about various municipal ordinances they mentioned, as the "requirements of standing are not satisfied by [an] abstract injury in nonobservance of the Constitution asserted by ... citizens." See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 482, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (internal quotation marks omitted).

**[10]** **[11]** Finally, the District Court did not abuse its discretion in denying appellants' motion for reconsideration.

Their motion was not based on an intervening change in the law, newly discovered evidence, or "the need to correct a clear error of law or fact or to prevent manifest injustice."[6] See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). Accordingly, we will affirm the District Court's judgment. We deny Montclair's motion to expand the record on appeal. See Burton v. Teleflex Inc., 707 F.3d 417, 435-36 (3d Cir. 2013). We also deny appellants' motion for leave to file a reply brief out of time.[7]

[6]    Appellants argue that the District Court's denial of reconsideration was improper because they included a few public records that were available prior to the start of this litigation in support of their motion. Such documents are not a proper basis for reconsideration, as they do not constitute newly discovered evidence, and regardless, they do not demonstrate that appellants' claims can survive dismissal.

[7]    On December 12, 2018, appellants were granted an extension of time to file their reply brief on or before January 2, 2019. They were advised that no further extensions of time to file a reply brief would be granted.

**All Citations**

765 Fed.Appx. 816

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

386 Fed.Appx. 251
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

HIGHWAY MATERIALS, INC., Appellant

v.

WHITEMARSH TOWNSHIP, Montgomery
County, PA; The Board of Supervisors of
Whitemarsh, Township, Montgomery County,
PA; Ann D. Younglove, Individually and in
her Capacity as Chairman of the Board of
Supervisors; Ronald J. Derosa, Individually
and in his Capacity as Supervisor; William P.
Rimel, III, Individually and in his Capacity
as Supervisor; Peter B. Cornog, Individually
and in his Capacity as Supervisor; Michael
A. Zeock, Individually and in his Capacity as
Supervisor; Thomas F. Zarko, Individually
and in his Capacity as Township Engineer;
Donald Cohan; Trina Cohan;
Paul Henkels; Barbara Henkels,
(Intervenors in District Court).

No. 04–4195
|
Submitted Under Third Circuit
LAR 34.1(a) June 3, 2010.
|
Opinion filed: July 7, 2010.

**Synopsis**
**Background:** Landowner sued township, township's board of
supervisors, board members, and township engineer pursuant
to § 1983, alleging violations of its due process and equal
protection rights. The United States District Court for the
Eastern District of Pennsylvania, Robert F. Kelly, J., 2004 WL
2220974, granted defendants' motion for summary judgment.
Landowner appealed.

**Holdings:** The Court of Appeals, Ambro, Circuit Judge, held
that:

[1] defendants did not engage in behavior that shocked the
conscience, as required to establish substantive due process
violation;

[2] board's actions were not unrelated to any legitimate
government interest, as required for substantive due process
claim; and

[3] defendants' challenged actions were not irrational and
wholly arbitrary, as required to establish landowner's class-
of-one equal protection claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (3)

[1]    **Constitutional Law** 🔑 Particular issues and
applications

**Zoning and Planning** 🔑 Proceedings on
Permits, Certificates, or Approvals

92  Constitutional Law
92XXVII  Due Process
92XXVII(G)  Particular Issues and Applications
92XXVII(G)3  Property in General
92k4091  Zoning and Land Use
92k4093  Particular issues and applications
414  Zoning and Planning
414VIII  Permits, Certificates, and Approvals
414VIII(B)  Proceedings on Permits, Certificates,
or Approvals
414k1410  In general
Even if township and its officials intentionally
refused to cooperate with landowner in
connection with its zoning application,
improperly applied township ordinances, treated
landowner differently from nearby owners, and
actively sought reasons to deny landowner
opportunity to develop its land, township and
officials at most committed bad-faith violation

of state law and did not engage in behavior that shocked the conscience, as required to establish substantive due process violation. U.S.C.A. Const.Amend. 14.

28 Cases that cite this headnote

[2]    **Constitutional Law** 🗝 Particular issues and applications

**Zoning and Planning** 🗝 Traffic conditions

**Zoning and Planning** 🗝 Streets and roads; traffic considerations

92   Constitutional Law
92XXVII   Due Process
92XXVII(G)   Particular Issues and Applications
92XXVII(G)3   Property in General
92k4091   Zoning and Land Use
92k4093   Particular issues and applications
414   Zoning and Planning
414III   Modification or Amendment;  Rezoning
414III(A)   In General
414k1157   Traffic conditions
414   Zoning and Planning
414VIII   Permits, Certificates, and Approvals
414VIII(A)   In General
414k1379   Maps, Plats, and Plans;  Subdivisions
414k1383   Grounds for Grant or Denial;  Conformity to Regulations
414k1383(2)   Streets and roads;  traffic considerations

Actions of township's board of supervisors, in rezoning landowner's property and denying its development proposal, were not unrelated to any legitimate government interest, as required for substantive due process claim, where proposal would significantly increase traffic in township, a consideration that was legitimate concern of local government. U.S.C.A. Const.Amend. 14.

12 Cases that cite this headnote

[3]    **Constitutional Law** 🗝 Zoning and Land Use

**Zoning and Planning** 🗝 Spot zoning

**Zoning and Planning** 🗝 Grounds for Grant or Denial;  Conformity to Regulations

**Zoning and Planning** 🗝 Streets and roads; traffic considerations

92   Constitutional Law
92XXVI   Equal Protection

92XXVI(E)   Particular Issues and Applications
92XXVI(E)3   Property in General
92k3511   Zoning and Land Use
92k3512   In general
414   Zoning and Planning
414III   Modification or Amendment;  Rezoning
414III(A)   In General
414k1155   Spot zoning
414   Zoning and Planning
414VIII   Permits, Certificates, and Approvals
414VIII(A)   In General
414k1379   Maps, Plats, and Plans;  Subdivisions
414k1383   Grounds for Grant or Denial;  Conformity to Regulations
414k1383(1)   In general
414   Zoning and Planning
414VIII   Permits, Certificates, and Approvals
414VIII(A)   In General
414k1379   Maps, Plats, and Plans;  Subdivisions
414k1383   Grounds for Grant or Denial;  Conformity to Regulations
414k1383(2)   Streets and roads;  traffic considerations

Actions of township and its officials in rezoning landowner's property but not rezoning adjacent property and denying landowner's development proposal were not irrational and wholly arbitrary, as required for landowner to establish class-of-one equal protection claim, where, even if landowner and adjacent landowner were similarly situated, township could rezone land as part of determination as to how much industrial development was in township's best interests, and township had number of valid reasons for denying proposal, including identified deficiencies in proposal under local ordinances, concerns about increased traffic burden that proposed development would produce, and concerns about how project would conform to surrounding area. U.S.C.A. Const.Amend. 14.

26 Cases that cite this headnote

**\*253**  Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civil Action No. 02–cv–03212), District Judge: Honorable Robert F. Kelly.

**Attorneys and Law Firms**

Walter M. Einhorn, Jr., Michael Sklaroff, Corey Field, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Appellant.

Harry G. Mahoney, Carla P. Maresca, Deasey, Mahoney & Bender, Philadelphia, PA, for Whitemarsh Township, Montgomery County, PA, The Board of Supervisors of Whitemarsh, Township, Montgomery County, PA, Ann D. Younglove, Ronald J. Derosa, William P. Rimel, III, Peter B. Cornog, Michael A. Zeock, Thomas F. Zarko.

Kevan F. Hirsch, Kaplin, Stewart, Meloff, Reiter & Stein, Blue Bell, PA, for Donald Cohan, Trina Cohan, Paul Henkels, Barbara Henkels.

Before: AMBRO, CHAGARES, and VAN ANTWERPEN, Circuit Judges.


OPINION

AMBRO, Circuit Judge.

Highway Materials, Inc. ("HMI") appeals the District Court's grant of defendants' motion for summary judgment on HMI's substantive due process and equal protection claims.[1] HMI argues that the District Court erred by: 1) failing to consider all the facts on the record, as well as reasonable inferences in HMI's favor, in applying the "shocks the conscience" standard to HMI's substantive due process claim; and 2) finding that HMI had not shown that defendants' behavior lacked any rational basis as needed to sustain its equal protection claim. For the reasons that follow, we disagree and thus affirm.

[1]    Defendants include Whitemarsh Township, the Whitemarsh Township Board of Supervisors, individual members of the Board, and Thomas Zarko (the Township engineer).


**I. Factual and Procedural History**

HMI purchased what was known as the Corson Limestone Quarry in 1997. The property comprises 309 acres over three parcels of land in Whitemarsh Township, Montgomery County, Pennsylvania (the "Township"). The subject of this land use dispute is a 54 acre parcel termed "Parcel One." Until late 2001, the majority of this land was zoned HVY–X

Industrial, with a small section zoned for residential use. The HVY–X zone permitted office development, among other uses, but prohibited residential development. Nearly all of the land in the area around HMI's property is zoned for residential use, with the exception of a 15 acre parcel adjacent to HMI's land zoned HVY–X, owned by KYW (a local radio broadcaster), upon which sits a radio transmitting tower and a small building.

The current dispute arose from HMI's efforts to develop Parcel One. Near the end of November 2000, HMI submitted a sketch plan proposing a mixed-use development that included 450,000 square feet of office space and 600 apartment units. This plan required that the Township re-zone the property to permit the residential development prohibited in an HVY–X zone.[2] The Montgomery County Planning Commission, in a January 29, 2001, meeting, determined that the proposal was too dense relative to the surrounding area.[3] **\*254** The Whitemarsh Township Planning Commission (the "Whitemarsh Planning Commission") then convened on February 21, 2001, at a meeting open to the public.[4] Many attendees, from both the general public and the Whitemarsh Planning Commission, were similarly critical of the proposal. In May 2001, HMI presented the proposal to the Board of Supervisors of Whitemarsh Township (the "Board") at an open meeting. Many nearby residents, identifying themselves as members of the Whitemarsh Township Residents Association (the "Residents Association"), attended this meeting. They spoke against the proposal, and voiced a general opposition to further development in the Township. The parties do not dispute that the proposed development would have led to traffic and congestion problems in the area.

[2]    HMI alternately could have sought a variance from the Township's Zoning Hearing Board.

[3]    The Montgomery County Planning Commission acts in an advisory role for the Township, which has the power to approve or reject development proposals within its jurisdiction.

[4]    The Whitemarsh Planning Commission acts in an advisory role for the Board (defined below in text), which ultimately decides land use requests and proposals for the Township.

Noting the Township's resistance to re-zoning to accommodate its mixed use proposal, HMI set out to develop the land in accordance with HVY–X regulations. Meanwhile, in July 2001 one resident, Donald Cohan, on

behalf of a substantial number of co-signing residents, submitted a private re-zoning petition in accordance with Whitemarsh's zoning regulations. The petition sought to re-zone HMI's property (previously zoned HVY–X) to EX–Extraction, which would limit acceptable development to single family residences on individual lots of at least one acre. On September 10, 2001, before any action was taken on this proposal, HMI submitted a preliminary plan for the development of Parcel One that included 500,000 square feet of office space, as allowed in an HVY–X zone. The Whitemarsh Subdivision Land Development Ordinance (the "Land Development Ordinance") requires that a proposal be evaluated under the relevant guidelines in place when it is submitted, such that the Township had to consider HMI's proposal under HVY–X regulations.

On October 18, 2001, the Board voted to re-zone HMI's property to EX–Extraction, as proposed in the private petition. HMI successfully challenged this re-zoning as procedurally defective, and the Board re-enacted the change on February 28, 2002. HMI alleges that this re-zoning was merely the first step in the Township's scheme to prevent it from developing its property.

The Township was required to act, via a Board vote, on HMI's proposal within 90 days of the first Whitemarsh Planning Commission meeting after the filing of the plans, or else it would be deemed approved. HMI offered the Township routine extensions of this deadline, such that it was not a factor. HMI alleges that, from the time it first submitted its proposal, the Board's behavior displayed intransigence and a clear effort to deny HMI the opportunity to develop Parcel One. The Township distributed the plan to its engineer, Thomas Zarko, for review. Two letters from Zarko in October 2001 detailed the deficiencies of HMI's proposal relative to the requirements specified in the Land Development Ordinance and other Township ordinances. HMI alleges that these objections were trivial and misinterpretations of the ordinances. The Montgomery County Planning Commission, in a November 20, 2001, letter to the Township, found the proposal to be too dense and to propose too intense a use to be compatible with the surrounding area.

HMI also states that throughout November 2001 it made multiple, but fruitless, **\*255** attempts to meet with Township officials to discuss the proposal and the deficiencies that Zarko had specified. Without further guidance from the Township, HMI submitted a revised preliminary plan on December 21, 2001. Zarko reviewed this plan and found there remained significant non-compliance with Township ordinances. HMI argues that these deficiencies resulted from its inability to engage officials in a dialogue to determine how to remedy the proposal's inadequacies. It further contends that this silence was part of an overt effort to prevent it from developing Parcel One. HMI supplements this claim with reference to a February 4, 2002, letter from attorney Marc Kaplin (whose firm represented Cohan and the Residents Association) to Township Solicitor Ross Weiss, relating Kaplin's research into landowners' rights to submit revised plans after a zoning change without subjecting the plans to review under the new zoning designation.

Township officials alerted HMI that the Board planned to discuss HMI's mixed-use proposal at a public meeting on March 12, 2002, and requested that HMI submit a plan. At this meeting, HMI outlined what it described as a less intense proposal calling for 308,000 square feet of office space (in four three-story buildings) and 380 apartments (in ten four-story buildings). Area residents, as well as members of the Board, remained staunchly opposed to development, citing concerns about traffic, drainage, and conformity with the surrounding area.

The next day, the Township Manager notified HMI that the Whitemarsh Planning Commission would review the revised preliminary plan for HMI's all-office building proposal at its meeting on March 19, 2002, and that the Board would then vote on the proposal at its meeting on March 21. These meetings were the last scheduled before the 90–day period for action expired. HMI responded with an offer of an extension in a March 12 letter, but the Board refused.

Before the March 19 Whitemarsh Planning Commission meeting, HMI submitted a second revised plan for its all-office building proposal that it claimed addressed the majority of the deficiencies that Zarko had specified. According to the Township's Land Development Ordinance, this revision automatically started a new 90–day period for the Board to act. Although Zarko could not review the second revised plan before the Whitemarsh Planning Commission meeting, the meeting went ahead, with many residents voicing strong objections to the proposal. Kaplin alerted the community members that his research indicated that the Board was within its rights to act on the proposal immediately, and could reject it. The Whitemarsh Planning Commission voted to recommend that the Board reject HMI's proposal.

Before the March 21 Board meeting, Zarko submitted his report reviewing the second revised plan. HMI received this report approximately two hours before the Board meeting. Zarko identified the deficiencies in this plan, many of which had already been specified in his reviews of the prior submissions. These deficiencies included, among others, a lack of specificity concerning the proposed sewage treatment plant, and the lack of a berm and chain link fence around the perimeter of the proposed construction. HMI alleges that Weiss gave Zarko specific instructions to alter the order of items in his report so that it differed from his report issued on January 24, 2002.

At the Board meeting on March 21, Weiss had a court reporter document the proceedings and had Township witnesses sworn. HMI's attorney James Garrity reiterated **\*256** HMI's request for an extension before the Board's vote. The Board denied this request and rejected the proposal. At depositions, Board members cited the lack of progress in the plan as indicating that an extension would not lead to an improvement in the proposal. They also noted Zarko's report specifying areas of the proposal not in compliance with Township ordinances as reasons for denying the plan. HMI alleges that this Board meeting was simply the final charade in the Township's effort to deny HMI its development rights. With the denial of the plan, all future proposals would be treated as new plans (and thus reviewed under the amended zoning ordinance enacted in February 2002).

On April 19, 2002, HMI filed a Notice of Appeal from the Board's decision in the Montgomery County Court of Common Pleas. The case was assigned to Judge Albright, who remanded the matter to the Board to conduct a "good faith" review of HMI's proposal as required under Pennsylvania law, principally in light of *Raum v. Board of Supervisors of Tredyffrin Township,* 29 Pa.Cmwlth. 9, 370 A.2d 777, 798 (1977) (requiring that a municipality, as part of a good faith review of a development proposal, "discuss[ ] matters involving technical requirements or ordinance interpretation with an applicant, and provid[e] an applicant a reasonable opportunity to respond to objections or to modify plans where there has been a misunderstanding or difference of opinion"). The Commonwealth Court affirmed this order on May 21, 2009. *Highway Materials, Inc. v. Bd. of Supervisors of Whitemarsh Twp.,* 974 A.2d 539 (Pa.Commw.Ct.2009).

Three days later, HMI filed the suit generating the appeal before us in the United States District Court for the Eastern District of Pennsylvania. HMI alleged, pursuant to 42 U.S.C. § 1983, that the defendants violated its procedural and substantive due process rights, and denied it equal protection of the law.[5] The District Court granted defendants' motion for summary judgment on all three claims. It found that there was no material fact in dispute that could lead a reasonable juror to conclude that defendants' behavior "shocked the conscience" (necessary to the substantive due process claim) or was "wholly arbitrary and irrational" (for the equal protection claim). HMI timely appealed. The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.

[5]    HMI does not pursue its procedural due process claim on appeal.

## II. Discussion

### A. Standard of Review

We exercise plenary review over the District Court's grant of summary judgment. *Lawrence v. City of Philadelphia,* 527 F.3d 299, 310 (3d Cir.2008). All evidence must be viewed in the light most favorable to HMI and all reasonable inferences drawn in its favor. *Id.* Summary judgment is appropriate when "there is no genuine issue as to any material fact [such] that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The District Court's grant of summary judgment will be affirmed if, in light of the facts and reasonable inferences drawn in HMI's favor, no reasonable juror could find in their favor. *Lawrence,* 527 F.3d at 310.

### B. Substantive Due Process

 **[1]**    To prevail on its claim that defendants violated its substantive due process rights, HMI must prove that defendants' behavior "shocks the conscience." **\*257** *Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 285 (3d Cir.2004); *United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 402 (3d Cir.2003). "[T]his test is designed to avoid converting federal courts into super zoning tribunals." *Eichenlaub,* 385 F.3d at 285. "[O]nly the most egregious official conduct" qualifies. *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708,

140 L.Ed.2d 1043 (1998). Moreover, "[l]and-use decisions are matters of local concern." *United Artists,* 316 F.3d at 402; *see also Clark v. Boscher,* 514 F.3d 107, 113 (1st Cir.2008) ("In the vast majority of instances, local and state agencies and courts are closer to the situation and better equipped to provide relief." (citation omitted)).

In support of its claim that defendants' behavior "shocked the conscience," HMI cites the Commonwealth Court's holding that defendants willfully and intentionally violated their duty under Pennsylvania law to process HMI's development application in "good faith." *Highway Materials,* 974 A.2d at 544–45. To this state court decision, HMI adds specific reference to Solicitor Weiss's statement that "[t]he township is not going to work with you and help you on a controversial development for such a large piece of property" as evidence that the Township officials refused to communicate with HMI and rejected "repeated requests to discuss and resolve those objections." Finally, HMI alleges that the deficiencies Zarko identified with its proposal, and that the Board gave as reasons for rejecting the application, were "spurious."

Even if defendants acted exactly as HMI claims, it would not amount to behavior that "shocks the conscience." As in *Eichenlaub,* the Township's alleged behavior in this case "does not rise sufficiently above that at issue in a normal zoning dispute to pass the 'shocks the conscience test.' " 385 F.3d at 286. Even if the purported deficiencies in its proposal were "spurious," and the Township intentionally refused to cooperate with HMI, the most that can be proven is a bad-faith violation of state law, which does not meet the standard. *See United Artists,* 316 F.3d at 402. "[T]here is no allegation of corruption or self-dealing here." *Eichenlaub,* 385 F.3d at 286 (explaining corruption as "hamper[ing] development in order to interfere with otherwise constitutionally protected activity at the project site, or because of some bias against an ethnic group"). Further, any claim brought by a developer to appeal an "adverse ruling of the local planning board involves some claim of abuse of legal authority." *United Artists,* 316 F.3d at 402. In the end, these allegations do not state a constitutional claim under § 1983. *Id.*

This decision fits with those of our sister circuit courts applying the "shocks the conscience" test. *See Tri–*

*County Paving, Inc. v. Ashe County,* 281 F.3d 430, 441 (4th Cir.2002) ("[T]he fact that state courts are available to redress and correct violations of state law belies the existence of a substantive due process claim." (quotation omitted)); *Chesterfield Dev. Corp. v. City of Chesterfield,* 963 F.2d 1102, 1105 (8th Cir.1992) ("A bad-faith violation of state law remains only a violation of state law."); *PFZ Props. v. Rodriguez,* 928 F.2d 28, 32 (1st Cir.1991) ("[A] mere bad faith refusal to follow state law in such local administrative matters does not amount to a deprivation of due process....").

The Township's actions are no more egregious than those of the defendants in these other land dispute cases, none of which was held to "shock the conscience." In *Eichenlaub,* the allegations included overly strict application of ordinances relative to other developers, delays in issuing permits and approvals, unannounced inspections, **\*258** and improper tax assessments. 385 F.3d at 286. *Chesterfield* involved the defendant city enforcing "an invalid zoning plan and ordinance" against a developer. 963 F.2d at 1103. In *PFZ,* allegations of "delaying tactics and refus[ing] to issue permits ... based on considerations outside the scope of [the Puerto Rico Regulations and Permits Authority's] jurisdiction" did not shock the conscience enough to prevail on an appeal of a Rule 12(b)(6) motion to dismiss the substantive due process claim. 928 F.2d at 32. "[T]he revocation of building permits, the unauthorized issuance of enforcement orders, and the delays in the processing and approval of [a developer's] application for an amended permit," do not shock the conscience. *Licari v. Ferruzzi,* 22 F.3d 344, 349–50 (1st Cir.1994). More recently, the First Circuit Court held that a city's denial of building permits "in furtherance of its own interests" does not shock the conscience. *Clark,* 514 F.3d at 113.

HMI claims that defendants intentionally refused to cooperate with it, improperly applied Township ordinances, treated it differently from nearby owners,[6] and actively sought reasons to deny it the opportunity to develop its land. Looking at the totality of the facts on the record, and the reasonable inferences that can be drawn therefrom in HMI's favor, defendants' actions, crystalizing in the re-zoning of HMI's property and subsequent denial of HMI's preliminary proposal, simply do not shock the conscience. If defendants intentionally misapplied the ordinances and disregarded their duty under Pennsylvania law to conduct a

good-faith evaluation of HMI's proposal, that "remains only a violation of state law." *United Artists,* 316 F.3d at 402 (*quoting Chesterfield,* 963 F.2d at 1105); *see also PFZ,* 928 F.2d at 32.

6    HMI substantiates its claim with reference to the KYW-owned land, which was not re-zoned from its HVY–X designation.

 **[2]**    Finally, HMI has failed to demonstrate that the Board's re-zoning of HMI's property and denying its proposal were unrelated to any legitimate government interest. Activities of the Board that do not "transgress the 'outer limit' of legitimate governmental action ... do not give rise to a federal substantive due process claim." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 505 (2d Cir.2001); *see also Lewis,* 523 U.S. at 849, 118 S.Ct. 1708 ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). Although HMI introduced evidence supporting its claim that defendants intentionally subverted its attempts to develop Parcel One, it was uncontested that HMI's proposal would significantly increase traffic in the Township. Such considerations are legitimate concerns of local governments.

As HMI failed to demonstrate any disputed fact that could lead a reasonable juror to find that defendants' actions "shocked the conscience," the District Court properly granted defendants' motion for summary judgment on HMI's substantive due process claim.

**C. Equal Protection**

 **[3]**    When "determining the validity of state legislation or other official action that is challenged as denying equal protection[,] [t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." **\*259** *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Although an exception arises when a statute differentially treats individuals based on a protected classification (*e.g., race, alienage, or national origin), id.,* HMI bases its equal protection claim on a "class of one" theory. *See Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) (allowing individuals to bring equal protection claims, not as members of a protected class, to guard against "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents").

A successful "class of one" claim has two prongs: a plaintiff must demonstrate both that 1) it "has been intentionally treated differently from others similarly situated," and 2) "there is no rational basis for the difference in treatment." *Id.* The second prong in particular imposes a high burden, requiring "different treatment [that] is 'irrational and wholly arbitrary.' " *Eichenlaub,* 385 F.3d at 286 (*quoting Vill. of Willowbrook,* 528 U.S. at 564, 120 S.Ct. 1073). These challenges fail when "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Additionally, we have explained that "we do not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation." *Eichenlaub,* 385 F.3d at 287.

For the first prong, requiring a showing that it was treated differently from other similarly situated landowners, HMI points to the KYW parcel adjacent to its property, which was also zoned HVY–X, but was not re-zoned along with HMI's land. Assuming that HMI and KYW are similarly situated, HMI fails on the second prong. HMI argues that its different treatment undermines the Township's claim that it re-zoned HMI's property to bring it into conformity with the surrounding area.

This allegation does not demonstrate that the Township's actions were "wholly arbitrary." *Eichenlaub,* 385 F.3d at 286. Local governments can re-zone land as part of a determination as to "how much industrial development is in the best interest of the Township and how that quantum of industrial development should be achieved." *Pace Res., Inc. v. Shrewsbury Twp.,* 808 F.2d 1023, 1035 (3d Cir.1987). HMI's contention that the Township re-zoned HMI's land without any input from land use experts does not change the matter. Land use experts may offer helpful assistance, but they are not mandatory. HMI's evidence merely identifies a dispute regarding the merits of the Township's choice, not whether there was a rational basis for re-zoning HMI's land.

Further, although HMI has introduced evidence that the Township intentionally refused to work with HMI, it failed to demonstrate that the Township had "no rational basis" for denying HMI's proposal. *Vill. of Willowbrook,* 528 U.S. at 564, 120 S.Ct. 1073. As noted above, the Township had a number of valid reasons for denying the proposal, including the deficiencies relative to Township ordinances that Zarko identified, concerns about the increased traffic burden that the proposed development would produce, and concerns about how the project would conform with the surrounding area. HMI alleges that these reasons should be viewed as "mere pretext" for the Township's alleged goal of "block[ing] HMI's vested right to develop" its property. The parties, however, do not dispute that HMI's proposal would increase the traffic burden in the surrounding area. Also, Zarko reported to the Board that HMI's proposal did not comply **\*260** with Township ordinances. Even if the ordinances were incorrectly interpreted, deficiencies in the proposal provided a rational basis for denying it. HMI perhaps has demonstrated a dispute as to whether the ordinances were correctly applied, but such a dispute is not material to HMI's equal protection claim, for which HMI must show that the Board had no rational basis for denying HMI's proposal.

HMI has not carried its burden of demonstrating that defendants' actions were "irrational and wholly arbitrary." *Eichenlaub,* 385 F.3d at 286. Therefore, its equal protection claim does not raise a disputed issue of material fact that could lead a reasonable juror to find that HMI was denied equal protection under the law. The District Court properly granted defendants' motion for summary judgment on HMI's equal protection claim.

\* \* \*

In this context, we affirm the District Court's decision.

**All Citations**

386 Fed.Appx. 251

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**639 Fed.Appx. 60**
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Jeffrey David HILL, Appellant

v.

Richard E. UMPSTEAD, Jr.;

William Ramsey; Muncy Borough.

No. 15–2616
|
Submitted for Possible Dismissal Pursuant to
28 U.S.C. § 1915(e)(2)(B) or Summary Action
|
Pursuant to Third Circuit LAR
27.4 and I.O.P. 10.6 Jan. 28, 2016.
|
Opinion filed: Feb. 2, 2016.

**Synopsis**
**Background:** Borough resident against whom sanctions had
been imposed, which required resident to obtain certification
from Magistrate Judge before bringing any future action,
filed suit against borough, borough manager, and borough
snow plow driver, asserting claims under § 1983, arising
out of dispute pertaining to snow removal. The United
States District Court for the Middle District of Pennsylvania,
Matthew W. Brann, J., adopted report and recommendation
of Magistrate Judge declining to grant certification for action
to proceed, and dismissed complaint. Resident appealed.

**Holdings:** The Court of Appeals held that:

[1] resident's allegations arising out of snow removal dispute
did not allege any violation of constitutional or statutory
rights actionable under § 1983, and

[2] letter from borough manager directing resident to
trim his hedge, and which described consequences for
noncompliance, did not implicate any constitutional or

statutory rights for which violation was actionable under §
1983.

Affirmed.

See also, 323 Fed.Appx. 167 and 2011 WL 676810.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (3)

**[1]** **Civil Rights** Public Services, Programs,
and Benefits

78    Civil Rights
78I    Rights Protected and Discrimination
Prohibited in General
78k1051    Public Services, Programs, and Benefits
78k1052    In general
Borough snow plow's alleged damage to hedge
on resident's property, its failure to clear snow
from section of alley adjacent to resident's
home, its splashing of significant amount of
"street slush" on sidewalk near where resident
was standing, and its deposit of substantial
amount of snow in front of resident's garage did
not implicate violation of federal constitutional
or statutory right, and thus did not support
resident's § 1983 action against borough,
borough manager, and snow plow driver. 42
U.S.C.A. § 1983.

**[2]** **Civil Rights** Zoning, building, and
planning; land use

78    Civil Rights
78I    Rights Protected and Discrimination
Prohibited in General
78k1073    Zoning, building, and planning; land
use
Letter from borough manager directing resident
to trim his hedge, and noting that failure
to comply within 10 days would result in
referral of matter to police department or code
inspection department for issuance of a notice of
violation, did not implicate violation of federal
constitutional or statutory right, and thus did not

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    1

support resident's § 1983 action against borough manager and borough. 🏳 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[3]　Federal Courts** 🔑 Particular cases

170B　Federal Courts
170BVI　Controversies Between Citizens of Different States; Diversity Jurisdiction
170BVI(B)　Particular Cases, Contexts, and Questions
170Bk2422　Coplaintiffs and Codefendants; Complete Diversity
170Bk2424　Particular cases

Did District Court have diversity jurisdiction over state law claims? No
Material Facts

- Borough resident did not set forth sufficient grounds for a federal court to exercise diversity jurisdiction over any state law causes of action

District Court lacked diversity jurisdiction over state law claims brought by borough resident against borough, borough manager, and borough snow plow driver.

2 Cases that cite this headnote
More cases on this issue

**\*60** On Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. Civil No. 4–15–cv–00587), District Judge: Honorable Matthew W. Brann.

**Attorneys and Law Firms**

Jeffrey David Hill, Muncy, PA, pro se.

**\*61** Before: AMBRO, SHWARTZ and GREENBERG, Circuit Judges.

OPINION[*]

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PER CURIAM.

Jeffrey David Hill appeals an order of the United States District Court for the Middle District of Pennsylvania dismissing his complaint pursuant to an order prohibiting him from filing civil actions without prior certification from a Magistrate Judge. For the following reasons, we will affirm.

Hill is a prodigious litigant who, since the late 1980s, has filed numerous lawsuits in the Middle District of Pennsylvania and appeals in this Court. In 2008, the District Court "forever barred [Hill] from bringing a civil action in the Middle District of Pennsylvania," and stated that he would be subject to contempt proceedings if he violated the order. 🚩 *Hill v. Carpenter,* 2008 WL 936927, at \*2 (M.D.Pa. Apr. 4, 2008). On appeal, we held that the "District Court clearly was within its discretion to impose sanctions against Hill," but we vacated the injunction because "there [was] no indication that the Court gave Hill adequate notice and an opportunity to respond before imposing sanctions." *Hill v. Carpenter,* 323 Fed.Appx. 167, 171 (3d Cir.2009). We recommended that the District Court consider issuing an order requiring Hill to obtain certification from a Magistrate Judge before bringing any future action. *Id.* at 171–72. Notably, we stated that the District Court should "impose more tailored sanctions against him." *Id.* at 172. On remand, after providing Hill with notice and an opportunity to respond, the District Court "sanction[ed] Hill by requiring him to receive certification from a magistrate judge prior to filing a future civil action within the Middle District of Pennsylvania." *Hill v. Carpenter,* 2011 WL 676810, at \*2 (M.D.Pa. Feb. 16, 2011).

In March 2015, Hill filed a "civil rights—racketeering complaint" in the District Court, which contained allegations pertaining to a dispute over snow removal in his neighborhood during the winter of 2014–2015.[1] He named as defendants the Borough of Muncy, Pennsylvania, the Borough Manager, and a Borough snow plow driver. The Magistrate Judge declined to certify the action for filing, concluding that it was "legally and factually frivolous." Hill submitted a "Writ of Error/Writ of Prohibition," which the District Court treated as objections to the Magistrate Judge's recommendations. By order entered June 25, 2015, the District Court adopted the Report and Recommendation and dismissed the complaint. Hill appealed.

1    To the extent that Hill's complaint included civil rights claims related to his decades-old convictions, *see Hill v. Thorne,* 430 Pa.Super. 551, 635 A.2d 186, 187 (1993) (noting that the Pennsylvania Supreme Court reversed Hill's criminal convictions), the claims are time-barred and not subject to tolling. *See Lake v. Arnold,* 232 F.3d 360, 368–69 (3d Cir.2000) (noting that a two-year statute of limitations applies to civil rights actions originating in Pennsylvania); *Fogle v. Pierson,* 435 F.3d 1252, 1258 (10th Cir.2006) (holding that statute of limitations may be raised sua sponte where the defense is obvious from the face of the complaint and no development of the factual record is required to determine whether dismissal is appropriate).

We have jurisdiction pursuant to 28 U.S.C. § 1291, and may affirm on any basis supported by the record. *See Fairview Twp. v. EPA,* 773 F.2d 517, 525 n. 15 (3d Cir.1985). We also may summarily affirm if the appeal presents no substantial question. *See* 3d Cir. LAR 27.4; I.O.P. 10.6.

**\*62** District Courts in this Circuit may issue an injunction to require litigants who have engaged in abusive, groundless, and vexatious litigation to obtain approval of the court before filing further complaints. *See Chipps v. U.S. Dist. Ct. for Middle Dist. of Pa.,* 882 F.2d 72, 73 (3d Cir.1989). We have recognized, however, that a pre-filing injunction is an extreme remedy which must be "narrowly tailored and sparingly used." *Abdul–Akbar v. Watson,* 901 F.2d 329, 332 (3d Cir.1990) (quoting *In re Packer Ave. Assocs.,* 884 F.2d 745, 747 (3d Cir.1989)). "Narrowly tailored" means fitting the language of the injunction to the particular circumstances of the case. *Brow v. Farrelly,* 994 F.2d 1027, 1038 (3d Cir.1993). Thus, we have approved of an order "directing that the litigant not file any section 1983 claims without leave of court and that in seeking leave of court, the litigant certify (1) that the claims he wishes to present are new claims never before raised and disposed of on the merits by any federal courts, (2) that he believes the facts alleged in his complaint to be true, and (3) that he knows of no reason to believe his claims are foreclosed by controlling law." *Abdul–Akbar,* 901 F.2d at 333. Here, the District Court's pre-filing injunction—which "sanction[ed] Hill by requiring him to receive certification from a magistrate judge prior to filing a future civil action within the Middle District

of Pennsylvania"—fails to comport with our direction that it "impose more tailored sanctions against him." *Hill,* 323 Fed.Appx. at 172. Despite this failure, however, the District Court properly dismissed Hill's complaint because, for the reasons provided below, his claims lack merit.

**[1]** **[2]** **[3]** Hill alleged that a Borough snow plow damaged a hedge on his property, failed to clear the snow from a section of an alley adjacent to his home, splashed a significant amount of "street slush" on the sidewalk near where he was standing, and purposely deposited a substantial amount of snow in front of his garage.[2] Hill also complains about a letter from the Borough Manager, directing Hill to trim his hedge, and noting that failure to comply within 10 days would result in referral of the matter to the police department or code inspection department for issuance of a "notice of violation." These facts do not support a claim under 42 U.S.C. § 1983 because they do not implicate a violation of a federal constitutional or statutory right.[3] *See Kach v. Hose,* 589 F.3d 626, 646 (3d Cir.2009) (providing that to assert a claim under § 1983, a plaintiff "must establish that she was deprived of a federal constitutional or statutory right by a state actor."). In addition, Hill did not set forth sufficient grounds for a federal court to exercise diversity jurisdiction over any state law causes of action, *see* 28 U.S.C. § 1332, and there is no indication that it would have been appropriate for the District Court to exercise supplemental jurisdiction over those claims. *See Hedges v. Musco,* 204 F.3d 109, 123 (3d Cir.2000) ("where the **\*63** claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.") (quotation marks omitted).

2    Hill also seemingly attempted to bring claims on behalf of his neighbors, who he alleged were likewise injured by improper snow removal. These claims are barred for lack of standing, however, because "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio,* 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

3    Hill's conclusory assertion that the defendants' actions constitute civil racketeering activity, without more, is insufficient to state a claim for relief under 18 U.S.C.

§ 1962. *See* ⚑ *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); ⚑ *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989) (holding that allegations supporting a conspiracy claim under civil RICO must be sufficiently specific).

For the foregoing reasons, this appeal presents no substantial question. Accordingly, we will summarily affirm.

**All Citations**

639 Fed.Appx. 60

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case: 25-3567 Document: 29 Page: 143 Date Filed: 06/05/2026

James v. Vornlocker, Not Reported in Fed. Supp. (2022)

2022 WL 3927203

2022 WL 3927203
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Patrice JAMES, Plaintiff,

v.

Robert VORNLOCKER, Jr., et al., Defendants.

3:19 Civ. 13690
|
Signed August 31, 2022

**Attorneys and Law Firms**

Adrian Jawaun Johnson, Johnson & Associates, PC, Iselin, NJ, for Plaintiff.

Eric L. Harrison, Steven K. Parness, Methfessel & Werbel, Esqs., Dison, NJ, for Defendants.

**MEMORANDUM OPINION**

CHERYL ANN KRAUSE, United States Circuit Judge

**\*1** Plaintiff Patrice James bought two lots and built a house in Franklin Township, located in Somerset, New Jersey, but after years of construction trouble, failed inspections, and disputes with Township officials, banks foreclosed on her house and land. James sued the Township, as well as Township officials Robert Vornlocker, Vincent Lupo, Carl Hauck, Richard Carabelli, and Louis N. Rainone, alleging violations of various federal and state laws relating to alleged discrimination and taking of property. Defendants now move for summary judgment. For the reasons detailed below, the Court will grant Defendants' motion.

**BACKGROUND**[1]

[1] The facts recounted here are drawn from Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1" (Dkt #38-6)); Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1" (Dkt #39)); Plaintiff's Supplemental Statements of Disputed Material Facts ("Pl. Supp. 56.1" (Dkt. #39)); the exhibits attached to Plaintiff's brief in opposition to summary judgment (Pl. Opp., Ex. [ ] (Dkt. #39-1));

the Certification of Steven K. Parness in Support of Defendants' Motion for Summary Judgment and the exhibits attached thereto ("Parness Decl., Ex. [ ]" (Dkt. #38-2, 38-3)); and the Certification of Vincent Lupo in Support of Defendants' Motion for Summary Judgment and the exhibits attached thereto ("Lupo Decl., Ex. [ ]" (Dkt. #38-4, 38-5)).

For ease of reference, the Court will refer to Defendants' brief in support of their motion for summary judgment as "Def. Br." (Dkt. #38-7); Plaintiff's brief in opposition as "Pl. Opp." (Dkt. #39); and Defendants' reply brief as "Def. Reply" (Dkt. #40). Plaintiff's First Amended Complaint, which is the operative pleading in this litigation, will be referenced as the "Amended Complaint" or "FAC." (Parness Decl., Ex. A). Because the Amended Complaint does not contain consecutively numbered paragraphs, citations are to page numbers.

**A. Factual Background**

Prior to outlining the pertinent facts in this matter, the Court must first briefly address which facts are undisputed on this record. Local Civil Rule 56.1(a) provides that opponents of summary judgment must furnish "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, *stating each material fact in dispute and citing to the affidavits and other documents* submitted in connection with the motion[.]" Local Civil Rule 56.1(a) (emphasis added). Thus, where a fact stated in a movant's Rule 56.1 Statement is supported by evidence, the Court finds such fact to be true where the non-movant merely denies it: (1) with a conclusory statement, (2) without evidentiary support, or (3) with the recitation of additional facts but without actually contesting the asserted proposition. *See, e.g.*, *Marsh v. GGB, LLC*, 455 F. Supp. 3d 113, 119 n.2 (D.N.J. 2020); *V.C. ex rel. Costello v. Target Corp.*, 454 F. Supp. 3d 415, 419 n.4 (D.N.J. 2020); *Read v. Profeta*, 397 F. Supp. 3d 597, 612 n.3 (D.N.J. 2019); *Barker v. Our Lady of Mount Carmel Sch.*, 2016 WL 4571388, at \*1 n.1 (D.N.J. Sep. 1, 2016).

**\*2** In her Rule 56.1 statement, Plaintiff admits all but 23 statements in Defendants' 176-paragraph submission. (*See generally* Pl. 56.1). And where Plaintiff does dispute a statement, her 23 objections merely consist of a conclusory declaration that Defendants' conduct was improper, add extraneous facts without actually contesting Defendants' statement, or advance legal conclusions disguised as statements of fact.[2] (Pl. 56.1 ¶¶ 6–7, 11, 34, 40, 44, 46, 63, 73–77, 146, 148, 150–52, 155, 164, 167, 169–70). *See, e.g.*, *V.C.*, 454 F. Supp. 3d at 419 n.4; *Read*, 397 F. Supp. 3d at 612 n.3;

Case: 25-3567   Document: 29   Page: 144   Date Filed: 06/05/2026

James v. Vornlocker, Not Reported in Fed. Supp. (2022)
2022 WL 3927203

accord *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Ops., Inc.*, 85 F. Supp. 3d 785, 792 (D.N.J. 2015) ("Statements that 'blur[ ] the line between fact and opinion' and include 'arguments cloaked as undisputed facts' are improper under [Local] Rule [56.1] and will not be considered by the court." (quoting *N.J. Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 395 n.4 (D.N.J. 1998)). Furthermore, for 20 of her 23 objections, Plaintiff fails to support her contentions with "affidavits [or] other documents submitted in connection with the motion[.]" Local Civil Rule 56.1(a). (Pl. 56.1 ¶¶ 6–7, 11, 34, 40, 44, 46, 63, 75–77, 146, 148, 150–52, 155, 167, 169–70).[3]

[2]   By way of illustration, in objecting to Paragraphs 150–52 and 155, which describe an incident where Plaintiff used a check that she subsequently cancelled to try to pay a fine, Plaintiff's objections do not dispute any of the facts alleged regarding the use of the cancelled check; instead she simply adds an additional "fact": stating—without any record support—that she had already paid the fine prior to the events described in the disputed paragraphs. (*Compare* Def. 56.1 ¶¶ 150–52, 155, *with* Pl. 56.1 ¶¶ 150–52, 155). As another example, Paragraphs 73–77 describe an incident where Defendant Carl Hauck told Plaintiff that she was required to put dry wells on her property due to a wetlands issue, and that she could do the work herself or pay the Township to put in the wells. Plaintiff does not dispute Defendants' assertion that Hauck relayed this information to her; rather she conclusively asserts, again without record support, that Hauck's insistence that she was required to install dry wells was itself untrue. (*Compare* Def. 56.1 ¶¶ 73–77, *with* Pl. 56.1 ¶¶ 73–77). As a third illustrative example, Paragraph 34 quotes Plaintiff's deposition testimony "that [her] accumulated debt 'was due to the two years of paying extra construction mortgage that was unnecessarily created because [she] could not get the CO [certificate of occupancy].' " (Def. 56.1 ¶ 34 (quoting Parness Decl., Ex. B at 57:4–7 ("James Dep."))). Plaintiff objects that "she was unable to obtain the CO due to the targeting of blacks and wom[e]n exhibited by the Defendants that Plaintiff was not deserving of such property. Plaintiff was repeatedly and unlawfully denied the same due to her race and sex[,]" thus offering an unsupported legal conclusion that, even if true, would not conflict with the statement that her debt was due to a failure to secure a CO. (Pl. 56.1 ¶ 34).

[3]   In the three paragraphs where Plaintiff does provide record support for her objections, she nevertheless fails to create any disputed issue of material fact because her objections either add additional facts without disputing Defendants' proffered facts (*see* Pl. 56.1 ¶¶ 73–74), or advance legal conclusions masquerading as fact (*see id.* at ¶ 164).

As such, even where Plaintiff objects to Defendants' Rule 56.1 statements, she fails to create a dispute. Accordingly, the Court deems Defendants' statements to be undisputed, but nevertheless notes objections below where appropriate. *See* Local Civil Rule 56.1(a); *see also Read*, 397 F. Supp. 3d at 611, 612 n.3; *Barker*, 2016 WL 4571388, at *1 n.1. And because a failure to dispute a statement of material facts "is not alone a sufficient basis for the entry of a summary judgment," the Court independently reviews the record to ensure Defendants have carried their burden of proof under Federal Rule of Civil Procedure 56(e). *Anchorage Assocs. v. V.I. Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990).[4]

[4]   Local Rule 56.1 further requires that "each statement of material facts shall be a separate document (not part of a brief)," but Plaintiff filed her Rule 56.1 statement in her brief. Despite this failure to comply with the Local Rules, the Court will exercise its discretion to consider her Rule 56.1 statement.

### 1. The Parties

**\*3** Plaintiff identifies herself as a black woman who is a principal property manager for the Port Authority of New York and New Jersey. (Def. 56.1 ¶ 4; James Dep. 12:5–7, 121:12–13). In 2007, she bought land in Franklin Township on which she built a home. (Def. 56.1 ¶¶ 1–3). After experiencing financial and construction trouble, and difficulties satisfying various local and state regulations, Plaintiff sued Franklin Township, as well as Township Manager Robert Vornlocker, Construction Manager Vincent Lupo, Public Works Engineer Carl Hauck, Tax Assessor Richard Carabelli, and Township Attorney Louis N. Rainone (the "Individual Defendants," and collectively with Franklin Township, "Defendants"), alleging race and sex discrimination in connection with various disputes over Plaintiff's property. (*See* FAC 4–14).[5]

[5]   Plaintiff also named as defendants Sherita A. Whitestone and Keith Jones, two employees of the State of New Jersey. (*See generally* FAC). Plaintiff subsequently voluntarily dismissed Whitestone and Jones pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). (Dkt. #29, 37).

### 2. Plaintiff's Construction Difficulties

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case: 25-3567   Document: 29   Page: 145   Date Filed: 06/05/2026

James v. Vornlocker, Not Reported in Fed. Supp. (2022)
2022 WL 3927203

In 2007, Plaintiff bought two adjacent lots in Franklin Township with plans to subdivide the property into three lots and build houses on each of the lots. (Def. 56.1 ¶¶ 1–2). The claims in this litigation arise from difficulties surrounding the construction of—and subsequent dispute over obtaining a certificate of occupancy ("CO") for—the first of these houses, where Plaintiff has lived since its construction. (*See id.* at ¶¶ 3, 6–7; *see also* FAC 3–4).

Plaintiff's difficulties grew out of an overly ambitious construction project. Although she had no direct experience with construction or home-building, she declined to hire a construction company or general contractor for the construction of her home. (Def. 56.1 ¶¶ 56–57). Instead, Plaintiff opted to serve as her own general contractor (*id.* at ¶¶ 56–62), consulted colleagues at the Port Authority as needed on an informal basis (*id.* at ¶¶ 63–64), and had family members do "a lot of the work" to keep the cost of construction down. (*id.* at ¶ 14).

But for myriad reasons, Plaintiff's plan to complete the construction herself quickly ran into trouble. For one, there were wetlands on her property, and she faced repeated delays, stop work orders, and violations arising out of her improper dumping and failure to comply with other wetlands-related requirements of the New Jersey Department of Environmental Protection ("NJDEP"). (*See* Def. 56.1 ¶¶ 65–79, 128–36, 138–41). These requirements included putting in dry wells to handle increased runoff from the house she built —a requirement Plaintiff disputed and continues to dispute to this day—which caused a significant delay and financial outlay to resolve. (*Id.* at ¶¶ 73–79).

For another, the construction required various building and zoning approvals that Plaintiff had difficulty securing. For example, it took roughly two years for the Township Planning Board to approve Plaintiff's proposed subdivision and issue zoning and construction permits, because Plaintiff required seven compliance reviews to finally satisfy at least thirteen of the fourteen compliance areas. (*See* Def. 56.1 ¶¶ 80–96).

Once Plaintiff secured necessary permits and approvals, she experienced further delays as a result of failed inspections and code violations. Township records reflect that between 2010 and 2013, Plaintiff requested 127 inspections, cancelled 31 inspection requests, and failed 44 inspections. (Def. 56.1 ¶¶ 117–19).[6] The Township carried out approximately 70 inspections on the interior construction alone. (*Id.* at ¶ 97). The record is replete with documentation explaining and substantiating the numerous reasons for Plaintiff's many failed inspections, including for deficient plumbing and electrical work (*id.* at ¶ 121), failure to connect a gas pipe to the furnace (*id.* at ¶¶ 104–05), and failure to install dry wells (*id.* at ¶ 114). (*See also id.* at ¶¶ 98–114 (detailing failed inspections); Lupo Decl., Ex. 1 (Township records regarding Plaintiff's property, including of inspections); *cf.* Lupo Decl. ¶ 7 (discussing the general procedure for creating records of and documenting inspections)).

[6]   Plaintiff testified that she believed 50 of the 127 requests were "bogus," and she disputed the Township's contention that its records showed 44 failed inspections. (James Dep. 70:1–19). However, Plaintiff provides no evidence to counter Defendants' records on this point and identifies no inspection record which she believes is fabricated or inaccurate.

**\*4** On top of these permitting and inspection difficulties, Plaintiff also received three stop work orders, "one for a soil disturbance violation, one for a potential wetlands/soil export issue, and another one for moving soil onto an adjacent property without a permit." (Def. 56.1 ¶ 123). These stop work orders required the involvement of the NJDEP, as they implicated the wetlands on and adjacent to Plaintiff's property (*see id.* at ¶¶ 128–29, 133–140), and required remediation, resulting in additional delays (*see id.* at ¶¶ 127, 132, 139–40). In total, Plaintiff claims the stop work orders delayed her by six-to-eight months, though she testified that she continued construction even while subject to a stop work order. (*Id.* at ¶¶ 141–42).

Despite Plaintiff's many failed inspections, stop work orders, fines, and violations, the record contains no evidence of a formal appeal of any of these adverse decisions. (Lupo Decl. ¶ 17; *see id.* at ¶¶ 11–13, 16 (detailing proper procedure for appealing stop work orders, fines, construction violations, and failed inspections).

### 3. Plaintiff's Financial Difficulties

Plaintiff had planned to construct homes on the property she purchased and then to refinance the homes to pay off the original mortgage. (Def. 56.1 ¶ 11). But when she ran into trouble completing the construction quickly, she faced serious financial challenges. (*Id.* at ¶ 32). So, over the following years, she obtained additional construction mortgages, refinanced her mortgages numerous times, obtained several private, high-interest loans, and received myriad extensions on those loan and mortgage payments. (*See id.* at ¶¶ 15–41).

Case: 25-3567    Document: 29    Page: 146    Date Filed: 06/05/2026

James v. Vornlocker, Not Reported in Fed. Supp. (2022)
2022 WL 3927203

To qualify for some of these loans and refinancing opportunities, Plaintiff had to shuffle ownership of the land among various people and corporate entities. For example, Plaintiff originally had the property deeded to her Port Authority colleague (who she identifies as a "Caucasian male partner") because, at the time she bought the land, she alleges that "she was aware of specifics relating to Defendants and their racial and sexist discriminatory practices." (Pl. 56.1 ¶ 46; *see id.* at ¶¶ 44–46.). Later, however, in order to refinance her mortgage, she had to add herself to the deed (Def. 56.1 ¶¶ 22, 47–48), and about a year later, to obtain additional funding, she transferred the deed to Hairouna, Inc. ("Hairouna"), a company Plaintiff formed with her brother-in-law for the purpose of obtaining construction mortgages for the property (*id.* at ¶¶ 29–31, 49–50). At a later point, she transferred the deed back to herself from Hairouna, then added her brother-in-law and then-fiancé, and then removed herself from the deed "because she needed financing and her 'credit was terrible at that point.' " (*Id.* at ¶¶ 52–54 (quoting James Dep. 55:7)). And after that, she transferred the property yet again to herself, her brother-in-law, and her new fiancé. (*Id.* at ¶ 55).

But this strategy of robbing Peter to pay Paul eventually caught up with Plaintiff, and she was unable to make payments on her various loans, ultimately causing Lanco Bank and Indymac Bank to foreclose: first, on the adjacent lots in 2014, and then on her home in 2018. (Def. 56.1 ¶¶ 38, 41; *see also id.* at ¶¶ 17, 32–41). Plaintiff testified that her accumulated debt "was due to the two years of paying extra construction mortgage that was unnecessarily created because I could not get the CO," (James Dep. 57:4–7), and claimed that had she obtained a CO earlier, she could have refinanced at a significantly lower interest rate and avoided the various fees, fines, and other financial burdens she incurred while awaiting its issuance (Def. 56.1 ¶¶ 33, 34, 36–37, 40).

### 4. Plaintiff's Certificate of Occupancy

**\*5** Because Plaintiff claims that her financial difficulties were caused by the delay in obtaining a CO, her dispute with the Township over that issue is at the heart of this lawsuit. As such, the Court briefly discusses the requirements for obtaining a CO in Franklin Township, and then recounts Plaintiff's difficulties in obtaining one.

Defendant Vincent Lupo was the Township's Construction Manager during the relevant period, and hence the official tasked with overseeing the implementation of the Uniform Construction Code (including the CO requirement) in the Township. (Parness Decl., Ex. D at 10:8-11:6 ("Lupo Dep.")). He testified that to obtain a CO in Franklin Township, one must satisfy the requirements laid out in the New Jersey Uniform Construction Code. (*Id.* at 24:16–20). *See* N.J. Admin Code § 5:23-24. In full, the legal requirements for obtaining a CO under state law are:

1. That the completed project meets the conditions of the construction permit, and all prior approvals and has been done substantially in accordance with the code and with those portions of the plans and specifications controlled by the code;

2. That all required fees have been paid in full;

3. That all necessary inspections have been completed and that the completed project meets the requirements of the regulations;

4. That all violations have been corrected and that any assessed penalties have been paid;

5. That all protective devices and equipment required to be installed by the regulations will continue to be operational as required by the regulations.

N.J. Admin. Code § 5:23-2.24(a).[7]

[7] Lupo's testimony regarding the CO requirements tracks the Uniform Construction Code: he specified that obtaining a CO in Franklin Township requires that "[a]ll prior approvals have to be met. That the home has to be finished. That all subcode officials have to sign off on it. All payments that have to be made, all penalties that have to be paid, all fines have to be paid, have to be paid. That's pretty much it. It's a chapter, a section in our code." (Lupo Dep. 24:12–18).

Lupo added that there are many reasons why CO requests are denied, including failure to obtain a homeowner's warranty (Lupo Dep. 10:21–24), or "[f]or nonpayment of penalties ... and for not meeting all prior approvals." (*Id.* at 24:25–25:1). In particular, he explained, CO requests can be denied for failure to make "COAH [Council on Affordable Housing] payments," or to comply with conditions of approval from "engineering, Somerset [County] [s]oils, ... [and] the Board of Health." (*Id.* at 25:2–4). As relevant here, the NJDEP was responsible for handling wetlands issues on Plaintiff's property (Def. 56.1 ¶ 68; Hauck Dep. 18:16–25), and the homeowner's warranty requirement was imposed by the State, not the Township (Def. 56.1 ¶¶ 171, 173; *see* Lupo Dep. 10:19–24, 13:21–24).

**James v. Vornlocker, Not Reported in Fed. Supp. (2022)**
2022 WL 3927203

Plaintiff first applied for a CO in February 2012, and did not ultimately receive one until September 2013, roughly 18 months later.[8] (Def. 56.1 ¶¶ 161, 176). Plaintiff complains that she was improperly denied a CO by Defendants, but the record reflects that over these 18 months, she failed to satisfy many of the CO requirements, including compliance with various prior approvals, payment of fees and fines, and obtaining a homeowner's warranty. (*See id.* at ¶¶ 159–76). For example, Lupo testified that Plaintiff had "a number of issues" that prevented her from obtaining a CO over the 18-month period, including that "[t]he home wasn't finished yet, it hadn't passed all its final inspections. It still doesn't, to this day, meet all the requirements under the Uniform Construction Code. The COAH fees haven't been paid yet. There was an outstanding penalty due .... It was quite a bit that was missing." (Lupo Dep. 12:2–14).

[8]   The CO was issued to Hairouna, not to Plaintiff. (Def. 56.1 ¶ 176).

**\*6**   In particular, Plaintiff disputed the homeowner's warranty and COAH fee requirements, and delayed her compliance for some time due to her belief that she need not comply with them. (*See* Def. 56.1 ¶¶ 164, 166, 169; *see also* Pl. 56.1 ¶¶ 164, 169–70). Lupo testified that, because a corporation owned the home (i.e., Hairouna, not Plaintiff), New Jersey law required that Plaintiff obtain a homeowner's warranty, and indeed, the State of New Jersey Department of Community Affairs ("DCA") wrote to Plaintiff and the Township informing her that Hairouna must supply a homeowner's warranty. (Def. 56.1 ¶¶ 167–174). Plaintiff admitted that she knew she could not receive her CO until she paid the COAH fee, but she refused to pay the fee until she was told when her CO would be issued. (*Id.* at ¶¶ 165–66; *see also* James Dep. 96:18–20 ("I have to pay the COAH fee before I get [the CO], but you can't hold up my CO because I didn't pay the COAH fee."). She finally paid the COAH fee in September 2013, the same month she received the CO. (Def. 56.1 ¶¶ 166, 176).

**B. Procedural Background**

Plaintiff initiated this action in December 2018 in the Superior Court of New Jersey, Chancery Division, Somerset County (*see* Dkt. #1-2), and she filed her Amended Complaint in April 2019 (*see generally* FAC). In June 2019, Defendants removed the action to federal court and answered the Amended Complaint, and the parties proceeded to discovery. (*See* Dkt. #1, 4, 15). After the close of fact discovery,

Defendants moved for summary judgment (*see* Dkt. #38), Plaintiff filed her opposition (Dkt. #39), and Defendants filed a reply (Dkt. #40). Defendants' fully briefed motion for summary judgment was reassigned to this Court in March 2022, for the limited purpose of resolving the pending motion. (Dkt. #42).

**DISCUSSION**

**A. Applicable Law**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Bonkowski v. Oberg Indus., Inc.*, 787 F.3d 190, 195 n.1 (3d Cir. 2015). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact that supports the elements of its claims. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (citing *Celotex*, 477 U.S. at 322–24). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing a genuine issue for trial." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991); *see also* Fed. R. Civ. P. 56(c). In reviewing a summary judgment motion, the Court is required to view all facts "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Curto v. A Country Place Condo. Ass'n, Inc.*, 921 F.3d 405, 409 (3d Cir. 2019) (citation omitted). But there are limits: "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

**B. Analysis**

Plaintiff's Amended Complaint states six counts, alleging, pursuant to 42 U.S.C. § 1983, violations of the Takings Clause of the U.S. Constitution ("Count 1"), the Equal Protection Clause of the U.S. Constitution ("Count 2"); and the Due Process Clause of the U.S. Constitution ("Count 4"); as well as claims under Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.* ("Count 3"); the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2 ("Count 5"); and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 *et seq.* ("Count 6"). (FAC 3–15). Plaintiff alleges that construction fines, stop work orders, failed inspections, and other delays in obtaining a CO were the result of Defendants' discrimination against her, ultimately leading to the foreclosures. But as discussed in greater detail below, Plaintiff presents no evidence to support any of her conclusory allegations, and because she fails to identify any disputed issue of material fact, the Court will grant Defendants' motion for summary judgment.

### 1. Plaintiff's Takings and Due Process Claims Fail (Counts 1 and 4)[9]

[9] Plaintiff purports to bring some of these claims under the Fourteenth Amendment, and others under the Fifth Amendment (*see* FAC 3–7), which the Court understands to mean the Fifth Amendment, as incorporated against the states by the Fourteenth Amendment. *See Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151, 155 (3d Cir. 2018); *Chicago, B & Q R., Co. v. City of Chicago*, 166 U.S. 226, 241 (1897). In addition to advancing a Fifth Amendment substantive due process claim in Count 1, Plaintiff alleges a substantive due process claim under the Fourteenth Amendment in Count 4. (*See* Pl. Opp. 49–50). Plaintiff also asserts, in Count 4, a procedural due process claim under the Fourteenth Amendment. (*See* Pl. Opp. 50–51.) The Court first addresses her takings claim, and then all of her due process claims.

**\*7** Plaintiff advances two theories of liability under the Fifth and Fourteenth Amendments: first, that Defendants violated the Takings Clause (Pl. Opp. 39–40), and second, that Defendants' conduct denied her substantive and procedural due process (*id.* at 40–41, 49–51). The Court addresses each theory in turn and concludes that each lacks merit.

#### a. There Was No Taking (Count 1)

The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. To establish a violation, a plaintiff must assert a "legally cognizable property interest," and then we ask: "(1) was there a taking?; (2) was that taking for public use?; (3) did the claimant receive just compensation?" *Park Restoration, LLC v. Erie Ins. Exch.*, 855 F.3d 519, 525–26 (3d Cir. 2017) (quotation omitted).

Here, Plaintiff has a cognizable interest in her property, but she does not allege "[t]he paradigmatic taking" of a physical invasion or appropriation that property. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). Instead, she contends that the delay in obtaining her CO constituted a taking by "prevent[ing] Plaintiff from obtaining new loans and having the ability to service any existing loans[, which] then led to the loss of the Vacant Lot [and house]" through foreclosure. (Pl. Opp. 40). Fatal to her takings claim, however, Plaintiff does not establish any connection between the alleged "taking"—*i.e.*, the foreclosures—and Defendants' actions. The "purely private" foreclosure by third-party banks on Plaintiff's property is not state action, much less government action for public use. *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984); *see Gibbs v. Titelman*, 502 F.2d 1107, 1113 (3d Cir. 1974) (holding that "private repossessions are not infused with 'state action' merely because the state enacted [laws allowing for foreclosure or repossession]").

Even construing Plaintiff to allege that the state and local ordinances that establish the CO requirement effected a taking, her claim fails. Government regulation may, "in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster," and "such 'regulatory takings' may be compensable under the Fifth Amendment," *Lingle*, 544 U.S. at 537, but Plaintiff has not established that the government action here rose to such a level. The CO requirement was not a "per se" taking, which is caused by "a regulation [that] denies all economically beneficial or productive use of land," *Murr v. Wisconsin*, 137 S. Ct. 1933, 1937 (2017) (quotation omitted), so we evaluate Plaintiff's regulatory takings claim under the *Penn Central* framework, balancing, *inter alia*, "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action," *Nekrilov v. City of Jersey City*,—F.4th—, 2022

Case: 25-3567    Document: 29    Page: 149    Date Filed: 06/05/2026

James v. Vornlocker, Not Reported in Fed. Supp. (2022)
2022 WL 3927203

WL 3366430, at \*7 (3d. Cir. 2022) (quoting *Murr*, 137 S. Ct. at 1937); *see also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). The application of this framework allows for flexibility, but in broad terms the "inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Nekrilov*, 2022 WL 3366430, at \*7 (quoting *Lingle*, 544 U.S. at 540).

**\*8** Here, Plaintiff vaguely contends that the "regulation violations to obtain the CO were improper, singled out the Plaintiff, and denied the Plaintiff the use of her property as it delayed her ability to move into the property," constituting a taking. (Pl. Opp. 40). But she does not marshal any evidence to support these contentions, which is perhaps because the land use regulation at issue here is a " 'classic example' of [a] permissible regulation[ ] that do[es] not require compensation even where [it] 'prohibit[s] the most beneficial use of the property.' " *Nekrilov*, 2022 WL 3366430, at \*10 (quoting *Penn Central*, 438 U.S. at 125).[10]

[10] *See also, e.g.*, *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 395 (1926); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 692 (3d Cir. 1980); *Pace Resources, Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1031 (3d Cir. 1978); *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 678 (3d Cir. 1991), *abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003).

In fact, none of the *Penn Central* factors weigh in favor of Plaintiff. First, the economic impact of the CO requirement is negligible. Obtaining a CO in Franklin Township simply requires compliance with § 5:23-2.24 of New Jersey's Uniform Construction Code, including that "that all prior approvals have to be met[,] the home has to be finished[,] all subcode officials have to sign off on it[,] [a]ll payments that have to be made, all penalties that have to be paid, [and] all fines have to be paid." (Def. 56.1¶ 157). *See also* N.J. Admin. Code § 5:23-2.24(a). Measuring the "economic impact" of the CO requirement "in terms of its effect on the value of the property," *Nekrilov*, 2022 WL 3366430, at \*7, the CO requirement does not decrease or depress the value of Plaintiff's property at all. A person can still use the land by living there, renting the property, selling it, or more—as long as they satisfy the basic requirements under New Jersey law for ensuring a new home is safe and commercially marketable. *See* N.J. Admin. Code §§ 5:23-2.24(a), 5:23-1.3(a)(5); *accord Nekrilov*, 2022 WL 3366430, at \*8 (demanding a "drastic reduction in the value of the property ... to require compensation," and finding no such reduction because "the properties retain[ed] multiple economically beneficial uses" (internal quotation marks and alteration omitted)).

Second, the CO requirement did not alter Plaintiff's investment-backed interests. Plaintiff does not allege that these requirements were amended after she bought the property, nor does the record establish that there was any change to the law surrounding the CO requirement that could have "interfered with [Plaintiff's] distinct, investment-backed expectations." *Nekrilov*, 2022 WL 3366430, at \*9. Thus, this is not a case where Plaintiff relied on an existing law or regulatory scheme, only to have it upended by government action. Accordingly, the second *Penn Central* factor favors Defendants.

And third, the character of the Government's action is a perfectly valid exercise of the police power, because it "bear[s] a 'substantial relation to the public health, safety, morals, or general welfare.' " *Rogin v. Bensalem Twp.*, 616 F.2d 680, 688 (3d Cir. 1980) (quoting *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 395 (1926)). As the Supreme Court has "consistently affirmed[,] States have broad power to regulate housing conditions in general," *Nekrilov*, 2022 WL 3366430, at \*11 (quoting *Yee v. City of Escondido*, 503 U.S. 519, 528 (1992)), and so "courts are more likely to uphold a regulation that 'applies generally to a broad class of properties,' " *id.*, at \*11 (quoting *Rogin*, 616 F.2d at 690). The CO requirement is one such regulation, and therefore this *Penn Central* factor weighs against finding a taking.

**\*9** In short, then, the CO requirement itself is not a "functional equivalent" to the direct appropriation of Plaintiff's property, so it does not constitute a regulatory taking. *Id.* at \*12.

James v. Vornlocker, Not Reported in Fed. Supp. (2022)
2022 WL 3927203

### b. Plaintiff Has Not Established a Substantive Due Process Violation (Counts 1 and 4)

Plaintiff also characterizes her takings claim as arising under "the modern doctrine of substantive due process." (Pl. Opp. 41 (citing *Lochner v. New York*, 198 U.S. 45 (1905)). The Third Circuit has "recognized that 'two very different threads' make up 'the fabric of substantive due process': substantive due process relating to legislative action and substantive due process relating to non-legislative action." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018) (quoting *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000)). Although Plaintiff's briefing is not a paragon of clarity, the Court understands her to raise a claim under both threads.

First, to the extent Plaintiff challenges the CO requirement itself on substantive due process grounds, such an ordinance is a "legislative act[ ]" and so is "subjected to rational basis review." *Nekrilov*, 2022 WL 3366430, at *13. The CO requirement therefore satisfies substantive due process so long as it is rationally related to a legitimate state interest, and we ask merely "whether it was irrational for the Township to have passed the law at all and to have applied it to [Plaintiff]." *Rogin*, 616 F.2d at 689; *accord Nekrilov*, 2022 WL 3366430, at *13 ("The City must demonstrate (1) the existence of a legitimate state interest that (2) could be rationally furthered by the statute.") (quotation omitted). Here, as noted above, to obtain a CO, a property owner must satisfy the requirements of the Uniform Construction Code, N.J. Admin. Code § 5:23-2.24(a), and the Township has a legitimate interest in applying and enforcing the code, which aims to, *inter alia*, "insure adequate maintenance of buildings and structures throughout the State and [ ] adequately protect the health, safety and welfare of the people," *id.* § 5:23-1.3(a)(5). Because the CO requirements "are a rational and reasonable means to accomplish that purpose," Plaintiff's substantive due process challenge cannot succeed. *Rogin*, 616 F.2d at 689; *see also Nekrilov*, 2022 WL 3366430, at *14 (rejecting substantive due process challenge to zoning ordinance where "the face of the ordinance articulates the very state interests that the ordinance furthers").[11]

[11] Plaintiff also challenges the requirement that a business or corporation obtain a home warranty if it owns the

property on substantive due process grounds, *see* Pl. 56.1 ¶¶ 169–70, but such a requirement is also a rational and reasonable means to "protect the health, safety and welfare of the people." N.J. Admin. Code § 5:23-1.3(a)(5); *see also* Lupo Dep. 12:16-21, 17:2-7. Her challenge to this requirement on equal protection and procedural due process grounds is discussed *infra*.

To the extent Plaintiff may be challenging individual official actions arising out of the application of the CO requirement —*e.g.*, the denial of a permit, issuance of a stop work order, imposition of a fine, or decision that she failed an inspection —she is raising substantive due process challenges to non-legislative state action for which civil liability arises from "only the most egregious official conduct," of the kind that "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004). But the conduct she highlights does not meet that threshold.

**\*10** Plaintiff contends, for example, that the 18-month delay in obtaining a CO suffices to shock the conscience (*see* Pl. Opp. 49–50), but that delay is primarily attributable not to any official Township action, but to Plaintiff's own reticence to pay the COAH fee and her disagreement with the state's requirement that Hairouna obtain a homeowner's warranty (Def. 56. 1 ¶¶ 164–76). And Third Circuit precedent makes clear that "a normal zoning dispute" will not satisfy the "shocks the conscience test," even where a plaintiff advances allegations—similar to those advanced here—that "officials applied ... requirements to [plaintiff's] property that were not applied to other parcels; that they pursued unannounced and unnecessary inspection and enforcement actions; that they delayed certain permits and approvals; [and] that they improperly increased tax assessments[.]" *Eichenlaub*, 385 F.3d at 286.

Plaintiff points to no other specific official decision as violative of substantive due process, and the Court has not identified any particular inspection, fine, violation, or stop work order that would shock the conscience. Defendants, on the other hand, have provided ample evidence to substantiate the rationale behind various official decisions related to Plaintiff's long-running dispute with the Township over her property. (*See* Def. 56.1 ¶¶ 65–175; Lupo Decl., Ex. 1 (Township records for Plaintiff's property)); *see also* Lupo Decl. ¶¶ 6–17). Plaintiff therefore fails to satisfy the "shocks the conscience" test.[12]

Case: 25-3567 Document: 29 Page: 151 Date Filed: 06/05/2026

James v. Vornlocker, Not Reported in Fed. Supp. (2022)
2022 WL 3927203

12   To the extent Plaintiff alleges that Defendants' actions constituted a taking by improperly denying her the normal process afforded to an applicant for a CO, Plaintiff is advancing a procedural due process claim. *See* Taylor Inv., Ltd. v. Upper Darby Twp., 983 F.2d 1285, 1293 n.14 (3d Cir. 1993). And to the extent she alleges that Defendants unevenly applied the law to her for discriminatory reasons, such a claim is more properly treated as a selective enforcement claim, not a substantive due process claim. *See* Karns v. Shanahan, 879 F.3d 504, 520–21 (3d Cir. 2018). Plaintiff's procedural due process and selective enforcement claims are discussed below.

### c. Plaintiff Has Not Established a Procedural Due Process Violation (Count 4)

Plaintiff also advances a conclusory procedural due process claim, arguing that Defendants failed to "prove[ ] or allege[ ] that [the denial of Plaintiff's CO] was [according to] standard procedure." (Pl. Opp. 51). But Plaintiff was not denied a CO; rather, it took her 18 months to satisfy the Uniform Construction Code, after which time the Township issued the CO. (Def. 56.1 ¶¶ 161, 166, 176). In any event, generously construing Plaintiff to allege that the cumulative process of obtaining a CO lacked constitutionally sufficient process, the claim must still be dismissed.

To analyze Plaintiff's procedural due process claim, we pursue a two-part inquiry: "(1) whether the plaintiff has a property interest protected by procedural due process, and (2) what procedures constitute 'due process of law.' " Schmidt v. Creedon, 639 F.3d 587, 595 (3d Cir. 2011) (quotation omitted). Here, the Court need not determine whether Plaintiff has a cognizable property interest in the issuance of a CO, because the record establishes that the procedure afforded Plaintiff was not constitutionally deficient in any way. As fully articulated in Lupo's sworn certification, the Township, County, and State each provided ample process for all of the various obstacles Plaintiff encountered in attempting to obtain a CO, including for inspections (Lupo Decl. ¶¶ 7, 11), stop work orders (*id.* at ¶¶ 8, 12), and construction violations and fines (*id.* at ¶¶ 9, 13), and provided avenues for appealing all adverse decisions (*id.* at ¶¶ 11–13, 16). Those robust procedural frameworks are more than constitutionally sufficient. *See* Rogin, 616 F.2d at 694–95.

**\*11**  And Plaintiff actually received this process, as evident from the voluminous records relating to her property, which include detailed inspection reports and letters from the Township and State notifying her of decisions and her right to appeal. (*Lupo Decl.*, Ex. 1; *see also id.* at ¶¶ 14–15 (reflecting compromise with Plaintiff to reduce fines owed by 90%); Lupo Dep. 27:14–22 (noting that the Township "tried to bend a little bit to be able to get [Plaintiff] in" to her house and issued the CO despite Plaintiff's failure to fully satisfy all requirements)). Yet Plaintiff never appealed any adverse decision. (*Lupo Decl.* at ¶ 17); *Accord* Parratt v. Taylor, 451 U.S. 527, 543–44 (1981), *overruled on other grounds by* Daniels v. Williams, 474 U.S. 327 (1986) (holding that a prisoner deprived of materials in prison by state employee could not state a due process claim if the State provided adequate post-deprivation process which the plaintiff failed to utilize).

Because Plaintiff received constitutionally adequate process, the Court will also grant summary judgment to Defendants on her procedural due process claim.

* * *

In advancing her takings and due process claims, Plaintiff points only to the straightforward application of garden variety local and state land use regulations as violative of her Constitutional rights. The Court declines Plaintiff's invitation to "convert[ ] federal courts into super zoning tribunals," Eichenlaub, 385 F.3d at 285, and will therefore grant summary judgment to Defendants on Counts 1 and 4.

### 2. Plaintiff's Equal Protection Claims Cannot Proceed (Counts 2 and 5)

Plaintiff brings an equal protection claim, pursuant to 42 U.S.C. § 1983, alleging a violation of the United States Constitution, as well as a corresponding equal protection claim under the NJCRA, N.J. Stat. Ann. § 10:6-2, alleging a violation of the New Jersey Constitution.[13] Plaintiff offers no evidence of unequal treatment and so Counts 2 and 5 will be dismissed.

13   The NJCRA was modeled after § 1983, and, thus, courts in New Jersey have consistently examined claims under the NJCRA "through the lens of § 1983."

147

Case: 25-3567    Document: 29    Page: 152    Date Filed: 06/05/2026

James v. Vornlocker, Not Reported in Fed. Supp. (2022)
2022 WL 3927203

*Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011) (collecting cases); *see also Lepping v. Cnty. of Mercer*, No. 18-cv-2118, 2018 WL 5263281, at *9 (D.N.J. Oct. 23, 2018) (construing New Jersey equal protection claims asserted under NJCRA analogously to § 1983 equal protection claims); *Chapman v. New Jersey*, Civ. No. 08-cv-4130, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart[.]"); *Armstrong v. Sherman,* No. 09-cv-716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983[.]"). Accordingly, Plaintiff's New Jersey State Constitution claim is analyzed analogously to her § 1983 equal protection claim. *Accord Trafton*, 799 F. Supp. 2d at 443–44.

To establish a claim under § 1983, "a plaintiff must plead [1] a deprivation of a constitutional right and [2] that the constitutional deprivation was caused by a person acting under the color of state law." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008). The Court understands Plaintiff to allege an equal protection claim based on the selective enforcement of the Township regulations because she contends that Defendants required her to obtain a home warranty when they did not require others to do so. (Pl. Opp. 42–44). For her selective enforcement claim to succeed, Plaintiff must demonstrate "(1) that [she] was treated differently from other similarly situated individuals; and (2) that this selective treatment was based on an unjustifiable standard, such as race, religion, some other arbitrary factor or to prevent the exercise of a fundamental right." *Karns v. Shanahan*, 879 F.3d 504, 520–21 (3d Cir. 2018) (footnote omitted).

**\*12** Here, Plaintiff claims she was treated differently on the basis of her race and sex, (Pl. Opp. 43), but she neither establishes that she was treated differently from similarly situated individuals, nor puts forward "evidence of discriminatory purpose," in that race or sex played a role in Defendants' actions, *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012). For example, Plaintiff "do[es] not even identify other individuals who might be similarly situated," *Karns*, 879 F.3d at 521, much less comparators who are alike "in all relevant aspects," *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008). As such, Plaintiff "point[s] to no evidence that [Defendants] treated similarly situated individuals differently," *Karns*, 879 F.3d at 521, and so fails to create a disputed issue of material fact as to differential treatment.

She also fails to raise a triable issue as to discriminatory purpose. The record establishes (and Plaintiff concedes) that at the time Plaintiff sought her CO, Hairouna, a corporation, owned the home. (Def. 56.1 ¶ 169). Because the home was owned by a corporation, New Jersey law required Hairouna to obtain a homeowner's warranty (*id.* at ¶¶ 167, 169–70, 173), even if Plaintiff did not intend to sell it (*see* Pl. Opp. 43–44). Defendants communicated that requirement to Plaintiff repeatedly, and the DCA wrote to Plaintiff and the Township confirming that Hairouna must obtain a homeowner's warranty. (Def. 56.1 ¶¶ 168–69, 171, 174). Thus, there is no evidence that Defendants required Plaintiff to obtain the warranty for discriminatory reasons.[14]

[14] Although Plaintiff identifies no record support whatsoever connecting Defendants' actions to her race and/or sex, the Court independently reviewed the record to ensure Defendants have carried their burden under Fed. R. Civ. P. 56. The record contains one non-conclusory allegation that the Court could identify. Plaintiff, citing to her own unsubstantiated interrogatory response, claims that in a 2013 meeting, Lupo told her that "that he had 'run an investigation on [Plaintiff]' and was 'concerned' about where Plaintiff was getting her money to build her home." (Pl. Supp. 56.1 ¶ 27). Plaintiff never broached this topic with Lupo at his deposition (*see generally* Lupo Dep.), nor does it give rise to an inference that the comment bears on her race or sex, given Lupo's knowledge of Plaintiff's financial and construction troubles up to that point (*see, e.g.*, Def. 56.1 ¶ 105, 169). But even accepting Plaintiff's attenuated allegation as true, it fails to create a disputed issue of material fact because Plaintiff cannot identify similarly situated individuals, nor has she connected this comment to the State's requirement that Hairouna, as a corporation that owned the home, obtain a homeowner's warranty.

Plaintiff also advances an equal protection claim against the Township under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as well as a Section 1983 conspiracy claim against the Individual Defendants. (Pl. Opp. 43–47). But, for the reasons provided above, Plaintiff provides no

Case: 25-3567   Document: 29   Page: 153   Date Filed: 06/05/2026

James v. Vornlocker, Not Reported in Fed. Supp. (2022)
2022 WL 3927203

evidence of a constitutional violation, much less that any violation was due to a discriminatory Township policy, and so these claims also falter. *See* C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005) ("To impose [Monell] liability ... under § 1983, Plaintiffs must show a 'relevant policy or custom, and that the policy caused the constitutional violation alleged.'" (alterations omitted) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003)). Similarly, Plaintiff's conspiracy claim falls short because she adduces no evidence of a conspiracy "to deprive any person of constitutional rights." *Jutrowski v. Twnp. of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018) (alterations omitted) (quoting *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001).[15]

[15]   Because Plaintiff's equal protection claims fail on the merits, the Court need not address Defendants' invocation of a qualified immunity defense.

**3. Plaintiff's Title VI Claim Lacks Merit (Count 3)**

**\*13**  Plaintiff alleges that Defendants violated Title VI of the Civil Rights Act of 1964 by "singl[ing] out and target[ing] Plaintiff" with "threats, harassment[,] and vested governmental powers [to] effectuate exorbitant violations" against the Plaintiff because of her race and sex. (FAC 9). Title VI provides, in relevant part, that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To establish a damages claim under Title VI, as Plaintiff attempts here, a litigant must "show that the defendant engaged in intentional discrimination." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014). But for the reasons discussed above, there is no evidence of discrimination—intentional or otherwise—in the record. Summary judgment therefore will go to Defendants on this claim as well.

**4. Plaintiff's NJLAD Claim Must Be Remanded (Count 6)**

Plaintiff's claim under the NJLAD must be remanded for lack of jurisdiction. Under N.J. Stat. Ann. § 10:5-12.5(a), it is unlawful for a municipality "to exercise the power to regulate land use or housing in a manner that discriminates" on the basis of, *inter alia*, race and sex. However, unlike claims brought under other provisions of the NJLAD, which are routinely resolved in federal courts, claims brought under § 10:5-12.5 "may only be enforced by initiating an action in [New Jersey] Superior Court[.]" § 10:5-12.5(b). The plain text of § 10:5-12.5(b) thus precludes federal courts from enforcing claims brought pursuant to § 10:5-12.5(a), and courts in this District have consistently interpreted § 10:5-12.5(b) as a bar to subject matter jurisdiction over § 10:5-12.5(a) claims in federal court. *See, e.g.*, *Hansen Found., Inc. v. City of Atlantic City*, 504 F. Supp. 3d 327, 342 (D.N.J. 2020) (collecting cases); *Kessler Inst. for Rehab., Inc. v. Mayor of Essex Fells*, 876 F. Supp. 641, 664–65 (D.N.J. 1995). The Court will therefore remand Plaintiff's NJLAD claim for lack of subject matter jurisdiction. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *Hansen, 504 F. Supp. 3d at 342*; *accord* *Bromwell v. Mich. Mut. Ins. Co.*, 115 F.3d 208, 213 (3d Cir.1997) (holding that "when a federal court has no jurisdiction of a case removed from a state court, it must remand [pursuant to § 1447(c)] and not dismiss on the ground of futility").

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment will be granted with respect to Counts 1–5, and the Court will remand Count 6 for lack of subject matter jurisdiction.

The Court will enter an Order consistent with this Memorandum Opinion.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3927203

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.   11

**James v. Vornlocker, Not Reported in Fed. Supp. (2022)**

2022 WL 3927203

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

785 Fed.Appx. 46
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

JOEY'S AUTO REPAIR & BODY
SHOP; On-Par Turf, Appellants

v.

FAYETTE COUNTY; Angela M.
Zimmerlink; Terry Kriss; Diane Kriss

No. 18-3087
|
Submitted Under Third Circuit LAR 34.1(a) May 2, 2019
|
(Filed August 29, 2019)

**Synopsis**
**Background:** Plaintiffs, two businesses that shared same owner and operated on same property, brought § 1983 action against county, county commissioner, and neighbors who owned abutting property, alleging equal protection and substantive due process claims arising from revocation of their zoning certificate, allegedly due to their animosity with the neighbors. The United States District Court for the Western District of Pennsylvania, Joy Flowers Conti, Chief Judge, 2018 WL 3997124, dismissed with prejudice. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Restrepo, Circuit Judge, held that:

[1] plaintiffs failed to sufficiently allege that defendants treated them differently from others similarly situated;

[2] plaintiffs failed to sufficiently allege that they were subjected to different treatment without rational basis;

[3] plaintiffs failed to allege official conduct that shocked the conscience; and

[4] plaintiffs failed to state a § 1983 conspiracy claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (4)

**[1]    Constitutional Law** ◈ Zoning and Land Use
**Zoning and Planning** ◈ Selective enforcement and discrimination

92  Constitutional Law
92XXVI  Equal Protection
92XXVI(E)  Particular Issues and Applications
92XXVI(E)3  Property in General
92k3511  Zoning and Land Use
92k3512  In general
414  Zoning and Planning
414XI  Enforcement of Regulations
414k1767  Defenses to Enforcement
414k1775  Selective enforcement and discrimination

Two businesses that operated on same property failed to sufficiently allege that defendants treated them differently from others similarly situated, as required to state a class of one equal protection claim against county, county commissioner, and neighbors, arising from revocation of their zoning certificate after county cited them for several zoning violations, which were allegedly due to plaintiffs' animosity with the neighbors, where plaintiffs' identified comparator was not alike in all relevant aspects, as it was not engaged in similar type of business, was not subject to same type of zoning as plaintiffs, and was not shown to have anything in common with plaintiffs other than being owned by same family. U.S. Const. Amend. 14.

24 Cases that cite this headnote

**[2]    Constitutional Law** ◈ Zoning and Land Use
**Zoning and Planning** ◈ Selective enforcement and discrimination

92  Constitutional Law
92XXVI  Equal Protection

92XXVI(E)  Particular Issues and Applications

92XXVI(E)3  Property in General

92k3511  Zoning and Land Use

92k3512  In general

414  Zoning and Planning

414XI  Enforcement of Regulations

414k1767  Defenses to Enforcement

414k1775  Selective enforcement and discrimination

Two businesses that operated on same property failed to sufficiently allege that they were subjected to different treatment without rational basis, as required to state a class of one equal protection claim against county, county commissioner, and neighbors, arising from revocation of their zoning certificate after county cited them for several zoning violations, allegedly due to animosity with the neighbors; plaintiffs alleged that the animosity led to efforts to deprive them of their property rights, but they alleged no other facts connecting the animosity to the zoning enforcement actions. U.S. Const. Amend. 14.

5 Cases that cite this headnote

**[3]    Constitutional Law** 🔑 Particular issues and applications

**Zoning and Planning** 🔑 Constitutional and civil rights in general

92  Constitutional Law

92XXVII  Due Process

92XXVII(G)  Particular Issues and Applications

92XXVII(G)3  Property in General

92k4091  Zoning and Land Use

92k4093  Particular issues and applications

414  Zoning and Planning

414XI  Enforcement of Regulations

414k1767  Defenses to Enforcement

414k1774  Constitutional and civil rights in general

Even if plaintiffs, two businesses that operated on same property, had a property interest in their zoning certificate that was protected under the Fourteenth Amendment, they failed to allege official conduct that shocked the conscience, as required to state a substantive due process claim against county, county commissioner, and neighbors, arising from the revocation of their zoning certificate

after county cited them for several zoning violations, allegedly due to animosity with the neighbors; zoning enforcement action did not generally shock the conscience, and plaintiffs did not provide anything more than conclusory statements to connect their zoning issues to their relationship between county commissioner and the neighbors. U.S. Const. Amend. 14.

13 Cases that cite this headnote

**[4]    Conspiracy** 🔑 Law enforcement and criminal prosecution; Fourth Amendment

91  Conspiracy

91III  Civil Liability

91III(C)  Civil Rights Conspiracies

91k548  Particular Rights or Privileges; Particular Deprivations

91k554  Law enforcement and criminal prosecution; Fourth Amendment

    (Formerly 91k7.5(2))

Plaintiffs, two businesses that operated on same property, failed to state a § 1983 conspiracy claim against county, county commissioner, and neighbors arising from revocation of their zoning certificate after county cited them for several zoning violations, allegedly due to their animosity with the neighbors, where plaintiffs failed to alleged a deprivation of a federally protected right. 🚩 42 U.S.C.A. § 1983.

1 Case that cites this headnote

 **\*47**  On Appeal from the District Court for the Western District of Pennsylvania (D.C. No.: 2-18-cv-00087), District Judge: Honorable Joy Flowers Conti

**Attorneys and Law Firms**

Joel S. Sansone, Esq., Elizabeth Tuttle, Esq., Law Offices of Joel Sansone, Pittsburgh, PA, for Plaintiffs - Appellants

Marie M. Jones, Esq., JonesPassodelis, Pittsburgh, PA, for Defendant - Appellee County of Fayette

Jessica M. Jurasko, Esq., Jennifer L. McPeak, Esq., Ira L. Podheiser, Esq., Burns White, Pittsburgh, PA, for Defendant - Appellee Angela M. Zimmerlink

Adam R. Gorzelsky, Esq., Williams Law Offices, Greensburg, PA, for Defendants - Appellees Terry Kriss, Diane Kriss

Before: RESTREPO, PORTER, and FISHER, Circuit Judges.

OPINION[*]

[*]   This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

RESTREPO, Circuit Judge.

Joey's Auto Repair & Body Shop and On-Par Turf ("Plaintiffs") appeal the District Court's dismissal with prejudice of **\*48** their Fourteenth Amendment claims in equal protection (class of one) and substantive due process, and the claim of a § 1983 conspiracy to deny Plaintiffs' constitutional rights. They also appeal the District Court's denial of Plaintiffs' motion for leave to file a second amended complaint. For the reasons that follow, we will affirm.

## I.

Because we write primarily for the parties who are familiar with this case, we recite only the facts and history relevant to this appeal. The following facts, alleged by the Plaintiffs in their first amended complaint, are assumed to be true for our analysis.

Joseph Cellurale, Jr., owns Joey's Auto Repair & Body Shop and On-Par Turf, which both operate on the same property in Fayette County, Pennsylvania. Plaintiffs' property abuts the land of Terry and Diane Kriss ("the Krisses"). The Krisses are Defendants in this case, along with Fayette County ("the County") and County Commissioner Angela Zimmerlink (collectively "Defendants"). The Krisses and Plaintiffs have had several property disputes since 1995. *See Kriss v. Fayette Cnty.*, 504 F. App'x 182 (3d Cir. 2012). Most recently, Plaintiffs were cited by Fayette County for several zoning violations and had their zoning certificate for On-Par Turf revoked by the County. As a result, Plaintiffs were sent several cease-and-desist letters by the County.

Plaintiffs filed a complaint in federal court protesting these actions by the County. Defendants filed motions to dismiss,

which were mooted when Plaintiffs filed a first amended complaint. In their first amended complaint, Plaintiffs alleged that no zoning violations had existed. They allege that the County's actions stem from a close relationship between the Krisses and Commissioner Zimmerlink, who allegedly instructed the County to pursue zoning actions to deprive Plaintiffs of their property rights. In their complaint, Plaintiffs asserted claims for infringement of their constitutional rights to substantive due process and equal protection under the law, along with a § 1983 conspiracy to deny these rights to Plaintiffs.

Defendants filed renewed motions to dismiss in response to the amended complaint. To correct pleading defects, Plaintiffs sought leave to file a second amended complaint, which they attached to their motion. The District Court, however, granted the renewed motions to dismiss with prejudice, and denied leave to file a second amended complaint. Plaintiffs appealed, arguing that the District Court erred in granting Defendants' motions to dismiss and for denying their motion for leave to amend.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's dismissal of the claims pursuant to Fed. R. Civ. P. 12(b)(6). *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

In reviewing a motion to dismiss, we "accept all of the complaint's well-pleaded facts as true." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). Any allegations that are "no more than conclusions" are not entitled to an assumption of truth. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). We then assess whether the alleged facts plausibly give rise to an entitlement to relief. **\*49** *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. For the analysis below, we review Plaintiffs' claims as pleaded in their first amended complaint.

### A.

To establish a "class of one" equal protection claim, Plaintiffs "must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).* "Irrational and wholly arbitrary" demands on a property that differ from demands on similarly situated properties can be sufficient to plead a claim. *Vill. of Willowbrook v. Olech, 528 U.S. 562, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).* Nonetheless, this standard for an equal protection claim is "difficult" to meet in a zoning dispute. *Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 286 (3d Cir. 2004).*

[1] Plaintiffs failed to allege that there are other businesses "similarly situated" in their first amended complaint, which is required for an equal protection claim. *Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008)* (quoting *Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005)).* Persons are "similarly situated" for equal protection purposes when they are alike "in all relevant aspects." *Id.* (quoting *Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)).* Plaintiffs point to one similarly situated business, Cellurale Garden Center. They note that the Garden Center also abuts the property of the Kriss family, and "was not subjected to arbitrary citations and complaints." However, Plaintiffs provide no further details that would indicate that the Garden Center is a "similarly situated" entity. Without more specific examples of how the Garden Center is similarly situated for this analysis, we cannot say that the Garden Center and Plaintiffs are alike "in all relevant aspects." *Id.* Thus, Plaintiffs fail to sufficiently meet the first part of a "class of one" claim.

[2] Plaintiffs also failed to allege that they were subjected to different treatment without a rational basis. Standing alone, "general accusations and the invocation of the Equal Protection Clause are not enough" to allege a class of one claim. *Phillips v. Cty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008).* An equal protection claim is difficult to plead if Plaintiffs "cannot assert that [ ] differences in treatment stem from racial or other invidious forms of discrimination." *Eichenlaub, 385 F.3d at 286.* In their complaint, Plaintiffs allege that the Krisses "harbor animosity towards the Plaintiffs," and allege that this animosity led to efforts to deprive Plaintiffs of their property rights. However, Plaintiffs offer no facts connecting this animosity to the zoning enforcement actions.

Because Plaintiffs failed to plead the elements of a "class of one" equal protection claim, we will affirm the District Court's dismissal of that claim.

### B.

"To establish a substantive due process claim," Plaintiffs must show that they have a property interest "protected by the substantive due process clause[,] and the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).*

A property interest is constitutionally protected if it is considered "fundamental" under the United States Constitution. *Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 140 (3d Cir. 2000).* Substantive due process review of property issues is generally limited "to cases involving real property ownership." *Id.* at 141. Plaintiffs allege that the zoning actions of the County **\*50** have resulted in a loss of business, which has deprived Plaintiffs of "owning and using real property." However, a substantive due process right to conduct business without zoning interference extends beyond our precedent. Our Court is "reluctant to extend substantive due process protection to other, less fundamental property interests." *Id.*; *see also Wrench Transportation Sys., Inc. v. Bradley, 340 F. App'x 812, 815 (3d Cir. 2009)* (declining to extend substantive due process protection to the right to "engage in business").

[3] Even assuming *arguendo* that Plaintiffs' property interest is protected under the Fourteenth Amendment, the official conduct at issue does not "shock the conscience." Only official conduct by a zoning official that "shocks the conscience" is a violation of substantive due process. *Eichenlaub, 385 F.3d at 285* (quoting *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA, 316 F.3d 392, 399 (3d Cir. 2003)).* The "shocks the conscience" standard encompasses "only the most egregious official conduct." *United Artists, 316 F.3d at 400* (quoting *Cty. of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct.*

1708, 140 L.Ed.2d 1043 (1998)). This test is not precise, though it is intended to limit the involvement of federal courts in zoning disputes. *Id.*; *see also* 🚩*Lewis,* 523 U.S. at 847, 118 S.Ct. 1708.

Plaintiffs do not allege any conduct that shocks the conscience. Conduct "at issue in a normal zoning dispute," such as an allegedly unnecessary zoning enforcement action, does not generally shock the conscience. 🚩⚠️*Eichenlaub,* 385 F.3d at 286. An "allegation of corruption or self-dealing" might strengthen a substantive due process claim. 🚩⚠️*Eichenlaub,* 385 F.3d at 286. However, Plaintiffs do not provide anything more than conclusory statements to connect their zoning issues to the relationship between Zimmerlink and the Krisses.

Because Plaintiffs failed to show that Defendants' actions "shock the conscience," we will affirm the District Court's dismissal of the substantive due process claim.

**C.**

**[4]** Plaintiffs also allege a conspiracy claim under 🚩§ 1983 against Commissioner Zimmerlink and the Krisses. In order to plead a 🚩§ 1983 claim, Plaintiffs must allege "a deprivation of a federally protected right ... by one acting under color of state law." 🚩*Lake v. Arnold,* 112 F.3d 682, 689 (3d Cir. 1997), *as amended* (May 15, 1997). But, as explained above, Plaintiffs fail to allege a deprivation of a federally protected right. A 🚩§ 1983 claim cannot proceed without a deprivation of a federal right, and we will therefore affirm the District Court's dismissal of that claim.

**D.**

We lastly turn to the District Court's denial of leave to file a second amended complaint. We review a District Court's denial of leave to amend for abuse of discretion, and review *de novo* its determination that amendment would be futile. 🚩*U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.,* 769

F.3d 837, 849 (3d Cir. 2014) (citing 🚩*In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir. 1997)).

A motion for leave to amend can be denied if there is bad faith or a dilatory motive behind the amendment, there is undue prejudice to the opposing party by granting the motion, or if amendment is futile. 🚩*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Plaintiffs' new amendments only address the flaws to their equal protection "class of one" claim. As noted earlier, an equal protection claim *must* show that Defendants treated Plaintiffs differently from "others **\*51** similarly situated," in addition to showing that this differing treatment was intentional and had no rational basis. 🚩*Kutztown,* 455 F.3d at 239.

Review of Plaintiffs' second amended complaint, which is attached to the motion for leave to amend, reveals that Plaintiffs' amendment does little to correct earlier flaws in their equal protection claim. While Plaintiffs include information about a second similarly situated business, which is a landscaping business owned by family members of Plaintiffs, the second amended complaint again fails to demonstrate that the other businesses were similarly situated. As the District Court rightly noted, Plaintiffs failed to plead that the landscaping business and the Garden Center "were subject to the same type of zoning [as Plaintiffs]," were engaged in "similar types of business," or had anything in common with Plaintiffs "other than being owned by the ... [Cellurale] family." App. 6, 167.

Because Plaintiffs' second amended complaint was a futile attempt to correct issues with their first amended complaint, we will affirm the District Court's denial of leave to amend.

**III.**

For the foregoing reasons, we will affirm the judgment of the District Court.

**All Citations**

785 Fed.Appx. 46

---

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

557 Fed.Appx. 141
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Marlene S. MILLER

v.

POCONO RANCH LANDS PROPERTY
OWNERS ASSOCIATION INC., and
its President; Kathleen Simoncic, and its
Treasurer and Member; Roy Borgfield, and
its board member and its Secretary; Paul D.
Menditto, and its Community Manager; David
Cavanaugh; Lehman Township Planning
Commission, and its Chairman; Richard
C. Vollmer, in their official capacity only.

Marlene S. Miller, and Maria Grusha–Manta[*],
a/k/a Mary Motidai Goriah, Appellants.

[*]     (Pursuant to F.R.A.P. 12(a))

No. 13–1477
|
Submitted Pursuant to Third
Circuit LAR 34.1(a) Feb. 20, 2014.
|
Opinion filed Feb. 21, 2014.

**Synopsis**
**Background:** Property owner brought action against a
housing association, individual members of the association,
and a local township, claiming that the defendants failed to
recognize her property as commercial and not residential.
The United States District Court for the Middle District of
Pennsylvania, Joel H. Slomsky, J., 2013 WL 83601, adopted
the report and recommendation of Malachy E. Mannion,
United States Magistrate Judge, 2012 WL 6803269, and
dismissed. The property owner appealed.

**Holdings:** The Court of Appeals held that:

[1] the owner failed to state a § 1981 and § 1982 racial
discrimination claim;

[2] the state's provision of a full judicial mechanism for an
aggrieved landowner to challenge the decision to deny a
variance precluded the owner's § 1983 claim;

[3] the township's denial of a variance did not shock the
conscience;

[4] the owner's Fifth Amendment takings claim was not ripe
for judicial review;

[5] claims of misconduct against prior owner of property
could not support current owner's Racketeer Influenced and
Corrupt Organizations Act (RICO) claim; and

[6] the Court of Appeals would not impose damages on the
owner for filing a frivolous appeal.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (6)

[1]    **Civil Rights**  🔑  Property rights

78   Civil Rights
78I   Rights Protected and Discrimination
Prohibited in General
78k1071   Property rights

Was discrimination claim
sufficiently pled? No
Material Facts

- There were no allegations
that property owner was a
racial minority
- There were no allegations
that allegedly discriminatory
misconduct was racially
motivated
Causes of Action

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.                    1

Civil Rights Violation > Housing DiscriminationCivil Rights Violation > Race Discrimination

Allegations that housing association, individual members of the association, and a local township violated a property owner's rights, failed to state a claim under § 1981 and § 1982, in the absence of allegations that the property owner was a racial minority or that the allegedly discriminatory misconduct was racially motivated. 🚩42 U.S.C.A. §§ 1981, 🚩1982.

2 Cases that cite this headnote
More cases on this issue

[2]    **Constitutional Law** 👈 Particular issues and applications

**Zoning and Planning** 👈 Review in general

92    Constitutional Law
92XXVII    Due Process
92XXVII(G)    Particular Issues and Applications
92XXVII(G)3    Property in General
92k4091    Zoning and Land Use
92k4093    Particular issues and applications
414    Zoning and Planning
414X    Judicial Review or Relief
414X(A)    In General
414k1570    Review in general

Pennsylvania's provision of a full judicial mechanism for an aggrieved landowner to challenge the decision to deny a variance precluded a landowner's claim that the denial of her request for a variance violated her procedural due process rights. U.S.C.A. Const.Amend. 14.

[3]    **Constitutional Law** 👈 Particular issues and applications

**Zoning and Planning** 👈 Business, commercial, and industrial uses in general

92    Constitutional Law
92XXVII    Due Process
92XXVII(G)    Particular Issues and Applications
92XXVII(G)3    Property in General
92k4091    Zoning and Land Use
92k4093    Particular issues and applications
414    Zoning and Planning

414IX    Variances and Exceptions
414IX(A)    In General
414k1488    Business, commercial, and industrial uses in general

A township's denial of a property owner's request for a variance to use property for commercial purposes did not shock the conscience, as required to support the owner's substantive due process claim. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

[4]    **Eminent Domain** 👈 Conditions precedent to action;  ripeness

148    Eminent Domain
148IV    Remedies of Owners of Property;  Inverse Condemnation
148k277    Conditions precedent to action;  ripeness

Was claim ripe for judicial review? No
Material Facts

- Property owner claimed that township's placement of a restrictive easement on her property and denial of her request for a variance constituted an unlawful taking under the Fifth Amendment
- Property owner had not sought compensation from the state

Causes of Action
Challenge to Constitutionality > Takings Clause

A property owner's claim that a township's placement of a restrictive easement on her property and denial of her request for a variance constituted an unlawful taking under the Fifth Amendment was not ripe for judicial review, where the owner had not sought compensation from the state. U.S.C.A. Const.Amend. 5.

More cases on this issue

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    2

**[5]** **Racketeer Influenced and Corrupt Organizations** 🔑 Business, property, or proprietary injury; personal injuries

    319H   Racketeer Influenced and Corrupt Organizations

    319HI   Federal Regulation

    319HI(B)   Civil Remedies and Proceedings

    319Hk56   Persons Entitled to Sue or Recover

    319Hk59   Business, property, or proprietary injury; personal injuries

A current property owner's claims of misconduct committed against the prior owner of the property could not support a Racketeer Influenced and Corrupt Organizations Act (RICO) claim, in the absence of allegations that the current owner suffered the requisite injury to her business or property. 🚩 18 U.S.C.A. § 1962(c).

25 Cases that cite this headnote

**[6]** **Costs, Fees, and Sanctions** 🔑 Constitutional law, civil rights, and discrimination

    102   Costs, Fees, and Sanctions

    102VI   Sanctions

    102VI(G)   Sanctions on Appeal or Other Review

    102k1364   Grounds

    102k1369   Particular Cases

    102k1369(4)   Constitutional law, civil rights, and discrimination

        (Formerly 170Ak2840)

        Was sanction for filing frivolous appeal warranted? No
        Material Facts

        •   Owner filed appeal without aid of counsel
        Causes of Action
        Religious Land Use Violation

The Court of Appeals would not impose damages on a property owner for filing a frivolous appeal in the owner's unsuccessful challenge to the township's refusal to grant a variance, where the owner filed the appeal without the aid of counsel. F.R.A.P.Rule 38, 28 U.S.C.A.

More cases on this issue

*143 On Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. Civil Action No. 3–11–cv–00317). District Judge: Joel H. Slomsky.

**Attorneys and Law Firms**

Marlene S. Miller, East Stroudsburg, PA, pro se.

Maria Grusha–Manta Cape Coral, FL, pro se.

Andrew W. Bonekemper, Esq. Timothy E. Gilsbach, Esq. W. Christian Moffitt, Esq. Fox Rothschild Blue Bell, PA Donald G. Karpowich, Esq., Sean W. Logsdon, Esq., Kevin M. Walsh, Jr., Esq., Drums, PA, for Pocono Ranch Lands Property Owners Association Inc., and its President; Kathleen Simoncic, and its Treasurer and Member; Roy Borgfield, and its board member and its Secretary; Paul D. Menditto, and its Community Manager; David Cavanaugh; Lehman Township Planning Commission, and its Chairman; Richard C. Vollmer, in their official capacity only.

Before: FUENTES, GREENBERG and VAN ANTWERPEN, Circuit Judges.

OPINION

PER CURIAM.

Pro se appellant Marlene Miller appeals the District Court's order dismissing her third amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. We have jurisdiction under 🚩 28 U.S.C. § 1291 and exercise a plenary standard of review. See 🚩 Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir.2012). For the reasons set forth below, we will affirm the District Court's judgment.

This case concerns a land dispute. In 2010, Miller acquired a parcel of property from her aunt, Maria Grusha. That property is located within the Pocono Ranch Lands Property Owners Association Inc. ("the Association"). Miller's third amended complaint—the operative complaint in this appeal—alleges that the Association, the individuals who control it, and certain Lehman Township officials (collectively, "the defendants") have acted improperly in the following ways: (1) they have failed to recognize that Miller's property is deeded commercial, not residential; (2) they have sent fee and assessment bills to her[1]; (3) they denied her request for

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

a variance that would have allowed her to use the property for commercial purposes; and (4) by placing an easement on the property and refusing to allow her to use the property for commercial purposes, they have effectively taken the property. Based on these allegations, she asserted numerous federal and state claims.

1    It appears that the Association charges property owners for items like road maintenance and public-safety services.

The defendants filed motions to dismiss the third amended complaint pursuant to **\*144** Fed.R.Civ.P. 12(b)(6), and in a thorough report and recommendation, a Magistrate Judge recommended that the District Court grant those motions and dismiss the complaint. The District Court adopted that report and recommendation and dismissed the action. Miller then filed a timely notice of appeal to this Court.

We agree in full with the District Court's disposition of this case. As an initial matter, the Court was correct to hold that Miller, as a pro se plaintiff, is not permitted to represent Grusha in this action. *See* Lazaridis v. Wehmer, 591 F.3d 666, 672 (3d Cir.2010). This same prohibition prevents her from representing her late uncle's estate. *See* Malone v. Nielson, 474 F.3d 934, 937 (7th Cir.2007) (per curiam). The District Court thus did not err in dismissing those claims that Miller purported to assert on behalf of others, although we stress that the dismissal as to these claims is without prejudice. *See, e.g.,* Berrios v. N.Y.C. Hous. Auth., 564 F.3d 130, 135 (2d Cir.2009). Further, since Grusha herself did not participate in the action before the District Court, she is not a proper party in this appeal. *See* United States v. Stoerr, 695 F.3d 271, 275–76 (3d Cir.2012). Accordingly, we will consider only Miller's claims.

**[1]**    Miller first argues that the defendants violated her rights under 42 U.S.C. §§ 1981 and 1982. However, as the District Court noted, these statutes outlaw *racial* discrimination. *See* Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir.2001). Miller has not alleged that she is a racial minority or that the defendants' alleged misconduct was racially motivated. Therefore, the District Court properly dismissed these claims. *See id.*

Miller's claim under 42 U.S.C. § 1985(3) suffers from a similar infirmity. To state a claim under § 1985(3), the "claimant must allege some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Farber v. City of Paterson,* 440 F.3d 131, 135 (3d Cir.2006) (quotation marks omitted). As noted above, Miller has not alleged racial discrimination; further, she has not identified any other class to which she belongs that is cognizable under § 1985. *See id. at 136.* Thus, the District Court was also correct to dismiss this claim.

**[2]**    Miller further asserts several claims under 42 U.S.C. § 1983; as the District Court concluded, none of these claims has merit. First, Miller contends that the defendants, in denying her request for a variance, violated her procedural-due-process rights. To state a procedural-due-process claim, Miller must show, among other things, that the state "procedures available to [her] did not provide due process of law." *Hill v. Borough of Kutztown,* 455 F.3d 225, 234 (3d Cir.2006) (quotation marks omitted). However, Pennsylvania affords a full judicial mechanism for an aggrieved landowner to challenge the decision to deny a variance. *See, e.g., DeFilippo v. Cranberry Twp. Bd. of Supervisors,* 49 A.3d 939, 941–42 (Pa.Commw.Ct.2012). We have held that these procedures provide due process, which is fatal to Miller's claim. *See* Rogin v. Bensalem Twp., 616 F.2d 680, 694–95 (3d Cir.1980).

**[3]**    Miller also contends that the defendants violated her substantive-due-process rights. This claim likewise fails as a matter of law. To state a substantive-due-process claim in a land-use case, the plaintiff must show that the defendants' conduct "shocks the conscience." Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 285 (3d Cir.2004). We have previously concluded that claims similar to Miller's— such as that the defendants applied zoning requirements **\*145** unfairly, pursued unnecessary enforcement actions, and delayed permits and approvals—failed to satisfy this standard. *See* id. at 286. Thus, we will affirm the District Court's dismissal of this claim.

**[4]**    In Miller's final § 1983 claim, she argues that, by placing a restrictive easement on the property and refusing to allow her to use the property for commercial purposes, the defendants have taken the property under the

Fifth Amendment. However, "[a] plaintiff must first seek compensation through the procedures the State has provided for doing so before asserting a federal takings claim." *Chainey v. Street,* 523 F.3d 200, 222 (3d Cir.2008). Miller has admittedly not done so, and as a consequence, this claim is not yet ripe for our review. *See id.* at 222–23.

Finally, Miller claims that the defendants violated the civil RICO statute. *See* 18 U.S.C. § 1962(c). In order to state a RICO claim, Miller must plausibly allege the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted). In order to have standing to litigate a civil RICO claim, a plaintiff must show that she suffered an injury to her business or property and that the injury was proximately caused by the defendant's racketeering activities. *See, e.g., Maio v. Aetna, Inc.,* 221 F.3d 472, 483 (3d Cir.2000).

[5] There are a few problems with Miller's RICO claim. First, her allegations concerning the defendants' alleged misconduct are vague and conclusory, and are simply insufficient to state a valid RICO claim. *See, e.g., Lum v. Bank of Am.,* 361 F.3d 217, 223–24 (3d Cir.2004). Moreover, Miller has not pleaded that she suffered the requisite injury to her business or property. While Miller alleges that Grusha was injured, a plaintiff cannot sustain a RICO claim based on "harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 521 (3d Cir.1998) (quotation marks omitted). Further, although Miller contends that the defendants committed mail or wire fraud by sending

assessment bills to her, Miller also asserts that she knew, even before she owned the property, that these bills were unwarranted; it does not appear that she has ever made any payment on them. Thus, Miller cannot establish either that the defendants committed fraud or that she suffered an injury. *See Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 746–47 (3d Cir.1996).[2]

[2] Having dismissed Miller's federal claims, the District Court acted within its discretion in declining to exercise supplemental jurisdiction over her state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Figueroa v. Buccaneer Hotel Inc.,* 188 F.3d 172, 181 (3d Cir.1999).

[6] Appellees, for their part, ask us to impose damages and costs for the filing of a frivolous appeal under Federal Rule of Appellate Procedure 38. An appeal is deemed frivolous if it is "wholly without merit." *Quiroga v. Hasbro, Inc.,* 943 F.2d 346, 347 (3d Cir.1991). While Rule 38 damages might be appropriate if Miller had filed this appeal with the aid of counsel, "an unrepresented litigant should not be punished with damages for [her] failure to appreciate legal subtleties in legal arguments." *Beam v. Bauer,* 383 F.3d 106, 109 (3d Cir.2004). Accordingly, we will not impose damages against Miller; we will, however, tax costs against her under Federal Rule of Appellate Procedure 39(a)(2).

We will therefore affirm the District Court's judgment. Appellees' Rule 38 motion **\*146** is denied. Miller's request for a jury trial is denied.

**All Citations**

557 Fed.Appx. 141

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

481 Fed.Appx. 754

This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Francisco MUNOZ, Appellant

v.

The CITY OF UNION CITY; Brian P. Stack,
individually and as Mayor of the City of Union
City; Martin Martinetti, individually and as
Building Director of the City of Union City;
Nacirema Environmental Services Inc; John
Doe (1 to 20), a fictitious designation whether
a person, male or female and/or a business
entity, association, partnership or corporation.

No. 11–2149
|
Submitted Under Third Circuit
LAR 34.1(a) Jan. 23, 2012.
|
Opinion Filed: May 11, 2012.

**Synopsis**

**Background:** Property owner filed action in state court
against mayor, construction code official, and private
contractor alleging violation of his procedural due process
rights and taking in violation of Fifth Amendment with regard
to razing of building after fire. Defendants removed action.
The United States District Court for the District of New
Jersey, Peter G. Sheridan, J., granted summary judgment for
employer. Employee appealed.

**Holdings:** The Court of Appeals, Greenaway, Jr., Circuit
Judge, held that:

[1] pre-deprivation hearing was not required;

[2] owner received adequate post-deprivation due process
hearing;

[3] demolition of building that was structurally unstable after
fire did not constitute a taking;

[4] municipal liability could not attach under § 1983 where
government actor did not violate plaintiff's constitutional
rights;

[5] claim that mayor had failed to supervise municipality's
construction code official with regard to razing of building
after fire was respondeat superior claim that was not
supportable under § 1983; and

[6] private contractor, who performed demolition of building
pursuant to public contract, was not state actor.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (8)

**[1]** **Constitutional Law** 👈 Destruction of
property

**Health** 👈 Buildings, structures, and building
components

92    Constitutional Law
92XXVII    Due Process
92XXVII(G)    Particular Issues and Applications
92XXVII(G)3    Property in General
92k4097    Destruction of property
198H    Health
198HII    Public Health
198Hk390    Unsafe or Unhealthful Premises
198Hk392    Buildings, structures, and building
components
(Formerly 268k628 Municipal Corporations)

Was pre-deprivation due process
hearing required? No
Material Facts

- Structural instability of
building created exigent
circumstance that warranted
immediate and decisive
action

Causes of Action

Challenge to

Constitutionality > Takings Clause

Pre-deprivation due process hearing was not required with regard to razing of building after fire, since structural instability of building created exigent circumstance that warranted immediate and decisive action. U.S.C.A. Const.Amend. 14; N.J.A.C. 5:23–2.32(b)(2).

3 Cases that cite this headnote

More cases on this issue

**[2]    Evidence** 🔑 Opinion evidence

157   Evidence

157XX   Weight and Sufficiency

157XX(D)   Nature of Evidence

157k3014   Opinion evidence

(Formerly 157k568(1))

Would court give credence to lay witness opinions? No

Material Facts

- Property owner interpreted photographs of fire damage to building, and tenants who lived in building made statements
- An investigation report was filed by county prosecutor's office to repudiate decision of municipality's construction code official to immediately demolish building due to lack of structural integrity
- Common deficiency of each of these sources suffered from lack of professional expertise in field of assessing architectural integrity of structure in matter of public safety

Causes of Action

Challenge to

Constitutionality > Due

ProcessInverse Condemnation

Court could not give credence to property owner's own interpretation of photographs of

fire damage to building, statements of tenants who lived in building, and investigation report filed by county prosecutor's office to repudiate decision of municipality's construction code official to immediately demolish building due to lack of structural integrity, in property owner's action alleging violation of his procedural due process rights and taking in violation of Fifth Amendment, since common deficiency of each of those sources suffered from lack of professional expertise in field of assessing architectural integrity of structure in matter of public safety. U.S.C.A. Const.Amends. 5, 14.

More cases on this issue

**[3]    Constitutional Law** 🔑 Destruction of property

**Health** 🔑 Buildings, structures, and building components

92   Constitutional Law

92XXVII   Due Process

92XXVII(G)   Particular Issues and Applications

92XXVII(G)3   Property in General

92k4097   Destruction of property

198H   Health

198HII   Public Health

198Hk390   Unsafe or Unhealthful Premises

198Hk392   Buildings, structures, and building components

(Formerly 268k628 Municipal Corporations)

Was post-deprivation due process hearing adequate? Yes

Material Facts

- Exigent circumstances obviated need for pre-deprivation hearing
- Four hearings were held, in total, addressing both costs associated with demolition and procedure by which owner was notified of necessary demolition

Causes of Action

Challenge to

Constitutionality > Due Process

Property owner received adequate post-deprivation due process hearing to challenge all

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

aspects regarding demolition of building that was structurally unstable after fire, where exigent circumstances obviated need for pre-deprivation hearing, and four hearings were held, in total, addressing both costs associated with demolition and procedure by which owner was notified of necessary demolition. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote
More cases on this issue

[4] **Eminent Domain** 👈 Nuisance and demolition

**Health** 👈 Buildings, structures, and building components

148 Eminent Domain
148I Nature, Extent, and Delegation of Power
148k2 What Constitutes a Taking; Police and Other Powers Distinguished
148k2.10 Zoning, Planning, or Land Use; Building Codes
148k2.10(3) Nuisance and demolition
198H Health
198HII Public Health
198Hk390 Unsafe or Unhealthful Premises
198Hk392 Buildings, structures, and building components
(Formerly 268k628 Municipal Corporations)

Did demolition of building constitute taking under Fifth Amendment? No
Material Facts

- Owner retained possessory interest in the property and was still entitled to put that property to any number of beneficial uses

Causes of Action
Challenge to
Constitutionality > Takings Clause
Demolition of building that was structurally unstable after fire did not constitute a taking under Fifth Amendment, despite placement of tax lien on property in amount of demolition costs, since owner retained possessory interest in the property and was still entitled to put

that property to any number of beneficial uses. U.S.C.A. Const.Amend. 5.

14 Cases that cite this headnote
More cases on this issue

[5] **Civil Rights** 👈 Acts of officers and employees in general; vicarious liability and respondeat superior in general

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1345 Acts of officers and employees in general; vicarious liability and respondeat superior in general
Municipal liability could not attach under § 1983 where government actor did not violate plaintiff's constitutional rights. 🚩42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[6] **Civil Rights** 👈 Property and housing

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Employees and Officials
78k1357 Property and housing
Claim that mayor had failed to supervise municipality's construction code official with regard to razing of building after fire was respondeat superior claim that was not supportable under § 1983. 🚩42 U.S.C.A. § 1983.

[7] **Civil Rights** 👈 Cooperation with state actor

78 Civil Rights
78III Federal Remedies in General
78k1323 Color of Law
78k1326 Particular Cases and Contexts
78k1326(3) Private Persons or Corporations, in General
78k1326(5) Cooperation with state actor
Private contractor, who performed demolition of building pursuant to public contract, was not state actor, and thus could not be liable under §

1983 for alleged violation of property owner's constitutional rights. 🚩 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

**[8]** **Civil Rights** 🔑 Privilege or Immunity; Good Faith and Probable Cause

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1373 In general

A private party acting at the behest of the state can invoke qualified immunity under § 1983.

🚩 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**\*755** Appeal from the United States District Court for the District of New Jersey, (Civ. Action No. 08–cv–5057), District Judge: Honorable Peter G. Sheridan.

**Attorneys and Law Firms**

Tomas Espinosa, Esq., Union City, NJ, for Appellant.

Juan C. Fernandez, Esq., O'Toole Fernandez Weiner Van Lieu, Verone, NJ, Susan P. Mahon, Esq., Gartner & Bloom, New York, NY, for Appellee.

Before: FISHER, GREENAWAY, JR., and ALDISERT, Circuit Judges.

OPINION

GREENAWAY, JR., Circuit Judge.

Francisco Munoz ("Munoz") appeals the March 28, 2011 Order of the District Court denying his motion for partial summary judgment and granting summary judgment in favor of Union City, New Jersey; Union City Mayor Brian P. Stack; Union City Construction Code Official Martin Martinetti (collectively, "City Appellees"); and Nacirema Environmental Services, Inc. (together, "Appellees"). For the following reasons, we will affirm the District Court's Order.

**I. *BACKGROUND***

Because we write primarily for the benefit of the parties, we recount only the essential facts.

In the early morning hours of September 9, 2006, a fire was reported in a building located at 1813 Bergenline Avenue in Union City, New Jersey (the "Building"). The Building was a multi-family, three-story dwelling owned by Munoz. North Hudson Regional Fire and Rescue was the first firefighting company to respond to the call. Upon arrival, several firefighters entered the burning structure. As the intensity and breadth of the fire progressed, additional alarms were put out, and the evacuation of emergency personnel inside the building was ordered. After battling the fire for almost two hours, the fire was brought under control at approximately 7:00 a.m. that morning.[1]

[1] Sadly, the blaze claimed the life of North Hudson Acting Fire Chief Vincent Neglia.

**\*756** Munoz was not at the scene when the fire began. He first received notification of the fire between 5:00 and 6:00 a.m., while at his apartment. After unsuccessfully attempting to get within close proximity of the Building, Munoz returned to his apartment and retained New Jersey Public Adjusters, Inc. to aid him in assessing his losses as a result of the fire. At some point thereafter, Munoz left his apartment and was allowed to approach the Building to be interviewed by emergency personnel at the scene.

At approximately 10:00 a.m., Martin Martinetti ("Martinetti"), Union City's Construction Code Official, arrived on scene to assess the damage caused by the fire. Martinetti believed that the structural integrity of the Building was so compromised that he could not enter the Building. He proceeded to the upper floors of the adjacent building and peered out on the damaged structure. Martinetti observed that the majority of the Building's roof had collapsed and that the floors were in the process of collapsing.

Martinetti determined that the Building was structurally unsafe and needed to be immediately demolished. Martinetti informed Munoz in the presence of Ralph Affuso, Munoz's insurance adjuster; Scott Sandman, the Deputy Director of Parks for Union City; and one of Munoz's sons that the Building must be demolished. Around this time, Martinetti posted a notice of unsafe structure on the Building, in

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

accordance with N.J. Admin. Code § 5:23–2.32(b)(2). Martinetti claims that he told Munoz that Munoz could retain a contractor to perform the demolition or Union City would retain one and place a tax lien on the property in the amount of the demolition costs. According to Martinetti, Munoz informed him that he (Martinetti) could take whatever actions were necessary.

Martinetti called several demolition companies. Nacirema Environmental Services, Inc. ("Nacirema") was the first company to respond. Affuso had dealt with Nacirema in the past and determined that Nacirema would be an appropriate contractor to perform the demolition. Nacirema was hired. The razing process began sometime after 4:00 p.m. on September 9, 2006 and was completed the next day. Contrary to Martinetti's viewpoint, Munoz claims that he never received oral or written notification that the Building needed to be demolished and first learned of the demolition approximately three to four days after Nacirema performed the razing.

Four due process hearings were held subsequent to the demolition—three in 2007 and one in 2008. Lane J. Biviano, Esq. was the hearing officer who conducted the proceedings. All parties participated fully. In a July 16, 2008 letter, Biviano submitted his findings. Biviano concluded that Munoz received sufficient oral notice of the impending demolition, prior to the Building being razed. As such, Biviano found that Munoz was required to pay $76,767.75 in total costs. Munoz did not appeal Biviano's decision, which was adopted by Union City's Board of Commissioners.

On September 5, 2008, Munoz filed suit in New Jersey state court. Munoz alleged numerous federal constitutional violations, pursuant to 42 U.S.C. § 1983, as well as violations of New Jersey's constitution and state law. The essence of Munoz's claims is that his Building did not require demolition and, in any event, Appellees failed to follow required protocol before razing the structure. After answering the complaint, the City Appellees removed the case to the District Court. All parties moved for summary judgment. On March 28, 2011, the District Court granted City Appellees' and Nacirema's motions for summary judgment, **\*757** in a telephonic ruling. Munoz filed a timely notice of appeal.

## II. *JURISDICTION AND STANDARD OF REVIEW*

City Appellees removed the case to the District Court under 28 U.S.C. § 1441, pursuant to federal question jurisdiction. The District Court, therefore, had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over the District Court's grant of summary judgment, *Doe v. Luzerne Cnty.,* 660 F.3d 169, 174 (3d Cir.2011) (citation omitted), including over determinations of qualified immunity, *Burns v. Pa. Dep't of Corr.,* 642 F.3d 163, 170 (3d Cir.2011) (citation omitted).

## III. *ANALYSIS*

To succeed on a claim brought under 42 U.S.C. § 1983, the "plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary,* 399 F.3d 279, 281 (3d Cir.2005) (citation omitted). In particular, the plaintiff must prove two elements: "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Schneyder v. Smith,* 653 F.3d 313, 319 (3d Cir.2011) (citation omitted).

The District Court addressed each of Munoz's § 1983 claims individually as to each Appellee. We shall employ the same analytical structure.

### A. Martinetti

[1]    Munoz asserted a claim against Martinetti, pursuant to 42 U.S.C. § 1983, on two theories. First, Munoz contends that Martinetti violated his procedural due process rights by failing to notify him before Martinetti made the decision to demolish the Building. Second, Munoz argues that Martinetti's decision to demolish the Building constituted a taking in violation of the Fifth Amendment. We agree with the District Court that Martinetti is entitled to qualified immunity under both theories. We will affirm the grant of summary judgment in favor of Martinetti.

"The qualified immunity doctrine protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Sharp v. Johnson,* 669 F.3d 144, 159 (3d Cir.2012) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). Martinetti is entitled to qualified immunity unless Munoz can demonstrate: (1) a violation of his constitutional rights; and (2) the right was clearly established, such that no reasonable official in Martinetti's position would have believed that Martinetti's conduct was constitutional. *Id.* Munoz cannot prevail on either prong.

### 1. Munoz's Constitutional Rights Were Not Violated

Munoz has alleged violations of both the Due Process Clause and the Takings Clause. We begin first with Munoz's procedural due process claim.

A plaintiff asserting the deprivation of procedural due process rights "must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Hill v. Borough of Kutztown,* 455 F.3d 225, 234 (3d Cir.2006) (citation and internal quotation marks omitted). Because Martinetti assumes, *arguendo,* in his brief that Munoz has been deprived of **\*758** a protected property interest, we focus our inquiry on the second prong.

While a due process hearing ordinarily should occur before an individual is deprived of his property, "in special circumstances, a state may satisfy the requirements of procedural due process merely by making available 'some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.' " *Elsmere Park Club, L.P. v. Town of Elsmere,* 542 F.3d 412, 417 (3d Cir.2008) (quoting *Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). "Where there is 'the necessity of quick action by the State,' or where 'providing any meaningful pre[-]deprivation process' would be impractical, the Government is relieved of the

usual obligation to provide a pre[-]deprivation hearing." *Id.* (quoting *Parratt,* 451 U.S. at 539, 101 S.Ct. 1908).

Neither side disputes that Munoz did not receive a due process hearing prior to his Building being demolished. Of course, that is not dispositive. We must determine: (1) whether a pre-deprivation hearing was required; and (2) if not, whether the State's post-deprivation hearings were sufficient. *See Elsmere Park Club,* 542 F.3d at 417.

As to the first issue, we agree with Martinetti that the Building's structural instability created an exigent circumstance that warranted immediate and decisive action. The New Jersey administrative code contemplates such an emergency situation:

> When, in the opinion of the construction official, there is actual and immediate danger of collapse or failure of a building or structure or any part thereof which would endanger life, the construction official shall cause the necessary work to be done to render such building or structure or part thereof temporarily safe, whether or not the legal procedure herein has been instituted. Such work may include such demolition as may be necessary in order to eliminate any actual and immediate danger to human life; provided, however, that any demolition work shall not commence until at least 24 hours following service of notice of the pending demolition upon the owner, unless such service is not possible because the identity or the address of the owner cannot be determined from public records. Upon expiration of the 24–hour period, demolition may proceed unless stayed by order of the Superior Court.

N.J. Admin. Code § 5:23–2.32(b)(2).

**[2]** Responsibility for executing this emergency mandate provision on September 9, 2006 lay with Martinetti, Union City's Construction Code Official. Based on his professional expertise and judgment, Martinetti determined that the fire had significantly compromised the structural integrity of the Building. Martinetti concluded that pressing safety concerns required the Building to be demolished as soon as possible. We find nothing in the record to undermine the propriety of Martinetti's decision.[2] He acted based on "the necessity of quick action[,]" *Parratt,* 451 U.S. at 539, 101 S.Ct. 1908, which obviated the need for a pre-deprivation hearing.[3]

---

[2]    Munoz would have this Court repudiate Martinetti's decision based on Munoz's own interpretation of

photographs of the fire damage, the statements of tenants who lived in the Building, and the investigation report filed by the Hudson County Prosecutor's Office. However, the common deficiency each of these sources suffers from is the lack of professional expertise in the field of assessing the architectural integrity of a structure. We cannot give credence to the observations of lay individuals in a field dependent on the expertise of licensed individuals regarding matters of public safety.

3    The fact that Martinetti commenced demolition prior to the expiration of New Jersey's 24–hour notice period is inconsequential. Even if this failure rendered Martinetti "without authorization[,] ... the state need only [have] provide[d] post-deprivation procedures." *Revell v. Port Auth. of N.Y. & N.J.,* 598 F.3d 128, 138 (3d Cir.2010) (noting that post-deprivation proceedings can remedy the effects of a state official who acts without authority). Moreover, we are not guided by state law in determining whether Munoz has alleged a violation of his due process rights under § 1983. *See Bayer v. Monroe Cnty. Children & Youth Servs.,* 577 F.3d 186, 193 n. 6 (3d Cir.2009). Although, it is worth noting, as Biviano concluded in his findings, that Martinetti orally informed Munoz that the Building needed to be demolished, to which Munoz responded by authorizing Martinetti to take whatever action was necessary.

**\*759   [3]**    Turning to the second prong of our inquiry, we conclude that Munoz received an adequate post-deprivation due process hearing to challenge all aspects regarding the demolition of the Building. Union City retained Biviano to preside over these hearings. Four hearings were held, in total, addressing both the costs associated with the demolition and the procedure by which Munoz was notified of the necessary demolition.[4] On July 16, 2008, Biviano submitted his findings, concluding that Munoz received adequate notice of the demolition under New Jersey law and that Munoz was responsible for costs related to the demolition.[5]

4    Munoz alleges that the hearings were intended to address only the costs associated with the demolition and not any due process considerations. This assertion is controverted by the briefing submitted in connection with the hearings as well as Biviano's findings in which he addressed the due process issue.

5    As Biviano noted, his ability to render a final decision was repeatedly delayed by counsels' requests for adjournments and additional briefing, as well as the availability of witnesses.

The post-deprivation procedure followed here was sufficient to satisfy the requirements of due process. Although not discussed by the District Court, the exigent circumstances that obviated the need for a pre-deprivation hearing, coupled with the adequacy of the post-deprivation hearing, is sufficient to support the District Court's grant of summary judgment to Martinetti on Munoz's procedural due process claim.

**[4]**    Munoz also asserted a § 1983 claim against Martinetti for an alleged violation of his Fifth Amendment rights. "The Takings Clause of the Fifth Amendment prohibits the federal government from taking private property for public use without providing just compensation." *Am. Express Travel Related Servs., Inc. v. Sidamon–Eristoff,* 669 F.3d 359, 370 (3d Cir.2012) (citing U.S. Const. amend. V). This applies with equal force through the Fourteenth Amendment where the state is the government actor. *Id.*

Munoz argues that the demolition of the Building eviscerated the property's intended purpose of providing rental income. But the Takings Clause asks not whether the plaintiff's most profitable use of the property has been destroyed. A Takings Clause claim cannot lie where the plaintiff was not deprived of all beneficial uses of his property. *See Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). Munoz concedes that he retains a possessory interest in the property. Indeed, Munoz is still entitled to put the property to any number of beneficial uses. The record reflects that Munoz simply lacks sufficient funds to do so, at present. Even if Martinetti was without authority to order the demolition, Munoz's continuing possessory interest in the property prevents him from establishing a Takings Clause violation.

*2. Martinetti Acted Reasonably*

Munoz also cannot demonstrate that no reasonable official would have believed that Martinetti's decision to demolish the Building was a reasonable one. Given that **\*760**   the Building's structural instability posed an imminent threat to public safety, we agree with the District Court that Martinetti acted reasonably in ordering the Building to be demolished.

**B. Union City**

**[5]**    Munoz similarly alleges claims of procedural due process and takings violations against Union City. A

municipality may be liable under 🚩§ 1983 where it " 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." 🚩*Connick v. Thompson,* ––– U.S. ––––, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (quoting 🚩*Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 691–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As an initial matter, municipal liability cannot attach under 🚩§ 1983 where the government actor did not violate the plaintiff's constitutional rights. *See* 🚩*City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Because we agree with the District Court that Martinetti did not violate Munoz's constitutional rights, we will affirm the District Court's grant of summary judgment in favor of Union City.

### C. Mayor Stack

Munoz also brought a 🚩§ 1983 claim against Mayor Stack. The District Court concluded that Munoz improperly sought to attribute liability to Mayor Stack based solely on Mayor Stack's supervisory authority over Martinetti. We agree. We will affirm that portion of the District Court's Order granting summary judgment in favor of Mayor Stack.

Mayor Stack is the Commissioner of Public Safety for Union City. The Construction Department is one of many departments that falls within the purview of Public Safety. Martinetti is the Construction Code Official who works within the Construction Department. Munoz's sole argument as to Mayor Stack is that he failed to properly supervise Martinetti by not promulgating a policy that would have prevented Martinetti from ordering an unwarranted demolition.

 **[6]** The theory of *respondeat superior* cannot support a claim of liability under 🚩§ 1983. *See* 🚩*Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir.2005). Although Munoz claims that his failure to supervise argument is distinct from liability premised on *respondeat superior,* we can discern no difference. Aside from the fact that the demolition here was proper, absent any evidence that Mayor Stack "participated in violating [Munoz's] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations[,]" 🚩*Santiago v. Warminster Twp.,* 629 F.3d 121, 129 (3d Cir.2010) (internal quotation marks and citation omitted), Munoz's theory of liability is indistinguishable from *respondeat superior.* Because Munoz

has produced no facts demonstrating Mayor Stack's personal involvement, the District Court's grant of summary judgment in favor of Mayor Stack was appropriate.

### D. Nacirema Environmental Services, Inc.

Finally, we address Munoz's 🚩§ 1983 claim against Nacirema. We will affirm the District Court's grant of summary judgment in favor of Nacirema.

Munoz asserts in his opening brief that Nacirema is liable only for negligent demolition and conversion, both violations of New Jersey state law. Perhaps recognizing that 🚩§ 1983 liability cannot be premised on violations purely of state law, *see* 🚩*Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health,* 503 F.3d 256 (3d Cir.2007), in his reply brief, Munoz **\*761** asserts for the first time that Nacirema is liable under 🚩§ 1983 as an instrumentality of Union City.

We generally do not consider arguments raised for the first time on appeal in a reply brief. 🚩*Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 204 n. 29 (3d Cir.1990). No reason is present here to deviate from this rule; Munoz has waived the argument that Nacirema is liable under 🚩§ 1983.[6]

[6]　This Court's finding of waiver is equally supported by Munoz's cursory, one-sentence argument regarding Nacirema's liability, devoid of any legal support. This opaque reference is insufficient to preserve the argument on appeal. *Cf.* 🚩*United States v. Hoffecker,* 530 F.3d 137, 162 (3d Cir.2008) ("This one-sentence footnote falls far short of meeting the requirement that an appellant raise an issue in his opening brief or else waive the issue on appeal.").

 **[7]** **[8]** Even if we were to look past Munoz's waiver, the argument fails on the merits. "Although it is possible for a private party to violate an individual's 🚩§ 1983 rights, the individual alleging such a violation is not relieved of the obligation to establish that the private party acted under color of state law." 🚩*Kost v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir.1993).[7] This requires the plaintiff to show "a sufficiently close nexus" between the actions of the private party and the State to warrant treating the actions as those of the State. *Id.* (citation omitted). We have outlined three circumstances

in which the requisite nexus exists: (1) the private party performed a function typically performed by the State; (2) the private party acted in concert with the State; or (3) the State has become interdependent with the private party. *Kach v. Hose,* 589 F.3d 626, 646 (3d Cir.2009) (citation omitted).

7    Moreover, as the Supreme Court recently held, a private party acting at the behest of the state can invoke qualified immunity. *Filarsky v. Delia,* —— U.S. ——, 132 S.Ct. 1657, 1666, 182 L.Ed.2d 662 (2012) (establishing that a private individual retained by the state can seek qualified immunity under § 1983).

We can discern no fact in the record to support a finding that Nacirema was a state actor under any of these circumstances. Munoz baldly alleges that Nacirema, a private contractor, acted as the agent of Union City in performing the demolition and is liable for constitutional violations to the extent Union City is liable. The only supporting fact that Munoz points to is the contract between Union City and Nacirema for the demolition. Simply because Nacirema performed pursuant to a public contract does not suffice to establish state action. *Boyle v. Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 76 (3d Cir.1991).[8]

8    The District Court granted summary judgment regarding all federal claims but failed to comment on its discretion to exercise supplemental jurisdiction over the state law claims. The District Court would have been required to decline to exercise supplemental jurisdiction, absent a countervailing reason, given that the District Court disposed of all federal claims providing it with original jurisdiction. *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995) (citations omitted). Despite the District Court's omission, we presume that it declined to exercise pendant jurisdiction because Munoz has pointed to no factor counseling in favor of the District Court retaining jurisdiction over the supplemental state law claims. *See Hedges v. Musco,* 204 F.3d 109, 122–23 (3d Cir.2000) (noting that "considerations of judicial economy, convenience, and fairness to the parties" are appropriate justifications for a district court to exercise supplemental jurisdiction). Indeed, neither party even raised this issue in their briefing. This conclusion is bolstered by the District Court's statement on the record that it was "going to dismiss the case." (App.38.) Accordingly, we perceive no abuse of discretion. *See Hedges,* 204 F.3d at 123–24.

## *762  IV. *CONCLUSION*

For the foregoing reasons, we will affirm the District Court's Order.

## All Citations

481 Fed.Appx. 754

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

2020 WL 4582018
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

HELEN and Konstantinos Natsis, Plaintiffs,

v.

Richard TURNER, in his official capacity
as Mayor of Weehawken, et al. Defendants.

Civil Action No. 13-7269
|
Signed 08/10/2020

**Attorneys and Law Firms**

Prabhkaran S. Bedi, Bedi Rindosh, Fort Lee, NJ, for Plaintiffs.

Elise Dinardo, Jersey City, NJ, Tracy Brooke Bussel, Gebhardt & Kiefer PC, Clinton, NJ, Thomas G. Deluca, Deluca & Forster, Esqs., Cranford, NJ, Joseph J. Fell, Joseph J. Fell & Associates LLC, Bernardsville, NJ, for Defendants.

**OPINION**

John Michael Vazquez, U.S.D.J.

**\*1** This matter arises out of a series of disputes – spanning years – regarding Plaintiffs' residential property that has a steep slope with a leaky sewer pipe. Plaintiffs Helen and Konstantinos Natsis (individually "Helen" or "Konstantinos," collectively "Plaintiffs") sued their neighbors, the Township of Weehawken, and various individuals who work for Weehawken. Currently pending are Defendants'[1] motion for summary judgment, D.E. 202, and Plaintiffs' motion for leave to file a Fourth Amended Complaint, D.E. 228. The Court reviewed all submissions made in support and in opposition to the motions[2] and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Plaintiffs' Motion for Leave to File a Fourth Amended Complaint is **DENIED**, and Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

[1]    The moving Defendants are Mayor Richard Turner, Frank Lamolino, Frank Tattoli, Shawn Masterson,

Vincent Rivelli, Police Officer Augusto A. Same, Police Officer Conrad Hablitz, Sergeant Patrick Cannon, Detective Sergeant Deputy Chief Jeffrey Fulcher, Sergeant John Johnson, and Township of Weehawken (collectively, "Weehawken Defendants"). D.E. 203. When referring to a Defendant individually, the Court uses his/her/its name, and otherwise refers to them collectively as Defendants.

The remaining Defendants are Plaintiffs' neighbors Harry and Denise Hodkinson ("Hodkinson Defendants"). On September 19, 2018, the Hodkinson Defendants filed a letter "to join with the Weehawken Defendants seeking permission to file a motion for summary judgment dismissing this action as against them." D.E. 183 at 1. The Court granted the Hodkinson Defendants leave to file the motion. D.E. 199. The Hodkinson Defendants, however, never actually filed a motion for summary judgment nor did they file any document joining in the arguments of the Weehawken Defendants. In short, the Hodkinson Defendants have not moved for summary judgment.

[2]    Defendants' brief in support of their motion for summary judgment is referred to as "Def. Br." (D.E. 202-2); Plaintiffs' brief in opposition is referred to as "Pl. Opp." (D.E. 218); and Defendants' reply brief is referred to as "Def. Reply" (D.E. 225). Plaintiffs' brief in support of their motion for leave to file a Fourth Amended Complaint is referred to as "Pl. Brief" (D.E. 228-51); the Weehawken Defendants' brief in opposition is referred to as "Def. Opp." (D.E. 229).

**I. BACKGROUND**

**1. Factual Background**[3]

[3]    The background facts are drawn from Defendants' Statement of Material Facts Not in Dispute ("DSOMF"), D.E. 181-1, Plaintiffs' Responsive Statement ("Pl. Resp. to DSOMF"), D.E. 189-1, Plaintiffs' Supplemental Statement ("Pl. Supp. SOMF"), D.E. 189-2, and Defendants' Response to Plaintiffs' Supplemental Statement ("Def. Resp. to PSOMF"), D.E. 225-1.

In March 2000, Plaintiffs Helen and Konstantinos Natsis purchased 347-353 Park Avenue, Weehawken, New Jersey ("Property"). Pl. Supp. SOMF ¶ 1. When Plaintiffs bought the Property, it was littered with trash, dead trees, sinks, toilet bowls, and other debris. *Id.* ¶ 18. Plaintiffs obtained title insurance from Old Republic National Title Insurance Company. *Id.* ¶ 2. It was later discovered that an easement for sewer pipes existed through the Property which Plaintiffs'

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    1

neighbors – the owners of 80 Hackensack Plank Road – were responsible for maintaining. *Id.* ¶ 3. Defendants Harry and Denise Hodkinson purchased 76 Hackensack Plank Road which was "uphill from the Plaintiffs and was illegally plugged into the malfunctioning sewer easement." *Id.* ¶ 154.

**\*2** Sewer waste and water regularly flowed onto the Property from the sewer lines of Plaintiffs' neighbors living above the Palisades Cliff. *Id.* ¶ 30. Plaintiffs complained to Weehawken municipal departments, the mayor, the media, and their neighbors about the failure to repair the broken sewer line. *Id.* ¶ 37. Konstantinos also frequently worked in his yard cleaning and gardening. DSOMF ¶ 19. On multiple occasions over the course of many years, Plaintiffs were issued summonses by Defendants for, among other things, failure to obtain approvals from the Planning Board before working on the Property, for violations of Weehawken's "Steep Slope Ordinance," and for public health nuisances. *See, e.g.*, Pl. Supp. SOMF ¶¶ 20, 22, 24, 40; DSOMF ¶¶ 178-208. Defendants list about twenty-five summonses, violations, and stop construction orders issued between 2001 and 2009. DSOMF ¶¶ 178-208. Eleven of the summonses were later dismissed in municipal court. *Id.* ¶¶ 203-207.

Since 2001, Plaintiffs have filed many complaint letters with the Weehawken Building Department, Mayor Turner, the Weehawken Police Department, and other town and state officials. *See, e.g., id.* ¶¶ 60, 76, 151, 153, 162, 170, 239. Plaintiffs have applied for permits and hired their own engineers, contractors, and other experts to evaluate the Property and offer recommendations for work and permit approvals. *See, e.g., id.* ¶¶ 58, 61, 256. Plaintiffs claim that many of their requests for work permits have been denied by the Weehawken Building Department, Pl. Supp. SOMF ¶¶ 42, 58, 61, 265, 281, and while it is true that many have been denied, Defendants point out that a number of Plaintiffs' cited exhibits do not support this proposition. Over the years, various work has been done on the Property pursuant to court orders – without Plaintiffs' consent – regarding emergent circumstances by way of proceedings instituted by the Township. *See, e.g., id.* ¶¶ 53, 67, 118, 149.

Plaintiffs and certain Defendants have a history of state court litigation. On July 18, 2001, the Weehawken Municipal Court issued an order permitting the Township emergency access to the Property and requiring Plaintiffs to pay for the emergency repairs. DSOMF ¶ 4. In light of further disputes over permit denials and access to Plaintiffs' property, Plaintiffs sued the Township and several other Defendants in the Superior Court

of New Jersey on May 31, 2002 (the "Natsis I Litigation"). *Id.* ¶ 5. Following a trial, on November 17, 2004, the state judge ordered that judgment be entered in favor of the Township and against Plaintiffs in the amount of $123,841.00. *Id.* ¶ 14. On December 13, 2004, that same court entered a stipulation of dismissal, but "the Township of Weehawken, Frank Tattoli, Pat Cannon, P.O. Hablitz, and Vincent Rivelli" agreed to "waive any and all statute of limitations defenses." *Id.* ¶ 15. On July 15, 2005, a writ of execution was entered against Plaintiffs. *Id.* ¶ 175. Plaintiffs appealed the judgment, resulting in the New Jersey Appellate Division reversing and remanding the matter. *Id.* ¶ 17. The second trial resulted in a June 3, 2008 judgment for Plaintiffs against their neighbors, the Pamperins. Pl. Supp. SOMF ¶ 201. The Pamperins are no longer parties to this matter.

On August 16, 2008, the Township filed an order to show cause and verified complaint against the Plaintiffs in Superior Court of New Jersey for work done on the Property without the proper permits (the "Natsis II Litigation"). DSOMF ¶ 18; Pl. Supp. SOMF ¶ 206. The order to show cause was granted in 2008 and a nine-day trial resulted in a February 27, 2012 judgment in favor of the Township. DSOMF ¶¶ 20, 25. Plaintiffs were directed to remediate and restore the Property in compliance with Weehawken's Steep Slope Ordinance. *Id.* ¶ 25. The decision was upheld on appeal. *Id.* ¶ 30. In January 2013, the Hudson-Essex-Passaic Soil Conservation District ("HEPSCD") issued a stop work order pertaining to construction and other activity on the Property, revoking an exemption Plaintiffs had been granted in May 2012. *Id.* ¶¶ 29, 246.

**\*3** Konstantinos testified that "the Mayor and his officials opposed his wish[ ] to develop his land because he did not support [M]ayor Turner in the 2002 election." *Id.* ¶ 167. Helen testified that "her family has been the only ones discriminated against," but was unable to provide proof as to whether her neighbors were able to obtain approvals permitting building, renovation, or remodeling. *Id.* ¶ 170. Helen also testified that she had no information to support the allegation that her neighbors were political supporters of Mayor Turner. *Id.* ¶¶ 216-17.

The parties dispute the following facts, among many others. The parties disagree whether the Property is located in Weehawken's "Steep Slope District." *Id.* ¶ 79; Pl. Resp. to DSOMF ¶ 79. Defendants claim Plaintiffs must abide by the Steep Slope Ordinance, but Konstantinos testified he did not

need a permit to take certain actions such as removing trees from the Property. DSOMF ¶ 88.

The parties also dispute Konstantinos' arrest history. According to the Weehawken Police Department's local arrest history tracking system, Konstantinos was arrested in April 2000, February 2002, January 2004, April 2009 (twice), and April 2012. Pl. Supp. SOMF ¶ 103. The facts of Konstantinos' February 6, 2002; January 28, 2004; and April 5, 2012 arrests are relevant to Plaintiffs' false arrest and malicious prosecution claims. DSOMF ¶¶ 219, 228, 237.

Konstantinos was arrested on February 6, 2002 by Defendant Cannon and charged under N.J.S.A. 2C:17-2(2) for "risking or causing widespread injury or damage" by breaking the sewer pipe. *Id.* ¶¶ 219-20. Konstantinos claims Cannon "did not have any personal knowledge" that Konstantinos broke the sewer pipe, lacked probable cause, and filed a "false and malicious" report. Pl. Supp. SOMF ¶¶ 87-88. Defendants deny these facts and claim that Cannon testified that there was probable cause based on witness statements made to him at the time. Def. Resp. to PSOMF ¶¶ 87-88; DSOMF ¶ 224. The investigative report signed by Cannon states that Cannon met with three of Plaintiffs' neighbors who "gave hand[-]written statements that after the pipe was repaired by the city [Konstantinos] broke the pipe with a pick-axe." D.E. 202, Ex. JJJJ. The report further notes that Cannon advised Assistant Prosecutor Jack Hill of the Hudson County Prosecutor's Office of the situation and Hill stated that Cannon should criminally charge Konstantinos. *Id.* Defendants claim that according to a deposition, Konstantinos "understood that an assistant prosecutor made a determination that there was probable cause for his arrest," DSOMF ¶ 222, which Plaintiffs deny. Defendants state that the Township "has no further documents regarding this arrest as the information was signed out for trial in the Hudson County Superior Court in 2002 and never returned," *id.* ¶ 226, whereas Plaintiffs contend "the warrant application and supporting documents never existed." Pl. Resp. to DSOMF ¶ 226.

According to Plaintiffs, on January 28, 2004, Defendant Hablitz arrested Konstantinos for "failing to produce identification so that [Hablitz] could issue a summons for throwing snow into a public area in violation of a local Weehawken ordinance." Pl. Supp. SOMF ¶ 105. Plaintiffs claim that Hablitz was aware that Konstantinos' identification was in the house and that Helen was retrieving it at the time of Konstantinos' arrest. *Id.* According to Defendants, Hablitz testified that he arrested Konstantinos "because he

was attempting to issue a summons and [Konstantinos] was not cooperating" but do not provide any further factual account of the arrest. DSOMF ¶ 229.

**\*4** On April 5, 2012, Konstantinos was arrested on a warrant. *Id.* ¶ 245. Defendants state that Defendant Tattoli "swore out a complaint against [Konstantinos] as he was doing something with the blue stone from the foundation of the residents up top of the hill and it was causing an avalanche condition." *Id.* ¶ 238. Defendants claim Tattoli personally witnessed the dangerous condition created by Konstantinos pushing stones down the hill, which Plaintiffs deny. *Id.* ¶ 239; Pl. Resp. to DSOMF ¶ 239. Plaintiffs claim that Defendant Tattoli "did not have personal knowledge, and instead was basing his criminal complaint on Mrs. Hodkinson's false report." Pl. Resp. to DSOMF ¶ 239. Defendants state that Defendant Tattoli "made a written statement in support of the probable cause for the arrest." DSOMF ¶ 240. Plaintiffs claim that no arrest warrant was presented to a judge for a probable cause determination. Pl. Supp. SOMF ¶ 245.

### 2. Procedural History

Plaintiffs commenced this litigation on December 3, 2013, filing their initial Complaint *pro se*. D.E. 1. On November 14, 2014, Judge Cecchi granted certain Defendants' motions to dismiss, D.E. 61, and Plaintiffs then filed their First Amended Complaint ("FAC") on December 12, 2014. D.E. 64. On February 29, 2016, Judge Cecchi granted in part and denied in part Defendants' motion to dismiss the FAC. D.E. 113.

The case was then transferred to the undersigned. D.E. 117. On March 30, 2016, Plaintiffs filed a Second Amended Complaint ("SAC"), which consisted of eleven causes of action. D.E. 123 ¶¶ 407-509. Defendants filed a partial motion to dismiss the SAC, D.E. 134, which the Court granted in part and denied in part, D.E. 146. Count One (Lack of Political Affiliation under the New Jersey Civil Rights Act ("NJCRA")), Count Two (Retaliation for Lack of Political Affiliation under 42 U.S.C. § 1983), Count Three (Free Speech Retaliation under NJCRA), and Count Four (Free Speech Retaliation under 42 U.S.C. § 1983) were dismissed with prejudice as to Defendants Fulcher, Lamolino, and Mayor Turner (in his personal and official capacity). *Id.* Count Five (False Arrest) was dismissed with prejudice as to Helen and Defendants Fulcher and Lamolino. *Id.* Count Five (False Arrest) was also dismissed as to Konstantinos' arrest

Case: 25-3567 Document: 29 Page: 177 Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

in 2009. *Id.* Count Seven (Abuse of Process) was dismissed without prejudice and Count Ten (Civil Conspiracy) was dismissed with prejudice. *Id.* All Counts as to Defendants Same and Johnson were dismissed without prejudice. *Id.*

On April 10, 2017, Plaintiffs filed a Third Amended Complaint ("TAC") alleging the following eleven causes of action: (1) Lack of Political Affiliation under NJCRA; (2) Retaliation for Lack of Political Affiliation under 42 U.S.C. § 1983; (3) Free Speech Retaliation under NJCRA; (4) Free Speech Retaliation under 42 U.S.C. § 1983; (5) False Arrest; (6) Malicious Prosecution; (7) Abuse of Process; (8) Equal Protection under 42 U.S.C. § 1983; (9) Municipal Liability under 42 U.S.C. § 1983; (10) Civil Conspiracy under 42 U.S.C. § 1985; and (11) "Taking of Property without Just Compensation." D.E. 148 ¶¶ 434-524. The remaining Defendants are the Weehawken Defendants (who brought the present summary judgment motion) and the Hodkinson Defendants, who Plaintiffs allege "acted at the direction, or in conjunction with, the Defendant state actors engaged in a pattern of harassment and retaliation against Plaintiffs." TAC ¶¶ 22-23.

Magistrate Judge Falk entered a July 10, 2017 Scheduling Order that set a fact discovery end date of January 1, 2018. D.E. 158. On June 26, 2018, Judge Falk extended the discovery deadlines, allowing for the parties to submit new or supplemental expert reports until July 10, 2018. D.E. 180.

On July 12, 2017, the Court issued a consent Stipulation of Dismissal. D.E. 160. As a result, the following Defendants were dismissed from the case with prejudice: Township of Weehawken Police Department, Thomas White, Rene Roa, Iggy Mitolo, Dona Jandik, Tracy Pamperin, and Kim Pamperin. *Id.* And the following claims were also dismissed: Konstantinos' claims for false arrest in 2009 as well as Count Ten (Civil Conspiracy). *Id.*

 **\*5** On April 18, 2019, the Weehawken Defendants filed the current motion for summary judgment. D.E. 202. Plaintiffs opposed the motion, D.E. 218, to which Defendants replied, D.E. 225. As referenced in note 1 above, the Hodkinson Defendants were granted leave to file a summary judgment motion but did not do so.

On October 11, 2019, Plaintiffs filed a letter requesting leave to amend discovery and to file a motion for leave to amend the pleadings, D.E. 220, which both the Weehawken and Hodkinson Defendants opposed, D.E. 221-22. Plaintiffs indicate that in May 2019, after the Weehawken Defendants filed the motion for summary judgment, Plaintiffs retained a licensed engineer to inspect the condition of erosion and stormwater management. D.E. 228-1 at 3. Plaintiffs' engineer completed the inspection on June 7, 2019. *Id.* A report was authored on September 4, 2019 and was provided to all Defendants on October 7, 2019. *Id.* at 4. In sum, the expert opined that "Defendant Hodkinson's property ... was still contributing to the ongoing stormwater runoff, falling rock, and other debris that was causing a hazard on Plaintiffs' property (and by extension to the public)." *Id.* On March 17, 2020, Plaintiff filed the pending motion for leave to file a Fourth Amended Complaint and to extend the discovery scheduling order. D.E. 228. The Weehawken Defendants objected to the motion. D.E. 229.

## II. MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT

Motions to amend are normally governed by Federal Rule of Civil Procedure 15(a), while motions to amend after a deadline in a scheduling order are also subject to a higher "good cause" standard set forth in Rule 16. Under Rule 15(a), once a responsive pleading has been filed, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). A court "should freely give leave when justice so requires." *Id.* As a result, leave to amend is generally granted unless there is (1) undue delay or prejudice; (2) bad faith; (3) dilatory motive; (4) failure to cure deficiencies through previous amendment; or (5) futility. *Forman v. Davis*, 371 U.S. 178, 182 (1962). The ultimate decision to grant or deny leave to amend is a matter committed to the Court's sound discretion. *See, e.g.* *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971). The futility analysis on a motion to amend is essentially the same as a Rule 12(b)(6) motion. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002) ("An amendment would be futile when 'the complaint, as amended, would fail to state a claim upon which relief could be granted.' "). For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

However, a party seeking to amend the pleadings after a deadline in a scheduling order must satisfy the requirements of Rule 16(b)(4); the party must show good cause. *See* Fed. R. Civ. P. 16; *Grasso v. Consol. Rail Corp.*, No. 12-398, 2013 WL 3167761 at \*5 (D.N.J. June 20, 2013); *see also* 🚩*Dimensional Commc'n, Inc. v. OZ Optics, Ltd.*, 148 F. App'x 82, 85 (3d Cir. 2005) (observing that good cause standard applies when determining the propriety of a motion to amend after the scheduling order deadline passed). Whether "good cause" exists under Rule 16 rests primarily on the diligence, or lack thereof, of the moving party. *GlobespanVirata, Inc. v. Texas Instruments, Inc.*, No. 03-2854, 2005 WL 1638136, at \*3 (D.N.J. July 12, 2005). In determining whether good cause exists, courts typically consider whether the movant possessed, or through the exercise of reasonable diligence should have possessed, the knowledge necessary to file the motion to amend before the deadline expired. *See* 🚩*Stallings ex rel. Estate of Stallings v. IBM Corp.*, No. 08-3121, 2009 WL 2905471, at \*16 (D.N.J. Sept. 8, 2009) (denying plaintiffs' motion to amend because they "had sufficient information to state the proposed claims well in advance of the [s]cheduling [o]rder deadline").

 **\*6** Plaintiffs filed the pending motion to amend, requesting that the Court extend the discovery deadline and also permit Plaintiffs to file a Fourth Amended Complaint. Pl. Br. at 4. Plaintiffs claim there is good cause for the amendment "in light of newly discovered evidence" revealing "ongoing nuisances and trespasses harming Plaintiffs" coming from Defendants Hodkinsons' property. *Id.* at 1. Plaintiffs contend that the amendment to add additional state law claims will not cause undue delays or prejudice to any parties. *Id.* at 5. Plaintiffs acknowledge that the Court's scheduling order for the production of expert reports has long expired, but claim that "Plaintiffs could not reasonably have produced a report until the inspection" was conducted. *Id.* at 7. However, Plaintiffs fail to provide an adequate explanation for why the inspection could not have been conducted earlier.

The Weehawken Defendants argue that Plaintiffs fail to establish that the amendment is warranted under either Rule 15 or Rule 16. Def. Opp. at 2-15. Defendants claim that Plaintiffs' motion reflects undue delay because the case was filed in 2013, Plaintiffs have filed previous amended complaints, the proposed amendment came after the motion for summary judgment, and Plaintiffs fail to provide any justification for the delay. *Id.* at 4-5. The Weehawken Defendants add that the amendment would unduly prejudice

Defendants by requiring Defendants to conduct additional fact and expert discovery as well as file another dispositive motion nearly seven years into the case. *Id.* at 9. Defendants also point out that Plaintiffs were aware of the issues of runoff and debris no later than when they filed their Third Amended Complaint, which referred to the runoff. *Id.* at 2.

The Court agrees with Defendants. The court-imposed deadline for the parties to submit new or supplemental expert reports was July 10, 2018. D.E. 180. The parties completed motion practice on Defendants' summary judgment motion in October 2019. Nonetheless, Plaintiffs disclosed a new expert report on October 7, 2019 and filed the pending motion seeking leave to amend the discovery schedule on March 17, 2020. D.E. 228-1 at 4. Plaintiffs argue that they could not have produced the report until the inspection had occurred. This may be accurate, but Plaintiffs have provided no explanation – let alone a reasonable explanation – as to why the inspection could not have been conducted earlier. As Defendants explained, Plaintiffs were well aware of sewer runoff problems in 2017 at the latest. Def. Opp. at 3. As a result, Plaintiffs fail to meet the "good cause" standard for amendment under Rule 16.

Given the length and current posture of this case and the fact that this would be Plaintiffs' third amendment, the Court also finds that amendment would cause undue delay and prejudice under Rule 15. The Defendants have a right to have this case determined in a reasonable time frame. Additional claims would not only lead to further discovery but also motion practice. Plaintiffs have provided no legitimate reason for their delay in conducting the inspection, submitting their expert report, and filing the pending motion. For the foregoing reasons, the Court denies Plaintiffs' motion to amend and proceeds to resolve Defendants' motion for summary judgment.

### III. MOTION FOR SUMMARY JUDGMENT

#### 1. Summary Judgment Standard

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." 🚩*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

Case: 25-3567 Document: 29 Page: 179 Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)

2020 WL 4582018

(1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' " *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**\*7** A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

**2. ANALYSIS**

**i. Defendants Lamolino, Same, Johnson, Masterson, and Fulcher**

Defendants argue that "Plaintiffs' complaint *fails to assert* viable causes of action as to" Defendants Lamolino, Same, Johnson, Masterson, and Fulcher. Def. Br. at 5-7 (emphasis added). Defendants argue that the claims against each Defendant must be dismissed, referring in their brief only to allegations set forth in the TAC and failing to cite to any evidence in the record. Defendants' argument relates to a motion to dismiss, not a motion for summary judgment. When dismissing claims at the summary judgment phase, courts must look to facts and evidence in the record, not mere allegations. As a result, the Court denies Defendants' request to dismiss the claims against Defendants Lamolino, Same, Johnson, Masterson, and Fulcher.

**ii. Doctrine of Laches and Statute of Limitations**

Defendants next argue that Plaintiffs' claims for malicious prosecution, abuse of process, and the false arrest claims of 2002 and 2004 are barred by the doctrine of laches. Def. Br. at 8-13. Laches is an equitable doctrine that consists of two elements: "(1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." *Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005) (internal citation omitted). Plaintiffs respond that that Defendants' argument fails because Defendants failed to assert laches as an affirmative defense. Pl. Opp. at 3. According to the Federal Rules of Civil Procedure, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defenses, including ... laches[.]" Fed. R. Civ. P. 8(c)(1). Since the Defendants failed to plead laches as an affirmative defense, the Court denies Defendants' request to bar Plaintiffs' claims under the doctrine of laches.

Defendants also argue that the claimed acts of retaliation which occurred before December 3, 2011 fall outside the scope of the statute of limitations. Def. Br. at 14. "The statute of limitations for any [Section] 1983 claim is the forum state's limitations statute for personal injury actions." *Levine v. New Jersey State Dep't of Cmty. Affairs*, 231 Fed. App'x 125, 127 (3d Cir. 2007). Since New Jersey has a two-year statute of limitations for personal injury actions, the Third Circuit has adopted this two-year period for Section 1983

Case: 25-3567    Document: 29    Page: 180    Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

actions. *Id.* Likewise, a two-year statute of limitations applies to Plaintiffs' NJCRA claims. *See Hawkins v. Feder*, No. A-4444-12T4, 2014 WL 6977836, at *1 (N.J. Super. Ct. App. Div. Dec. 11, 2014). As stated by Judge Cecchi in her 2016 motion to dismiss opinion, "[s]ince Plaintiffs filed their original federal complaint on December 3, 2013, D.E. 1, the latest date on which the facts giving rise to their ⚑Section 1983 and NJCRA claims could have occurred – absent some tolling exception – would be December 3, 2011." D.E. 113 at 8-9.

**\*8** Defendants first argue that the 2004 waiver of the statute of limitations in the Natsis I Litigation "is unlimited and must be barred as against public policy and void." Def. Br. at 15. Defendants further argue that "even if the waiver was not void, it could only include those claims contemplated and pled at the time it was entered into in December of 2004." *Id.* at 16. Plaintiffs' amended complaint in the Natsis I Litigation did not include claims for retaliation under the First Amendment. D.E. 202, Ex. F. Therefore, Defendants argue that the 2004 waiver of the statute of limitations cannot apply to the claims for retaliation in Counts One through Four. Def. Br. at 16. Plaintiffs respond that the statute of limitations waiver is valid and applicable. Pl. Opp. at 6-7. However, Plaintiffs fail to address whether the waiver applies to the retaliation acts in particular.

The 2004 waiver states as follows: "It is hereby stipulated and agreed that Counts 8-26 of the complaint against defendants, Township of Weehawken ... Frank Tattoli, Det. Sgt. Pat Cannon, P.O. Hablitz ... and Vincent Rivelli be and it is hereby voluntarily dismissed without prejudice. These defendants agree to waive any and all statute of limitations defenses." D.E. 202, Ex. K. The Court finds that Defendants waived "any and all statute of limitations defenses" *as to the claims laid out in Counts 8-26*, which did not include First Amendment retaliation claims. There is no indication in the waiver that it applied to *unasserted*, related claims. And Plaintiffs fail to provide any authority indicating that the waiver should be extended to such claims. Therefore, the Court finds that the 2004 statute of limitations waiver does not apply to Counts One through Four.

This finding, however, does not end the inquiry. The second issue is whether the continuing violations doctrine applies. Under the continuing violations doctrine, "a plaintiff can sue for actions that occurred outside the applicable limitations period if 'a defendant's conduct is part of a continuing practice [and] ... the last act evidencing the practice falls within the limitations period.' " ⚑*Cibula v. Fox*, 570 F. App'x 129, 135 (3d Cir. 2014) (internal citation omitted). "To determine whether a practice was continual, a court must consider (1) whether the violations are part of the same subject matter and (2) whether the violations occurred frequently."[4] *Id.*

[4]   The parties do not address whether the continuing violations doctrine is a jury issue. While the Court did not find binding precedent from the Third Circuit on the issue, the First Circuit ruled that "[u]nless there are no material facts in dispute permitting resolution as a matter of law as to whether a continuing violation occurred, it is a jury issue." ⚑*O'Rourke v. City of Providence*, 235 F.3d 713, 727 (1st Cir. 2001). The Court follows this First Circuit decision as persuasive because it is analogous to the affirmative defense of statute of limitations, which is also jury issue when there is a genuine issue of material fact.

Defendants argue that the continuing violations doctrine does not apply to Plaintiffs' claims "because they are based upon separate acts which [Plaintiffs] knew or should have known, were actionable at the time they occurred, namely, that the issuance of summons[es], violations, stop work orders, denials of permits and arrests of Konstantinos Natsis were actionable before December 2011." Def. Br. at 18. Plaintiffs respond that "the Weehawken Defendants have caused Plaintiffs to suffer continuous, ongoing civil rights violations that should trigger a tolling of the statute of limitations to Plaintiffs' claims not preserved by the waiver." Pl. Opp. at 7.

The Third Circuit has found that the continuing violations doctrine applies in ⚑Section 1983 cases. *See Bennett v. Susquehanna Cty. Children and Youth Servs.*, 592 Fed. App'x 81, 85 (3d Cir. 2014); ⚑*Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001). In *Bennett*, the Third Circuit found that "the continuing violations doctrine is not a substitute for a plaintiff's 'awareness of and duty to assert his/her rights' in a timely fashion," and, as such, the doctrine "does not apply when plaintiffs are aware of the injury at the time it occurred." *Bennett*, 592 Fed. App'x at 85 (quoting ⚑*Cowell*, 263 F.3d at 295; ⚑*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 416 n.6 (3d Cir. 2003)).

**\*9** In *Flanders v. Dzugan*, a property owner sued a municipality and building code official alleging civil rights violations "related to [his] unsuccessful attempt to construct

Case: 25-3567 Document: 29 Page: 181 Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

an addition to his business premises." 156 F. Supp. 3d 648, 655 (W.D. Pa. 2016). Flanders alleged that the defendants deprived him of his protected property interest by, among other things, failing to issue building and demolition permits, issuing a stop work order, refusing to grant a variance, and criminally prosecuting him. *Id.* at 665. Flanders argued that the continuing violations doctrine rendered his claim timely. The district court, citing *Bennett*, found that the doctrine did not apply because Flanders was aware of a number of the wrongs (including the refusal to issue a construction order and issuance of a stop work order) at the time they occurred, far before the applicable limitations period. *Id.* at 667 (citing *Bennett*, 592 Fed. App'x. at 85).

In *Holt v. Pennsylvania*, a police officer alleged discrimination and First Amendment retaliation claims against various defendants while he was employed with the Pennsylvania State Police. No. CV 17-2511, 2018 WL 2363535, at *1 (E.D. Pa. May 24, 2018). Holt relied on numerous adverse actions and incidents over the course of many years in support of his claims against multiple Defendants. *Id.* Holt argued that these many incidents, "when viewed as a whole, 'developed a continuing practice to retaliate against Plaintiff for first amendment activity.' " *Id.* at *8. The court found that "[t]his effort to invoke to continuing violations doctrine improperly lumps the acts of the various Defendants together, disregarding the fundamental principle that 'a defendant in a civil rights action must have personal involvement in the alleged wrongs[.]' " *Id.* To comply with the continuing violations doctrine, the court held, "a plaintiff must establish, for each defendant, that his/her acts outside the limitations period were part of a continuing practice by that same defendant with the last act by that defendant falling within the limitations period." *Id.*

In defining "continuing practice," a court in this Circuit has found that "if the allegedly violative acts that occurred before the limitations period were 'discrete' then they are time-barred." *Nahouraii v. Ind. Univ. of Pennsylvania*, No. 2:11-CV-00973, 2015 WL 401422, at *12 (W.D. Pa. Jan. 28, 2015) (internal citation omitted). Therefore, a critical distinction in the continuing violations doctrines lies in "discrete and non-discrete acts." *Id.* Discrete acts are "easy to identify," whereas non-discrete acts "necessarily 'occur [ ] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.' " *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-115 (2002)).

In requesting that the Court apply the continuing violations doctrine, Plaintiffs point to " 'emergency repairs' and forced inspection by the Township since 2001," the issuance of violations, the denial of permits, state court litigation, and the arrest of Konstantinos in 2012. Pl. Opp. at 13-14. However, all of these acts are "easy to identify" and therefore constitute discrete acts as opposed to non-discrete acts. Like in *Bennett* and *Flanders*, Plaintiffs were aware of each of these discrete acts and injuries at the time they occurred, and "the continuing violations doctrine is not a substitute for a plaintiff's 'awareness of and duty to assert his/her rights' in a timely fashion." *Bennett*, 592 Fed. App'x at 85. The Court concludes that the continuing violations doctrine does not apply.

### iii. Plaintiffs' Section 1983 and NJCRA Claims

Plaintiffs bring Counts Two, Four, Five, and Nine pursuant to Section 1983. Section 1983, in relevant part, provides as follows:

> **\*10** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To state a Section 1983 claim, a plaintiff must demonstrate that "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Burt v. CFG Health Sys.*, No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015).

Plaintiff brings Counts One and Three pursuant to the New Jersey Civil Rights Act ("NJCRA"). Like Section 1983, The NJCRA affords a private cause of action to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities

Case: 25-3567    Document: 29    Page: 182    Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law.

N.J.S.A. 10:6-2. Civil claims for a violation of the New Jersey Constitution can only be asserted by way of the NJCRA, which is interpreted analogously to Section 1983. *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 548 (D.N.J. 2013); *see also Roman v. City of Newark*, No. 16-1110, 2017 WL 436251, at *3-4 (D.N.J. Jan. 31, 2017). The "NJCRA was modeled after [Section] 1983, [and so] courts in New Jersey have consistently looked at claims under the NJCRA through the lens of [Section] 1983 and have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart." *Velez v. Fuentes*, No. 15-6939, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016) (internal quotations and citation omitted). Therefore, the Court considers Plaintiffs' Section 1983 and NJCRA claims together.

### 1. Retaliation Claims

Plaintiffs assert retaliation claims pursuant to 42 U.S.C. § 1983 for violations of the First Amendment of the United States Constitution as well as the NJCRA, N.J.S.A. 10:6-2, and Article 1, Section 18 (right of assembly and to petition) of the New Jersey Constitution. TAC ¶¶ 424-62. Plaintiffs assert Counts One and Two for lack of political affiliation retaliation and Counts Three and Four for free speech retaliation. *Id.*

In order to succeed on a retaliation claim under the First Amendment, a plaintiff must demonstrate "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). "The key question in determining whether a cognizable First Amendment claim has been stated is whether the alleged retaliatory conduct was sufficient

to deter a person of ordinary firmness from exercising his First Amendment rights." *Id.* (citing *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotation marks omitted)); *see also Crawford-El v. Britton*, 523 U.S. 574, 588 n. 10 (1998) ("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of [a constitutionally] protected right."). The third element, "a causal link," requires "but-for" causation. *Mirabella v. Villard*, 853 F.3d 641, 651 (3d Cir. 2017) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "In order to establish the required causal connection, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 133 (3d Cir. 2017) (citing *Lauren W.*, 480 F.3d at 267).

**\*11** Counts One and Two assert retaliation for lack of political affiliation. TAC ¶¶ 424-42. Plaintiffs allege that they "openly opposed Mayor Turner politically," *id.* ¶ 437, and in response, Defendants "retaliated against Plaintiffs based of [sic] Defendants['] actual or perceived belief that Plaintiffs were not politically affiliated with Mayor Turner and openly opposed his political policies in the Township of Weehawken," *id.* ¶ 427. Plaintiffs claim that Defendants' retaliation against Plaintiffs – which included filing false reports, selectively enforcing ordinances, denying Plaintiffs permit applications – was "substantially motivated by Plaintiffs['] actual and/or perceived lack of political affiliation and support of Mayor Turner." *Id.* ¶ 430.

Defendants respond that Plaintiffs fail to set forth a violation of their First Amendment rights for political affiliation. Def. Br. at 25. Critically, Defendants claim that there is "no evidence that anyone in Weehawken was aware of the Plaintiffs' political affiliation. Plaintiffs have identified no evidence in the record anyone was aware of their lack of support for Mayor Turner." *Id.* at 26. In their opposition, Plaintiffs fail to point to any evidence that they openly opposed Mayor Turner politically or that Defendants were ever aware of either Plaintiffs' political affiliation or opposition to Mayor Turner.

The third element of a retaliation claim under the First Amendment requires "a causal link between the constitutionally protected conduct and the retaliatory action."

Case: 25-3567   Document: 29   Page: 183   Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

*Thomas*, 463 F.3d at 296. Of course, before a defendant can retaliate against a plaintiff for constitutionally protected activity, the defendant must be aware of such activity. In failing to provide any evidence that Plaintiffs openly opposed Mayor Turner politically or that Defendants were aware of such activity, Plaintiffs fail to provide sufficient evidence of a necessary element of their claim – a causal link between the alleged constitutionally protected conduct and retaliatory action. Plaintiffs have failed to point to any genuine dispute as to any material fact on this issue, and Defendants are entitled to judgment as a matter of law. Therefore, summary judgment is granted as to Counts One and Two.

Counts Three and Four of Plaintiffs' TAC assert free speech retaliation. TAC ¶¶ 443-62. Plaintiffs claim that they engaged in protected free speech activities in the form of complaints to municipal entities and the media regarding "the inefficacies of public officials and the denial of municipal resources in the Township of Weehawken," lawsuits, appeals of adverse legal determinations and permit applications, and more. *Id.* ¶¶ 446-47, 456, 459. Plaintiffs allege that Defendants retaliated against Plaintiffs for exercising their free speech rights through a "policy, practice and custom of Defendant Township of Weehawken and Mayor Turner's administration designed to intimidate and chill free speech." *Id.* ¶¶ 448-49, 457-58. According to Plaintiffs, their "decision to exercise their First Amendment rights was a substantial and motivating force behind Defendants' retaliation." *Id.* ¶ 460.[5]

[5]     Plaintiffs opposition brief asserts that "Plaintiffs' First Amendment claims should be construed to include denial of access to court process." Pl. Opp. at 27. However, denial of access to court process was not asserted in the TAC and, as a result, is not considered herein. *See Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 534 n.5 (D.N.J. 2008) (declining to consider allegations that were not pled in the complaint and were only raised for the first time in opposition to a motion for summary judgment).

Defendants argue that Plaintiffs fail to set forth a violation of their First Amendment rights to free speech. Def. Br. at 29. Defendants claim that "[f]rom the record evidence it is obvious Plaintiffs continually fail to follow applicable laws and court orders. The fact that they spoke out is of no consequence." *Id.* at 34. Defendants add that "[t]here is absolutely no proof that Plaintiffs' free speech rights were chilled, or that they suffered any sort of retaliation." *Id.* at 30. Defendants continue that Plaintiffs "cannot demonstrate any causal connection between their speech and the actions taken by the Township in an effort to minimize health and safety issues caused by Plaintiffs' [sic] and their property, and their failure to maintain the slope as required by law." *Id.* at 32-33. Plaintiffs respond that they "have performed numerous discrete First Amendment activities, and the factual record would permit a rational jury to conclude the Weehawken Defendants' conduct was substantially motivated to retaliate against Plaintiffs and intimidate them for exercising their First Amendment rights." Pl. Opp. at 21.

**\*12** Since the continuing violations doctrine does not apply, the Court only considers conduct that occurred between December 3, 2011 and April 10, 2017, the date of the filing of the TAC. Plaintiffs claim that "the totality of the factual record shows ... the Weehawken Defendants repeatedly interfere with Plaintiffs any time they seek to develop or otherwise enjoy the use of their Property." However, the bulk of specific examples of retaliation that Plaintiffs provide predate December 3, 2011. For example, Plaintiffs point to public comments made after the Natsis I litigation and the commencement of the Natsis II litigation as retaliatory acts, both of which fall outside of the statute of limitations. Pl. Opp. at 21.

It is clear that Plaintiffs satisfy the first element of their free speech retaliation claim, having engaged in multiple forms of protected speech activity, including complaints to government entities, reporting local government officials to media sources, and initiation of legal actions. *See Bradshaw v. Twp. of Middleton*, 296 F. Supp. 2d 526, 546 (D.N.J. 2006) (stating that "[t]he First Amendment guarantees 'the right of the people ... to petition the Government for redress of grievances' " and that citizens have the right to be free from government retaliation for exercising this right).

However, as to alleged retaliatory actions between December 3, 2011 and April 10, 2017, Plaintiffs fail to provide evidence as to the third element, a causal link between the constitutionally protected conduct and the retaliatory action. Plaintiffs claim that "[i]n 2014 and 2015, the Township of Weehawken revived numerous summonses and complaints against Plaintiffs that were many years old and had never received a hearing." Pl. Supp. SOMF ¶ 275. Plaintiffs argue that "Weehawken Defendants instituted numerous criminal complaints against Plaintiffs ... left these complaints in abeyance, and then relisted them when Plaintiffs commenced this litigation so they could further undermine First Amendment rights." Pl. Opp.at 24. In response, Defendants deny that "the Township 'revived' the summonses," and claimed "[t]he summonses were brought

Case: 25-3567    Document: 29    Page: 184    Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

based upon change of venue." Def. Resp. to Pl. Supp. SOMF ¶ 275.

The evidence supports Defendants' claim that there was a change of venue due to conflicts of interest between Plaintiffs and the Weehawken Municipal Court stemming from complaints filed. *See* D.E. 218, Ex. 152. Furthermore, Plaintiffs fail to establish that there is an unusually suggestive temporal proximity between the protected activity, Plaintiffs filing this federal litigation, and the allegedly retaliatory action, the revival of old summonses and complaints. Plaintiffs' evidence reflects that in August 2015, Plaintiffs were summonsed to appear in the Bayonne Municipal Court for "assorted" complaints. D.E. 218, Ex. 151. Plaintiffs initiated the current litigation on December 3, 2013, yet the alleged retaliatory action did not take place until approximately eighteen months later. The temporal proximity between December 2013 and August 2015 is too remote to draw a reasonable inference as to the necessary causal link. Plaintiffs also broadly claim that the denial of permits, selection of contractors by the Township, and the 2012 arrest of Konstantinos constitute free speech retaliation. Pl. Opp. at 21-22, 26. However, as to each of these instances, Plaintiffs fail to demonstrate the necessary temporal and causal connections between their exercises of free speech and the retaliatory actions. Plaintiffs merely list actions they deem retaliatory and broadly argue that a causal connection exists. Plaintiffs fail to tie their protected speech activities to specific retaliatory actions in the relevant timeframe.

**\*13** Plaintiffs fail to demonstrate any genuine dispute as to any material fact in the pertinent timeframe. Therefore, summary judgment is granted as to Counts Three and Four.

### 2. Count Nine: Municipal Liability

Count Nine of the TAC alleges municipal liability under Section 1983 against Defendant Weehawken. TAC ¶¶ 504-510. Plaintiffs assert that "Weehawken has a policy, custom, and practice of retaliating against property owners that take legal action or exercise their free speech against the Township of Weehawken and/or Mayor Turner." *Id.* ¶ 506. Plaintiffs allege that the policy, custom, and practice is carried out "in part, by members of the Weehawken Police Department through the filing of false reports and frivolous complaints, as well as through the Weehawken Building Department by abusing the construction permit application procedure and maliciously issuing summonses/

citations." *Id.* ¶ 507. The alleged retaliatory acts include "false arrests, illegal searches, commencing frivolous litigation, taking Plaintiffs' property for regulation and assessment of violations, denial and destruction of permit applications without legitimate reason, arbitrary and capricious denial of municipal services, and other forms of harassment designed to retaliate and intimidate." *Id.* ¶ 508.

Defendants claim that Plaintiffs have failed to adduce any proof of a policy or custom of retaliation by the Township. Def. Br. at 71. Plaintiffs respond that Defendant Tattoli and Mayor Turner acted as final policymakers commencing and enforcing a policy or custom of free speech retaliation. Pl. Opp. at 82-84.

A municipality cannot be liable under Section 1983 for the acts of its employees on the basis of *respondeat superior*. *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)). Rather, to hold a municipality liable, a plaintiff must demonstrate that the violation of rights was caused by a municipal policy or custom. *Id.* To sufficiently state a claim based on a municipal policy or custom, a plaintiff must identify a policy or custom that "violates the Constitution or ... while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees." *Id.* (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1027 (3d Cir. 1991)). "In other words, the plaintiff must show that the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation." *Noble v. City of Camden*, 112 F. Supp. 3d 208, 221 (D.N.J. 2015) (internal citation omitted). "A plaintiff may show the existence of a *policy* when a decision-maker with final authority issues an official proclamation, policy, or edict." *Id.* (emphasis added) (internal quotations and citations omitted); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (" 'policy' generally implies a course of action consciously chosen from among various alternatives."). "[A] *custom* may be established by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (emphasis added) (internal quotations and citations omitted).

**\*14** Ultimately, "[a] plaintiff must identify the challenged policy [or custom], attribute it to the [municipality] itself,

Case: 25-3567    Document: 29    Page: 185    Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

and show a causal link between execution of the policy and the injury suffered." *Kranson v. Valley Crest Nursing Home*, 755 F.2d 46, 51 (3d Cir. 1985) (internal citation and quotation marks omitted). If the policy or custom does not violate federal law on its face, "causation can only be established by 'demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequence.' " *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (quoting *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)).

To sufficiently state a claim for municipal liability, Plaintiffs must identify a policy, custom, or practice that either violates the Constitution or is the moving force behind a constitutional tort of an employee. *Thomas*, 749 F.3d at 222. The underlying constitutional tort alleged in this municipal liability claim is free speech retaliation. However, as discussed above, the Court holds that Plaintiffs fail to establish a claim for free speech retaliation. Without a constitutional violation, the City cannot be held liable under *Monell*. See *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L. Ed. 2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."). So too here, since Plaintiffs failed to establish an underlying constitutional tort, Plaintiffs' claim for municipal liability fails.[6] Therefore, Defendants' motion for summary judgment is granted as to Count Nine.

[6]   Plaintiffs also argue in their opposition brief that Mayor Turner and Defendant Tattoli personally retaliated against Plaintiffs in their capacities as officials with final policymaking authority. Pl. Opp. at 83-84. Plaintiffs rely on *Pembaur v. Cincinnati*, 475 U.S. 469 (1986), which "makes clear that an official with policymaking authority can create official policy, even by rendering a single decision." *McGreevy v. Stroup*, 413 F.3d 359, 367-68 (3d Cir. 2005). However, since Plaintiffs failed to establish an underlying constitutional violation of free speech retaliation, Plaintiffs' *Pembaur* arguments must also fail.

### 3. Count Five: False Arrest

Count Five of Plaintiffs' TAC asserts false arrest by Defendant Cannon on February 6, 2002; by Defendant Hablitz on January 28, 2004;[7] by Defendant Same on April 5, 2009;[8] and by Defendants Tattoli, Hodkinson, and unnamed members of the Weehawken Police Department on April 5, 2012. TAC ¶¶ 463-76. "An arrest made without probable cause creates a cause of action for false arrest under 42 U.S.C. § 1983." *O'Connor v. City of Philadelphia*, 233 F. App'x 161, 164 (3d Cir. 2007) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). "The proper inquiry in a Section 1983 claim based on false arrest ... is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634-35 (3d Cir. 1995) (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). "Where the police lack probable cause to make an arrest, the arrestee has a claim under [Section] 1983 for false imprisonment based on a detention pursuant to that arrest." *Id.* at 636 (quoting *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988)). The inquiry into wrongful arrest under the New Jersey Constitution is the same. *See, e.g. Geissler v. City of Atlantic City*, 198 F. Supp. 3d 389, 397 (D.N.J. 2016) ("Under *federal and New Jersey law*, a plaintiff states a claim for false imprisonment by demonstrating that (1) she was detained and (2) the detention was unlawful." (emphasis added)).

[7]   As mentioned earlier in this Opinion and in the prior motion to dismiss opinion, Plaintiffs' allegations pertaining to the 2002 and 2004 arrests by Defendants Cannon and Hablitz, respectfully, are not barred by the statute of limitations because they waived the defense in the 2004 consent decree. D.E. 147.

[8]   Konstantinos' false arrest claim for April 2009 was dismissed on March 10, 2017. D.E. 160.

**\*15** Probable cause exists if, at the time a suspect is arrested, "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005). In determining whether a police officer had probable cause to arrest, a court must review the totality of

**Helen v. Turner, Not Reported in Fed. Supp. (2020)**
2020 WL 4582018

the circumstances of the events leading up to the arrest and must do so from the "standpoint of an objectively reasonable police officer[.]" *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (internal citation omitted). "A police officer may be liable for civil damages for an arrest if 'no reasonable competent officer' would conclude that probable cause exists." *Wilson v. Russo*, 212 F.3d 781, 789-90 (3d Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A defendant is entitled to qualified immunity for a Section 1983 false arrest claim "unless it would have been clear to a reasonable officer there was no probable cause to arrest." *Frohner v. City of Wildwood*, No. 07-1174, 2008 WL 5102460, at *6 (D.N.J. Dec. 1, 2008) (quoting *Giles v. Davis*, 427 F.3d 197, 205 (3d Cir. 2005)). Moreover, this question must be considered within the context of the specific facts of the case. *Thomas*, 463 F.3d at 300 (quoting *Saucier*, 533 U.S. at 201). As such, the proper inquiry is whether a reasonable officer in the defendant's shoes would have understood that he did not have probable cause to arrest the plaintiff. *Janowski*, 2017 WL 18210978, at *6 ("Courts must instead objectively assess whether, at the time of the arrest and based upon the facts known to the officer, probable cause existed 'as to any offense that could be charged under the circumstances.' ") (quoting *Wright*, 409 F.3d at 606)).

Defendants move for summary judgment on the February 6, 2002 false arrest claim, arguing that probable cause existed for the arrest and that Defendant Cannon is entitled to qualified immunity. Def. Br. at 44-46, 51. Plaintiffs reply that the 2002 arrest was not supported by probable cause "because Defendant Cannon made a false report to blame [Konstantinos] for the sewer easement line's failure." Pl. Opp. at 36. Plaintiffs continue that Defendant Cannon "did not have any personal knowledge to support probable cause to believe that Plaintiff Konstantinos Natsis broke the sewer pipe" and filed a "false and malicious report." Pl. Supp. SOMF ¶¶ 86-88. The investigative report of the incident signed by Defendant Cannon demonstrates that three of Plaintiffs' neighbors (Richard Allgayer, Igor Sidorets, and Tracy Pamperin) "gave hand written statements that after the pipe was repaired by the city [Konstantinos] broke the pipe with a pickaxe." D.E. 202, Ex. JJJJ. Defendant Cannon testified that "probable cause for the arrest existed based

upon the witness statements made to him." DSOMF ¶ 224; D.E. 202, Ex. KKKK at 52:20-54:19. Plaintiffs claim that the witness statements "were hearsay or otherwise did not support probable cause as they were self-serving, not proximate in time, and failed to establish a basis to hold [Konstantinos] accountable for destroying the sewer easement line." Pl. Opp. at 39.

Defendants note that, aside from the investigative report itself and deposition testimony, "[t]he Township has no further documents regarding this arrest as the information was signed out for trial in the Hudson County Superior Court in 2002 and never returned." DSOMF ¶ 226. Plaintiffs, in turn, "without information to admit or deny," contend that "the warrant application and supporting documents never existed." Pl. Resp. to DSOMF ¶ 226.

**\*16** Plaintiffs fail to introduce a genuine issue of material fact as to whether probable cause existed. The issue is whether the three witnesses actually made the statements, inculpating Konstantinos, to the officer. Plaintiffs provide no evidence that their neighbors did not actually make statements to Defendant Cannon. Probable cause may rest upon hearsay. *Franks v. Delaware*, 438 U.S. 154, 165 (1978). Defendant Cannon could reasonably rely on three witness statements to establish probable cause. Plaintiffs point to no legal authority requiring Defendant Cannon to have personal knowledge, in addition to the witness statements, to support probable cause. In Plaintiffs' opposition brief, Plaintiffs also argue that in arresting Plaintiff in 2002, "Defendant Cannon was abusing his police powers against Plaintiffs once they filed the Natsis I litigation." Pl. Opp. at 36. However, Plaintiffs' supplemental statement of material facts notes that Plaintiffs commenced the Natsis I litigation on May 30, 2002, months *after* Defendant Cannon arrested Konstantinos. Pl. Supp. SOMF ¶ 96.

There is no genuine dispute of material fact as to whether probable cause existed for the 2002 arrest. As a result, the Court grants Defendants' motion for summary judgment as to the 2002 false arrest claim.

Defendants also move for summary judgment on the January 28, 2004 false arrest claim, arguing that probable cause existed for the arrest and that Defendant Hablitz is entitled to qualified immunity. Def. Br. at 46-48, 51. Plaintiffs claim Defendant Hablitz did not have probable cause to arrest Konstantinos. Pl. Opp. at 43-45. Plaintiffs assert that Defendant Hablitz arrested Konstantinos for "failing to

Case: 25-3567　　Document: 29　　Page: 187　　Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

produce identification so that he could issue a summons for throwing snow into a public area in violation of a local Weehawken ordinance." Pl. Supp. SOMF ¶ 105. Defendant Hablitz testified in November 2017 "that he arrested [Konstantinos] because he was attempting to issue a summons and [Konstantinos] was not cooperating." DSOMF ¶ 229.

Critically, the parties present different underlying facts of the arrest. Defendant Hoblitz stated in his deposition testimony that Konstantinos was "obstructing" and "fled into his home to avoid being issued the summons." D.E. 202, Ex. MMMM. Plaintiffs, on the other hand, indicate that Helen was retrieving Konstantinos' identification from inside the house, Pl. Supp. SOMF ¶ 105, and that Konstantinos "came back outside on his own accord[.]" *Id.* ¶ 106. The parties' conflicting representations call into question whether Defendant Hablitz had probable cause at the time he executed the arrest, which is material to the false arrest claim. Because a genuine dispute of material fact exists, the Court denies Defendants' summary judgment motion as to the 2004 false arrest claim.

Defendants next move for summary judgment on the April 5, 2012 false arrest claim. Def. Br. at 48. Defendants first argue that the claim must be dismissed because Plaintiffs fail to identify the officer who arrested Konstantinos. *Id.* at 48. Alternately, Defendants argue that the claim must be dismissed because Konstantinos was arrested pursuant to a valid warrant. *Id.* at 50-51. Plaintiffs respond that there was no probable cause to arrest Konstantinos because Defendants Tattoli and Hodkinson misled the municipal judge through false testimony. Pl. Opp. at 45-46.

Defendant Tattoli, a construction code official in Weehawken, was a witness and complainant, but did not execute the arrest. *Id.* ¶¶ 3, 238-39, 243. Plaintiffs do not name the police officers who executed the April 5, 2012 arrest, referring to them only as "[m]embers of Defendant Weehawken's Police Department" in the TAC. *See* TAC ¶ 474; DSOMF ¶ 245.

"The proper inquiry in a 🚩 Section 1983 claim based on false arrest ... is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." 🚩*Groman, 47 F.3d at 634-35* (quoting 🚩*Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988)*). Critically, even assuming Plaintiffs' allegation

that Defendants Tattoli and Hodkinson misled the municipal judge through false testimony, Plaintiffs have brought forth no evidence that the arresting officers knew or should have known that the information provided by Defendants Tattoli and Hodkinson was untrustworthy. The arrest was made pursuant to an arrest warrant.[9] As the Supreme Court stated in 🚩*United States v. Leon, 468 U.S. 897, 921 (1984),* "[in] the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." As the Court found, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* In this case, Plaintiffs failed to demonstrate that the unnamed arresting officers did not sincerely believe the warrant was valid and that their belief was objectively reasonable. *See* 🚩*United States v. Katzin, 769 F.3d 163, 171 (3d Cir. 2014)* ("Where the particular facts of a case indicate that law enforcement officers 'act[ed] with an objectively 'reasonable good-faith belief' that their conduct [was] lawful, or when their conduct invite[d] only simple, 'isolated' negligence,' there is no illicit conduct to deter.") (internal citations omitted). For these reasons, the 2012 false arrest claim is dismissed as to the unnamed officers.

9　　While Plaintiffs claim "there was no arrest warrant application presented to a magistrate judge to determine whether there was sufficient evidence to support a finding of probable cause," Pl. Supp. SOMF ¶ 245, Plaintiffs *themselves* attach a Weehawken Township Municipal Court "Probable Cause Determination and Issuance of Warrant," *see* D.E. 218, Ex. 146. The document is dated April 5, 2012, lists the complainant as Defendant Tattoli, and states "probable cause for this complaint is based on witnesses/officers observations and written statements." *Id.* It further states "[p]robable cause IS found for the issuance of this complaint ... to any peace office or other authorized person: pursuant to this warrant you are hereby commanded to arrest the named Defendant [Konstantinos Natsis][.]" *Id.*

**\*17** As to Defendant Tattoli, it appears Plaintiffs are making a claim for causing a false arrest. Plaintiffs state in their opposition brief that "the false statements of Defendant Tattoli should be considered actions by a state actor that proximately caused [Konstantinos] to be arrested without probable cause." Pl. Opp. at 46. Plaintiffs cite to 🚩*Pomykacz v. Borough of W. Wildwood, 438 F. Supp. 2d 504, 510-11 (D.N.J. 2006)* in support of the proposition that in that case, the "mayor's

Case: 25-3567    Document: 29    Page: 188    Date Filed: 06/05/2026

Helen v. Turner, Not Reported in Fed. Supp. (2020)
2020 WL 4582018

statement made to obtain [a] warrant based on probable cause states a claim for false arrest[.]" *Id.* However, Defendants argue that *Pomykacz* does not support Plaintiff's position that Defendant Tattoli can be held liable for a 1983 false arrest claim. Def. Reply at 18-20.

In *Pomykacz*, the plaintiff, a "citizen activist," became concerned about issues in the town and began "monitoring" a police officer and mayor. 🚩*Pomykacz,* 438 F. Supp. 2d at 506-07. After tensions grew, the police officer and mayor jointly called the county prosecutor to discuss filing stalking charges against the plaintiff. 🚩*Id.* at 508. The prosecutor "advised [the police officer] about the necessary facts to support a stalking charge" and after the meeting, the police officer called a municipal court judge to obtain a warrant for plaintiff's arrest. *Id.* The record reflects that the police officer told the judge her version of the events, but "[t]he record does not indicate what, if any, specific information was given about [plaintiff's] actions with respect to [the mayor]," and the warrant for plaintiff's arrest was signed. *Id.*

The police officer and mayor argued that they were not subject to 🚩Section 1983 liability because they were acting as private citizens, and not under the color of state law, when they made the criminal complaint. 🚩*Id.* at 509. The district judge noted that "private citizens do not have such ease of access to the County Prosecutor's Office or judges at any time" and that the police officer and mayor "used their authority as law enforcement officials to contact the county prosecutor directly." 🚩*Id.* at 510. Therefore, the *Pomykacz* court found that the police officer and mayor were "[a]t the very least ... acting simultaneously as private citizens and law enforcement officials at that time" and thus subject to 🚩Section 1983 liability. 🚩*Id.* at 510. As to the false arrest claim, the Court found that disputed issues of fact existed as to "whether [the police officer and mayor] made false statements to [the judge] when applying for the warrant." *Id.*

Defendants argue that the facts here are different because "[Defendant] Tattoli cannot be deemed a law enforcement official for purposes of liability." Def. Reply at 19. Further, Defendant Tattoli "was not circumventing the system as did the parties in *Pomykacz*, one of them being a police officer." *Id.* The Court agrees that Defendant Tattoli was not acting in a law enforcement capacity and that *Pomykacz* alone is not enough to support the broad proposition that affiants who are

public officials may be held liable for 🚩Section 1983 false arrest claims.

Instead, the Court adopts the United States District Court of the Northern District of Iowa's test for determining when to hold public officials liable under 🚩Section 1983 for causing a false arrest:

> To hold a public official liable under 🚩Section 1983 for causing a false arrest or imprisonment, a plaintiff must show that the official "instigated" the arrest. *See, e.g., Busch v. City of Anthon, Iowa,* 173 F. Supp. 2d 876, 895 (N.D. Iowa 2001). This means much more than simply reporting information to law enforcement. Indeed: "[t]here is no liability for merely giving information to legal authorities, who are left entirely free to use their own judgment, or for identifying the plaintiff as the person wanted." *Id.* (quoting *Dixon v. Hy–Vee, Inc.,* No. 00-1234, 2001 WL 912738 (Iowa Ct. App. Aug. 15, 2001)). Instead, the official must have knowingly supplied false information, which means "supplying information the supplier knows is false, and does not mean the mere good faith supplying of mistaken information." *Id.* (citing 🚩⚠️*Powers v. Carvalho,* 117 R.I. 519, 368 A.2d 1242, 1248 (1977)).

**\*18** *Perzynski v. Cerro Gordo Cty., Iowa,* 953 F. Supp. 2d 916, 927 (N.D. Iowa 2013), *aff'd,* 557 F. App'x 619 (8th Cir. 2014). To hold Defendant Tattoli liable as a public official for causing a false arrest under Section 1938, Plaintiffs must demonstrate that Defendant Tattoli knowingly supplied false information. However, as Plaintiffs admit, Defendant Tattoli "did not have personal knowledge, and instead was basing his criminal complaint on Mrs. Hodkinson's false report." Pl. Resp. to DSOMF ¶ 239. Plaintiffs critically fail to point to any evidence that Defendant Tattoli knew that Defendant Hodkinson's report was false, and therefore that Defendant Tattoli himself knowingly supplied false information. As a result, Plaintiffs do not demonstrate a genuine issue of material fact as to whether Defendant Tattoli knowingly supplied false information. As a result, Plaintiffs' claim against Defendant Tattoli for causing a false arrest are dismissed.

For the reasons stated above, the Court grants Defendants' summary judgment motion as to the 2012 false arrest claim and the claim must be dismissed as against the unnamed officers and Defendant Tattoli.

### i. Count Six: Malicious Prosecution

Count Six of the TAC asserts malicious prosecution. TAC ¶¶ 477-58. Plaintiffs allege that Defendants Tattoli, Hodkinson, and unnamed members of the Weehawken Police Department lacked probable cause and "maliciously filed charges against Plaintiff Konstantinos Natsis on or about April 5, 2012 to intimidate him in retaliation of his prior exercise of his constitutional rights." *Id.* ¶ 480. Plaintiffs add that "on other occasions, as [set] forth in this Complaint, criminal charges and municipal ordinance summons[es] were issued to Plaintiffs without a legitimate basis." *Id.* ¶ 482. Plaintiffs then generally state that "criminal charges and ordinance violations were dismissed in favor of Plaintiff Konstantinos Natsis." *Id.* ¶ 484.

For a Section 1983 malicious prosecution claim, a plaintiff must establish that (1) defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) plaintiff suffered from a "deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *See* *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). The elements of a malicious prosecution claim under New Jersey law are as follows: (1) the defendant instituted a criminal action against the plaintiff; (2) the action was actuated by malice; (3) there was an absence of probable cause; and (4) the proceeding terminated in the plaintiff's favor. *Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 393-94 (2009) (quoting *Helmy v. City of Jersey City*, 178 N.J. 183, 190 (2003)). Plaintiffs must satisfy each of the elements of malicious prosecution. *Kossler*, 564 F.3d at 186.

Defendants move for summary judgment on the basis that Plaintiffs fail to set forth a claim for malicious prosecution.[10] Def. Br. at 55. Defendants' brief sets forth eighteen indictable offenses and municipal citations from 2000 to 2008, *id.* at 56-57, which is only a subset of the charges and ordinances alleged in the TAC. Defendants argue that Plaintiffs do not adequately establish the favorable termination element, that Plaintiffs fail to satisfy the malice element, that Plaintiffs

suffered no deprivation of liberty, and that probable cause did exist for the 2002 and 2004 arrests. *Id.* at 56-64. Plaintiffs oppose the motion, arguing that "Plaintiffs were subjected to numerous criminal proceedings without probable cause that ended in Plaintiffs' favor." Pl. Opp. at 57.

[10]   In arguing that Plaintiffs "fail to state a claim," Defendants again refer to the motion to dismiss legal standard instead of the summary judgment standard.

**\*19** Defendants argue that "to the extent this claim is asserted as to [Defendant Township of Weehawken], Plaintiffs fail to show that they are entitled to relief, as the City is incapable of acting with malice." Def. Br. at 58. To the extent the claim is asserted against Defendant Township of Weehawken, Plaintiff must prove acts pursuant to an unconstitutional policy, custom, or practice. *Monell*, 436 U.S. at 690-91. Plaintiffs have not offered sufficient evidence of any unconstitutional policy, custom, or practice pursuant to which Defendants have engaged in malicious prosecution. Therefore, the Court dismisses the malicious prosecution claims as to Defendant Township of Weehawken.

However, as to the remaining Defendants, Defendants have not shouldered their burden to prove that there is no genuine dispute as to any material fact. Defendants merely list eighteen instances of summonses, notices of violations, and arrests, but fail to address why Plaintiff has failed to meet the malicious prosecution elements for each.[11] Instead, Defendants briefly and broadly allege that certain elements have not been met as to *all* summonses, notices, and arrests. *See* Def Br. at 55-64. For example, in support of Defendants' claim that Plaintiffs fail to establish the favorable termination element, Defendants' entire argument (excluding related case law) consists of the following sentence:

> Here, Plaintiffs have failed to meet the necessary requirements to establish that the complaints issued against them terminated in their favor, as a dismissal by the court due to lack of discovery and age is hardly a finding of innocence of the accused, and therefore this element is not met.

Def. Br. at 59. Defendants' arguments regarding probable cause, malice, and deprivation of liberty are similarly conclusory and overbroad.

[11]   Konstantinos' arrest claim of 2002 is a notable exception, because Defendants sufficiently proved the existence of probable cause in the false arrest claim section of

Case: 25-3567   Document: 29   Page: 190   Date Filed: 06/05/2026

**Helen v. Turner, Not Reported in Fed. Supp. (2020)**
2020 WL 4582018

their brief. *See* Def. Br. at 44-46. Because the Court found probable cause existed in Plaintiff's 2002 arrest, any malicious prosecution claim as to the 2002 arrest is dismissed.

While Plaintiffs' allegations were themselves broad in referring to multiple charges, Plaintiffs at least specifically alleged one malicious prosecution claim as to the charges stemming from the April 5, 2012 arrest. *See* TAC ¶¶ 478-80. Defendants entirely fail to address the charges stemming from the 2012 arrest in their malicious prosecution argument. Defendants also failed to cite to the extensive evidentiary record to support their motion, instead referring only to the TAC and one exhibit. The Court denies summary judgment as to the malicious prosecution claims except as to Defendant Township of Weehawken and Konstantinos' 2002 arrest claim.

### ii. Count Seven: Abuse of Process

Count Seven asserts a cause of action for abuse of process. TAC ¶¶ 486-95. Plaintiffs allege that Defendants "intentionally and maliciously continue to obstruct the permit application process to prevent Plaintiffs from cleaning, clearing, and developing their Property." *Id.* ¶ 589. They claim that "since filing this litigation, Plaintiffs have not received any permits despite the fact their contractors have represented to [Defendant Tattoli] that they will follow all applicable rules and regulations." *Id.* ¶ 588. Plaintiffs allege that "Defendants, in particular Defendant Tattoli, have misused and abused the permitting process through the Weehawken Building Department by using said process to intimidate and retaliate against Plaintiffs while also obtaining adverse state court rulings to be used against Plaintiffs in this civil rights litigation." *Id.* ¶ 491. Plaintiffs add that Defendants are "using the criminal complaint process to falsely accuse and charge Plaintiffs to bolster their own position in a civil rights case." *Id.* ¶ 492.

**\*20** A claim for "abuse of process is concerned with perversion of process *after* litigation has begun." *Gebhart v. Steffen,* 574 F. App'x 156, 160 (3d Cir. 2014) (emphasis added) (internal quotation marks omitted). In order to assert a claim for abuse of process, "the improper use must be the *primary* purpose of the proceeding and there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive or spite or ulterior purpose of benefit to the defendant." *Id.* The Appellate Division has described abuse of process as follows:

The gist of the tort is misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance. The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wil[l]ful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, such as the surrender of property, by the use of the process as a threat or club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort. *Gambocz v. Apel*, 102 N.J. Super. 123, 128 (App. Div. 1968) (internal quotation marks omitted).

Defendants note that Plaintiffs allege wrongdoing as to Defendant Tattoli in particular and "Defendants" collectively. Def. Br. at 65; TAC ¶ 491. Moreover, as Defendants point out, this Court's March 10, 2017 Opinion on Defendants' partial motion to dismiss held that an allegation of abuse of process against Defendants collectively is overbroad. D.E. 147. The only Defendant specifically named in Plaintiffs' TAC is Defendant Tattoli. Therefore, the Court deems Plaintiffs' allegations to be against Defendant Tattoli alone.

Additionally, Plaintiffs' abuse of process claim alleges wrongdoing Plaintiffs have suffered "since filing this litigation." TAC ¶ 488. Because Plaintiffs' TAC alleges that "*since filing this litigation,*" Defendants have maliciously misused the permit process, the time frame for Plaintiffs' abuse of process claim is December 2013 (the initiation of this litigation) through April 2017 (the filing of the Third Amended Complaint). The Court does consider allegations set forth in Plaintiffs' opposition brief that were not included in the TAC because a complaint may not be amended through opposition briefs. *See Anderson*, 589 F. Supp. 2d at 534 n.5.

Plaintiffs' remaining abuse of process claims concern Defendant Tattoli's failure to issue permits following the HEPSCD's January 2013 stop work order. Defendants argue that Plaintiffs' cause of action for abuse of process must fail. Def. Br. at 65. Defendants claim that while Plaintiffs

were repeatedly advised between 2013 and 2017 of their obligations under the stop work order issued January 22, 2013, not once did Plaintiffs comply with the order. *Id.* at 66. Defendants also point to Konstantinos' July 28, 2015 complaint in the Superior Court of New Jersey, Chancery Division, "challenging denial of an application filed with the Township to obtain a permit allowing [Konstantinos] to remove 70 feet by 25 feet of soil from his property." DSOMF ¶ 33; Def. Brief at 68. After a hearing on the matter on April 3, 2017, the Honorable Christine M. Vanek, J.S.C., issued an opinion determining that Weehawken's failure to issue the permit dated April 27, 2015 was "reasonably grounded in evidence in the record" related to the existence of the stop work order and was "not arbitrary, capricious, or unreasonable." DSOMF ¶ 33; D.E. 202, Ex. DD; Def Br. at 68. According to Defendants, "[w]hat Plaintiffs fail to realize is that the Township was not able to issue any permits due to the Stop Work Order," therefore there was no abuse of process in denying the permits. Def. Br. at 67.

**\*21** Plaintiffs oppose the motion, claiming "summary judgment should be denied because the Weehawken Defendants have abused legal processes for self-interested purposes and to interfere with Plaintiffs' constitutional rights." Pl. Opp. at 71. Plaintiffs, however, reference evidence outside of the relevant 2013-2017 time period. Additionally, Plaintiffs argue that "the aforementioned abuse of process should also be construed as a denial of access to courts claim" and "a separate abuse of process related to the Weehawken Defendants attempts to undermine Plaintiffs' First Amendment rights in this litigation." *Id.* at 77-78. However, these new claims – raised in Plaintiffs' opposition – were not raised in the TAC. *See Anderson*, 589 F. Supp. 2d at 534 n .5 (ruling that a complaint cannot be amended through an opposition brief).

Critically, Plaintiffs fail to show that there is a genuine dispute as to any material fact regarding the denial of permits between December 2013 and April 2017. In fact, Plaintiffs initially failed to provide evidence that Plaintiffs requested the permits. Yet, in their supplemental statements of material facts, Plaintiffs claim that "[e]ven though the HEPSCD has removed the stop work order on Plaintiffs' property, the Township of Weehawken has refused to permit Plaintiffs to remove more any [sic] soil from their site without submitting an engineering plan." Pl. Supp. SOMF ¶ 281. However, Plaintiffs fail to provide a timeframe for the Township's denial of permits, and the exhibits Plaintiffs attach in support of this claim all fall outside of the pertinent December 2013 to

April 2017 time period. *See* D.E. 218, Ex. 104 (emails dated February 2013); Ex. 105 (undated stope stability plans); Ex. 127 (emails dated February 2013); Ex. 129 (emails dated July 2019); Ex. 147 (emails dated February 2013); Ex. 148 (emails dated February 2013); Ex. 149 (emails dated March 2013); Ex. 170 (emails dated April 2018).

Therefore, in failing to point the Court toward evidence that Defendant Tattoli (or any Defendant for that matter) denied permits to Plaintiffs during the pertinent time period, Plaintiffs have failed to establish a genuine dispute of material fact. Therefore, summary judgment is granted as to the abuse of process claim.

### iii. Count Eleven: Taking Without Just Compensation

Count Eleven asserts a cause of action for taking of property without just compensation. TAC ¶¶ 517-24. Plaintiffs allege that Defendants' actions constituted a taking by denying and destroying Plaintiffs' permit applications; intimidating and deterring Plaintiffs' engineers, architects, and contractors; and selectively enforcing ordinances against Plaintiffs "thereby precluding Plaintiffs from obtaining the highest and best use of their Property." TAC ¶ 518. Plaintiffs also allege that Defendant Weehawken "installed a sump pump system on the Palisades Cliff slope area without proper NJDEP permits or notice" and that the system leaks sewage and fecal matter onto the Property. *Id.* ¶¶ 521-22.

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V. "The Takings Clause applies to state action through the Fourteenth Amendment." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012). "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). "Government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster ... such 'regulatory takings' may be compensable under the Fifth Amendment." *Id.*

**\*22** Supreme Court precedent identifies two categories of regulatory action that are generally deemed *per se* takings under the Fifth Amendment:

First, where government requires an owner to suffer a permanent physical invasion of her property – however minor – it must provide just compensation. *See* *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e] of her property. *Lucas*, 505 U.S. at 1019, 112 S. Ct. 2886 (emphasis in original).

*Id.* Outside of these two categories, the Supreme Court has identified several factors to evaluate regulatory takings claims, including primarily "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Id.* (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)). Another factor is " 'the character of the governmental action' – for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.' " *Id.*

Defendants' cites *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985) for the proposition that plaintiffs must exhaust state remedies before claiming a violation of the Takings Clause. Defendants argue that since Plaintiffs have not exhausted their state administrative remedies, their taking claim is unripe under *Williamson County*. Def. Br. at 82. However, *Williamson County* was overruled on June 21, 2019 in *Knick v. Township of Scott*, - U.S. -, 139 S. Ct. 2162, 2170 (2019), two months after Defendants filed their motion for summary judgment. The *Knick* Court ruled as follows:

> [T]he state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of our takings jurisprudence, and must be overruled. A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it. That does not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities. But it does mean that the property owner has suffered violation

of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time. *Id.* at 2167-2168. As a result, the Court disagrees with Defendants' ripeness argument.

However, Defendants also argue that Plaintiffs' takings claim fails to meet the necessary elements. Def. Reply at 34-37. Plaintiffs allege a physical taking through the installation of a sump pump system on the Palisades Cliff by Defendant Weehawken. TAC ¶¶ 521-22.[12] According to the TAC, the sump pump system was installed in September of 2007. TAC ¶ 294. However, the proper statute of limitations on a takings claim is six years. *See* *287 Corp. Ctr. Assocs. v. Twp. of Bridgewater*, 101 F.3d 320, 324 (3d Cir. 1996); *Klumpp v. Borough of Avalon*, 202 N.J. 390, 409, 997 A.2d 967, 978 (2010). Plaintiffs' original Complaint was filed on December of 2013, D.E. 1, approximately three months outside of the six-year limit. Therefore, Plaintiffs claim as to the September 2007 taking is dismissed.

[12]    Plaintiffs refer to another alleged physical taking in 2004 through Weehawken's selection of contractor J. Fletcher Creamer & Sons, Inc. in their opposition papers, Pl. Opp. at 85-86. However, Plaintiffs failed to allege this 2004 taking in its TAC, so the Court will not consider it.

**\*23** As to Plaintiffs' claimed regulatory takings, Defendants assert that the denial of permit applications and alleged selective enforcement of ordinances does not constitute a deprivation of all economically viable use of the property. The Court agrees that Plaintiffs have failed to make a showing sufficient to establish a deprivation of all economically viable use of the Property. Similarly, Plaintiffs do not argue that a taking occurred in light of the other factors that a court must consider when a property owner has not been denied all economically viable use of his or her property. Therefore, no genuine issue as to any material fact exists, and Count Eleven is dismissed.

### IV. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Leave to File a Fourth Amended Complaint (D.E. 228) is **DENIED** and Defendants' Motion for Summary Judgment (D.E. 202) is **GRANTED in part** and **DENIED in part**. Defendants' Motion for Summary Judgment is granted as to Counts One, Two, Three, Four, Five (as to the 2002 and 2012 false arrest claims), Six (as to Defendant Township of Weehawken and

Konstantinos' 2002 arrest claim), Seven, Nine, and Eleven and all of those Counts are dismissed. Summary judgment is denied as to Counts Five (as to the 2004 false arrest claim) and Six (as to all remaining Defendants). An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4582018

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

238 Fed.Appx. 848

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals, Third Circuit.

Narendra PAPAIYA;

Kailas Papaiya, Appellants

v.

CITY OF UNION CITY; Mayor Brian P. Stack, Individually and in his Official Capacity; Luis Miranda, Union Fire Official Individually and his Official Capacity; Alex Velasquez, Building Department Inspector; Martin Martinotti, Union City Building Official, Individually and in his Official Capacity; Police Officer Badge No. 93 of the Union City Police Department, Individually and in his Official Capacity; John Doe (1 Thru 10), Being a Fictitious Designation of One or More Officials of the City of Union City, Acting individually or in their Official Capacity.

No. 06–3674.

|

Submitted Under Third Circuit LAR 34.1(a) July 12, 2007.

|

Filed: Aug. 14, 2007.

**Synopsis**

**Background:** Owners of residential apartment buildings brought action in state court against city and city officials, claiming that defendants violated their constitutional rights by depriving them of their property after city officials closed their apartment buildings for public health violations. After removal, the United States District Court for the District of New Jersey, Dennis M. Cavanaugh, J., granted summary judgment in favor of defendants, and owners appealed.

**Holding:** The Court of Appeals, Ambro, Circuit Judge, held that city officials actions in closing the apartment buildings did not "shock the conscience" and did not result in a violation of the owners' substantive due process rights.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (1)

[1]  **Constitutional Law** 🔑 Building and Safety Codes

**Health** 🔑 Buildings, Structures, and Building Components

92  Constitutional Law
92XXVII  Due Process
92XXVII(G)  Particular Issues and Applications
92XXVII(G)3  Property in General
92k4074  Building and Safety Codes
198H  Health
198HII  Public Health
198Hk390  Unsafe or Unhealthful Premises
198Hk392  Buildings, Structures, and Building Components

Given undisputed evidence that owners' residential apartment buildings contained numerous health and safety violations, city officials actions in closing the apartment buildings did not "shock the conscience" and did not result in a violation of the owners' substantive due process rights. U.S.C.A. Const.Amend. 14; 🚩42 U.S.C.A. § 1983.

3 Cases that cite this headnote

***849** Appeal from the United States District Court for the District of New Jersey (D.C. Civil Action No. 05–cv–02722), District Judge: Honorable Dennis M. Cavanaugh.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.  1

**Attorneys and Law Firms**

Robert L. Podvey, Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman, Tomas Espinosa, Newark, NJ, for Narendra Papaiya, Kailas Papaiya, City of Union City, Brian P. Stack, Luis Miranda, Alex Velasquez and Martin Martinotti.

Gregory T. Keller, Stein, McGuire, Pantages & Gigl, Livingston, NJ, for Luis Miranda.

Before: RENDELL, AMBRO and NYGAARD, Circuit Judges.

OPINION

AMBRO, Circuit Judge.

**\*\*1** Narendra and Kailas Papaiya appeal the grant of summary judgment in favor of the City of Union, New Jersey, Brian Stack, Martin Martinotti, Alejandro Velasquez, and Luis Miranda (collectively "defendants"). The Papaiyas contend that a genuine issue of material fact exists as to whether defendants violated their constitutional rights by depriving them of their property after City officials closed the Papaiyas' residential apartment buildings for public health violations. Given the undisputed facts in the record that unsafe conditions on the Papaiyas' property warranted the action of the City officials, we affirm the order granting summary judgment for the defendants.

**Facts and Procedural History**

As we write for the parties, only a brief summary of the pertinent facts is necessary. The Papaiyas owned and operated **\*850** residential apartment buildings located at 806–808, 22nd Street in Union City. On March 4, 2005, police and fire officials arrived at the property after being alerted that eight tenants had complained of headaches and dizziness, possible symptoms of carbon monoxide poisoning. Public Service Electric and Gas tested the buildings and concluded that there was a high reading of carbon monoxide, warranting the shutting down of gas services.

The Union City Health Department, Fire Bureau, and Construction Department also conducted inspections of the property, finding numerous health and safety violations. Due to the high levels of carbon monoxide, cemented and plugged flu vents, electrical hazards, and sewage in the basement, the health, fire, and construction officials determined the buildings to be unsafe for human habitation. These violations warranted the issuance of two Notices of Imminent Hazard and Orders to take Corrective Action, a Punitive Closing Order, and a Notice of Unsafe Structure under the New Jersey Administrative Code §§ 5:70–2.16, 5:70–2.18 & 5:23–2.32. These orders stipulated that the property must be vacated and closed until the unsafe conditions were abated.[1]

[1] These notices also informed the Papaiyas of their right to an immediate administrative appeal of the orders to the Hudson County Construction Board. They did not exercise this right.

The Papaiyas did not effectively apply for any building permits, did not submit any plans to correct the violations, and have not filed them. Instead, they filed an action in state court against the defendants, claiming violations of their civil rights under 42 U.S.C. § 1983. The defendants removed the suit to federal court. Both the defendants and the Papaiyas made motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The District Judge granted the defendants' motion and denied that of the Papaiyas. They appeal.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. Because this is an appeal from a final judgment of a district court, we have appellate jurisdiction under 28 U.S.C. § 1291.[2]

[2] On appeal, the defendants contend that we lack subject matter jurisdiction because the Papaiyas' failure to exhaust New Jersey's administrative remedies caused their claim to lack ripeness. We disagree. An administrative action must be final before it is judicially reviewable. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 192, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In this case, the orders issued by the City officials were final administrative actions because the "initial decisionmaker[s]" came to a definitive decision regarding the property that "inflict[ed] an actual, concrete injury" on the Papaiyas. *Id.* at 193, 105 S.Ct. 3108. Moreover, even though the Papaiyas did not exhaust these state remedies, their claim does not lack ripeness because the exhaustion of state remedies is not a prerequisite to bringing an action under § 1983.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

🏴*Patsy v. Bd. of Regents of Fla.,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

## Discussion

A trial court grants summary judgment only if the record, viewed with all inferences in favor of the non-moving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Our review of grants of summary judgment is plenary. 🏴*Kautz v. Met–Pro Corp.,* 412 F.3d 463, 466 (3d Cir.2005) (citing 🏴*Carrasca v. Pomeroy,* 313 F.3d 828, 832–833 (3d Cir.2002)). Therefore, we apply the same approach, under Federal Rule of Civil Procedure 56(c), as the District Court.

**\*\*2** The Papaiyas argue that the deprivation of their property by the city officials violated **\*851** their substantive due process rights under the Fourteenth Amendment, allowing them to bring claims under 🏴§ 1983.[3] To be successful on this challenge, the Papaiyas must show that the actions of the officials "shock[ ] the conscience." 🏴*County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting that only the most egregious government conduct is constitutionally arbitrary and violates due process). The Papaiyas additionally contend that they have presented a valid conspiracy claim under 🏴42 U.S.C. § 1985(3). Because 🏴§ 1985 does not itself create any substantive rights but acts as a "vehicle to vindicate [other] federal rights and privileges," the Papaiyas first must establish a violation of their constitutional rights in order to have a successful 🏴§ 1985 claim. 🏴*Brown v. Philip Morris, Inc.,* 250 F.3d 789, 805 (3d Cir.2001).

[3]    🏴Section 1983 in relevant part provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

🏴42 U.S.C. § 1983.

The defendants respond by arguing that the unsafe and unhealthy conditions of the Papaiyas' property justified the actions taken by the government officials. As such, their behavior in no way "shocks the conscience." Furthermore, they contend that the City officials should have been shielded from this litigation by qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 🏴*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The District Court ably analyzed the relevant claims in reaching its conclusion that defendants were entitled to summary judgment. The undisputed evidence demonstrates that the Papaiyas' property contained numerous health and safety violations. The actions taken by the City officials were no doubt warranted; thus, their behavior hardly "shocks the conscience" and did not result in a violation of the Papaiyas' substantive due process rights. In this context, we need not reach the other issues appealed, as they lack the critical underpinning of a constitutional violation. Accordingly, for the reasons stated in the District Court's opinion granting summary judgment, we affirm.[4]

[4]    The Papaiyas also contend that the City engaged in a physical taking of their property without just compensation in violation of the Fifth Amendment. This claim underwhelms. The City did not physically take the Papaiyas' property or physically trespass on the property in a permanent way. It was merely regulating the use of the premises for the legitimate purpose of maintaining safe and healthy living conditions for its citizens. Moreover, if the Papaiyas had fixed the code violations, they could have rented the apartments or sold the buildings. The Supreme Court has held that "land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does 'not den[y] an owner economically viable use of his land.'" 🏴*Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (quoting 🏳*Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)).

## All Citations

238 Fed.Appx. 848, 2007 WL 2307525

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

449 Fed.Appx. 153
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Brian SKILES, Appellant

v.

CITY OF READING; Thomas J. McMahon,
Mayor City of Reading, In His Individual
and Official Capacity; Brad Reinhart, Code
Administrator, City of Reading, In His
Individual and Official Capacity; William
Frymore, Code Enforcement Officer City of
Reading, In His Official Capacity; Michelle
Mayfield, Code Enforcement Department,
City of Reading, In Her Official Capacity;
James V. Sanocki, Health Inspector, City
of Reading Codes Enforcement Division,
Property Maintenance Unit, In His Individual
and Official Capacity; Fred Yourkavitch,
Plumbing Inspector, City of Reading Codes
Enforcement Division, Building/Trades Unit,
In His Individual and Official Capacity;
Steve Dunkle, Building Inspector, City
of Reading Codes Enforcement Division,
Building/Trades Unit, In His Individual and
Official Capacity; Michelle Mayfield, Legal
Specialist City of Reading Department of
Law, In Her Individual and Official Capacity.

No. 11–1328
|
Submitted Under Third Circuit
LAR 34.1(a) Sept. 22, 2011.
|
Opinion Filed: Oct. 27, 2011.

**Synopsis**
**Background:** Owner of residential rental properties and nightclub brought action under § 1983 against various city officials, asserting violations of due process. The United States District Court for the Eastern District of Pennsylvania, Lawrence F. Stengel, J., dismissed complaint for failure to state claim on which relief could be granted, 2011 WL 53069, and owner appealed.

**Holdings:** The Court of Appeals, Greenaway, Jr., Circuit Judge, held that:

[1] owner's due process rights were violated with respect to city officials' enforcement of zoning and health permit laws if officials' conduct shocked the conscience;

[2] owner's allegation that city officials improperly redesignated zoning and housing classifications for his residential rental properties did not state claim for due process violations; and

[3] allegations did not state claim for due process violations relating to enforcement of health permit and zoning laws for nightclub.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (3)

[1] **Constitutional Law** ⬤ Zoning and Land Use
**Health** ⬤ Buildings, structures, and building components
**Zoning and Planning** ⬤ Constitutional and civil rights in general

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)3 Property in General
92k4091 Zoning and Land Use
92k4092 In general
198H Health
198HII Public Health
198Hk390 Unsafe or Unhealthful Premises

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

198Hk392   Buildings, structures, and building components
414   Zoning and Planning
414XI   Enforcement of Regulations
414k1767   Defenses to Enforcement
414k1774   Constitutional and civil rights in general

Residential and commercial property owner's substantive due process rights were violated with respect to city officials' enforcement of zoning and health permit laws if officials' conduct shocked the conscience. U.S.C.A. Const.Amend. 14.

11 Cases that cite this headnote

[2]   **Constitutional Law** 🗝 Particular issues and applications

**Zoning and Planning** 🗝 Changes Within Residential Districts in General

92   Constitutional Law
92XXVII   Due Process
92XXVII(G)   Particular Issues and Applications
92XXVII(G)3   Property in General
92k4091   Zoning and Land Use
92k4093   Particular issues and applications
414   Zoning and Planning
414III   Modification or Amendment; Rezoning
414III(A)   In General
414k1158   Particular Uses or Restrictions
414k1161   Changes Within Residential Districts in General
414k1161(1)   In general

Allegation by owner of residential properties that city officials improperly redesignated zoning and housing classifications for his properties did not state claim for substantive due process violations, in action brought under § 1983; city corrected erroneous designations, other similar owners of residential properties received same treatment, and allegations did not indicate that officials' conduct shocked the conscience, but was part of mayor's plan to revitalize city's rental properties. U.S.C.A. Const.Amend. 14; 🚩42 U.S.C.A. § 1983.

12 Cases that cite this headnote

[3]   **Constitutional Law** 🗝 Particular issues and applications

**Health** 🗝 Adult establishments

**Zoning and Planning** 🗝 Selective enforcement and discrimination

92   Constitutional Law
92XXVII   Due Process
92XXVII(G)   Particular Issues and Applications
92XXVII(G)3   Property in General
92k4091   Zoning and Land Use
92k4093   Particular issues and applications
198H   Health
198HII   Public Health
198Hk390   Unsafe or Unhealthful Premises
198Hk394   Adult establishments
414   Zoning and Planning
414XI   Enforcement of Regulations
414k1767   Defenses to Enforcement
414k1775   Selective enforcement and discrimination

Allegations by owner/operator of nightclub that catered to homosexual community that city inspector referred to owner/operator as "faggot" during inspection of nightclub, that city officials closed nightclub, and that city officials targeted nightclub due to personal animus toward homosexual patrons, did not state claim for violation of substantive due process, in action brought under § 1983; city closed nightclub for health permit and zoning violations, and owner/operator was permitted to reopen nightclub when regulatory violations were corrected. U.S.C.A. Const.Amend. 14; 🚩42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**\*154**   Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civ. Action No. 10–cv–02270), District Judge: Honorable Lawrence F. Stengel.

**Attorneys and Law Firms**

Brian C. Legrow, Esq., Paul J. Toner, Esq., Vincent B. Mancini & Associates, Media, PA, for Appellant.

Andrew B. Adair, Esq., Deasey, Mahoney, Valentini & North, Media, PA, for Appellees.

Before: FISHER, HARDIMAN, and GREENAWAY, JR., Circuit Judges.

OPINION

GREENAWAY, JR., Circuit Judge.

Brian Skiles ("Skiles") appeals the District Court's January 7, 2011 Order dismissing, with prejudice, his Amended Complaint against the City of Reading (the "City") and certain of its governmental officials (collectively, the "City Defendants"),[1] pursuant to **\*155** Federal Rule of Civil Procedure 12(b)(6). The Amended Complaint alleged that the City Defendants violated his constitutional rights through the improper enforcement of the City's zoning, housing, and health regulations applicable to his residential and commercial properties. Skiles contends that the District Court applied an improper heightened standard to determine the merits of his substantive due process claim and otherwise failed to consider his well-pled factual allegations. For the reasons that follow, we will affirm the District Court's Order.

[1]   The City Defendants named in the Amended Complaint are: the City, City Mayor Thomas McMahon, City Code Administrator Brad Reinhart, City Code Enforcement Officer William Frymoyer, City Assistant Solicitor Michelle Mayfield, Esq., City Health Inspector James Sanocki, City Building Inspector Steve Dunkle, and City Plumbing Inspector Fred Yourkavitch. According to the City Defendants, although named in the Amended Complaint, Mr. Yourkavitch died prior to the initiation of the lawsuit, and is no longer a party to this action, as service was never perfected on his estate.

I. *BACKGROUND*

Because we write primarily for the benefit of the parties, we recount only the essential facts.

Skiles owns multiple residential rental properties throughout the City and one commercial property—the "Scarab" bar and restaurant that is known as "Daddy's Night Club"—located in the City at 724 Franklin Street. Beginning in 2006, Mayor McMahon began implementation of a policy called "Downtown 20/20," designed to "establish a unified vision for improving the quality of life in Greater Reading." (App.11.) The objective of the policy was to reduce the number of rental properties and boarding houses and to revitalize the City's commercial center.

Skiles alleged that the City Defendants sought to destroy the economic viability of his residential and commercial properties through their enforcement of various zoning, residential, and health regulations. Skiles alludes to two instances proving that the policy was inimical to his interest. First, Skiles points to an exchange in May 2008 in which the City Defendants "arbitrarily" changed the zoning approval for one of his residential properties, reducing the number of permissible parking spaces from sixteen to eight.[2] (App.14.) The second instance occurred a month later, when the City Defendants allegedly misrepresented to two potential buyers of Skiles's residential properties that the properties were zoned for single families when, in fact, they were zoned as multi-family dwellings.

[2]   The zoning permit was eventually corrected to allow for sixteen parking spaces.

In February 2009, the City Defendants "arbitrarily and unilaterally" sought to redesignate the zoning and housing classifications for several of Skiles's residential properties. (App.13.) Skiles claimed that despite Assistant Solicitor Mayfield's promise in an April 2009 letter to correct the improper redesignations, the requisite corrections were never made. Skiles does not allege, however, that he complied with the prerequisites to the issuance of new permits that Assistant Solicitor Mayfield identified in her letter.[3] Moreover, Skiles acknowledged that he was not the sole target of the City Defendants' efforts to redesignate the zoning and housing classifications for rental properties, as other residential property owners were issued incorrect housing rental permits.

[3]   Although Skiles did not attach the April 2009 letter as an exhibit to his Amended Complaint, his reliance upon the letter allows us to consider it, as the City Defendants attached the letter as an exhibit to their motion to dismiss.
    *See* Miller v. Clinton County, 544 F.3d 542, 550 (3d Cir.2008).

Skiles also alleged that the City Defendants sought to shut down his business, Daddy's Night Club. He maintained that it **\*156** was widely known that Daddy's Night Club entertained a homosexual clientele. As such, the City Defendants sought to close Daddy's Night Club under the guise of regulatory violations based on the City Defendants' animus towards homosexuals. Since 1982, Skiles has held the title to the property and has operated the business. From

196

2006–2008, Jose Perez ("Perez"), a business associate of Skiles, was named on the commercial lease for Daddy's Night Club. Both the 2006 and 2007 health permits for the business were held in Perez's name. In March 2007, the zoning permit for Daddy's Night Club was transferred to Perez. Skiles never received an application in 2008 to renew the annual health permit for Daddy's Night Club, as he had in previous years. On May 14, 2008, Skiles attempted to pay for and obtain the health permit at the City's Code Enforcement Office. The office refused to issue the health permit and notified Skiles that Daddy's Night Club would be closed as of that day. Skiles maintained that neither he nor Perez had any prior notice that Daddy's Night Club was subject to closure due to violations of City regulations, though the 2007 health permit for Daddy's Night Club expired on December 31, 2007.

Skiles alleged that the first notice he received came by letter two weeks after the City closed Daddy's Night Club, informing him that the business was closed for failure to obtain a health permit. Skiles also was notified that he had to obtain a valid zoning permit for Daddy's Night Club. In July 2008, Skiles transferred the zoning permit for Daddy's Night Club from Perez back to his name. A month later, Skiles received a detailed letter outlining all of the regulatory violations identified at Daddy's Night Club and an edict that the violations had to be corrected before a health permit could issue. Skiles rectified the health violations and obtained a health permit for Daddy's Night Club, allowing him to reopen the business, in December 2009.

Skiles's federal lawsuit asserted three causes of action: (1) violation of his First Amendment right to freedom of association, pursuant to 42 U.S.C. § 1983; (2) violation of his Fourteenth Amendment due process rights, pursuant to 42 U.S.C. § 1983; and (3) conspiracy to violate his First and Fourteenth Amendment rights, pursuant to 42 U.S.C. §§ 1983 and 1985. The District Court granted the City Defendants' Motion to Dismiss the Amended Complaint, holding that Skiles could not establish a constitutional violation.[4]

[4] Skiles does not raise any arguments in his opening brief on appeal regarding the District Court's dismissal of his First Amendment freedom of association claim. This claim is waived. *See Gonzalez v. AMR,* 549 F.3d 219, 225 (3d Cir.2008) (arguments not raised on appeal are waived).

## II. *JURISDICTION AND STANDARD OF REVIEW*

The District Court had jurisdiction over Skiles's claims, pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction, pursuant to 28 U.S.C. § 1291, to review the District Court's final order.

We review a district court's order granting a motion to dismiss *de novo. Victaulic Co. v. Tieman,* 499 F.3d 227, 234 (3d Cir.2007). A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). A plaintiff is required, by Federal Rule of Civil Procedure 8(a)(2), to provide the "grounds of his entitle[ment] **\*157** to relief [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citation and internal quotation marks omitted; second alteration added). Like the district court, "[w]e accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in [the plaintiff's] favor." *Capogrosso v. Supreme Court of New Jersey,* 588 F.3d 180, 184 (3d Cir.2009) (quoting *McGovern v. City of Philadelphia,* 554 F.3d 114, 115 (3d Cir.2009)).

We review a district court's order dismissing a complaint with prejudice for an abuse of discretion. *United States ex rel. Willis v. United Health Grp., Inc.,* 659 F.3d 295, 302 (3d Cir.2011).

## III. *ANALYSIS*

To state a Fourteenth Amendment substantive due process claim pursuant to 42 U.S.C. § 1983, a plaintiff must first establish that, as a threshold matter, he has a protected constitutional interest at issue.[5] *See McCurdy v. Dodd,* 352 F.3d 820, 825–26 (3d Cir.2003) (recognizing that § 1983 protects only the deprivation of an individual's constitutional rights). Assuming that this threshold is met, a plaintiff must

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    4

prove that government employees engaged in conduct that "shocks the conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 846–47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 399–400 (3d Cir.2003). This standard reflects the cornerstone of substantive due process that values "protection of the individual against arbitrary action of government." *Lewis,* 523 U.S. at 845, 118 S.Ct. 1708 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). As a result, this conscience-shocking standard will be satisfied for "only the most egregious official conduct." *Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 285 (3d Cir.2004) (citations and internal quotation marks omitted).

5    The parties do not dispute that Skiles has a constitutionally protected interest in his residential and commercial land.

Governmental conduct that is purposefully injurious is most likely to be indicative of conduct that "shocks the conscience." *Evans v. Sec'y Pa. Dep't of Corrs.,* 645 F.3d 650, 660 (3d Cir.2011); *see also Eichenlaub,* 385 F.3d at 286 (recognizing that allegations of corruption and self-dealing would "shock the conscience"). "The exact degree of wrongfulness necessary to reach the conscience-shocking' level depends upon the circumstances of a particular case." *Miller v. City of Philadelphia,* 174 F.3d 368, 375 (3d Cir.1999). In the zoning and land use context, the "shocks-the-conscience" standard is "designed to avoid converting federal courts into super zoning tribunals." *Eichenlaub,* 385 F.3d at 285.

 [1]    Skiles argues that the District Court improperly categorized this action as a land-use dispute and then applied a heightened land-use version of the conscience-shocking standard. We disagree. The District Court correctly recognized that only governmental conduct that "shocks the conscience" will rise to the level of a substantive due process violation. We have never recognized a heightened standard applicable to those substantive due process claims arising in the land-use context. *See id.* ("The District Court properly held ... that whether a zoning official's actions or inactions violate due process is determined by utilizing a shocks the conscience' test."). Indeed, we have **\*158** merely recognized that land-use decisions "are matters of

local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with improper' motives." *United Artists,* 316 F.3d at 402. That land-use decisions are not matters for federal courts to address, absent conduct that "shocks the conscience," in no way alters, and certainly does not heighten, this substantive due process standard.

 [2]    But regardless of whether this lawsuit bears the hallmarks of a traditional land-use dispute, taking into account all of Skiles's well-pled allegations, we agree with the District Court that Skiles's substantive due process claim cannot survive a motion to dismiss. Skiles alleged that the City Defendants improperly redesignated the zoning and housing classifications for his residential property. As Skiles acknowledged, the City Defendants corrected certain erroneous designations and, in any event, other residential property owners received similar treatment. These allegations simply do not rise to the level of conduct that "shocks the conscience." Moreover, Mayor McMahon instituted a policy designed to revitalize the City's rental properties—a legitimate governmental interest—that belies Skiles's claim of unfair treatment. *See Nicholas v. Pa. State Univ.,* 227 F.3d 133, 142 (3d Cir.2000).

 [3]    Skiles's factual assertions are equally insufficient as a matter of law with respect to Daddy's Night Club. Though Skiles claimed that the City Defendants targeted Daddy's Night Club based on personal animus towards its homosexual patrons, Skiles's only evidentiary support for this statement is that City Plumbing Inspector Yourkavitch allegedly referred to Skiles as a "fagot" [sic] during a 2006 inspection of Daddy's Night Club. (App. 19.) Even accepting the truth of this factual allegation, it falls woefully short of demonstrating that the City Defendants' treatment of Daddy's Night Club "shocks the conscience." Although the City Defendants closed Daddy's Night Club due to zoning and health code violations, Skiles was able to reopen his business once the violations were rectified. If the City Defendants had been so intent on furthering their discriminatory goal by eradicating Daddy's Night Club, they would not have allowed the business to reopen once the regulatory violations were corrected.

Assuming the truth of Skiles's factual averments, Skiles is, at best, an aggrieved property owner, which is insufficient to sustain a substantive due process claim.[6] As we have acknowledged, it is not the role of federal courts to provide a remedy for merely aggrieved land owners. *See*

*Eichenlaub,* 385 F.3d at 285. The conscience-shocking standard demands more.

[6]

Following the Supreme Court's decisions in *Twombly* and *Iqbal,* a plaintiff need only demonstrate that the factual averments in the complaint state a plausible, rather than probable, claim for relief. Skiles's contention that the District Court failed to accept his well-pled factual allegations and instead applied an improper probability standard is not correct. The District Court made clear that Skiles could not survive a motion to dismiss, even assuming the truth of his factual allegations. Further, Skiles acknowledges that the District Court recognized that it must apply the plausibility standard. (Appellant's Br. at 24.)

Because we will affirm the District Court's dismissal of Skiles's substantive due process claim, it follows *a fortiori* that Skiles cannot succeed on his claim alleging that the City Defendants conspired to violate his civil rights. Accordingly, the District Court also did not err in dismissing **\*159** the conspiracy count of Skiles's Amended Complaint.[7]

[7] Skiles argues that, at a minimum, the District Court erred in dismissing his suit without offering him an opportunity to further amend his Amended Complaint. While it is true that a district court ordinarily should not dismiss a civil rights suit for failure to state a claim before affording the plaintiff an opportunity to amend the complaint, such opportunity is not required where amendment would be futile. *Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 251 (3d Cir.2007). Skiles already has amended the Complaint once, and there is nothing in the record to suggest that allowing him to further amend would be anything but futile.

## IV. *CONCLUSION*

For the foregoing reasons, we will affirm the District Court's January 7, 2011 Order.

## All Citations

449 Fed.Appx. 153

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

758 Fed.Appx. 258
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Dale W. THORPE; Renee
M. Thorpe, Appellants

v.

UPPER MAKEFIELD TOWNSHIP; Upper
Makefield Township Board of Supervisors;
Thomas F. Cino, Chairman; Larry S. Breeden,
Vice Chairman; Mike Tierney; Dan Rattigan;
Mary Ryan; David A. Kuhns, Upper Makefield
Township Director of Planning & Zoning; John
C. Kernan, Upper Makefield Fire Marshall

No. 17-3228
|
Submitted Under Third Circuit
L.A.R. 34.1(a) November 1, 2018
|
(Filed: December 28, 2018)

**Synopsis**
**Background:** Farm residents involved in zoning dispute brought action against township alleging discrimination in violation of due process and equal protection. The United States District Court for the Eastern District of Pennsylvania, No. 2:14-CV-06154, Cynthia M. Rufe, J., granted summary judgment for township, and residents appealed.

**Holdings:** The Court of Appeals, Vanaskie, Circuit Judge, held that:

[1] evidence did not indicate racial animus on part of township in connection with adoption of 150-foot setback requirement;

[2] township had rational basis for amending joint zoning ordinance to require 150-foot setback;

[3] residents could not maintain equal protection claim based on alleged selective enforcement of zoning ordinances absent any nexus between resident's Native American race and the enforcement actions; and

[4] alleged differential treatment of residents as compared to other farm owners was supported by rational reasons.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (4)

[1] **Constitutional Law** Particular issues and applications

**Zoning and Planning** Building or setback lines

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)3 Property in General
92k4091 Zoning and Land Use
92k4093 Particular issues and applications
414 Zoning and Planning
414II Validity of Zoning Regulations
414II(B) Particular Matters
414k1066 Architectural or Structural Designs
414k1069 Building or setback lines

Native American farm resident's testimony that "somebody complained about the Native American drumming" and that one neighbor commented "it just takes one bad Indian," and incident between residents' African-American contractor and township's director of planning and zoning which resulted in police report listing contractor as "black," did not indicate racial animus on part of township in connection with adoption of 150-foot setback requirement, which impacted residents' plans for development of property and which allegedly violated their substantive due process rights. U.S. Const. Amend. 14.

1 Case that cites this headnote

**[2]** **Constitutional Law** 🔑 Particular issues and applications

**Zoning and Planning** 🔑 Building or setback lines

92 Constitutional Law

92XXVII Due Process

92XXVII(G) Particular Issues and Applications

92XXVII(G)3 Property in General

92k4091 Zoning and Land Use

92k4093 Particular issues and applications

414 Zoning and Planning

414II Validity of Zoning Regulations

414II(B) Particular Matters

414k1066 Architectural or Structural Designs

414k1069 Building or setback lines

Township had rational basis for amending joint zoning ordinance to require 150-foot setback and thus did not violate due process rights of residents who had planned on redeveloping their farm property; amendment was adopted by all three municipalities subject to the joint zoning ordinance and contained numerous provisions that applied to general commercial agricultural land uses, amendment was proposed before residents even owned the property, and township was generally concerned about commercial activity and traffic. U.S. Const. Amend. 14.

**[3]** **Constitutional Law** 🔑 Zoning and land use

**Zoning and Planning** 🔑 Selective enforcement and discrimination

92 Constitutional Law

92XXVI Equal Protection

92XXVI(B) Particular Classes

92XXVI(B)8 Race, National Origin, or Ethnicity

92k3257 Property in General

92k3261 Zoning and land use

414 Zoning and Planning

414XI Enforcement of Regulations

414k1767 Defenses to Enforcement

414k1775 Selective enforcement and discrimination

Native American resident and wife could not maintain equal protection claim against township based on alleged selective enforcement of zoning ordinances, even assuming that residents were treated differently, absent any nexus between resident's Native American race and the enforcement actions. U.S. Const. Amend. 14.

4 Cases that cite this headnote

**[4]** **Constitutional Law** 🔑 Zoning and land use

**Zoning and Planning** 🔑 Selective enforcement and discrimination

92 Constitutional Law

92XXVI Equal Protection

92XXVI(B) Particular Classes

92XXVI(B)8 Race, National Origin, or Ethnicity

92k3257 Property in General

92k3261 Zoning and land use

414 Zoning and Planning

414XI Enforcement of Regulations

414k1767 Defenses to Enforcement

414k1775 Selective enforcement and discrimination

Alleged differential treatment of Native American farm resident and other farm owners involved in zoning disputes with township was supported by rational reasons, including differences in the activities conducted on the farms, requests for zoning variances, and the outcome of zoning appeals, and thus did not violate equal protection of resident and his wife, who had sought to redevelop farm property; owners of other farms applied for zoning permits, appealed permit denials, and sought zoning variances, but, unlike resident and his wife, appealed adverse zoning decisions and sometimes prevailed in obtaining permits for new land uses. U.S. Const. Amend. 14.

**\*259** On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civ. No. 2:14-cv-06154), District Judge: Honorable Cynthia M. Rufe

**Attorneys and Law Firms**

Robert T. Vance, Jr., Esq., Philadelphia, PA, for Plaintiffs-Appellants

Meghan Henry, Esq., Harry G. Mahoney, Esq., Deasey Mahoney & Valentini, Philadelphia, PA, for Defendants-Appellees

Meghan Henry, Esq., Harry G. Mahoney, Esq., Deasey Mahoney & Valentini, Philadelphia, PA, for Defendants-Non-Participating

John P. Gonzales, Esq., Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, Meghan Henry, Esq., Harry G. Mahoney, Esq., Deasey Mahoney & Valentini, Philadelphia, PA, for Defendants

Before: CHAGARES, JORDAN, and VANASKIE, Circuit Judges

OPINION[*]

[*]     This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

VANASKIE, Circuit Judge.

Appellants Dale and Renee Thorpe appeal the District Court's September 25, 2017, order granting Appellees' motion for summary judgment and dismissing the Thorpes' Fourteenth Amendment due process and equal protection claims. Their claims arise from numerous land use and zoning disputes with Upper Makefield Township ("the Township"). The gist of the Thorpes' claims is that they have been discriminated against on the basis of Dale Thorpe's Native American race. For the reasons that follow, we will affirm the District Court's order.

I.

In 2007, the Thorpes purchased Thorpe Farm from Dale's cousins. Seven years **\*260** earlier, Dale's cousins had entered into two conservation easement agreements with the Township, Bucks County, and the Commonwealth of Pennsylvania. Those agreements restrict the farm to agricultural uses and other specified uses in effect in 2000. At all relevant times, Thorpe Farm was zoned CM-Conservation Management and subject to the Joint Municipal Zoning Ordinance ("JMZO"), which governs zoning in the Township and two neighboring municipalities.[1] After purchasing the farm, the Thorpes told the Township's Director of Planning and Zoning, Appellee David Kuhns,[2] that they intended to expand the uses on the property.

[1]     Wrightstown Township and Newtown Township are the other municipalities that are party to the JMZO, which has been in effect since 1983.

[2]     As the Township's Director of Planning and Zoning, Kuhns is responsible for enforcing the Township's zoning ordinances, including the JMZO.

The Thorpes assert that this conversation with Kuhns led to a Township-wide campaign to "prevent [them] from obtaining the highest and best economic use of [Thorpe Farm]." (Appellants' Br. 4). The Thorpes identified twenty-three zoning "enforcement actions" between 2007 and 2014, which they claim were initiated solely to harass and intimidate them. (*Id.* at 6). As the District Court noted, "[t]hese range from denials of permits to the issuance of enforcement notices and citations, to what [the Thorpes] describe as threats of legal action." (App. 4).

Some disputes arose from hazardous electrical wiring in the Thorpe Farm Store, the installation of neon signs, soil stockpiling, and other non-permitted uses of the farm by contractors. Other zoning disputes stem from the Thorpes' attempts to conduct new activities on the farm: a deer processing business, tractor trailer storage, a timber harvest, commercial storage, a metal fabrication business, and a planned Halloween attraction in 2011. In all of these instances, the Township either ordered the Thorpes to cease the non-permitted activity or refused to issue them a zoning permit to begin the activity. In particular, Kuhns denied a permit application to hold a haunted house inside a barn on the farm because it was within 150 feet of a public road and would have required a zoning variance under a 2007 Amendment to the JMZO.[3]

[3]     The 2007 Amendment provides that "[n]o activity, event or structure used for an agricultural entertainment use shall be located within one hundred fifty (150) feet of a right-of-way line or residential property line...." (App. 5 n.5).

The Thorpes never pursued any of the zoning dispute remedial procedures available to them, such as appealing Kuhns' zoning decisions to the Township Zoning Hearing Board. Instead, they filed suit in the United States District Court for the Eastern District of Pennsylvania alleging that they were discriminated against on the basis of race, in violation of their due process and equal protection rights under the Fourteenth Amendment.[4] After discovery, the defendants (at that point, the Township and Kuhns) moved for

summary judgment, which the District Court granted.[5] This appeal timely followed.

[4] The Thorpes also brought claims for abuse of process and intentional interference with contractual relations in violation of Pennsylvania common law. Those claims were dismissed and are not at issue in this appeal.

[5] The District Court declined to exercise supplemental jurisdiction over the Thorpes' tortious interference claims and dismissed it without prejudice.

## II.

The District Court had jurisdiction pursuant to [28 U.S.C. § 1331](), as Appellants' **\*261** claims arise under the United States Constitution. We have appellate jurisdiction pursuant to [28 U.S.C. § 1291](). We exercise plenary review over the District Court's grant of summary judgment. *See, e.g.,* *[Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.,]()* 316 F.3d 431, 443 (3d Cir. 2003).

## III.

The Thorpes allege that Appellees violated their rights under the Fourteenth Amendment's Due Process and Equal Protection Clauses. To survive a motion for summary judgment, a plaintiff must present concrete evidence in the record to prove that a genuine dispute of material fact exists. *See* [Fed. R. Civ. P. 56(a)](); *[Celotex Corp. v. Catrett,]()* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Here, the record lacks sufficient evidence for either of the Thorpes' claims to survive summary judgment.

### A.

The Thorpes assert two violations of their substantive due process rights: the Township's general zoning enforcement and, more specifically, the Township's adoption of the 150 foot set-back in the 2007 Amendment to the JMZO.[6] To succeed on a substantive due process claim, a plaintiff must prove that he was deprived of a constitutionally protected liberty or property interest by arbitrary government action. *See* *[United Artists Theatre Circuit, Inc. v. Twp. of]()* *[Warrington,]()* 316 F.3d 392, 399 (3d Cir. 2003) (citing *[Cty. of Sacramento v. Lewis,]()* 523 U.S. 833, 845-47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ). Constitutional arbitrariness is defined as egregious official conduct that "shocks the conscience." *[Lewis,]()* 523 U.S. at 846-47, 118 S.Ct. 1708. Using this "shocks the conscience" standard in the zoning context helps to ensure that courts are not "cast in the role of a 'zoning board of appeals.' " *[United Artists,]()* 316 F.3d at 402 (internal citations omitted). We have held that conscience shocking behavior includes the deprivation of a liberty or property interest based on, *inter alia,* self-dealing, government corruption, or racial animus. *See* *[Eichenlaub v. Twp. of Indiana,]()* 385 F.3d 274, 285-86 (3d Cir. 2004). However, without more, unfair enforcement of zoning ordinances is not conscience shocking behavior. *[Id.]()*

[6] At the District Court, the Thorpes also challenged the Township's enforcement of the set-back provision against them. However, we decline to address this argument as they have not raised that challenge on appeal.

Here, the Thorpes contend that the Township deprived them of the best use of their land. Cases involving zoning permits or the enforcement of zoning ordinances implicate the constitutionally protected property interest in land ownership. *See* *[Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth.,]()* 103 F.3d 1165, 1179 n.12 (3d Cir. 1997). Thus, we must determine whether the allegedly unfair zoning enforcement shocks the conscience such that it rises to the level of a constitutional violation.

**[1]** The Thorpes assert that the Township's unfair zoning enforcement shocks the conscience because it was motivated by racial animus toward Native Americans. Race-based discriminatory enforcement of zoning ordinances would certainly constitute conscience shocking behavior. *See* *[Holder v. City of Allentown,]()* 987 F.2d 188, 197 (3d Cir. 1993). The Thorpes assert two pieces of evidence to support their allegation of racial animus. First, they cite Dale Thorpe's own testimony that "somebody complained about the Native American drumming and one neighbor walking one day made a comment to [him] that it just **\*262** takes one bad Indian." (App. 296). Second, the Thorpes cite an incident in which Kuhns met with their African-American contractor at the Township Building. While it is unclear what transpired

at this meeting, the police were called and they completed a police report listing the contractor's race as "black." (App. 11 n.25).

This evidence proffered by the Thorpes is insufficient proof of racial animus. There is no evidence that the complaint about drumming led to any zoning enforcement action by the Township, and a comment by a neighbor cannot rationally be attributed to the Township or to Kuhns. Further, with respect to the police incident, we agree with the District Court's finding that, albeit strange, this incident is not sufficient evidence to support the Thorpes' claim that Kuhns has a general racial bias, and is therefore biased against Native Americans.

Nor have the Thorpes offered evidence of any other allegedly conscience-shocking behavior. To the contrary, the record shows that the Township's zoning enforcement actions amount to nothing more than typical municipal land-use disputes.

**[2]** The Thorpes also claim that the Township violated their substantive due process rights because the Township had no rational basis to adopt the 2007 Amendment to the JMZO, particularly its set-back provision. We disagree. The Thorpes bear the burden of proving that there was no rational basis for enacting the Amendment. To meet that burden, the Thorpes allege that the Amendment was enacted solely "to affect [them] because [they were] told the [T]ownship had other plans for the property and [the Township was] going to make it too hard for [the Thorpes] to afford to stay there...." (App. 342). However, the record shows that the Amendment was adopted by all three municipalities subject to the JMZO and contained numerous provisions that applied to general commercial agricultural land uses. It was proposed in 2006, before the Thorpes even owned Thorpe Farm. Further, the Thorpes concede that the Township is generally concerned about commercial activity and traffic, particularly relating to Halloween attractions. (App. 15). These are sufficient rational bases for the enactment of the Amendment.

We agree with the District Court that no reasonable jury could conclude that the Township lacked a rational basis to enact the Amendment or that it was enacted to spite the Thorpes. The Thorpes have failed to demonstrate a genuine issue of material fact regarding their due process claims. Accordingly, we hold that the District Court properly granted summary judgment on these claims.

B.

The Thorpes also allege a violation of their equal protection rights. We have previously declared that it is "very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach." *Eichenlaub*, 385 F.3d at 287. We will review the District Court's grant of summary judgment for the Appellees on the Thorpe's equal protection claim under two theories: (1) a selective enforcement theory and (2) a "class of one" theory. *See id.* at 286.

**[3]** A selective enforcement claim is based on the well-established principle that discriminatory enforcement of a facially neutral law violates the Equal Protection Clause. *Holder*, 987 F.2d at 197 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). To succeed on a selective enforcement claim, a party must prove that he was treated differently than similarly situated individuals and that the selective treatment **\*263** was based on " 'an unjustifiable standard, such as race, or religion, or some other arbitrary factor....' " *Id.* (quoting *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989)). The Thorpes contend that, unlike the owners of similarly situated farms, they were subject to increased zoning scrutiny because Dale Thorpe is Native American. Assuming, *arguendo*, that the Thorpes were in fact treated differently, there is no evidence that race was the impetus for the different treatment. That is, nothing in the record suggests any nexus between Dale Thorpe's Native American race and the Township's zoning enforcement actions. Thus, the Thorpe's equal protection claim must fail under a selective enforcement theory.

**[4]** Under a "class of one" equal protection claim, a party must prove that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) (holding that a class of one could challenge different treatment under the Equal Protection Clause where treatment was alleged to be "irrational and wholly arbitrary") ). The Thorpes contend that they are similarly situated to the owners of several

other CM-zoned farms—Ely Farm, Tierney Farm, Gunser Farm, and Slack Farm—who received more favorable zoning enforcement decisions, for no rational reason. However, the record shows that, just like the Thorpes, these other farm owners had various zoning disputes with the Township. In contrast to the Thorpes, the owners of the other farms took advantage of the remedial procedures afforded to them, such as appealing adverse decisions to the Township Zoning Hearing Board or seeking zoning variances.[7] The Thorpes, however, failed to avail themselves of these remedial procedures.

[7]   The following are examples of zoning issues between the Township and owners of the other CM-zoned farms, as noted by the District Court, *see* App. 6-7:

1. The Elys appealed Kuhns' denial of a zoning permit for a farm store. They obtained a variance, which allowed them to operate the store provided that they comply with certain conditions, such as installing a fire suppression system and planting trees and bushes to hide propane tanks and solar panels.

2. Kuhns denied Michael Tierney's zoning application to build a pole barn because it violated a set-back ordinance. He also denied Tierney's application to build a layer house for his chickens. Tierney successfully appealed these decisions to the Township Zoning Hearing Board and was forced to get a mercantile license for his farm store.

3. Kuhns denied the Gunsers' application for a hayride, corn maze, and live Halloween entertainment. The Gunsers appealed to the Township Zoning Hearing Board, which granted a variance for the Halloween event, with no amplified entertainment. They also appealed to the Court of Common Pleas of Bucks County, which allowed them to have live, amplified entertainment. The Township inspects the Halloween attraction every year and once refused to authorize a haunted house attraction until a fire suppression system was installed.

4. The Slacks applied for a permit from Kuhns prior to displaying a directional sign to advertise their Milk House Farm Market.

Although the record shows that the Thorpes may have had more zoning disputes than the other farm owners, the increased frequency of zoning enforcement actions alone is not enough to demonstrate that the Township treated the Thorpes less favorably than the similarly situated farm owners. Moreover, the fact that the owners of the other CM-zoned farms applied for zoning permits, appealed permit denials, and sought zoning variances **\*264** proves that they, too, were subjected to similar zoning enforcement as were the Thorpes. The difference is that, unlike the Thorpes, these farm owners appealed adverse zoning decisions and sometimes prevailed in obtaining permits for new land uses. Thus, we agree with the District Court that any ultimate difference in zoning treatment was supported by legitimate, rational reasons, including differences in the activities conducted on the farms, requests for zoning variances, and the outcome of zoning appeals.

In sum, the Thorpes have failed to show a genuine issue of material fact regarding their equal protection claim. Accordingly, we agree with the District Court's award of summary judgment on this claim.

IV.

For the foregoing reasons, we will affirm the District Court's order.

**All Citations**

758 Fed.Appx. 258

**End of Document**      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

521 Fed.Appx. 62
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Vamsidhar Reddy VURIMINDI, Appellant

v.

CITY OF PHILADELPHIA; Commissioner
Frances Burns; FNA Zoning Committee;
New Kensington CDC, (NKCDC); Darrell
L. Clarke, 5th District Councilman; Mayor
City of Philadelphia; John Coates, Director,
OHCD; Terry Gillen, Executive Director,
RDA; Richard F. Levins, President,
NKCDC; Scott Mulderig, Emergency Svcs
& Abatement; Michael Curran, Emergency
Svcs & Abatement; Edward Devlin.

No. 11–2815
|
Submitted Pursuant to Third
Circuit LAR 34.1(a) April 2, 2013.
|
Opinion filed: April 8, 2013.

**Synopsis**
**Background:** Property owner, who was a native of India and
practicing Hindu, brought action in state court against city and
various other defendants, alleging national origin and religion
discrimination in violation of the Fourteenth Amendment in
denial of applications to purchase vacant properties and for
zoning licenses. Following removal, the United States District
Court for the Eastern District of Pennsylvania, Edmund O.
Ludwig, J., granted defendants' motion to dismiss. Owner
appealed.

**Holdings:** The Court of Appeals held that:

[1] owner was not deprived of procedural due process;

[2] conduct by defendants did not shock the conscience; and

[3] allegations were insufficient to state an equal protection
claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (3)

**[1]** **Constitutional Law** ⚷ Proceedings and
review
**Zoning and Planning** ⚷ Proceedings on
Permits, Certificates, or Approvals

92  Constitutional Law
92XXVII   Due Process
92XXVII(G)   Particular Issues and Applications
92XXVII(G)3   Property in General
92k4091   Zoning and Land Use
92k4096   Proceedings and review
414   Zoning and Planning
414VIII   Permits, Certificates, and Approvals
414VIII(B)   Proceedings on Permits, Certificates,
or Approvals
414k1410   In general
Assuming property owner was deprived of
protected property interest in city denying
applications to purchase vacant properties and
for zoning licenses to alter his properties, owner
was not deprived of procedural due process,
as would violate the Fourteenth Amendment;
owner pursued some, but not all, of the
administrative and state court remedies available
to him to challenge the denials. U.S.C.A.
Const.Amend. 14.

11 Cases that cite this headnote

**[2]** **Constitutional Law** ⚷ Particular issues and
applications
**Zoning and Planning** ⚷ Grounds for grant or
denial in general

92  Constitutional Law
92XXVII   Due Process
92XXVII(G)   Particular Issues and Applications

92XXVII(G)3  Property in General

92k4091  Zoning and Land Use

92k4093  Particular issues and applications

414  Zoning and Planning

414VIII  Permits, Certificates, and Approvals

414VIII(A)  In General

414k1354  Grounds for grant or denial in general
City and various departments denying property owner's applications to purchase vacant properties and for zoning licenses to alter his properties was not conduct that shocked the conscience, as would violate Fourteenth Amendment substantive due process. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[3]**   **Constitutional Law** 🔑 Zoning and land use

**Constitutional Law** 🔑 Zoning and land use

**Zoning and Planning** 🔑 Statutory or constitutional liability

92  Constitutional Law

92XXVI  Equal Protection

92XXVI(B)  Particular Classes

92XXVI(B)8  Race, National Origin, or Ethnicity

92k3257  Property in General

92k3261  Zoning and land use

92  Constitutional Law

92XXVI  Equal Protection

92XXVI(B)  Particular Classes

92XXVI(B)9  Religion

92k3316  Property in General

92k3318  Zoning and land use

414  Zoning and Planning

414VII  Administration in General

414k1325  Boards and Officers in General

414k1332  Liabilities

414k1332(3)  Statutory or constitutional liability
Allegations by property owner, who was a native of India and practicing Hindu, that he was treated differently in zoning matters from other developers who purchased property in city based on his religion and national origin were insufficient to state a claim for violations of Fourteenth Amendment equal protection, absent allegations identifying comparators. U.S.C.A. Const.Amend. 14.

16 Cases that cite this headnote

**\*63** On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civil Action No. 2–10–cv–0088), District Judge: Honorable Edmund O. Ludwig.

**Attorneys and Law Firms**

Vamsidhar Reddy Vurimindi, Philadelphia, PA, pro se.

Kelly S. Diffily, Esq., City of Philadelphia Law Department, Philadelphia, PA, Genelle Franklin, Marshall, Dennehey, Warner, Coleman & Goggin, King of Prussia, PA, for City of Philadelphia, Frances Burns, Darrell L. Clarke, 5th District Councilman, Mayor Philadelphia, John Coates, Diretor, Ohcd, Scott Mulderig, Emergency Svcs & Abatement, Michael Curran, Emergency Svcs & Abatement, Edward Devlin.

Audrey J. Copeland, Esq., Joseph J. Santarone, Jr., Esq., Marshall, Dennehey, Warner, Coleman & Goggin, King of Prussia, PA, for New Kensington CDC, **\*64** NKCDC, Richard F. Levins, President, NKCDC.

Genelle Franklin, Marshall, Dennehey, Warner, Coleman & Goggin, King of Prussia, PA, Lawrence S. Rosenwald, Esq., Philadelphia, PA, for Terry Gillen, Executive Director, RDA.

Michael T. Manuel, Esq., West Chester, PA, for FNA Zoning Committee.

Before: FUENTES, VANASKIE and VAN ANTWERPEN, Circuit Judges.

OPINION

PER CURIAM.

Vamsidhar Reddy Vurimindi instituted this action by filing a complaint in the Philadelphia Court of Common Pleas against nineteen defendants.[1] The matter was later removed to the United States District Court for the Eastern District of Pennsylvania. The gravamen of Vurimindi's claim is that, since 2006, he has unsuccessfully attempted to develop two residential properties that he owns in Philadelphia. In addition, he has submitted applications to purchase additional vacant properties throughout the City, but the applications have been denied. He claims that the unlawful actions of the defendants have thwarted both endeavors. Vurimindi believes that he has been treated unfairly because of his national origin

and his religion. Vurimindi is a native of India and a practicing Hindu.

[1] Those defendants include: New Kensington Community Development Corporation ("NKCDC") and Richard Levins, President of the Board of Directors of NKCDC (collectively the "the NKCDC defendants"), as well as the City of Philadelphia and several of its departments, various current and former city employees, and City Councilman Darrell L. Clarke (collectively "the City Defendants").

Vurimindi amended his complaint twice after it was removed to the District Court. The defendants moved to dismiss Vurimindi's second amended complaint. The District Court granted the defendants' motions to dismiss the 76–page second amended complaint without prejudice to Vurimindi's filing a third amended complaint if, and only if, he cured deficiencies the Court identified in its decision. Vurimindi subsequently filed an 81–page third amended complaint.

After determining that Vurimindi had not corrected the deficiencies that it identified in its prior decision, the District Court granted the defendants' motions to dismiss the third amended complaint with prejudice. Vurimindi appeals the District Court's order.[2]

[2] We note that a separate appeal filed by Vurimindi, docketed at C.A. No. 11–2814, was taken from this order. Because that appeal involves different defendants in a separate lawsuit, it has not been consolidated with this appeal and will be considered separately.

We have jurisdiction under 28 U.S.C. § 1291, and our review of the District Court's grant of a motion to dismiss is plenary. *McGovern v. City of Phila.,* 554 F.3d 114, 115 (3d Cir.2009). Dismissal is proper if the plaintiff fails to allege sufficient factual matter which, if accepted as true, could " 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

As to the City Defendants, in his third amended complaint, Vurimindi alleged that the denial of his applications to purchase vacant properties throughout the City, and for zoning licenses to alter the properties he already owns, violated his substantive and procedural due process rights, as well as his right to equal protection.

*65 To state a procedural due process claim, Vurimindi must show that the defendants deprived him of a protected property interest and that the state procedure for challenging the deprivation was constitutionally inadequate. *Hill v. Borough of Kutztown,* 455 F.3d 225, 233–34 (3d Cir.2006); *Revell v. Port Auth. of N.Y. & N.J.,* 598 F.3d 128, 138 (3d Cir.2010). "[A] state provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body." *DeBlasio v. Zoning Bd. of Adjustment for Twp. of West Amwell,* 53 F.3d 592, 597 (3d Cir.1995), *abrogated in part on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 400 (3d Cir.2003). We have upheld as reasonable Pennsylvania's post-deprivation judicial remedies for challenging administrative land use decisions. *See Bello v. Walker,* 840 F.2d 1124, 1128 (3d Cir.1988) (explaining that Pennsylvania's "judicial mechanism with which to challenge the administrative decision to deny an application for a building permit" is constitutionally adequate), *abrogated in part on other grounds by United Artists,* 316 F.3d at 400. We have also held that the City of Philadelphia's scheme under the Philadelphia Code and Home Rule Charter for challenging administrative licensing decisions adequately protects the procedural due process rights of individuals. *See Midnight Sessions, Ltd. v. City of Phila.,* 945 F.2d 667, 680–681 (3d Cir.1991), *abrogated in part on other grounds by United Artists,* 316 F.3d at 400.

[1] Assuming arguendo that Vurimindi has been deprived of a protected property interest, we agree with the District Court that he failed to state a procedural due process claim. According to Vurimindi's third amended complaint, he has pursued some, but not all, of the administrative and state court remedies available to him to challenge the defendants' allegedly improper bad acts. Vurimindi's failure to avail himself of all of the available state court appeals, including an appeal to the Court of Common Pleas, *see Midnight Sessions, Ltd.,* 945 F.2d at 680, does not suggest that the City's post-deprivation remedies are inadequate. Dismissal of this claim was therefore appropriate.

To state a substantive due process claim, Vurimindi must show that the City Defendants deprived him of a protected

property interest and that such deprivation "shocks the conscience." ⚠*Chainey v. Street,* 523 F.3d 200, 219 (3d Cir.2008); *see also* 🚩⚠*United Artists,* 316 F.3d at 400–02. " '[O]nly the most egregious official conduct' " shocks the conscience. 🚩⚠*United Artists,* 316 F.3d at 400 (quoting 🚩*Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). What is shocking depends on the factual context, 🚩⚠*id.* at 399–400, but, in the land use context, the standard is sufficiently high to "avoid converting federal courts into super zoning tribunals." 🚩⚠*Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 285 (3d Cir.2004); *see also* 🚩⚠*United Artists,* 316 F.3d at 402 (recognizing that the "shocks the conscience" standard "prevents [the Court] from being cast in the role of a zoning board of appeals") (internal quotation marks omitted).

In 🚩⚠*Eichenlaub,* we held that allegations of inconsistent application of zoning requirements, unnecessary inspections, delaying permits and approvals, improperly increasing tax assessments, and "malign[ing] and muzzl[ing]" a property owner were not enough to shock the conscience, particularly where "[t]the local officials are not accused of seeking to hamper development in order to interfere with otherwise constitutionally protected activity at the project site, or because of some bias against an ethnic group." 🚩⚠385 F.3d at 286. We noted that complaints related to zoning requirements, inspections, and permits **\*66** were "frequent in [land use] planning disputes" and that, while adversely affected property owners can couch such complaints as abuses of legal authority, such complaints do not rise to the level of substantive due process violations. 🚩⚠*Id.*

 **[2]**    Like 🚩⚠*Eichenlaub,* Vurimindi's complaints are of the sort frequently at issue in zoning and land use disputes.[3] He has not alleged any conduct by the defendants that can be said to shock the conscience, and therefore he has failed to state a substantive due process claim.[4]

[3]     The crux of Vurimindi's claim is that the City's Zoning Board, its Board of Building Standards, and its licensing and inspection authority have refused to issue him zoning and building permits for his properties located at 1782

Frankford Avenue and 1510 Palmer Street. As a result, he has been unable to develop these properties, and has suffered financial loss. Although Vurimindi asserts that these zoning decisions have been arbitrary, he does not suggest *why* any of these authorities would purposely subvert his development initiatives.

[4]     Because we will affirm the District Court's dismissal of Vurimindi's substantive due process claim, it follows that Vurimindi cannot succeed on his claim alleging that the City Defendants conspired with the NKCDC defendants to violate his civil rights.

To state an equal protection claim, Vurimindi must demonstrate that he received different treatment than other similarly situated persons and that the disparate treatment was based on his protected class status. *See* 🚩*Andrews v. City of Phila.,* 895 F.2d 1469, 1478 (3d Cir.1990). To be "similarly situated," parties must be "alike in all relevant aspects." 🚩*Startzell v. City of Phila.,* 533 F.3d 183, 203 (3d Cir.2008) (internal quotation marks omitted).

 **[3]**    Although Vurimindi alleged that he was treated differently from other developers who have purchased property in the City, he did not adequately identify any such person in his lengthy complaint. Absent specific allegations as to the allegedly similarly situated parties, he has not made plausible the conclusion that those parties exist and that they are like him in all relevant aspects. Accordingly, Vurimindi failed to state an equal protection claim.

The District Court provided Vurimindi with multiple opportunities to amend his complaint and gave him specific instructions as to what must be included in order to state a claim for relief. Vurimindi did not do so. Accordingly, granting him leave to file yet another amended complaint would have been futile, and the District Court did not abuse its discretion by dismissing the third amended complaint with prejudice. *See, e.g.,* 🚩*Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002).

For these reasons, we will affirm the District Court's judgment. Vurimindi's motion to expedite the appeal is denied as moot.

## All Citations

521 Fed.Appx. 62

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.